IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

---

DONALD MACK DOVE,

Plaintiff,

-v.- Civil Action No. 9:10-CV-0002 (DNH/DEP)

BROOME COUNTY CORRECTIONAL FACILITY;[1] K. MOORE, Captain; TIMOTHY HILL, Lieutenant; DANIEL SNYDER, Correction Officer; and C. MOGENSON, Chaplain,

Defendants.

---

APPEARANCES:

FOR PLAINTIFF: OF COUNSEL:

DONALD MACK DOVE, *Pro Se*
Attica Correctional Facility
Box 149
Albany, NY 14011

FOR BROOME COUNTY DEFENDANTS:

BROOME COUNTY ATTORNEY'S OFFICE AARON J. MARCUS, ESQ.
Edwin L. Crawford County Office Bldg.
P.O. Box 1766
Binghamton, NY 13902-1766

---

[1] The Broome County Correctional Facility is listed as a defendant in both the caption of plaintiff's complaint, and on the court's records. The facility is not, however, identified as a defendant in the body of the complaint. *See* Complaint (Dkt. No. 1) section 3. In any event, as defendants have argued, the Broome County Correctional Facility is not a separate entity with its own legal identity and amenable to suit. *See* *Legett-Edwards v. City of Syracuse*, No. 5:06-CV-892, 2007 WL 2891774, at *2 (N.D.N.Y. Sept. 28, 2007) (Mordue, C.J.) (citing *Loria v. Town of Irondequot,* 775 F.Supp. 599, 606 (W.D.N.Y. 1990)). Accordingly, if this case survives the pending motion the Broome County Correctional Facility should be removed as a defendant in the action.

FOR DEFENDANT C. MOGENSON:

LYNCH SCHWAB, PLLC
75 South Broadway, 4th Floor
White Plains, NY 10601

LOUIS U. GASPARINI, ESQ.

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

REPORT AND RECOMMENDATION

*Pro se* plaintiff Donald Mack Dove, a New York State prison inmate who at the relevant times was confined locally at the Broome County Correctional Facility ("Broome CCF"), has commenced this action pursuant to 42 U.S.C. § 1983, alleging that the defendants deprived him of his civil rights during the period of his incarceration at the facility. In his complaint, plaintiff maintains that while in the Broome CCF he was unlawfully denied kosher food for a period of thirty days after having been observed eating a non-kosher meal, and that the denial constituted 1) an unlawful interference with his right to freely exercise his chosen religion, as guaranteed under the First Amendment; 2) a deprivation of due process and equal protection, in violation of the Fourteenth Amendment; 3) cruel and unusual punishment, as prohibited by the Eighth Amendment; and 4) a violation of the Religious Freedom Restoration Act ("RFRA"), 42

U.S.C. § 2000bb *et seq*.[2] As relief, plaintiff seeks an injunction directing that he be provided with kosher meals as well as a monetary award.[3]

Currently pending before the court in connection with the action are two motions. In the first one of the named defendants, C. Mogenson, who is identified in plaintiff's complaint as a prison chaplain, requests dismissal of Dove's claims against him on a variety of grounds including, *inter alia*, lack of personal involvement and lack of personal jurisdiction, as well as on the merits.[4] The second motion is brought on behalf of the remaining defendants in the action seeking the entry of summary judgment dismissing plaintiff's claims, arguing that the record now before the court fails to disclose the existence of evidence upon which a reasonable

---

[2] The RFRA was invalidated by the Supreme Court in *City of Boerne v. Flores*, 521 U.S. 507, 117 S. Ct. 2157 (1997). In deference to his *pro se* status, I have chosen to analyze plaintiff's statutory religious claims under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc, which was in enacted by Congress to rectify the perceived constitutional infirmity of the RFRA. *See Pugh v. Goord,* 571 F. Supp.2d 477, 504 n. 11 (S.D.N.Y. 2008).

[3] Since it appears that plaintiff is no longer confined in the Broome CCF, his request for injunctive relief is subject to denial as moot. *Prins v. Coughlin*, 76 F.3d 504, 506 (2nd Cir. 1996) (citing *Young v. Coughlin*, 866 F.2d 567, 568 n. (2d Cir.), *cert. denied*, 492 U.S. 909, 109 S. Ct. 3224 (1989), and *Beyah v. Coughlin*, 789 F.2d 986, 988 (2d Cir.1986)); *Candelaria v. Greifinger*, No. 96-CV-0017, 1998 WL 312375, at *2 (N.D.N.Y. June 8, 1998) (Pooler, J. and Scanlon, M.J.).

[4] In his motion, defendant Mogenson initially also sought dismissal of plaintiff's claims based upon his alleged failure to exhaust available administrative remedies before commencing suit. Dkt. No. 16. After having reviewed plaintiff's submissions in opposition, *see* Dkt. No. 27, however, defendant Mogenson has now withdrawn that portion of his motion. *See* Defendant's Reply Memorandum (Dkt. No. 25-1) at p. 3.

factfinder could conclude that any of the constitutional or statutory rights referenced in plaintiff's complaint were violated. For the reasons set forth below, I recommend that both motions be granted, and that plaintiff's complaint be dismissed in its entirety.

## I. BACKGROUND[5]

The circumstances giving rise to plaintiff's claims in this action are neither complex nor controversial. Plaintiff, a follower of the Kashrut of Judaism religious tenets, was confined in the Broome CCF at the times relevant to his claims. *See generally* Complaint (Dkt. No. 1) § 6 and Exhs. at p. 12 of 13. While there, plaintiff requested and was provided kosher meals in accordance with his religious beliefs. *Id.*

---

5 When addressing defendant Mogenson's motion I have considered the contents of plaintiff's complaint and deemed the material allegations of that complaint to be true. *See Erickson v. Pardus*, 551 U.S. 89, 127 S. Ct. 2197, 2200 (2007) (*citing Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S. Ct. 1955, 1965 (2007). I have also considered and incorporated into the background description facts derived from the exhibits attached to the plaintiff's complaint, which may also be properly considered in connection with the dismissal motion. *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991), *cert. denied*, 503 U.S. 960, 112 S. Ct. 1561 (1992); *see also Samuels v. Air Transp. Local 504*, 992 F.2d 12, 15 (2d Cir. 1993). For purposes of the remaining defendants' summary judgment motion the following recitation is derived from the record now before the court. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir. 2003). In both instances, all reasonable inferences have been drawn in favor of the plaintiff and any conflicts and ambiguities have been resolved in his favor. *Papelino v. Albany College of Pharmacy of Union University,* ____ F.3d ____, 2011 WL 199124, *12 n. 1 (2d Cir. Jan. 24, 2011) (citing *Pena v. DePrisco,* 432 F.3d 98, 107 (2d Cir. 2005)).

On September 30, 2009, it was discovered that plaintiff's dinner time kosher meal was missing from the prison meal cart. Snyder Aff. (Dkt. No. 28-14) ¶ 4. Defendant Daniel J. Snyder, a corrections officer at the facility, reported the missing meal to the facility's kitchen staff, and was informed that plaintiff's meal would be delivered shortly to the pod in which he was confined at the time. *Id.*

While awaiting delivery of the missing kosher meal plaintiff consumed a non-kosher meal, advising Corrections Officer Snyder that he had "bought" the meal and needed to eat it, adding in substance that when he works hard he can eat more, and while it is his right to receive kosher meals he is also entitled to eat more when he needs to. *Id.* at ¶¶ 5-7. Plaintiff's scheduled kosher meal was ultimately delivered and also consumed by the plaintiff. *Id.* at ¶ 8.

Corrections Officer Snyder reported the fact of plaintiff's consumption of a non-kosher meal to medical and kitchen personnel at the facility, as well as to the jail chaplain. Snyder Aff. (Dkt. No. 28-14) ¶ 9. After reviewing Corrections Officer Snyder's report of the incident, prison officials at the Broome CCF ordered the discontinuance of plaintiff's kosher diet for a period of thirty days, and plaintiff was informed that he

could reapply for kosher meals at the end of the thirty-day period. Complaint (Dkt. No. 1) § 6 and Exhs. p. 12 of 13; Hill Aff. (Dkt. No. 28-15) ¶ 6. Although the discontinuance was not effectuated pursuant to a formal written policy, it followed the practice of the New York State Department of Correctional Services ("DOCS") and is consistent with a prior suspension of kosher meals to another inmate at the Broome CCF under similar circumstances. Hill Aff. (Dkt. No. 28-15) ¶¶ 6-7; Moore Aff. (Dkt. No. 28-16) ¶¶ 4-6.

## II. PROCEDURAL HISTORY

Plaintiff commenced this action on January 4, 2010. Dkt. No. 1. In his complaint Dove has named the Broome CCF, Corrections Captain K. Moore, Corrections Lieutenant Timothy Hill, Corrections Officer Daniel Snyder, and Chaplain C. Mogenson as defendants, and claims interference with his right of free religious exercise under both the First Amendment and the RFRA, cruel and unusual punishment, deprivation of equal protection, and the denial of procedural due process.[6] *Id.*

In response to plaintiff's complaint, while defendants Hill, Moore, and Snyder have answered, generally denying plaintiff's allegations and

---

[6] As was previously noted, plaintiff's complaint is equivocal as to whether the Broome CCF was intended to be a defendant in the action. *See* p. 1, n. 1, *ante*.

additionally interposing a series of affirmative defenses, Dkt. No. 17,

defendant C. Mogenson, who is separately represented, instead has

moved seeking its dismissal pursuant to Rules 12(b)(2) and 12(b)(6) of the

Federal Rules of Civil Procedure.  Dkt. No. 16.  In his motion defendant

Mogenson argues that 1) the complaint does not sufficiently allege his

personal involvement in the conduct giving rise to plaintiff's constitutional

claims; 2) the complaint fails to establish that plaintiff's religious beliefs

are sincerely held, warranting dismissal of his free religious exercise

claims; 3) plaintiff's equal protection and cruel and unusual punishment

claims are without merit; and 4) the court lacks personal jurisdiction over

him based upon the fact that he has not been properly served in the

action.  *Id.*  In response to defendant Mogenson's motion, plaintiff has

submitted an opposition which is comprised wholly of a series of exhibits,

many of which were attached to his original complaint.  Dkt. No.  27.

Defendant Mogenson has since replied in response to that opposition and

in further support of his dismissal motion.  Dkt. Nos. 25, 26.

On January 21, 2011, defendants Broome County CCF, K. Moore,

Timothy Hill, and Daniel Snyder moved for entry of summary judgment

dismissing plaintiff's complaint in its entirety.  Dkt. No. 28.  In their motion

those defendants argue that 1) plaintiff's claims against the Broome CCF should be dismissed since it is not a separate entity amenable to suit; 2) plaintiff's request for injunctive relief is moot based upon his transfer out of the facility; 3) plaintiff's religious freedom statutory claim, which should be analyzed under the RLUIPA, and First Amendment free exercise claim are deficient based upon the insincerity of plaintiff's beliefs in subscribing to an exclusively kosher diet and the claim that in any event the penological interests giving rise to the temporary suspension of plaintiff's kosher meals outweigh the burden to plaintiff's religious beliefs resulting from the thirty-day suspension; 4) plaintiff's equal protection, due process and Eighth Amendment claims are deficient as a matter of law; and 5) in any event they are entitled to qualified immunity based upon their good faith reliance upon a standard DOCS practice.  Despite the fact that his response to defendants' summary judgment motion was due on February 8, 2011, the plaintiff has not opposed the motion.

Both motions, which are now ripe for determination, have been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).  *See also* Fed. R. Civ. P. 72(b).

## III. DISCUSSION

### A. Personal Jurisdiction Over Defendant Mogenson

A review of the court's records in this matter reflects that on April 6, 2010 the summons issued by the clerk was returned unexecuted as to various of the named defendants, including Chaplain Mogenson. Dkt. No. 11. While there are subsequent acknowledgment of service forms on file with regard to the various other defendants, *see* Dkt. Nos. 18-21, there is no record of defendant Mogenson having been served or waived service in the action. He therefore asserts that the court lacks personal jurisdiction over him and should dismiss plaintiff's claims against him on this basis.

There is no proof in the record now before the court that Mogenson has been served in the action or has acknowledged or waived service, nor has plaintiff supplied any evidence regarding the issue in opposing defendant's motion. This court therefore lacks jurisdiction over defendant Mogenson.[7] *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S.

---

[7] By appearing in the action for the limited purpose of making the instant motion defendant has not submitted to the court's jurisdiction for all purposes and waived the requirement of service. *Louring v. Kuwait Boulder Shipping Co.*, 455 F. Supp. 630, 634 (D. Conn. 1977) (citing *Orange Theatre Corp. v. Rayherstz Amusement Corp.*, 139 F.2d 871 (3d Cir. 1944), *cert. denied sub nom.*, *Orange Theatre Corp. v. Brandt*, 322 U.S. 740, 64 S.Ct. 1057 (1944)).

344, 350, 119 S. Ct. 1322, 1327 (1999) (citation omitted). The question remains whether this fact entitles defendant Mogenson to dismissal at this juncture, or instead whether more time should be allotted in order to allow for further efforts to obtain jurisdiction over him.

The summons in this case was issued on January 6, 2010. *See* Dkt. No. 5. Rule 4(m) of the Federal Rules of Civil Procedure requires that service of a summons be made within 120 days of its issuance, absent a court order extending that period.[8] "[W]here good cause is shown, the court has no choice but to extend the time for service, and the inquiry is ended." *Panaras v. Liquid Carbonic Indus. Corp.*, 94 F.3d 338, 340 (7th Cir. 1996). "If, however, good cause does not exist, the court may, in its discretion, either dismiss the action without prejudice or direct that service be effected within a specified time." *Id.* (citing Fed. R. Civ. P. 4(m)); *Zapata v. City of New York*, 502 F.3d 192, 196 (2d Cir. 2007) ("[D]istrict

---

8 That rule provides that

> [i]f a defendant is not served within 120 days after the complaint is filed, the court – on motion or on its own after notice to the plaintiff – must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period. . . .

Fed. R. Civ. P. 4(m). This court's local rules shorten the time for service from the 120 day period under Rule 4(m) to sixty days. *See* N.D.N.Y.L.R. 4.1(b).

courts have discretion to grant extensions even in the absence of good cause."); *Romandette v. Weetabix Co., Inc.*, 807 F.2d 309, 311 (2d Cir. 1986).  When examining whether to extend the prescribed period for service, a district court is afforded broad discretion to weigh the "overlapping equitable considerations" involved in determining whether good cause exists and whether an extension may be granted in the absence of good cause.  *See Zapata*, 502 F.3d at 197.

A *pro se* litigant such as the plaintiff is entitled to a certain degree of leniency insofar as service of process is concerned; courts generally favor resolution of a case on its merits rather than on the basis of a procedural technicality.  *Poulakis v. Amtrak*, 139 F.R.D. 107, 109 (N.D. Ill. 1991). When a plaintiff proceeds *in forma pauperis*, as is the case in this instance, the court is obligated to forward the plaintiff's process to the United States Marshal's Service, which must in turn effect service upon the defendants, thereby relieving the plaintiff of the burden to serve process once reasonable steps have been taken to identify for the court the defendants named in the complaint.  *Byrd v. Stone*, 94 F.3d 217, 219 (6th Cir. 1996).  That does not mean, however, that a *pro se* plaintiff may stand idly by upon being notified that efforts by the U.S. Marshal's Service

to serve a particular defendant have been unsuccessful. *VanDiver v. Martin*, 304 F. Supp. 2d 934, 938-43 (E.D. Mich. 2004). In such circumstances it is incumbent upon the plaintiff to develop, through pretrial discovery or otherwise, any additional information necessary to permit service by the United States Marshal's Service. *See VanDiver*, 304 F. Supp. 2d at 942.

In this case I recommend that if the court finds all or some of plaintiff's claims should survive the pending motions, in its discretion it should also reject the suggestion that plaintiff's complaint be dismissed as against Chaplain Mogenson, without prejudice, as neither serving the interest of justice nor promoting judicial economy, and instead order that the United States Marshal for the Northern District of New York personally serve Chaplain Mogenson with the summons and complaint in this matter.[9]

B. Dismissal Motion Standard

A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the

---

9 In the event plaintiff's claims survive and this action goes forward, defendant Mogenson and his counsel could ultimately decide that it is more expeditious to accept service in this matter and avoid the necessity and embarrassment of having the United States Marshal's Service effectuate personal service upon him.

facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny.  *Ashcroft v. Iqbal*, ___ U.S. ___, ___, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554, 555, 127 S. Ct. 1955, (2007)).  Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  *Id.*  While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."  *Ashcroft,* 129 S.Ct. at 1950.

To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim which is plausible on its face.  *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (citing *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974).  As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.'" *In re Elevator*

*Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974).

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party.  *Cooper v. Pate*, 378 U.S. 546, 546, 84 S. Ct. 1723, 1734 (1964); *Miller v. Wolpoff & Abramson, LLP*, 321 F.3d 292, 300 (2d Cir. 2003), *cert. denied*, 540 U.S. 823, 124 S. Ct. 153 (2003); *Burke v. Gregory*, 356 F. Supp. 2d 179, 182 (N.D.N.Y. 2005) (Kahn, J.). The burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) is substantial; the question presented by such a motion is not whether the plaintiff is likely ultimately to prevail, "'but whether the claimant is entitled to offer evidence to support the claims.'" *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.*, 223 F. Supp.2d 435, 441 (S.D.N.Y. 2001) (quoting *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir. 1995)) (citations and quotations omitted).

C.    Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure.  Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on

file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4, 106 S. Ct. at 2511 n.4; *Security Ins.*, 391 F.3d at 83. In the event this initial burden is met the opposing party must show, through

affidavits or otherwise, that there is a material issue of fact for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *Anderson*, 477 U.S. at 250, 106 S. Ct. at 2511.  Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party.  *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998).  The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party.  *See Building Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S. Ct. at 2511 (summary judgment is appropriate only when "there can be

but one reasonable conclusion as to the verdict").

D. Plaintiff's Failure To Oppose Defendants' Summary Judgment Motion

Although he has properly and timely opposed defendant Mogenson's dismissal motion, the plaintiff has not responded to the summary judgment motion subsequently filed by the remaining defendants.[10] Before turning to the merits of plaintiff's claims, a threshold issue to be addressed is the legal significance, if any, of his failure to oppose the pending summary judgment motion, and specifically whether that failure automatically entitles defendants to summary judgment dismissing plaintiff's complaint.

This court's rules provide that

> [w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

N.D.N.Y.L.R. 7.1(b)(3). Undeniably, *pro se* plaintiffs are entitled to some measure of forbearance when defending against summary judgment

---

[10] The notice of defendants' summary judgment motion was accompanied by a notification to the plaintiff of the consequences of failing to oppose the motion, as required pursuant to the court's local rules. *See* N.D.N.Y.L.R. 56.2.

motions. *See Jemzura v. Public Serv. Comm'n,* 961 F. Supp. 406, 415 (N.D.N.Y. 1997) (McAvoy, C.J.). The deference owed to *pro se* litigants, however, does not extend to relieving them of the ramifications associated with Local Rule 7.1(b)(3). *Robinson v. Delgado*, No. 96-CV-169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J. & Hurd, M.J.); *Cotto v. Senkowski*, No. 95-CV-1733, 1997 WL 665551, at *1 (N.D.N.Y. Oct. 23, 1997) (Pooler, J. & Hurd, M.J.); *Wilmer v. Torian*, 980 F. Supp.106, 106-07 (N.D.N.Y. 1997) (Pooler, J. & Hurd, M.J.).[11] Accordingly, absent a showing of good cause defendants' unopposed summary judgment motion should be granted, if determined to be facially meritorious. *See Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 231-32 (N.D.N.Y. 2000) (Scullin, C.J.); *Leach v. Dufrain*, 103 F. Supp. 2d 542, 545-46 (N.D.N.Y. 2000) (Kahn, J.).

It should also be noted that the plaintiff's failure to properly oppose defendants' summary judgment motion is not without further consequences. By failing to submit papers in opposition to their motion, plaintiff has left the facts set forth in defendants' Local Rule 7.1(a)(3) Statements unchallenged, thus permitting the court to deem facts set forth

---

[11] Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

in the defendants' statement of material facts not in dispute to have been admitted based upon his failure to properly respond to that statement.[12] *See Elgamil v. Syracuse Univ.*, No. 99-CV-611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corrs.*, 214 F.3d 275, 292 (2d Cir. 2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)). [13]

Based upon plaintiff's failure to oppose defendants' motion, I recommend that the court review the motion for facial sufficiency, accepting defendants' assertions of facts as set forth in their Local Rule 7.1(a)(3) Statement as uncontroverted, and that the motion be granted if determined to be facially meritorious.

E. Personal Involvement

At the heart of defendant Mogenson's motion is his claim that plaintiff's complaint fails to disclose a sufficient degree of involvement in the constitutional deprivations alleged to support a finding of liability

[12] Local Rule 7.1(a)(3) provides that "[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." *See* N.D.N.Y.L.R. 7.1(a)(3)(emphasis in original).

[13] Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

against him.

It is well-established that personal involvement of a defendant in an alleged constitutional deprivation is a prerequisite to an award of damages against that party under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S. Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). A defendant may only be held accountable for his or her role in a constitutional deprivation, and not for the actions of others on the basis on *respondeat superior* or otherwise. *Iqbal*, 129 S. Ct. at 1952.

Here, plaintiff's complaint and supporting exhibits, interpreted in a light most favorable to him, state a plausible claim of personal involvement in the constitutional deprivations alleged on defendant Mogenson's part. In the body of his complaint plaintiff asserts that defendant Mogenson was in the direct chain of communication between corrections officials and prison kitchen personnel concerning the report of plaintiff having

consumed non-kosher food, directing that his kosher meals be discontinued for a period of thirty days.  *See* Complaint (Dkt. No. 1) § 6. Chaplain Mogenson's role in the suspension of kosher meals is also disclosed in a memorandum dated October 15, 2009, which he wrote to the plaintiff and copied to Corrections Lieutenant Hill, Corrections Captain Moore, and the prison kitchen, explaining to Dove why his kosher meals were being temporarily discontinued.  Complaint (Dkt. No. 1) Exhs. at p. 12 of 13.  That Chaplain Mogenson appears to have played an integral role in the decision-making process is further confirmed by plaintiff's statement describing the relief sought in his inmate grievance concerning the matter, in which he requested the opportunity "to see Reverend Mogenson concerning this matter ASAP . . .".  *Id.* Exhibits at p. 10, 13.

Drawing all inferences and resolving all ambiguities in plaintiff's favor, I conclude that his complaint adequately states a plausible claim of personal involvement on the part of defendant Mogenson in the conduct giving rise to plaintiff's claims, and therefore recommend denial of the portion of that defendant's motion challenging the sufficiency of plaintiff's allegations regarding that defendant's personal involvement.

F. Merits of Plaintiff's Claims

In their motions defendants challenge the sufficiency of plaintiff's religious exercise claims under the First Amendment and the RLUIPA, arguing that plaintiff's professed religious beliefs are not genuinely held, and that in any event the burden upon his religious beliefs resulting from defendants' actions is far outweighed by the legitimate penological interests at stake. Defendants additionally argue that plaintiff's equal protection, due process, and Eighth Amendment claims lack merit.

1. First Amendment

Plaintiff asserts that the defendants unlawfully interfered with the exercise of his religious beliefs by denying him kosher meals for a period of thirty days. The First Amendment to the United States Constitution guarantees the right to free exercise of religion.[14] U.S. CONST. AMEND. I; *Cutter v. Wilkinson*, 544 U.S. 709, 719, 125 S. Ct. 2113, 2020 (2005). As is true with regard to the First Amendment generally, the free exercise clause applies to prison inmates, subject to appropriate limiting factors. *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) ("Prisoners have long

[14] That amendment provides, in pertinent part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. CONST. AMEND. I.

been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause.") (citing *Pell v. Procunier,* 417 U.S. 817, 822, 94 S. Ct. 2800, 2804 (1974)). Thus, for example, under accepted free exercise jurisprudence inmates are guaranteed the right to participate in congregate religious services under most circumstances. *See*, *e.g.*, *Salahuddin v. Coughlin*, 993 F.2d 306, 308 (2d Cir. 1993) (citing cases).

The right of prison inmates to exercise their religious beliefs, however, is not absolute or unbridled, but instead is subject to valid penological concerns, including those relating to institutional security. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348, 107 S. Ct. 2400, 2404 (1987); *Salahuddin*, 993 F.2d at 308. A determination of whether the refusal to permit attendance at a religious service, for example, has abridged an inmate's constitutional rights hinges upon the balancing of the inmate's First Amendment free exercise right against institutional needs of officials tasked with the increasingly daunting task of operating prison facilities; that determination is "one of reasonableness, taking into account whether the particular [act] affecting [the] constitutional right . . . is 'reasonably related to legitimate penological interests.'" *Benjamin v.*

*Coughlin*, 905 F.2d 571, 574 (2d Cir.) (quoting *Turner v. Safley*, 482 U.S. 78, 89, 107 S. Ct. 2254, 2261 (1987)), *cert. denied*, 498 U.S. 951, 111 S. Ct. 372 (1990).

Undeniably, the reach of the First Amendment's free exercise clause extends beyond mere attendance at congregate religious services to other aspects of prison life including, pertinently, that of an inmate's diet and participation in religious meals.  *McEachin v. McGuinnis,* 357 F.3d 197, 204-05 (2d Cir. 2004); *Ford,* 352 F.3d at 597.  Ordinarily, the Eighth Amendment establishes as a constitutional minimum the requirement that inmates be provided with nutritionally adequate meals; provided this threshold is met, prison officials otherwise retain considerable discretion in determining dietary constituents.  *Word v. Croce,* 169 F. Supp. 2d 219, 226 (S.D.N.Y. 2001).  This requirement, however, is on occasion narrowed by the First Amendment's free exercise clause, which is broad enough to include an inmate's "clearly established" right "to a diet consistent with his or her religious scruples."  *Ford*, 352 F.3d at 597; *see also Bass v. Coughlin*, 976 F.2d 98, 99 (2d Cir. 1992).  "Courts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free

exercise rights."  *McEachin,* 357 F.3d at 203.

Pivotal to his First Amendment claim is a showing that plaintiff's religious beliefs, leading to the need for an exclusively kosher diet, are sincerely held.  *Salahuddin*, 467 F.3d at 274-75.  In their motions defendants challenge the genuineness of plaintiff's stated religious beliefs and invite the court to dismiss plaintiff's free religious exercise claims on this basis.  The Second Circuit has had occasion to address this element – the bonafides of a plaintiff's sincerely held religious beliefs – in the context of a religious dietary restriction request made by an inmate in *Ford*. 352 F.3d 582.  Noting the difficulties inherent in casting upon the judiciary the task of probing the extent of a plaintiff's legitimately held beliefs, the court observed that "[a]n individual claiming violation of free exercise rights need only demonstrate that the beliefs professed are 'sincerely held' and in the individual's 'own scheme of things, religious.'" *Id.* at 588 (citations omitted).

In the end, analysis of plaintiff's First Amendment claim requires a balancing of the legitimate penological interests advanced by prison officials for taking the challenged action against the resulting burden upon plaintiff's religious beliefs.  In this instance, defendants note that the

average daily cost of feeding an inmate is $2.69, while the cost of feeding an inmate participating in a religious meal plan can range from $7.82 to $9.91 per day. Moore Aff. (Dkt. No. 28-16) ¶ 8 and Exh. H. Accordingly, the financial burden of providing plaintiff with a kosher meal as opposed to making available food ordinarily provided to other inmates is not inconsequential. Turning to the burden, it appears that by plaintiff's own actions and admissions he has signaled that while he may hold sincere beliefs in the Kashrut of Judaism tenets, his beliefs do not extend to requiring him *exclusively* to eat kosher food. Under these circumstances no reasonable factfinder could conclude that by depriving him of his kosher diet for a period of thirty days plaintiff's sincerely held religious beliefs were unlawfully impinged and that legitimate penological concerns did not justify the defendants' actions. *See Tapp v. Stanley*, No. 04-CV-6400, 2008 WL 4934592, at *7-9 (W.D.N.Y. Nov. 17, 2008) . Accordingly, I recommend dismissal of plaintiff's First Amendment claim.

2. RLUIPA

The RLUIPA provides, in pertinent part, that

> [n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . . even if the burden results from a rule of general applicability, unless

> the government demonstrates that imposition of a burden on that person – 1) is in furtherance of a compelling governmental interest; and 2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). The familiar principles which inform the analysis of plaintiff's free exercise claim are similar to those applicable to the potential RLUIPA cause of action, although the two claims are analyzed under somewhat different frameworks. *See Salahuddin v. Goord*, 467 F.3d 263, 274 (2d Cir. 2006). Like the First Amendment's free exercise clause, the RLUIPA prohibits governmental entities subject to its reach from imposing a substantial burden on religion even where it stems from a generally applicable law, practice, or policy.[15]

---

[15] The RLUIPA, enacted by Congress under authority of the Spending Clauses of the Constitution, applies only to programs and for activities receiving federal financial assistance. *Pugh v. Goord*, 571 F. Supp. 2d 477, 504 n.11(S.D.N.Y. 2008) (citing *Marria v. Broaddus*, No. 97 Civ. 8297(NRB), 2003 WL 21782633, at *12 (S.D.N.Y. July 31, 2003); *Fluellen v. Goord*, No. 06 Civ. 602E (HKS), 2007 WL 4560597, at *5 (W.D.N.Y. Mar.12, 2007)). While defendants assert that the Broome CCF does not in general receive federal funding they do not acknowledge that it has received federal funds to the extent of being reimbursed for housing federal prison inmates. In light of my determination on the merits, I find it unnecessary to address this issue.

It should also be noted, as defendants have argued, that although there is not uniformity on this issue, the weight of authority appears to be that under the RLUIPA does not allow for recovery of damages against defendants, either individually or in their official capacities. *Singh v. Goord,* No. 05-Civ. 9680 (SCR) (LMS), 2010 WL 1875653, at * 6 (S.D.N.Y. March 9, 2010); *Sweeper v. Taylor*, No. 906-CV-379, 2009 WL 815911, at *9 (N.D.N.Y. Mar. 27, 2009) (Mordue, C.J.); *Pugh,* 571 F. Supp. 2d at 503; *but see Hankins v. New York State Dep't of Corr.*, No. 07 CV 408, 2008 WL 2019655, at *6 (N.D.N.Y. March 10, 2008) (Lowe, M.J.) (concluding in *dicta*, that by accepting federal funds New York effectively has waived its sovereign immunity

To establish a violation of the RLUIPA a plaintiff must prove that prison officials, through their actions, have substantially burdened his or her religious exercise through actions not found to promote a compelling governmental interest advanced through the least restrictive means. *Pilgrim v. Artus*, No. 9:07-CV-1001 (GLS/RFT), 2010 WL 3724883, at *10 (N.D.N.Y. March 18, 2010) (Treece, M.J.). The RLUIPA places a higher burden on the defendants than does the First Amendment, which requires only a burden that is "reasonably related to legitimate penological interests". *Id.*

Despite these differences, I conclude the record in this case fails to disclose evidence from which a reasonable factfinder could find that plaintiff's religious beliefs were substantially burdened by defendants' actions and that those actions were not prompted by a compelling governmental interest advanced through the least restrictive means. Once again, plaintiff has demonstrated by his own conduct that his religious beliefs do not require him to exclusively consume kosher meals. Accordingly, by their actions the defendants did not unreasonably burden

thereby allowing for damages against defendants in their official capacities). In light of my determination on the merits I also find it unnecessary to stake out a position regarding this complex issue.

plaintiff's religious beliefs by denying him access to kosher meals for a period of thirty days based upon a determination that his religious beliefs allegedly requiring the kosher meals are not sincerely held and in light of the substantial increase in cost in providing kosher meals as compared to those given to other inmates. I therefore recommend dismissal of plaintiff's RLIUPA claims on the merits.

3. Eighth Amendment

In his complaint plaintiff alleges that by their failure to provide him with a kosher diet defendants have caused him to suffer stomach pain and discomfort in violation of his right under the Eighth Amendment to be free of cruel and unusual punishment.[16] Defendants argue that this claim, which is distinct from plaintiff's free exercise causes of action, lacks merit.

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and

---

[16] It is unclear from the record now before the court whether, while confined at the Broome CCF, plaintiff was a convicted and sentenced prisoner, or instead in pretrial confinement. If at the relevant time plaintiff had yet to be convicted and sentenced, then his food deprivation claim would be more appropriately analyzed under the Fourteenth Amendment since he would not be subject to the Eighth Amendment's prohibition against cruel and unusual punishments. *Benjamin v. Fraser*, 343 F.3d 35, 49-50 (2d Cir. 2003). In addressing that claim I have nonetheless applied an Eighth Amendment analysis since there does not appear to be a material difference in the legal principles governing the provision of food to prison inmates under either provision. *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009).

wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S. Ct. 285, 290, 291 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S. Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle*).  While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny.  *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S. Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman*, 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement – the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference".  *See Leach v. Dufrain,* 103 F. Supp. 2d 542, 546 (N.D.N.Y. 2000) (Kahn, J.) (citing *Wilson v. Seiter*, 501 U.S. 294, 111 S. Ct. 2321 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.); *see also,*

*generally, Wilson*, 501 U.S. 294, 111 S. Ct. 2321.[17] Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837, 114 S. Ct. at 1978; *Leach*, 103 F. Supp. 2d at 546 (citing *Farmer*); *Waldo*, 1998 WL 713809, at *2 (same).

To establish an Eighth Amendment conditions of confinement claim, a plaintiff must demonstrate a deprivation of "'the minimal civilized measure of life's necessities,' such as adequate food, clothing shelter, sanitation, medical care, and personal safety." *May v. DeJesus*, No.3:06CV1888, 2010 WL 1286800, at *4 (D.Conn. Mar. 30, 2010) (quoting *Alvarez v. County of Cumberland*, Civil No. 07-346(RBK), 2009 WL 750200, at *2 (D.N.J. Mar. 18, 2009) (citation omitted)). Conditions that are merely restrictive or harsh, however, do not implicate the Eighth Amendment; "they are merely part of the penalty that criminal offenders pay for their offense against society." *May*, 2010 WL 1286800, at *4 (quoting *Alvarez*,1009 WL 750200, at *2).

---

[17] Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

The Second Circuit has recognized that the Eighth Amendment requires that prisoners be provided with "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Couglin*, 725 F.2d 12, 15 (2d Cir. 1983) (citation omitted); *Brown v. Eagen*, No. 9:08-CV-0009, 2009 WL 815724, at *10 (N.D.N.Y. Mar. 26, 2009) (McAvoy, S.J.) (citations omitted); *Midalgo v. Bass*, No. 9:03-CV-1128, 2006 WL 2795332, at * 11 (N.D.N.Y. Sept. 26 2006) (Mordue, C.J.) (citations omitted).  In this instance, plaintiff has failed to allege that the food at the Broome CCF was prepared and served in a manner that endangered his health.  While plaintiff may claim that he did not eat the non-kosher meals provided to him such a claim, while perhaps cognizable under the First Amendment or the RLUIPA, does not also implicate cruel and unusual punishment in violation of the Eighth Amendment, particularly since it appears plaintiff did not hesitate to consume a non-kosher meal on September 30, 2009 even knowing his replacement kosher meal would be provided, and thus the deprivation of kosher meals cannot reasonably be expected to result in plaintiff not eating.  *Modlenaar v. Liberatore,* No. 07-CV-6012 CJS, 2009 WL 2179661, at * 5 (W.D.N.Y. July 22, 2009).

Indeed, the plaintiff "'has not [and cannot] provide[ ] any authority for the proposition that denial of [kosher] food in prison would rise to the level necessary to be deemed cruel and unusual under the Eighth Amendment.'" *Perez v. Westchester Cnty. Dep't of Corr.*,No. 05 Civ. 8120, 2007 WL 1288579, at * 5 (S.D.N.Y. Apr. 30, 2007) (quoting *Wesley v. Kalos*, No. 97 CIV 1598, 1997 WL 767557, at *4 (S.D.N.Y. Dec. 11, 1997)); *see also Modlenaar v. Liberatore*, No. 07-CV-6012, 2009 WL 2179661, at * 5 (W.D.N.Y. 2009). I therefore recommend dismissal of plaintiff's Eighth Amendment cruel and unusual punishment claim.

4. Equal Protection

Without any specificity concerning the classifications drawn by the defendants, plaintiff asserts in his second cause of action that the suspension of his daily kosher meals represented a deprivation of equal protection. In their motions defendants seek dismissal of that claim.

The Equal Protection Clause directs state actors to treat similarly situated people alike. *See City of Cleburne, Texas v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S. Ct. 3249, 3254 (1985). To prove a violation of the Equal Protection Clause, a plaintiff must demonstrate that he or she was treated differently than others similarly situated as a result

of intentional or purposeful discrimination directed at an identifiable or suspect class. *See Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir.1995) (citing, *inter alia*, *McCleskey v. Kemp*, 481 U.S. 279, 292, 107 S. Ct. 1756, 1767 (1987)). The plaintiff must also show that the disparity in treatment "cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not reasonably related to [any] legitimate penological interests." *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005) (quoting *Shaw v. Murphy*, 532 U.S. 223, 225, 121 S.Ct. 1475 (2001) (internal quotation marks omitted)).

Plaintiff's complaint fails to allege facts demonstrating a plausible claim of denial of equal protection. Plaintiff does not identify the classifications drawn by the defendants, nor does he assert that he was treated differently than other similarly situated inmates as a result of intentional or purposeful discrimination. Accordingly, I recommend dismissal of plaintiff's equal protection claim.

5. Procedural Due Process

In his complaint, plaintiff also purports to assert a procedural due process claim based upon the thirty-day deprivation of kosher meals. In their motion defendants similarly challenge the legal sufficiency of this

claim.

To successfully state a claim under 42 U.S.C. § 1983 for the denial of procedural due process, a plaintiff must show that he or she 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient process. *See Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000) (citations omitted); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir.), *cert. denied*, 525 U.S. 901, 119 S. Ct. 246 (1998); *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996).

As a threshold matter, a party asserting such a claim must demonstrate the deprivation of a cognizable liberty interest. *Tellier*, 280 F.3d at 80. While the provision of a kosher diet may implicate free exercise concerns under the First Amendment and the RLUIPA, it does not rise to the level of a cognizable liberty interest giving rise to the procedural safeguards guaranteed under the Fourteenth Amendment. *George v. Conway*, No. 05-CV-510A, 2009 WL 1449046, at *16 (W.D.N.Y. May 21, 2009). I therefore recommend dismissal of plaintiff's due process claim on this basis.

6. Retaliation

Finally, in the margin of his complaint, though not in the body of that

claim, plaintiff's second cause of action also refers to "retaliation". Such a claim, if indeed it was intended to be set forth, is facially lacking in merit.

When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under 42 U.S.C. § 1983 lies. *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 346-47 (N.D.N.Y. 2010). In order to state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that 1) the conduct at issue was protected; 2) the defendants took adverse action against the plaintiff; and 3) there was a causal connection between the protected activity and the adverse action – in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S. Ct. 568, 576 (1977); *Dillon v. Morano*, 497 F.3d 247, 251 (2d Cir. 2007); *Dawes*, 239 F.3d at 492 (2d Cir. 2001).

In this case, plaintiff does not allege that the suspension of his kosher meals was in response to his having engaged in activity protected

under the First Amendment. Accordingly, to the extent that his complaint could be construed as asserting a retaliation claim, that claim should be dismissed.

E. Whether to Grant Leave to Amend

If the recommendations contained in this report are adopted all of plaintiff's claims will be dismissed. The next issue to be addressed, then, is whether plaintiff should be afforded an opportunity to amend his complaint to assert additional facts demonstrating the existence of plausible constitutional claims.

Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend *at least* once if there is any indication that a valid claim might be stated. *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir.1991) (emphasis added); *see also* Fed. R. Civ. P. 15(a) (leave to amend "shall be freely given when justice so requires"); *see also Mathon v. Marine Midland Bank, N.A.,* 875 F.Supp. 986, 1003 (E.D.N.Y.1995) (leave to replead granted where court could not say that under no circumstances would proposed claims provide a basis for relief). This hold true regardless of whether dismissal comes pursuant to a Rule 12(b) dismissal motion, or instead by way of the entry of summary

judgment.  *See Kilgore v. Kaufman*, 374 Fed. App'x 89, 91 (2d Cir. 2010) (cited in accordance with Fed. R. App. Proc. 32.1).  The court must therefore determine whether plaintiff is entitled to the benefit of this general rule, given the procedural history of the case.

In this instance, having reviewed the entire record associated with the pending summary judgment motion, I conclude that plaintiff cannot assert a plausible constitutional claim under the facts disclosed in that record.  Accordingly, I recommend that plaintiff not be afforded an opportunity to amend his complaint in this action.  *Clarke v. Max Advisors, LLC,* 235 F. Supp.2d 130, 151 (N.D.N.Y. 2002) (citing *Foman v. Davis,* 371 U.S. 178, 182, 83 S. Ct. 227, 230 (1962)).

IV.    SUMMARY AND RECOMMENDATION

Plaintiff's complaint, though succinct and addressed to a finite and modest set of facts, alleges in general terms a variety of constitutional claims against the moving defendants.  Because plaintiff's complaint is bereft of facts demonstrating the existence of plausible cruel and unusual punishment, equal protection, procedural due process, and retaliation claims, I recommend dismissal of those causes of action, without leave to amend.  I further recommend dismissal of plaintiff's First Amendment and

RLUIPA free religious exercise claims based upon a finding that no reasonable factfinder could conclude that plaintiff's sincerely held beliefs were substantially impinged by defendants' failure to provide a kosher diet for thirty days, and that the penological interests associated with that deprivation were neither compelling nor substantially outweighed by the *de minimis* interference with plaintiff's religious exercise stemming from that deprivation.  Accordingly, it is hereby respectfully

RECOMMENDED that the motion of defendant Mogenson to dismiss plaintiff's complaint (Dkt. No. 16) be GRANTED, and further that the motion of the remaining defendants for summary judgment dismissing plaintiff's complaint (Dkt. No. 28) also be GRANTED, and that plaintiff's complaint be DISMISSED in its entirety, without leave to replead.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report.  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

ORDERED the clerk is also serve a copy of the Report and

Recommendation upon the parties in accordance with this court's local

David E. Peebles
U.S. Magistrate Judge

Dated:      February 17, 2011
            Syracuse, NY



Page 1

Not Reported in F.Supp., 1998 WL 312375 (N.D.N.Y.)

(Cite as: 1998 WL 312375 (N.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Juan CANDELARIA, Plaintiff,

v.

Robert B. GREIFINGER; Bethlynn Terry; Anthony J. Annucci; Susan J. Butler; Dr. Lester Wright; Thomas Lavalley; Daniel A. Senkowski; Philip Coombe, Jr.; Mark R. Chassin, M.D.,M.P.P., M.P.H.; Public Health Council of the State of New York; Salvatore Canonico, Joseph Ostrowsky; Richard L. Herzfeld; David Neier; Quentin Moore; Kings County District Attorney; New York City Police Department; Supreme Court of the State of New York-County of Kings Criminal Term; George Pataki; Brown and Williamson Tobacco Corporation; Republic Tobacco Company, Defendants.

No. 96-CV-0017 (RSP/DS).

June 8, 1998.

Juan Candelaria, plaintiff, pro se.

Hon. Dennis C. Vacco, Attorney General of the State of New York, Department of Law, the Capitol, Albany, New York, for State Defendants, Howard L. Zwickel, Asst. Attorney General, of counsel.

MEMORANDUM-DECISION AND ORDER

POOLER, J.

***1** This matter comes to me following a report-recommendation by Magistrate Judge Daniel Scanlon, duly filed on the 24th day of April, 1998. Ten days after service thereof, the Clerk of the Court has sent me the entire file, including any and all objections filed by the parties. No party filed objections.

In this action pursuant to the Rehabilitation Act, the Americans with Disabilities Act, and various civil rights statutes, Candelaria challenges the conditions of his confinement at Clinton Correctional Facility ("Clinton"). Candelaria moved for injunctive relief requiring Clinton to transport physically disabled inmates in a wheelchair-accessible vehicle. Dkt. No. 15. On April 9, 1997, I concluded that Candelaria's motion could not be addressed on the record before me and remanded the issue to the magistrate judge for further consideration. Dkt. No. 99. Candelaria also renewed his motion for appointment of counsel, dkt. nos. 115, 116, and 121, and requested an extension of time in which to provide the United States Marshall Service with information necessary to effect service of process on certain of the defendants, dkt. no. 121.

The magistrate judge recommended I deny as moot Candelaria's motion for injunctive relief, on the grounds that Candelaria had been transferred from Clinton to Elmira Correctional Facility. Dkt. No. 123. In addition, the magistrate judge denied Candelaria's motion for appointment of counsel, granted his motion for an extension of time in which to provide information relevant to service, and recommended that, in the event Candelaria fails to provide the Court with completed USM-285 forms for each of the unserved defendants within forty-five (45) days of the date of the magistrate judge's order, the action

© 2011 Thomas Reuters. No Claim to Orig. US Gov. Works.

be dismissed as to those defendants for whom Candelaria had not submitted the forms. *Id.*

After careful review of the record, including the report-recommendation, to which the parties submitted no objections, I conclude that the magistrate judge's findings were not clearly erroneous. It is therefore

ORDERED that the report-recommendation is approved, and it is further

ORDERED that Candelaria's motion for injunctive relief concerning the transportation of disabled inmates is DENIED as moot, and it is further

ORDERED that if Candelaria fails to provide, within forty-five (45) days of the date of this order, completed USM-285 forms for each of the unserved defendants, this action will be dismissed without further order of the Court as to those defendants for whom Candelaria has not submitted the forms, and it is further

ORDERED that the Clerk of the Court serve a copy of this order on the parties by regular mail.

IT IS SO ORDERED.

ORDER and REPORT-RECOMMENDATION

SCANLON, Magistrate J.

Plaintiff Juan Candelaria filed this civil rights action in January 1996 to challenge his conviction and the conditions of his confinement at the Clinton Correctional Facility ("Clinton"). Candelaria alleges causes of action pursuant to the Rehabilitation Act, the Americans with Disabilities Act, and various civil rights statutes. This matter is before the Court for further consideration of that portion of plaintiff's motion for injunctive relief which relates to the adequacy of Clinton's method of transporting physically disabled inmates, in light of the parties' submissions filed pursuant to this Court's Order filed July 9, 1997. *See* Dkt. No. 107. Also before the Court are renewed motions from Candelaria for the appointment of counsel (Dkt. Nos. 115, 116 and 121), and a request for a further extension of time in which to provide the U.S. Marshal Service with certain information necessary to effect service of process on the remaining defendants. *See* Dkt. No. 121.[FN1] These matters will be addressed separately below.

FN1. The Court notes that Candelaria submitted with one of his requests for appointment of counsel a document entitled "Consolidated Next of Kin-Powers of Attorney-and-Last Will and Testament." *See* Dkt. No. 116.

*I. Injunctive Relief*

***2** Candelaria is paralyzed from the waist down and is confined to a wheelchair. By his motion for injunctive relief, Candelaria sought an order of this Court requiring Clinton to transport physically disabled inmates such as himself in a wheelchair-accessible van. According to plaintiff, Clinton's use of a prison station wagon which was neither equipped nor designed to accommodate passengers with physical impairments was both unsafe and in violation of his civil and constitutional rights. *See* Dkt. No. 68 at ¶ 18.

District Judge Rosemary S. Pooler determined that Candelaria's claim regarding Clinton's method of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

transporting physically disabled inmates could not be addressed on the record then before the Court and remanded that issue to this Court for review upon further factual development. *See* Dkt. No. 99. By Order filed July 9, 1997, this Court directed the state defendants to submit affidavits, together with supporting documentary evidence, if any, on the adequacy of Clinton's method of transporting such inmates. *See* Dkt. No. 107. Plaintiff was afforded an opportunity to respond to such submission and the Court reserved decision on whether an evidentiary hearing would be required prior to the resolution of plaintiff's motion for injunctive relief. *Id.* at 4.

Pursuant to the Court's Order, the state defendants filed the affidavits of John Mitchell, the Nurse Administrator at Clinton, and Mark Vann, a Correctional Lieutenant at Clinton. *See* Dkt. No. 114. By these affidavits, the state defendants continue to assert that physically disabled inmates (including Candelaria) have been transported without incident while sitting on a seat in one of the vans used for this purpose. *See id.* Candelaria filed responding papers in which he asserts that inmates are sometimes required to sit on the floor of the van and that, moreover, disabled persons such as himself are not always able to sit safely on a van seat. *See* Dkt. No. 117.

Since the entry of the Court's Order, Candelaria has been transferred to the Elmira Correctional Facility ("Elmira"), where he has been housed since December 2, 1997. *See* Dkt. No. 121.[FN2]

FN2. Candelaria was transferred to Green Haven Correctional Facility on July 27, 1997, and was thereafter hospitalized from August 25, 1997 until December 2, 1997, when he was discharged to Elmira. *See* Dkt. No. 121.

It is settled in this Circuit that a transfer from a prison facility moots an action for injunctive relief against the transferring facility. *Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996) (citations omitted) (finding request for injunctive relief moot where inmate transferred from subject facilities). Accordingly, the Court recommends that plaintiff's motion for injunctive relief be denied without prejudice to renew in the event that he is transported from Elmira to outside medical visits in a vehicle which is not equipped for the transport of wheelchair-bound inmates.[FN3]

FN3. In recommending that plaintiff's motion for injunctive relief be denied as moot, the Court makes no findings with regard to the adequacy of the method of transport utilized at Clinton or the need for an evidentiary hearing to determine same.

*II. Appointment of Counsel*

Turning to Candelaria's requests for the appointment of counsel, a review of the file in this matter, including plaintiff's most recent submissions requesting appointment of counsel (*see* Dkt. Nos. 115, 116 and 121), in conjunction with the factors a court is to consider when ruling on such motions, *see* *Hodge v. Police Officers,* 802 F.2d 58, 61 (2d Cir.1986); *Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997), indicates no change of circumstances that would warrant appointment of counsel *pro bono* for the plaintiff at the present time. In this regard, Candelaria's apparent poor health does not appear as a matter of record in this action to have prevented him from effectively litigating this action. To the contrary, plaintiff has actively pursued his lawsuit against the defendants and has filed numerous motions during the course of this litigation.

***3** Accordingly, plaintiff's requests for appointment of counsel are denied for the reasons stated in this Court's prior order concerning this issue. *See* Dkt. No. 107.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*III. Service of Process*

By its July Order, this Court granted Candelaria's requests for an extension of time in which to effect service of process on four individuals and seven entities named as defendants in this action. *See* Dkt. No. 107 at 18-20. Upon the completion of a new USM-285 form for each unserved defendant containing whatever information Candelaria possessed or was able to obtain in a reasonable period of time, the U.S. Marshals Service (the "Service") was directed to attempt to effect service of process on these defendants in accordance with the Federal Rules of Civil Procedure. *See* Dkt. No. 107.[FN4]

FN4. The following defendants have not yet been served with the summons and complaint in this action: Mark E. Chassin, M.D.; Salvatore Canonico; Joseph Ostrowsky; Quentin Moore; Brown & Williamson Tobacco Corporation; Republic Tobacco, Company; Public Health Council of the State of New York; New York City Police Department; Supreme Court of the State of New York; County of Kings, Criminal Division; and Kings County District Attorney. *See* Dkt. No. 107.

Candelaria now seeks a further extension of time to permit him to provide the Service with the completed USM-285 forms. *See* Dkt. No. 121. According to Candelaria, his three transfers, including a lengthy hospitalization, prevented him from timely completing that paperwork.[FN5]

FN5. Candelaria also contends that he is now confined to the infirmary at Elmira Correctional Facility, where he is not permitted "to possess a large quantity of legal papers." *Id.* at 1.

Plaintiff is hereby granted a further extension of forty-five (45) days from the filing date of this Order in which to provide the Service with the completed USM-285 forms. Said forms shall contain any and all information presently known to plaintiff concerning (i) the whereabouts of the individual defendants, and (ii) the name(s) of the individual(s) upon whom service can be effected on behalf of the seven entities. Upon receipt of same, the Service shall attempt to effect service of process on the these defendants in accordance with the Federal Rules of Civil Procedure and the July Order. [FN6] Candelaria is advised that his failure to timely provide the Service with the completed USM-285 forms will result in the dismissal of his action as against those defendants for whom plaintiff has not completed them.

FN6. The Service is obligated to effect service of process in accordance with the Federal Rules of Civil Procedure and, if necessary, the Service must make multiple attempts at service. *See* *Armstrong v. Sears,* 33 F.3d 182, 188 (2d Cir.1994) (where defendant refused to acknowledge Service's request for waiver under Rule 4(d), Service must effect personal service under Rule 4(e)). *Accord,* *Hurlburt v. Zaunbrecher,* 169 F.R.D. 258, 259 (N.D.N.Y.1996) (Smith, M.J.).

WHEREFORE, it is hereby

RECOMMENDED, that Candelaria's motion for a preliminary injunction (Dkt. No. 19) be denied as moot insofar as it challenges the method of transporting physically disabled inmates at the Clinton Correctional Facility, and it is further

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

ORDERED, that Candelaria's requests for the appointment of counsel (Dkt. Nos. 115, 116 and 121) are denied, and it is further

ORDERED, that Candelaria's request for an extension of time in which to provide the Service with completed USM-285 forms for each of the unserved defendants in this action is granted. Candelaria shall provide such forms, containing all of the information presently known to him relative to effecting service of process on those defendants within forty-five (45) days of the filing date of this Order, and it is further

RECOMMENDED, that if plaintiff fails to timely provide completed USM-285 forms as discussed herein, this action be dismissed as against those defendants for whom plaintiff has not submitted them, and it is further

ORDERED, that the Service shall attempt to serve each of the remaining defendants in accordance with the Federal Rules of Civil Procedure and the terms of the July Order promptly upon receipt of the completed USM-285 forms from Candelaria, and it is further

***4** ORDERED, that the Clerk serve a copy of this Order on the parties hereto, and on the Service, by regular mail.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten (10) days within which to file written objections to the foregoing report-recommendation. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW, *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e) and 72.

IT IS SO ORDERED.

N.D.N.Y.,1998.

Candelaria v. Greifinger

Not Reported in F.Supp., 1998 WL 312375 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



H

Only the Westlaw citation is currently available.

United States Court of Appeals,

Second Circuit.

Daniel R. PAPELINO and Michael Yu, Plaintiffs-Appellants,

Carl Basile, Plaintiff,

v.

ALBANY COLLEGE OF PHARMACY OF UNION UNIVERSITY, James Gozzo, individually and as President of Albany College of Pharmacy of Union University, Howard D. Colby, individually and as Associate Dean for Academic Affairs, Elisabeth Vines, individually and as Faculty Advisor to the Student Honor Committee, and Thomas Dalton, individually and as Chairperson of the Appellate Board, Defendants-Appellees.FN*

Docket No. 09-4248-cv.

Argued: Aug. 24, 2010.

Decided: Jan. 24, 2011.

**Background:** Pharmacy students brought action against college and individual defendants, alleging sexual harassment and retaliation claims under Title IX, and breach of contract and tort claims under New York common law. The United States District Court for the Northern District of New York, Mordue, Chief Judge, 2009 WL 2957789, granted summary judgment dismissing the claims, and students appealed.

**Holdings:** The Court of Appeals, Chin, Circuit Judge, held that:

(1) summary judgment in favor of college was precluded on student's quid pro quo sexual harassment claim;

(2) summary judgment in favor of college was precluded on student's hostile environment claim; and

(3) summary judgment in favor of college was precluded on student's Title IX retaliation claim.

Affirmed in part, reversed in part, and remanded.

West Headnotes

**[1] Civil Rights 78 1067(3)**

78 Civil Rights

78I Rights Protected and Discrimination Prohibited in General

78k1059 Education

78k1067 Sex Discrimination

78k1067(3) k. Sexual Harassment; Sexually Hostile Environment. Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Title IX provides a remedy to a student who is subjected to sexual harassment by a teacher or professor at an educational institution receiving federal funds; for an educational facility to be liable, the plaintiff must establish that a school official with authority to address the alleged discrimination and to institute corrective measures had actual knowledge of the discrimination and failed to adequately respond. Education Amendments of 1972, § 901 et seq., 20 U.S.C.A. § 1681 et seq.

**[2] Civil Rights 78 1067(1)**

78 Civil Rights

78I Rights Protected and Discrimination Prohibited in General

78k1059 Education

78k1067 Sex Discrimination

78k1067(1) k. In General. Most Cited Cases

Under Title IX, a school fails to adequately respond to alleged discrimination and to institute corrective measures if it provides no response or if it provides a response that amounts to deliberate indifference to discrimination; school's response to sex discrimination must be clearly unreasonable in light of known circumstances. Education Amendments of 1972, § 901 et seq., 20 U.S.C.A. § 1681 et seq.

**[3] Civil Rights 78 1067(1)**

78 Civil Rights

78I Rights Protected and Discrimination Prohibited in General

78k1059 Education

78k1067 Sex Discrimination

78k1067(1) k. In General. Most Cited Cases

**Civil Rights 78 1067(3)**

78 Civil Rights

78I Rights Protected and Discrimination Prohibited in General

78k1059 Education

78k1067 Sex Discrimination

78k1067(3) k. Sexual Harassment; Sexually Hostile Environment. Most Cited Cases

Title IX sex discrimination claim requires the same kind of proof required in a Title VII sex discrimination claim; quid pro quo sexual harassment claim under Title IX requires proof of: (1) the rejection of sexual advances; (2) a tangible school-related consequence; and (3) a causal connection between the two. Education Amendments of 1972, § 901 et seq., 20 U.S.C.A. § 1681 et seq.; Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**[4] Civil Rights 78 1067(3)**

78 Civil Rights

78I Rights Protected and Discrimination Prohibited in

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

General

78k1059 Education

78k1067 Sex Discrimination

78k1067(3) k. Sexual Harassment; Sexually Hostile Environment. Most Cited Cases

For purposes of quid pro quo sexual harassment claim under Title IX, a "tangible consequence" occurs when some benefit or adverse action, such as a change in a grade, is made to depend upon providing sexual favors to someone in authority. Education Amendments of 1972, § 901 et seq., 20 U.S.C.A. § 1681 et seq.

**[5] Civil Rights 78 1067(3)**

78 Civil Rights

78I Rights Protected and Discrimination Prohibited in General

78k1059 Education

78k1067 Sex Discrimination

78k1067(3) k. Sexual Harassment; Sexually Hostile Environment. Most Cited Cases

A Title IX hostile education environment claim is governed by traditional Title VII "hostile environment" jurisprudence; Title IX plaintiff must show that he subjectively perceived the environment to be hostile or abusive and that the environment objectively was hostile or abusive, that is, that it was permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter the conditions of his educational environment. Education Amendments of 1972, § 901 et seq., 20 U.S.C.A. § 1681 et seq.; Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**[6] Federal Civil Procedure 170A 2491.5**

170A Federal Civil Procedure

170AXVII Judgment

170AXVII(C) Summary Judgment

170AXVII(C)2 Particular Cases

170Ak2491.5 k. Civil Rights Cases in General. Most Cited Cases

Genuine issues of material fact existed as to whether college had "actual knowledge" of the serious nature of professor's sexual overtures towards student or that the college acted with deliberate indifference, precluding summary judgment in favor of college on student's quid pro quo sexual harassment claim under Title IX. Education Amendments of 1972, § 901 et seq., 20 U.S.C.A. § 1681 et seq.

**[7] Civil Rights 78 1067(3)**

78 Civil Rights

78I Rights Protected and Discrimination Prohibited in General

78k1059 Education

78k1067 Sex Discrimination

78k1067(3) k. Sexual Harassment; Sexually Hostile Environment. Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Close temporal proximity between student's final rejection of professor's advances and student's initiation of proceedings against professor combined with the apparent speciousness of the proffered proof of professor's cheating allegations against student constituted evidence of causal connection element of Title IX quid pro quo sexual harassment claim, especially given professor's warning that it would be "a big mistake" for student to report her to Dean. Education Amendments of 1972, § 901 et seq., 20 U.S.C.A. § 1681 et seq.

**[8] Federal Civil Procedure 170A 2491.5**

170A Federal Civil Procedure

170AXVII Judgment

170AXVII(C) Summary Judgment

170AXVII(C)2 Particular Cases

170Ak2491.5 k. Civil Rights Cases in General. Most Cited Cases

Genuine issues of material fact existed as to whether professor engaged in incidents of sexually hostile conduct because student rejected her sexual advances, and whether those actions were part of a pattern of pervasive conduct that was sufficiently hostile or abusive to alter the conditions of student's educational environment, precluding summary judgment in favor of college of student's Title IX hostile environment claim. Education Amendments of 1972, § 901 et seq., 20 U.S.C.A. § 1681 et seq.

**[9] Limitation of Actions 241 58(1)**

241 Limitation of Actions

241II Computation of Period of Limitation

241II(A) Accrual of Right of Action or Defense

241k58 Liabilities Created by Statute

241k58(1) k. In General. Most Cited Cases

Under the continuing violation doctrine, a Title IX plaintiff may bring claims for discriminatory acts that would have been barred by the statute of limitations as long as an act contributing to that hostile environment took place within the statutory time period. Education Amendments of 1972, § 901 et seq., 20 U.S.C.A. § 1681 et seq.

**[10] Civil Rights 78 1067(1)**

78 Civil Rights

78I Rights Protected and Discrimination Prohibited in General

78k1059 Education

78k1067 Sex Discrimination

78k1067(1) k. In General. Most Cited Cases

A plaintiff claiming retaliation under Title IX must first establish a prima facie case by showing: (1) protected activity by the plaintiff; (2) knowledge by the defendant of the protected activity; (3) adverse school-related action; and (4) a causal connection between the protected activity and the adverse action. Education Amendments of 1972, § 901 et seq., 20 U.S.C.A. § 1681 et seq.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

**[11] Civil Rights 78 1067(1)**

78 Civil Rights

78I Rights Protected and Discrimination Prohibited in General

78k1059 Education

78k1067 Sex Discrimination

78k1067(1) k. In General. Most Cited Cases

Even if the agents who carried out the adverse action did not know about the plaintiff's protected activity, the "knowledge" requirement for Title IX retaliation claim is met if the legal entity was on notice; further, while lack of knowledge on the part of particular agents who carried out the adverse action is evidence of lack of causal connection, a plaintiff may counter with evidence that the decision-maker was acting on orders or encouragement of a superior who did have the requisite knowledge. Education Amendments of 1972, § 901 et seq., 20 U.S.C.A. § 1681 et seq.

**[12] Civil Rights 78 1067(1)**

78 Civil Rights

78I Rights Protected and Discrimination Prohibited in General

78k1059 Education

78k1067 Sex Discrimination

78k1067(1) k. In General. Most Cited Cases

In a Title IX retaliation case, a plaintiff is only required to prove that a retaliatory motive played a part in adverse actions toward him, whether or not it was the sole cause. Education Amendments of 1972, § 901 et seq., 20 U.S.C.A. § 1681 et seq.

**[13] Federal Civil Procedure 170A 2491.5**

170A Federal Civil Procedure

170AXVII Judgment

170AXVII(C) Summary Judgment

170AXVII(C)2 Particular Cases

170Ak2491.5 k. Civil Rights Cases in General. Most Cited Cases

Genuine issues of material fact existed as to whether as to college knew that pharmacy student had engaged in protected activity in reporting professor's alleged sexual harassment, whether professor initiated Honor Code proceedings against student for retaliatory reasons rather than a good faith belief that student had actually cheated, and whether college's refusal to provide an unqualified certification of student to the Florida Pharmacy Board was based on an impermissible retaliatory motive, precluding summary judgment in favor of college on student's Title IX retaliation claim. Education Amendments of 1972, § 901 et seq., 20 U.S.C.A. § 1681 et seq.

**[14] Colleges and Universities 81 9.10**

81 Colleges and Universities

81k9 Students

81k9.10 k. In General. Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Under New York law, an implied contract is formed when a university accepts a student for enrollment; terms of the implied contract are contained in the university's bulletins, circulars, and regulations made available to the student, and if the student complies with the terms prescribed by the university and completes the required courses, the university must award him a degree.

**[15] Colleges and Universities 81 9.10**

81 Colleges and Universities

81k9 Students

81k9.10 k. In General. Most Cited Cases

Under New York law, implicit in the implied contract which is formed when a university accepts a student for enrollment is the requirement that the institution act in good faith in its dealing with its students; at the same time, the student must fulfill his end of the bargain by satisfying the university's academic requirements and complying with its procedures.

**[16] Colleges and Universities 81 5**

81 Colleges and Universities

81k5 k. Powers, Franchises, and Liabilities in General. Most Cited Cases

New York law does not recognize a claim against university for "educational malpractice," and a student may not seek to avoid this rule by couching such a claim as a breach of contract claim.

**[17] Federal Civil Procedure 170A 2492**

170A Federal Civil Procedure

170AXVII Judgment

170AXVII(C) Summary Judgment

170AXVII(C)2 Particular Cases

170Ak2492 k. Contract Cases in General. Most Cited Cases

Genuine issues of material fact existed as to whether college breached its implied duty of good faith by failing to investigate student's complaint of sexual harassment, mishandling the Honor Code proceedings against student after professor accused student of cheating, and denying students a diploma and failing another student in a course, precluding summary judgment in favor of college on students' breach of contract claim.

**[18] Labor and Employment 231H 3043**

231H Labor and Employment

231HXVIII Rights and Liabilities as to Third Parties

231HXVIII(B) Acts of Employee

231HXVIII(B)1 In General

231Hk3043 k. Negligent Supervision. Most Cited Cases

Under New York law, a plaintiff asserting a claim for

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

negligent supervision must prove: (1) the tortfeasor and defendant were in an employee-employer relationship; (2) the employer knew or should have known of the employee's propensity for the tortious conduct; and (3) the tort was committed on the employer's premises or with the employer's chattels.

**[19] Labor and Employment 231H 3043**

231H Labor and Employment

231HXVIII Rights and Liabilities as to Third Parties

231HXVIII(B) Acts of Employee

231HXVIII(B)1 In General

231Hk3043 k. Negligent Supervision. Most Cited Cases

Under New York law, an employer will be liable to an injured party for an employee's tort when the employer knew or had reason to know that the employee was unfit for the job.

**[20] Federal Civil Procedure 170A 2497.1**

170A Federal Civil Procedure

170AXVII Judgment

170AXVII(C) Summary Judgment

170AXVII(C)2 Particular Cases

170Ak2497 Employees and Employment Discrimination, Actions Involving

170Ak2497.1 k. In General. Most Cited Cases

Given professor's apparent conflict of interest, college's decision to permit her to serve, in essence, as the prosecutor and star witness in the Honor Code proceedings against student whom professor had accused of cheating raised a genuine issue of material fact as to whether college knew or had reason to know that professor would misuse the Honor Code process, precluding summary judgment in favor of college on student's negligent supervision claim.

Appeal from a final judgment of the United States District Court for the Northern District of New York (Mordue, Chief Judge) dismissing plaintiffs-appellants' sexual harassment and retaliation claims under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq., and their breach of contract and tort claims under New York law.Alan J. Pierce, Hancock & Estabrook, LLP, Syracuse, NY, for Plaintiffs-Appellants.

Gerald H. Katzman, General Counsel, Albany College of Pharmacy, Albany, NY, for Defendants-Appellees.

Before WINTER, CABRANES, and CHIN, Circuit Judges.

CHIN, Circuit Judge:

***1** In this case, plaintiff-appellant Daniel Papelino alleges that he was sexually harassed by a professor when he was enrolled as a student at the defendant-appellee Albany College of Pharmacy (the “College”). He complained to the Associate Dean of Student Affairs. Shortly thereafter, the College accused Papelino and his two roommates, plaintiff-appellant Michael Yu and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

plaintiff Carl Basile, of cheating on exams. All three were disciplined, and Papelino and Basile were expelled.

The three students successfully brought an Article 78 proceeding in state court to challenge the College's decisions. The Appellate Division, Third Department, held that the College's determination that the students had cheated was "arbitrary and capricious" and lacked a "rational basis."

Papelino, Basile, and Yu brought this case asserting sexual harassment and retaliation claims under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq. ("Title IX"), and breach of contract and tort claims under New York common law. In a decision dated February 5, 2003, the district court (Norman A. Mordue, Chief Judge), dismissed all but two of plaintiffs' claims. In a memorandum decision dated March 28, 2005, the district court granted plaintiffs leave to reinstate certain claims but denied leave to reinstate four claims. And in a memorandum decision dated September 11, 2009, the district court granted summary judgment dismissing all plaintiffs' remaining claims. Final judgment was entered the same day. This appeal followed.

We affirm in part and reverse in part. We conclude that while the district court properly dismissed certain claims, plaintiffs demonstrated the existence of genuine issues of material fact for trial with respect to their claims for sexual harassment, retaliation, breach of contract, and negligent supervision. Accordingly, we remand for further proceedings.

*BACKGROUND*

A. *The Facts*[FN1]

In 1997, Papelino, Yu, and Basile were pharmacy students at the College. They were roommates, study partners, and friends. All three were enrolled in a year-long Medicinal Chemistry course taught by Professor Deanne Nowak.

In the fall of 1997, Nowak began to flirt with Papelino in and out of class. She would wink and smile at him. She sat on the edge of his desk during one class, and gave him excessive praise for his work.

In October 1997, after the first Medicinal Chemistry exam, many students, including Papelino, petitioned Nowak for additional points. When Papelino went to Nowak's office to pick up his exam, she informed him that she had awarded him extra points, and told him, in what Papelino described as a voice "laced with sexual innuendo": "[N]ot everyone got extra points, they truly have to earn them. You know what I mean, don't you Dan?"

In January 1998, Papelino again visited Nowak's office, this time to discuss a class project. Nowak stated in a flirtatious manner: "I can really appreciate a man who is good with his hands, if you know what I mean." As Papelino tried to leave, she stated: "You know I am always here for you handsome."

***2** A month later, in February 1998, Papelino visited Nowak's office a third time, to ask a question about class material. Nowak invited Papelino to sit down. As Papelino began to ask his question, Nowak stood up, and then bent down in front of him so that her backside was in Papelino's face. As Nowak looked over some papers on the floor, she directed Papelino to pick up a book from the shelf above her. When Papelino moved to pick up the book, Nowak stood up and Papelino "felt her hand rub against [his] crotch." Papelino asked: "What was that for[?]" Nowak responded, with a "grin on her face": "It's an accident,"

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 9

--- F.3d ----, 2011 WL 199124 (C.A.2 (N.Y.))

(Cite as: 2011 WL 199124 (C.A.2 (N.Y.)))

and then, "Do you know how lonely I've been lately?" When Papelino asked why she was telling him that, Nowak replied: "I thought you might be interested in knowing that." Papelino told her that she had him "all wrong," and left the office.

In March 1998, Nowak asked Papelino to stay after class. Nowak invited Papelino to attend a college-sponsored party with her so that she could "teach [him] to dance." When Papelino declined, Nowak said: "So that means you are going to make me go alone?"

Finally, on April 6, 1998, Papelino and his classmates attended a "poster session" in the school gymnasium, where groups of students presented posters and pamphlets of information about different prescription drugs. Nowak approached Papelino and asked him to go out with her the next day to celebrate her birthday. According to Papelino, the following ensued:

> I told her, "I thought I made it clear that I am not interested in any kind of personal relationship." Nowak said, "C'mon, what are you worried about?" I said, "I have a girlfriend, you are married, and I'm not interested!" Nowak then persisted and stated: "I wouldn't be too concerned about my husband, he's in Ohio." I told her that if she couldn't take "NO" for an answer, I think Dean White might be interested in hearing about this. Nowak's attitude changed and sternly told me that doing so would be a "big mistake." She then said, "Well, if you think it's necessary, go ahead and try it and see what happens!"

Papelino immediately reported Nowak's sexual advances to the College's Associate Dean for Student Affairs, Albert White. As defendants conceded below, Papelino spoke to White "on or about April 6, 1998" about Nowak, when he sought advice about Nowak's "sexual overtures." According to Papelino, White reported back to him in late April 1998, stating that he had "spoken to Nowak" and that the matter had been "taken care of." Dean White testified at his deposition, however, that he "never spoke to anybody" about the situation, nor did he "go to any member of the administration ... 'cause [he] didn't want to let it out." Around that time, Papelino noticed a change in Nowak's behavior, as she started to act cold and unfriendly toward him.

On or about May 6, 1998, Nowak told Elisabeth Vines, the Faculty Advisor to the Student Honor Code Committee, that she believed Papelino and Basile had cheated in her Medicinal Chemistry course, as well as in a Pharmacology course taught by Nowak's roommate, Professor Diane Sylvester. Nowak testified at her deposition that she first decided to look into whether Papelino and Basile had been cheating in early December 1997 when she received an "anonymous note" slipped under the door to her office.[FN2] She thereafter told Sylvester that she thought Papelino and Basile "were cheating" and she asked Sylvester to check her exams. At some point she approached other instructors as well, including Professor Jeffrey Voight, who had Papelino and Basile in their classes, asking them to look at their exams to see whether the students had cheated.

***3** On May 8, 1998, just two days after Nowak spoke to Vines, Papelino and Basile received e-mail notices that they had been accused of violating the College Honor Code. Over the next week, Yu was also charged with cheating, and the number of courses in which Papelino and Basile were accused of cheating grew to nine.

A hearing was held on May 20, 1998.[FN3] In support of the charges, Nowak presented evidence, which consisted primarily of "statistical" charts that she had prepared based on her review of exams taken by Papelino, Basile, and Yu in various courses. Papelino, Basile, and Yu countered with (1) the lack of evidence of the means by

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 10

--- F.3d ----, 2011 WL 199124 (C.A.2 (N.Y.))

(Cite as: 2011 WL 199124 (C.A.2 (N.Y.)))

which the three might have managed to cheat; (2) the fact that the three studied together, and therefore had similar knowledge bases; and (3) the lack of validity of the "statistical" evidence. During the hearing, Nowak leaned over while showing a document to plaintiffs, "whereby her shirt fell forward and plaintiffs were exposed to her bare breasts." The Student Honor Code Committee found Papelino guilty of cheating in three classes, Basile guilty of cheating in six classes, and Yu guilty of cheating in one class.

The three students appealed the decision to the College Honor Code Appellate Board, but the Board declined to hear the appeal. The students received failing grades in the classes in which they were found to have cheated. In August 1998, Papelino and Basile were expelled, and Yu was permitted to retake the one class.

In September 1998, plaintiffs commenced an Article 78 proceeding in New York State Supreme Court, Albany County. They sought to annul the Honor Code Committee decision. The Supreme Court dismissed their petition, but on appeal, the Third Department reversed and held that the College's determinations to expel Basile and Papelino and to award Yu a failing grade were "arbitrary and capricious" and lacked a "rational basis." *Basile v. Albany Coll. of Pharmacy of Union Univ.,* 279 A.D.2d 770, 771, 719 N.Y.S.2d 199 (3d Dep't), *leave to appeal denied,* 96 N.Y.2d 708, 725 N.Y.S.2d 639, 749 N.E.2d 208 (2001). Specifically, the Third Department concluded that the Honor Code Committee's determinations were based "solely" on a "statistical compilation" that was based upon "false assumptions" and did not provide "a rational basis to conclude that petitioners cheated." 279 A.D.2d at 771, 719 N.Y.S.2d 199. The Third Department also held that as "the same statistical methodology" was used to evaluate the charges, there was "no rational explanation" for why Basile was found guilty of cheating in six out of nine courses, Papelino in three out of nine courses, and Yu in one out of seven courses. *Id.* at 772, 719 N.Y.S.2d 199. Finally, the Third Department held that the allegations of cheating were based on "either hearsay anonymous notes or ... sheer speculation," and that "it was irrational of the Committee to determine that it could rely solely on the inference of cheating raised by the statistical compilation, particularly when faced with proof that petitioners took these examinations in separate rooms and under the watchful eye of a proctor, who discerned no evidence of cheating." *Id.*

***4** After the Article 78 proceedings, the College faculty voted in May 2001 to award Papelino and Basile their diplomas. Yu had already received his diploma after having retaken the one course. According to the President of the College, Papelino's diploma was issued "without notation or qualification," and it was back-dated to Papelino's originally-planned graduation date. On May 1, 2001, the College sent Papelino's transcripts to the Division of Professional Licensing Services in New York-without any reference to the Honor Code proceedings or the Article 78 decision.

On July 9, 2001, after the commencement of this action below, Papelino requested that the College certify his degree to Florida's pharmacy licensing authorities. The College's attorney responded to Papelino as follows:

> [The College] proposes to complete the certification and attach thereto the decisions of Justice Malone and the Appellate Division, and send the same to Florida. A further caveat needs to be added as to the pendency of this lawsuit, which upon resolution may effect [sic] the award of the degree. I would like to discuss with you appropriate language to the effect that: "It may be determined in a pending action commenced by Mr. Papelino that the charges were true, which may result in the revocation of Mr. Papelino's degree."

B. *Proceedings Below*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

On or about May 8, 2001, plaintiffs commenced this action in the Supreme Court of the State of New York, Oneida County. Papelino asserted claims for sexual harassment and retaliation under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, and all three plaintiffs asserted claims for breach of contract, negligent and intentional infliction of emotional distress, and prima facie tort.

Defendants removed the action to the district court below on June 7, 2001. Plaintiffs filed an amended complaint in September 2001, adding, *inter alia,* negligent supervision claims and a claim that the College's refusal to provide an unqualified certification of Papelino's degree to Florida constituted unlawful retaliation for filing this lawsuit.

Defendants moved to dismiss. In a memorandum decision and order dated February 5, 2003, the district court dismissed plaintiffs' breach of contract, tort, and hostile educational environment sexual harassment claims, but permitted Papelino to proceed with his claims for *quid pro quo* sexual harassment and retaliation.

Plaintiffs filed a motion for leave to file a second amended complaint. In a memorandum decision and order dated March 28, 2005, the district court granted plaintiffs leave to file a second amended complaint reinstating certain claims, but denied plaintiffs leave to reinstate four claims: prima facie tort, negligent infliction of emotional distress, intentional infliction of emotional distress, and hostile environment sexual harassment.

Following discovery, defendants moved for summary judgment. On September 11, 2009, the district court granted summary judgment to defendants on all claims, *Papelino v. Albany College of Pharmacy of Union Univ.,* No. 01 Civ. 909(NAM), 2009 WL 2957789 (N.D.N.Y. Sept.11, 2009), and entered final judgment dismissing the second amended complaint in its entirety. This appeal followed.

## *DISCUSSION*

### A. *Standard of Review*

***5** We review *de novo* a district court's grant of summary judgment, reversing where there are genuine issues of material fact. *See* *Schiano v. Quality Payroll Sys., Inc.,* 445 F.3d 597, 603 (2d Cir.2006). Similarly, we review *de novo* a district court's grant of a motion to dismiss under Rule 12(b)(6). *See* *Simmons v. Roundup Funding, LLC,* 622 F.3d 93, 95 (2d Cir.2010). While we generally review a district court's denial of a motion for leave to amend a pleading for abuse of discretion, where the denial is based on rulings of law, our review is de novo. *See* *Spiegel v. Schulmann,* 604 F.3d 72, 78 (2d Cir.2010); *Kassner v. 2nd Ave. Delicatessen, Inc.,* 496 F.3d 229, 242 (2d Cir.2007).

### B. *The Merits*

We address in turn the claims for sexual harassment, retaliation, breach of contract, and negligent supervision, and then we discuss the remaining claims.

#### 1. *Sexual Harassment*

##### a. *Applicable Law*

[1][2] Title IX provides a remedy to a student who is subjected to sexual harassment by a teacher or professor at an educational institution receiving federal funds. *Hayut v. State Univ. of N.Y.,* 352 F.3d 733, 749-50 (2d

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Cir.2003); *see also* *Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 280, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998). For an educational facility to be liable, however, the plaintiff must establish that a school official with "authority to address the alleged discrimination and to institute corrective measures" had "actual knowledge" of the discrimination and failed to adequately respond. *Gebser,* 524 U.S. at 290. A school fails to adequately respond if it provides no response or if it provides a response that "amount[s] to deliberate indifference to discrimination." *Id.* The school's response to sex discrimination must be "clearly unreasonable" in light of known circumstances. *Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, 648, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999).

[3][4] In other respects, a Title IX sex discrimination claim requires the same kind of proof required in a Title VII sex discrimination claim. *See* *Torres v. Pisano,* 116 F.3d 625, 630 n. 3 (2d Cir.1997) ("We have held that Title VII principles apply in interpreting Title IX."). Therefore, as under Title VII, a *quid pro quo* sexual harassment claim under Title IX requires proof of three elements: (1) the rejection of sexual advances; (2) a tangible school-related (as opposed to employment) consequence; and (3) a causal connection between the two. *See* *Karibian v. Columbia Univ.,* 14 F.3d 773, 778 (2d Cir.1994). In the education context, a tangible consequence occurs when "some benefit or adverse action," such as a change in a grade, is made to depend upon providing sexual favors to someone in authority. *Wills v. Brown Univ.,* 184 F.3d 20, 25 (1st Cir.1999).

[5] Similarly, a Title IX hostile education environment claim is "governed by traditional Title VII 'hostile environment' jurisprudence." *Hayut,* 352 F.3d at 744. A Title IX plaintiff must show that he subjectively perceived the environment to be hostile or abusive and that the environment objectively was hostile or abusive, that is, that it was permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter the conditions of his educational environment. *Id.* at 745; *see also* *Davis,* 526 U.S. at 633 (for Title IX sexual harassment claim, plaintiffs must show conduct "that [was] so severe, pervasive, and objectively offensive that it effectively bar[red] ... access to an educational opportunity or benefit").

b. *Application*

***6** We discuss first the *quid pro quo* claim and then the hostile environment claim.

(i) *Quid Pro Quo Harassment*

[6] We conclude that genuine issues of material fact exists with respect to Papelino's *quid pro quo* claim. The district court concluded that Papelino had failed to present sufficient evidence that the College had "actual knowledge" of the serious nature of Nowak's sexual overtures towards him or that the College acted with deliberate indifference. We disagree.

There is sufficient evidence in the record to permit a reasonable jury to find that the College had actual notice of Nowak's sexual advances: Papelino complained to Dean White about Nowak's sexual advances. First, White was a high-ranking member of the College's administration who was "responsible for the administration of the Student Code." Second, in their amended answer to the amended complaint, defendants admitted that Papelino spoke to White about "sexual overtures" made by Nowak against him. Third, White testified at his deposition that Papelino spoke to him on or about April 6, 1998, and told him that Nowak was giving him "favorable marks because of actions," as well as "something about a blouse" and "something about dinners or ... going out." Finally, Papelino asserted that he gave White detailed information:

I told [Dean White] that I was having problems with

Page 13

--- F.3d ----, 2011 WL 199124 (C.A.2 (N.Y.))

(Cite as: 2011 WL 199124 (C.A.2 (N.Y.)))

Prof. Nowak. He asked me, "What kind of problems?" I told him Prof. Nowak has been making passes at me. He asked me, "What do you mean by that?" I told him that on several occasions Nowak had asked me to go out with her on a personal level[.] I also explained that she went so far as to touch me. Dean White said, "Where did she touch you?" I then explained to him the incident that happened on Feb. 18, 1998 and the several other incidents that took place. I told him these incidents have made me very uncomfortable and nervous.

Together, this evidence provides a more-than-sufficient basis for a reasonable jury to conclude that White (and hence the College) was on "actual notice" of Nowak's alleged behavior.

As for deliberate indifference, Papelino was required to adduce evidence that the College or its agents "knowing[ly] refus[ed] to take any action in response" to the behavior, such as "investigat[ing] or put[ting] an end to the harassment," *Davis,* 526 U.S. at 651, 654, or "refus[ed] to take action to bring the recipient [institution] into compliance," *Gebser,* 524 U.S. at 290. We conclude that Papelino did so. White testified at his deposition that he "kept ... quiet" about Papelino's complaint-that he did not speak to Nowak or anyone else at the College about the complaint-because he "didn't want to let it out." Although White was responsible for administering the Student Code, he did nothing to investigate Papelino's complaint. He did not follow the procedures established by ACP for processing complaints of sexual harassment. He did not "take care" of the situation as he had told Papelino he would. He failed to intervene in the Honor Code proceedings initiated by Nowak against plaintiffs. A reasonable jury could surely find "deliberate indifference" from these facts.

***7** [7] Finally, we also conclude that there is sufficient proof of the elements of a *quid pro quo* claim to entitle Papelino to a jury trial. Papelino adduces evidence that: Nowak made sexual advances toward him, he rejected them, and Nowak initiated Honor Code proceedings against him soon thereafter, falsely accusing him of cheating. The close temporal proximity between Papelino's final rejection of Nowak's advances and her initiation of proceedings *combined with* the apparent speciousness of the proffered proof of cheating constitute evidence of a causal connection, especially given Nowak's warning that it would be "a big mistake" for Papelino to report her to White.

(ii) *Hostile Environment Harassment*

As for the hostile environment claim, the district court dismissed the claim on grounds of timeliness. It held (correctly) that a three-year statute of limitations applied, *see Torre v. Columbia Univ.,* No. 97 Civ. 0981(LAP), 1998 WL 386438, at *5 (S.D.N.Y. July 10, 1998), *aff'd,* 189 F.3d 462 (2nd Cir.1999); *Benzo v. N.Y. State Div. of Human Rights,* No. 95 Civ. 5362(LAP), 1997 WL 37961, at *5 (S.D.N.Y. Jan.31, 1997), *aff'd,* 141 F.3d 1151 (2d Cir.1998), and determined that the claim was untimely because the last act of alleged sexual harassment occurred in April 1998, more than three years before suit was filed (on May 8, 2001). The district court concluded that the only "harassing event" alleged to have occurred within the three years prior to filing of suit was when Nowak purportedly exposed her breasts to plaintiffs at the Honor Code hearing on May 20, 1998. The district court held that this incident was not sufficiently severe to constitute actionable sexual harassment.

[8] We reverse. First, the incident at the Honor Code hearing cannot be so easily dismissed. Nowak's alleged exposure of her breasts at the hearing cannot be viewed in isolation. In context, a jury could reasonably find that Nowak engaged in the conduct as a final sexual taunting of Papelino and the others. *See Gregory v. Daly,* 243 F.3d 687, 693 (2d Cir.2001) (to determine whether an environment is hostile or abusive, courts must look at "the totality of the circumstances rather [than] individual events in isolation"); *accord Harris v. Forklift Sys., Inc.,* 510

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) ("[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances.").

[9] Second, the record contains evidence of other incidents of hostile conduct within the three-year limitations period. For example, after plaintiffs were notified by email on May 8, 1998 of the cheating charges, Nowak spearheaded the prosecution of the charges by meeting with other professors and leading the presentation of the evidence. A reasonable jury could find that Nowak engaged in this conduct because Papelino rejected her sexual advances, and that these actions were part of a pattern of pervasive conduct that was sufficiently hostile or abusive to alter the conditions of Papelino's educational environment. While this adverse treatment was not overtly sexual in nature, in the circumstances here, a reasonable jury could find that it was "on account of sex." *See* *Raniola v. Bratton,* 243 F.3d 610, 621 (2d Cir.2001) (both sex-specific and other adverse treatment can be part of a hostile environment where the "other adverse treatment was also suffered on account of sex"). Moreover, under the continuing violation doctrine, a plaintiff may bring claims for discriminatory acts that would have been barred by the statute of limitations as long as "an act contributing to that hostile environment [took] place within the statutory time period." *McGullam v. Cedar Graphics, Inc.,* 609 F.3d 70, 75 (2d Cir.2010) (quoting *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 105, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002)). A reasonable jury could find that the post-May 8, 1998 conduct was part of a continuing course of conduct that began with Novak's earlier sexual advances.

2. *Retaliation*

a. *Applicable Law*

***8** [10] "[R]etaliation against individuals because they complain of sex discrimination is 'intentional conduct that violates the clear terms of [Title IX].' " *Jackson v. Birmingham Bd. of Educ.,* 544 U.S. 167, 183, 125 S.Ct. 1497, 161 L.Ed.2d 361 (2005) (quoting *Davis,* 526 U.S. at 642). As in the context of Title VII, a plaintiff claiming retaliation under Title IX must first establish a *prima facie* case by showing: (1) protected activity by the plaintiff; (2) knowledge by the defendant of the protected activity; (3) adverse school-related action; and (4) a causal connection between the protected activity and the adverse action. *See* *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 769 (2d Cir.1998). "Close temporal proximity between the plaintiff's protected activity and the ... adverse action may in itself by sufficient to establish the requisite causal connection." *Kaytor v. Elec. Boat Corp.,* 609 F.3d 537, 552 (2d Cir.2010).

Once a plaintiff establishes a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). After the defendant has done so, the burden shifts back to the plaintiff to demonstrate that the articulated reasons are pretextual. *Id.* at 804-05.

[11] Even if the agents who carried out the adverse action did not know about the plaintiff's protected activity, the "knowledge" requirement is met if the legal entity was on notice. *Gordon v. N .Y.C. Bd. of Educ.,* 232 F.3d 111, 113-14 (2d Cir.2000) (Title VII context). "Neither this nor any other circuit has ever held that, to satisfy the knowledge requirement, anything more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity." *Id.* at 116.

[12] While the individual agents' claims of unawareness of the protected activity are relevant to the jury's determination of causality, a jury is entitled to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

disregard such claims if they are unreliable. Further, while lack of knowledge on the part of particular agents who carried out the adverse action is evidence of lack of causal connection, a plaintiff may counter with evidence that the decision-maker was acting on orders or encouragement of a superior who did have the requisite knowledge. *See* *Gordon,* 232 F.3d at 117 (2d Cir.2000); *Henry v. Wyeth Pharm., Inc.,* 616 F.3d 134, 148 (2d Cir.2010). In a retaliation case, a plaintiff is only required to prove that “a retaliatory motive play[ed] a part in adverse [ ] actions toward [him], whether or not it was the sole cause.” *Terry v. Ashcroft,* 336 F.3d 128, 140-41 (2d Cir.2003) (citing *Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033, 1039 (2d Cir.1993)).

b. *Application*

[13] Here, a jury could find actionable retaliation both in terms of the initiation of the Honor Code proceedings *and* the College's refusal to provide an unqualified certification of Papelino's degree to the State of Florida.

***9** In terms of the initiation of the Honor Code proceedings, the district court concluded that the individuals who participated in the Honor Code Panel's decision were unaware of Papelino's complaints against Nowak, and that, therefore, they found plaintiffs guilty of cheating only because they actually believed the students were guilty. The district court concluded, therefore, that Papelino failed to establish “knowledge” and a “causal relationship.”

Construing the evidence and drawing all reasonable inferences in favor of plaintiffs, however, we conclude that triable issues of facts existed as to knowledge and causation. First, there was evidence of knowledge-evidence that the College knew that Papelino had engaged in protected activity. Papelino complained to White, and thus White was aware that Papelino was engaging in protected activity. Yet, White did nothing even after the cheating charges were lodged against Papelino. Moreover, Papelino told Nowak that he was going to report her to White, and indeed he did so. Although White testified that he never spoke to Nowak, the jury was not required to credit this testimony. There is evidence that Nowak's behavior toward Papelino changed-she became cold and hostile toward him-around this time, and Papelino asserted that White reported that he had spoken to Nowak. The record also includes evidence that members of the College faculty discussed Papelino's allegations of sexual harassment during and after the Honor Code appeals process. A reasonable jury could also conclude that even if the Panel members were themselves unaware that Papelino had engaged in protected activity, they were acting on Nowak's explicit encouragement, or that they acted without information that White should have imparted to them.

Second, the record contains substantial evidence of causation. A reasonable jury could find that Nowak initiated the Honor Code proceedings for retaliatory reasons rather than a good faith belief that Papelino had actually cheated. Nowak compiled and presented the evidence to the Panel, serving as the hearing's primary witness. The speciousness of the evidence presented to the Panel, as determined by the Third Department, is further evidence of a retaliatory motive and a causal connection. A reasonable jury could also find that White should have followed up on Papelino's complaint once the cheating charges were brought against him. In any case, for Papelino to recover on his retaliation claim, he need only establish that impermissible retaliation was one motive behind the initiation of the Honor Code charges against him-not that it was the sole reason that any of the Panel members voted to find him guilty of cheating. *See* *Terry,* 336 F.3d at 140-41. From the evidence adduced, a reasonable jury surely could reach such a conclusion.

As for the College's refusal to provide an unqualified certification to the Florida Pharmacy Board, we also find an issue of fact as to impermissible retaliatory motive. Though the College claims that it refused to give an

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

unqualified certification to the State of Florida because it still harbored doubts about Papelino's academic integrity, the validity of this explanation is undermined by the College's decision to provide an unqualified certification to the State of New York two months prior. The only circumstance that changed in the interim was plaintiffs' filing of this litigation. Further, the College's letter to Papelino's counsel as much as admits that the "pendency of this lawsuit" was the reason why the College was no longer willing to provide an unqualified certification. At a minimum, there are issues of fact here.

3. *Breach of Contract*

a. *Applicable Law*

***10** [14][15] Under New York law, an implied contract is formed when a university accepts a student for enrollment: if the student complies with the terms prescribed by the university and completes the required courses, the university must award him a degree. *Carr v. St. John's Univ.,* 17 A.D.2d 632, 633, 231 N.Y.S.2d 410 (2d Dep't), *aff'd,* 12 N.Y.2d 802, 235 N.Y.S.2d 834, 187 N.E.2d 18 (1962); *accord Clarke v. Trs. of Columbia Univ.,* No. 95 Civ. 10627(PKL), 1996 WL 609271, at *5 (S.D.N.Y. Oct.23, 1996). The terms of the implied contract are "contained in the university's bulletins, circulars and regulations made available to the student." *Vought v. Teachers Coll., Columbia Univ.,* 127 A.D.2d 654, 654, 511 N.Y.S.2d 880 (2d Dep't 1987). Implicit in the contract is the requirement that the institution "act in good faith in its dealing with its students." *Olsson v. Bd. of Higher Educ.,* 49 N.Y.2d 408, 413-14, 426 N.Y.S.2d 248, 402 N.E.2d 1150 (1980). At the same time, "the student must fulfill [his] end of the bargain by satisfying the university's academic requirements and complying with its procedures." *Gally v. Columbia Univ.,* 22 F.Supp.2d 199, 206 (S.D.N.Y.1998).

[16] As the district court noted below, New York law does not recognize a claim for "educational malpractice," *Introna v. Huntington Learning Ctrs., Inc.,* 78 A.D.3d 896, 896, 911 N.Y.S.2d 442 (2d Dep't 2010), and a student may not seek to avoid this rule by couching such a claim as a breach of contract claim. *Gally,* 22 F.Supp.2d at 207. Indeed, courts must show the "utmost restraint" in intervening in controversies involving a student's academic qualifications, for "the decisions surrounding the issuance of [academic] credentials [must] be left to the sound judgment of the professional educators who monitor the progress of their students on a regular basis." *Olsson,* 49 N.Y.2d at 413, 426 N.Y.S.2d 248, 402 N.E.2d 1150.

b. *Application*

[17] This is one of those rare education cases where it is appropriate for a court to intervene. Indeed, the Third Department has already done so, setting aside the College's determination that plaintiffs had cheated. Largely for the reasons set forth above, we conclude that genuine issues exist for trial with respect to whether the College breached its implied duty of good faith by, *inter alia,* failing to investigate Papelino's complaint of sexual harassment, mishandling the Honor Code proceedings after Nowak accused plaintiffs of cheating, and denying (at least initially) Papelino and Basile a diploma and failing Yu in a course. Accordingly, we conclude that the district court erred in granting summary judgment dismissing plaintiffs' breach of contract claim.

4. *Negligent Supervision*

a. *Applicable Law*

[18] Under New York law, a plaintiff asserting a claim for negligent supervision must prove: (1) the tortfeasor and defendant were in an employee-employer

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

relationship; (2) the employer knew or should have known of the employee's propensity for the tortious conduct; and (3) the tort was committed on the employer's premises or with the employer's chattels. *Ehrens v. Lutheran Church,* 385 F.3d 232, 235 (2d Cir.2004).

***11** [19] When describing an employee's "tortious propensities," case law often turns to the concept of "unfitness." *See, e.g., Loughry v. Lincoln First Bank, N.A.,* 67 N.Y.2d 369, 378, 502 N.Y.S.2d 965, 494 N.E.2d 70 (1986); *Malone v. Hathaway,* 64 N.Y. 5, 10 (1876); *Steinborn v. Himmel,* 9 A.D.3d 531, 533, 780 N.Y.S.2d 412 (3d Dep't 2004). An employer will be liable to an injured party for an employee's tort when the employer knew or had reason to know that the employee was unfit for the job. An "unfit" employee may take a variety of shapes. Commonly, she is alleged to be habitually violent, *Fernandez v. Rustic Inn, Inc.,* 60 A.D.3d 893, 897, 876 N.Y.S.2d 99 (2d Dep't 2009), or careless, *Lawrence v. City of N.Y.,* 82 A.D.2d 485, 503, 447 N.Y.S.2d 506 (2d Dep't 1981), or drunk, *Cygan v. City of N.Y .,* 165 A.D.2d 58, 68, 566 N.Y.S.2d 232 (1st Dep't 1991). The common theme, though, is that for whatever reason-whether something about an employee's essential nature or something less permanent and more situational-she is unsuited for the task that she has undertaken to perform.

b. *Application*

Here, plaintiff's negligent supervision claim asserts that the College is liable for Nowak's tortious conduct in two respects: the sexual harassment and her misuse of the Honor Code proceedings.

As to the sexual harassment, we agree with the district court that the record contained insufficient evidence to permit a jury to find that the College knew or had reason to know that Nowak would sexually harass a student. Although, as we have held, the record contains evidence of the College's actual notice of Nowak's purported sexual conduct, that notice arose *after* the conduct had occurred. There is nothing in the record to suggest that the College knew, or should have known, that Nowak was unfit to teach because she had a propensity for sexually harassing students.

[20] As to the handling of the cheating charges, however, we conclude that issues of fact existed as to whether the College knew or had reason to know that Nowak would misuse the Honor Code process to engage in what plaintiffs have described as a "charade." Given Nowak's apparent conflict of interest, the College's decision to permit her to serve, in essence, as the prosecutor and star witness in the Honor Code proceedings was highly questionable. *Cf. In re Estate of Palma,* 40 A.D.3d 1157, 1158, 835 N.Y.S.2d 755 (3d Dep't 2007) ("conflict, divided loyalty, self-interest, and hostility" rendered petitioner "unfit" to serve as a fiduciary). The College had a duty to plaintiffs to administer the Honor Code proceedings in a fair and impartial manner. A reasonable jury could conclude, on this record, that the College was negligent in its handling of the proceedings by permitting an unfit person to lead the disciplinary process.

Accordingly, we reverse the dismissal of the negligent supervision claim to the extent the claim is based on the filing and prosecution of the cheating charges.

5. *Remaining Claims*

We affirm the district court's dismissal of the remaining claims substantially for the reasons articulated by the district court.

CONCLUSION

***12** The orders of the district court are hereby

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

REVERSED with respect to the Title IX *quid pro quo* and hostile environment sexual harassment, Title IX retaliation, breach of contract, and negligent supervision claims, and AFFIRMED in all other respects. We REMAND for further proceedings.

FN* The Clerk of Court is directed to amend the official caption in accordance with this Opinion.

FN1. This is an appeal from the district court's grant of defendants' motions to dismiss and for summary judgment and the district court's denial of plaintiffs' motion for leave to reinstate certain claims. Accordingly, as to the claims dismissed on motion to dismiss, we assume as true all the material allegations of the amended complaint and proposed second amended complaint, *see* *Pena v. DePrisco,* 432 F.3d 98, 107 (2d Cir.2005), and, as to the claims dismissed on summary judgment, we construe the evidence in the light most favorable to plaintiffs. *Colavito v. N.Y. Organ Donor Network, Inc.,* 438 F.3d 214, 217 (2d Cir.2006). In both instances, we draw all reasonable inferences and resolve all conflicts and ambiguities in favor of plaintiffs. *Id.; Pena,* 432 F.3d at 107.

FN2. At her deposition, Nowak testified that she “kept” the note, although she could not recall where, and that she was later unable to find it.

FN3. Prior to the hearing, there was a meeting of the professors who were going to be presenting the case at the hearing. Nowak chaired or ran the meeting and “summarized the data that everyone had given [her].”

C.A.2 (N.Y.),2011.

Papelino v. Albany College of Pharmacy of Union University

--- F.3d ----, 2011 WL 199124 (C.A.2 (N.Y.))

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Anthony ROBINSON, Plaintiff,

v.

Jane DELGADO, Hearing Officer and Lieutenant; and Donald Selsky, Director of Inmate Special Housing Program, Defendants.

No. 96-CV-169 (RSP/DNH).

May 22, 1998.

Anthony Robinson, Veterans Shelter, Brooklyn, for Plaintiff, Pro Se.

Hon. Dennis C. Vacco, Attorney General of the State of New York, Attorney for Defendants, Albany, Ellen Lacy Messina, Esq., Assistant Attorney General, of Counsel.

ORDER

POOLER, D.J.

***1** Anthony Robinson, a former inmate incarcerated by the New York State Department of Corrections ("DOCS"), sued two DOCS employees, alleging that they violated his right to due process in the course of a disciplinary proceeding and subsequent appeal. On September 9, 1997, defendants moved for summary judgment. Defendants argued that plaintiff failed to demonstrate that the fifty days of keeplock confinement that he received as a result of the hearing deprived him of a liberty interest within the meaning of the Due Process Clause. Plaintiff did not oppose the summary judgment motion, and Magistrate Judge David N. Hurd recommended that I grant it in a report-recommendation filed April 16, 1998. Plaintiff did not file objections.

Because plaintiff did not file objections, I "need only satisfy [myself] that there is no clear error on the face of the record in order to accept the recommendation." Fed.R.Civ.P. 72(b) advisory committee's note. After reviewing the record, I conclude that there is no clear error on the face of the record. After being warned by defendants' motion that he must offer proof in admissible form that his disciplinary confinement imposed an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," Robinson failed to offer any such proof. *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995). Consequently, he cannot maintain a due process challenge. *Id.* Therefore, it is

ORDERED that the report-recommendation is approved; and it is further

ORDERED that defendants' motion for summary judgment is granted and the complaint dismissed; and it is further

ORDERED that the Clerk of the Court serve a copy

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

of this order on the parties by ordinary mail.

HURD, Magistrate J.

REPORT-RECOMMENDATION

The above civil rights action has been referred to the undersigned for Report and Recommendation by the Honorable Rosemary S. Pooler, pursuant to the local rules of the Northern District of New York. The plaintiff commenced the above action pursuant to 42 U.S.C. § 1983 claiming that the defendants violated his Fifth, Eighth, and Fourteenth Amendment rights under the United States Constitution. The plaintiff seeks compensatory and punitive damages.

Presently before the court is defendants' motion for summary judgment pursuant to Fed R. Civ. P. 56. However:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P 56(e).

In addition, "[f]ailure to file any papers as required by this rule shall, unless for good cause shown, be deemed by the court as consent to the granting or denial of the motion, as the case may be." L.R. 7.1(b)(3).

***2** The defendants filed their motion on September 9, 1997. The response to the motion was due on October 23, 1997. It is now five months beyond the date when the plaintiff's response was due, and he has failed to file any papers in opposition to defendants' motion.

Therefore, after careful consideration of the notice of motion, affirmation of Ellen Lacy Messina, Esq., with exhibits attached, and the memorandum of law; and there being no opposition to the motion; it is

RECOMMENDED that the motion for summary judgment be GRANTED and the complaint be dismissed in its entirety.

Pursuant to 28 U.S.C. § 636(b)(l), the parties have ten days within which to file written objections to the foregoing report. *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696(1992). Such objections shall be filed with the Clerk of the Court with a copy to be mailed to the chambers of the undersigned at 10 Broad Street, Utica, New York 13501. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(l); Fed.R.Civ.P. 72, 6(a), 6(e); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of HHS,* 892 F.2d 15, 16 (2d Cir.1989); and it is

ORDERED, that the Clerk of the Court serve a copy of this Order and Report-Recommendation, by regular mail, upon the parties to this action.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

(Cite as: 1998 WL 278264 (N.D.N.Y.))

N.D.N.Y.,1998.

Robinson v. Delgado

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



C
Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Marcus COTTO, Plaintiff,
v.
Daniel SENKOWSKI, Superintendent of Clinton Annex; T.J. Howard, Hearing Officer; J. Maggy, Sergeant; Byron Wind, Officer; Barry Rock, Officer; and Philip Coombe, Jr., Acting Commissioner, Defendants.
**No. 95-CV-1733 (RSP/DNH).**

Oct. 23, 1997.

Marcus Cotto, Plaintiff, pro se, Auburn Correctional Facility, Auburn, New York.

Hon. Dennis C. Vacco, Attorney General of the State of New York, Attorney for Defendants, Albany, New York, Darren O'Connor, Esq., Asst. Attorney General, of Counsel.

MEMORANDUM DECISION AND ORDER

POOLER, D.J.

***1** This matter comes to me following a report-recommendation by Magistrate Judge David N. Hurd, duly filed on the 29th of August, 1997. Following ten days from the service thereof, the Clerk has sent me the entire file, including any and all objections filed by the parties herein.

In his *pro se* complaint, Cotto alleges that in August 1995, he and some other inmates were attacked while incarcerated at Clinton Correctional Facility. Compl., Dkt. No. 1, ¶ 2. Cotto alleges that as a result of this incident he was charged with engaging in violent conduct and conduct which disturbed the order of the facility. *Id.* Although Cotto was found guilty of these charges and sentenced to a term of one year in the Special Housing Unit and loss of six months good time, his sentence was reversed on administrative appeal. *Id.* Cotto brought this action pursuant to 42 U.S.C. § 1983, alleging various violations of his rights under the Eighth and Fourteenth Amendments. *Id.*

By motion filed March 3, 1997, defendants sought summary judgment. Dkt. No. 17. Plaintiff filed no papers in opposition to the motion. In his report-recommendation, the magistrate judge recommended that I grant defendants' motion pursuant to Local Rule 7.1(b)(3), which provides that, absent a showing of good cause, failure to respond to a motion shall be deemed consent to the relief requested. Dkt. No. 19, at 2. Cotto has filed no objections to the report-recommendation.

After careful review of all of the papers herein, including the magistrate judge's report-recommendation, it is

ORDERED that the report-recommendation is hereby approved, and it is further

ORDERED that defendants' motion for summary judgement is GRANTED and the complaint against them dismissed in its entirety, and it is further

ORDERED that the Clerk of the Clerk serve a copy of this order on the parties by regular mail.

IT IS SO ORDERED.
DAVID N. HURD, United States Magistrate Judge.

*REPORT-RECOMMENDATION*

This matter was referred to the undersigned by the Honorable Rosemary S. Pooler, for

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Report-Recommendation pursuant to the Local Rules of the Northern District of New York.

Plaintiff commenced the above § 1983 action making various allegations regarding violations of his civil rights under the United States Constitution. Pursuant to Fed.R.Civ.P. 56, the defendants have moved for summary judgment alleging that there is no genuine issue as to any material fact and that as a matter of law they are entitled to judgment.

The defendants have filed a motion pursuant to Fed.R.Civ.P. 56 granting summary judgment in favor of the defendants on grounds including that there is no genuine issue as to any material fact, and that the defendant is entitled to judgment as a matter of law.

It is now more than ninety days beyond the date when the response papers were due, and the plaintiff has not filed any papers in opposition to the motion. "Failure to file any papers as required by this rule shall, unless for good cause shown, be deemed by the court as consent to the granting or denial of the motion, as the case may be." Rules of U.S. Dist. Ct. for Northern Dist. of N.Y., L .R. 7.1(b)(3).

***2** NOW, upon careful consideration of the notice of motion, statement pursuant to Local Rule 7.1(F), with exhibits attached, and the memorandum of law submitted in support of the defendants' motion; and there being no opposition to the motion, it is

RECOMMENDED that the motion be granted and the complaint be dismissed in its entirety.

Pursuant to 28 U.S.C. § 636(b)(I), the parties have ten days within which to file written objections to the foregoing report. *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992). Such objections shall be filed with the Clerk of the Court with a copy to be mailed to the chambers of the undersigned at 10 Broad Street, Utica, New York 13501. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(I); Fed.R.Civ.P. 72, 6(a), 6(e); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of HHS,* 892 F.2d 15, 16 (2d Cir.1989); and it is

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation, by regular mail, upon the parties to this action.

N.D.N.Y.,1997.
Cotto v. Senkowski
Not Reported in F.Supp., 1997 WL 665551 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Lisa ELGAMIL, Plaintiff,
v.
SYRACUSE UNIVERSITY, Defendant.
**No. 99-CV-611 NPMGLS.**

Aug. 22, 2000.

Joch & Kirby, Ithaca, New York, for Plaintiff, Joseph Joch, of counsel.

Bond, Schoeneck & King, LLP, Syracuse, New York, for Defendant, John Gaal, Paul Limmiatis, of counsel.

MEMORANDUM-DECISION AND ORDER

MCCURN, Senior J.

INTRODUCTION

***1** Plaintiff brings suit against defendant Syracuse University ("University") pursuant to 20 U.S.C. § 1681*etseq.* ("Title IX") claiming hostile educational environment, and retaliation for complaints of same. Presently before the court is the University's motion for summary judgment. Plaintiff opposes the motion.

LOCAL RULES PRACTICE

The facts of this case, which the court recites below, are affected by plaintiff's failure to file a Statement of Material Facts which complies with the clear mandate of Local Rule 7.1(a)(3) of the Northern District of New York. This Rule requires a motion for summary judgment to contain a Statement of Material Facts with specific citations to the record where those facts are established. A similar obligation is imposed upon the non-movant who

shall file a response to the [movant's] Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises.... *Any facts set forth in the [movant's] Statement of material Facts shall be deemed admitted unless specifically controverted by the opposing party.*

L.R. 7.1(a)(3) (emphasis in original).

In moving for summary judgment, the University filed an eleven page, twenty-nine paragraph Statement of Material Facts, replete with citations to the record in every paragraph. Plaintiff, in opposition, filed a two page, nine paragraph statement appended to her memorandum of law which failed to admit or deny the specific assertions set forth by defendant, and which failed to contain a single citation to the record. Plaintiff has thus failed to comply with Rule 7.1(a)(3).

As recently noted in another decision, "[t]he Local Rules are not suggestions, but impose procedural requirements upon parties litigating in this District." *Osier v. Broome County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999). As a consequence, courts in this district have not hesitated to enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f) FN1 by deeming the facts asserted in a movant's proper Statement of Material Facts as admitted, when, as here, the opposing party has failed to comply with the Rule. *See,e.g.,Phipps v. New York State Dep't of Labor,* 53 F.Supp.2d 551, 556-57 (N.D.N.Y.1999); *DeMar v. Car-Freshner Corp.,* 49 F.Supp.2d 84, 86 (N.D.N.Y.1999); *Osier,* 47 F. Supp .2d at 317;*Nicholson v. Doe,* 185 F.R.D. 134, 135 (N.D.N.Y.1999); *TSI Energy,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Inc. v. Stewart and Stevenson Operations, Inc.,* 1998 WL 903629, at *1 n. 1 (N.D. N.Y.1998); *Costello v.. Norton,* 1998 WL 743710, at *1 n. 2 (N.D.N.Y.1998); *Squair v. O'Brien & Gere Engineers, Inc.,* 1998 WL 566773, at *1 n. 2 (N.D.N.Y.1998). As in the cases just cited, this court deems as admitted all of the facts asserted in defendant's Statement of Material Facts. The court next recites these undisputed facts.

FN1. Amended January 1, 1999.

BACKGROUND

***2** Plaintiff became a doctoral student in the University's Child and Family Studies ("CFS") department in the Spring of 1995. Successful completion of the doctoral program required a student to (1) complete 60 credit hours of course work; (2) pass written comprehensive examinations ("comp.exams") in the areas of research methods, child development, family theory and a specialty area; (3) after passing all four comp. exams, orally defend the written answers to those exams; (4) then select a dissertation topic and have the proposal for the topic approved; and (5) finally write and orally defend the dissertation. Plaintiff failed to progress beyond the first step.

Each student is assigned an advisor, though it is not uncommon for students to change advisors during the course of their studies, for a myriad of reasons. The advisor's role is to guide the student in regard to course selection and academic progress. A tenured member of the CFS department, Dr. Jaipaul Roopnarine, was assigned as plaintiff's advisor.

As a student's comp. exams near, he or she selects an examination committee, usually consisting of three faculty members, including the student's advisor. This committee writes the questions which comprise the student's comp. exams, and provides the student with guidance and assistance in preparing for the exams. Each member of the committee writes one exam; one member writes two. Two evaluators grade each exam; ordinarily the faculty member who wrote the question, and one other faculty member selected by the coordinator of exams.

Roopnarine, in addition to his teaching and advising duties, was the coordinator of exams for the entire CFS department. In this capacity, he was generally responsible for selecting the evaluators who would grade each student's comp. exam, distributing the student's answer to the evaluators for grading, collecting the evaluations, and compiling the evaluation results.

The evaluators graded an exam in one of three ways: "pass," "marginal" or "fail." A student who received a pass from each of the two graders passed that exam. A student who received two fails from the graders failed the exam. A pass and a marginal grade allowed the student to pass. A marginal and a fail grade resulted in a failure. Two marginal evaluations may result in a committee having to decide whether the student would be given a passing grade. In cases where a student was given both a pass and a fail, a third evaluator served as the tie breaker.

These evaluators read and graded the exam questions independently of each other, and no indication of the student's identity was provided on the answer. FN2 The coordinator, Roopnarine, had no discretion in compiling these grades-he simply applied the pass or fail formula described above in announcing whether a student passed or failed the comp. exams. Only after a student passed all four written exam questions would he or she be permitted to move to the oral defense of those answers.

FN2. Of course, as mentioned, because one of the evaluators may have written the question, and the question may have been specific to just that one student, one of the two or three evaluators may have known the student's identity regardless of the anonymity of the examination answer.

***3** Plaintiff completed her required course work and took the comp. exams in October of 1996. Plaintiff passed two of the exams, family theory and specialty, but failed two, child development and research methods. On each of the exams she failed, she had one marginal grade, and one failing grade. Roopnarine, as a member of her committee,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

authored and graded two of her exams. She passed one of them, specialty, and failed the other, research methods. Roopnarine, incidently, gave her a pass on specialty, and a marginal on research methods. Thus it was another professor who gave her a failing grade on research methods, resulting in her failure of the exam. As to the other failed exam, child development, it is undisputed that Roopnarine neither wrote the question, nor graded the answer.

Pursuant to the University's procedures, she retook the two exams she failed in January of 1997. Despite being given the same questions, she only passed one, child development. She again failed research methods by getting marginal and fail grades from her evaluators. This time, Roopnarine was not one of the evaluators for either of her exam questions.

After this second unsuccessful attempt at passing research methods, plaintiff complained to the chair of the CFS department, Dr. Norma Burgess. She did not think that she had been properly prepared for her exam, and complained that she could no longer work with Roopnarine because he yelled at her, was rude to her, and was otherwise not responsive or helpful. She wanted a new advisor. Plaintiff gave no indication, however, that she was being sexually harassed by Roopnarine.

Though plaintiff never offered any additional explanation for her demands of a new advisor, Burgess eventually agreed to change her advisor, due to plaintiff's insistence. In March of 1997, Burgess and Roopnarine spoke, and Roopnarine understood that he would no longer be advising plaintiff. After that time period, plaintiff and Roopnarine had no further contact. By June of that year, she had been assigned a new advisor, Dr. Mellisa Clawson.

Plaintiff then met with Clawson to prepare to take her research methods exam for the third time. Despite Clawson's repeated efforts to work with plaintiff, she sought only minimal assistance; this was disturbing to Clawson, given plaintiff's past failures of the research methods exam. Eventually, Clawson was assigned to write plaintiff's third research methods exam.

The first time plaintiff made any mention of sexual harassment was in August of 1997, soon before plaintiff made her third attempt at passing research methods. She complained to Susan Crockett, Dean of the University's College of Human Development, the parent organization of the CFS department. Even then, however, plaintiff merely repeated the claims that Roopnarine yelled at her, was rude to her, and was not responsive or helpful. By this time Roopnarine had no contact with plaintiff in any event. The purpose of plaintiff's complaint was to make sure that Roopnarine would not be involved in her upcoming examination as exam coordinator. Due to plaintiff's complaints, Roopnarine was removed from all involvement with plaintiff's third research methods examination. As chair of the department, Burgess took over the responsibility for serving as plaintiff's exam coordinator. Thus, Burgess, not Roopnarine, was responsible for receiving plaintiff's answer, selecting the evaluators, and compiling the grades of these evaluators; [FN3] as mentioned, Clawson, not Roopnarine, authored the exam question.

FN3. Plaintiff appears to allege in her deposition and memorandum of law that Roopnarine remained the exam coordinator for her third and final exam. *See* Pl.'s Dep. at 278; Pl.'s Mem. of Law at 9. The overwhelming and undisputed evidence in the record establishes that Roopnarine was not, in fact, the coordinator of this exam. Indeed, as discussed above, the University submitted a Statement of Material Facts which specifically asserted in paragraph 18 that Roopnarine was removed from all involvement in plaintiff's exam, including the role of exam coordinator. *See* Def.'s Statement of Material Facts at ¶ 18 (and citations to the record therein). Aside from the fact that this assertion is deemed admitted for plaintiff's failure to controvert it, plaintiff cannot maintain, without any evidence, that Roopnarine was indeed her exam coordinator. Without more than broad, conclusory allegations of same, no genuine issue of material fact exists on this question.

***4** Plaintiff took the third research methods examination

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

in September of 1997. Clawson and another professor, Dr. Kawamoto, were her evaluators. Clawson gave her a failing grade; Kawamoto indicated that there were "some key areas of concern," but not enough for him to deny her passage. As a result of receiving one passing and one failing grade, plaintiff's research methods exam was submitted to a third evaluator to act as a tie breaker. Dr. Dean Busby, whose expertise was research, was chosen for this task. Busby gave plaintiff a failing grade, and began his written evaluation by stating that

[t]his is one of the most poorly organized and written exams I have ever read. I cannot in good conscience vote any other way than a fail. I tried to get it to a marginal but could not find even one section that I would pass.

Busby Aff. Ex. B.

The undisputed evidence shows that Clawson, Kawamoto and Busby each evaluated plaintiff's exam answer independently, without input from either Roopnarine or anyone else. Kawamoto and Busby did not know whose exam they were evaluating. FN4 Importantly, it is also undisputed that none of the three evaluators knew of plaintiff's claims of sexual harassment.

FN4. Clawson knew it was plaintiff's examination because she was plaintiff's advisor, and wrote the examination question.

After receiving the one passing and two failing evaluations, Burgess notified plaintiff in December of 1997 that she had, yet again, failed the research methods exam, and offered her two options. Although the University's policies permitted a student to only take a comp. exam three times (the original exam, plus two retakes), the CFS department would allow plaintiff to retake the exam for a fourth time, provided that she took a remedial research methods class to strengthen her abilities. Alternatively, Burgess indicated that the CFS department would be willing to recommend plaintiff for a master's degree based on her graduate work. Plaintiff rejected both offers.

The second time plaintiff used the term sexual harassment in connection with Roopnarine was six months after she was notified that she had failed for the third time, in May of 1998. Through an attorney, she filed a sexual harassment complaint against Roopnarine with the University. This written complaint repeated her allegations that Roopnarine had yelled at her, been rude to her, and otherwise had not been responsive to her needs. She also, for the first time, complained of two other acts:

1. that Roopnarine had talked to her about his sex life, including once telling her that women are attracted to him, and when he attends conferences, they want to have sex with him over lunch; and

2. that Roopnarine told her that he had a dream in which he, plaintiff and plaintiff's husband had all been present.

Prior to the commencement of this action, this was the only specific information regarding sexual harassment brought to the attention of University officials.

The University concluded that the alleged conduct, if true, was inappropriate and unprofessional, but it did not constitute sexual harassment. Plaintiff then brought this suit. In her complaint, she essentially alleges two things; first, that Roopnarine's conduct subjected her to a sexually hostile educational environment; and second, that as a result of complaining about Roopnarine's conduct, the University retaliated against her by preventing her from finishing her doctorate, mainly, by her failing her on the third research methods exam.

***5** The University now moves for summary judgment. Primarily, it argues that the alleged conduct, if true, was not sufficiently severe and pervasive to state a claim. Alternatively, it argues that it cannot be held liable for the conduct in any event, because it had no actual knowledge of plaintiff's alleged harassment, and was not deliberately indifferent to same. Finally, it argues that plaintiff is unable to establish a retaliation claim. These contentions are addressed below.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

DISCUSSION

The principles that govern summary judgment are well established. Summary judgment is properly granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party. *See* *Torres v. Pisano,* 116 F.3d 625, 630 (2d Cir.1997). As the Circuit has recently emphasized in the discrimination context, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial." *Danzer v. Norden Sys., Inc.,* 151 F.3d 50, 54 (2d Cir.1998). Rather, there must be either an absence of evidence that supports plaintiff's position, *see* *Norton v. Sam's Club,* 145 F.3d 114, 117-20 (2d Cir.), *cert. denied,* 525 U.S. 1001 (1998), "or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." *Danzer,* 151 F.3d at 54. Yet, as the Circuit has also admonished, "purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat a motion for summary judgment. *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985). With these principles in mind, the court turns to defendant's motion.

*I. Hostile Environment*

Title IX provides, with certain exceptions not relevant here, that

[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Recently, the Supreme Court reiterated that Title IX is enforceable through an implied private right of action, and that monetary damages are available in such an action. *See* *Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, , 118 S.Ct. 1989, 1994 (1998) (citing *Cannon v. University of Chicago,* 441 U.S. 677 (1979) and *Franklin v. Gwinnett County Pub. Sch.,* 503 U.S. 60 (1992)).

A. Severe or Pervasive

Provided that a plaintiff student can meet the requirements to hold the school itself liable for the sexual harassment,[FN5] claims of hostile educational environment are generally examined using the case law developed for hostile work environment under Title VII. *See* *Davis,* 119 S.Ct. at 1675 (citing *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67 (1986), a Title VII case). *Accord* *Kracunas v. Iona College,* 119 F.3d 80, 87 (2d Cir.1997); *Murray v. New York Univ. College of Dentistry,* 57 F.3d 243, 249 (2d Cir.1995), both abrogated on other grounds by *Gebser,* 118 S.Ct. at 1999.

FN5. In *Gebser,* 118 S.Ct. at 1999, and *Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, , 119 S.Ct. 1661, 1671 (1999), the Supreme Court explicitly departed from the *respondeat superior* principles which ordinarily govern Title VII actions for purposes of Title IX; in a Title IX case it is now clear that a school will not be liable for the conduct of its teachers unless it knew of the conduct and was deliberately indifferent to the discrimination. Defendant properly argues that even if plaintiff was subjected to a hostile environment, she cannot show the University's knowledge and deliberate indifference. This argument will be discussed below.

It bears noting that courts examining sexual harassment claims sometimes decide first whether the alleged conduct rises to a level of actionable harassment, before deciding whether this harassment can be attributed to the defendant employer or school, as this court does here. *See,e.g.,* *Distasio v. Perkin Elmer Corp.,* 157 F.3d 55 (2d Cir.1998). Sometimes, however, courts first examine whether the defendant can be held liable for the conduct,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

and only then consider whether this conduct is actionable. *See,e.g.,Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767 n. 8 (2d Cir.1998). As noted in *Quinn,* the Circuit has not instructed that the sequence occur in either particular order. *Seeid.*

***6** In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993), the Supreme Court stated that in order to succeed, a hostile environment claim must allege conduct which is so "severe or pervasive" as to create an " 'objectively' hostile or abusive work environment," which the victim also "subjectively perceive[s] ... to be abusive." *Richardson v. New York State Dep't of Corr. Servs .,* 180 F.3d 426, 436 (alteration in original) (quoting *Harris,* 510 U.S. at 21-22). From this court's review of the record, there is no dispute that plaintiff viewed her environment to be hostile and abusive; hence, the question before the court is whether the environment was "objectively" hostile. *Seeid.* Plaintiff's allegations must be evaluated to determine whether a reasonable person who is the target of discrimination would find the educational environment "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victim['s] educational experience, that [this person is] effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

Conduct that is "merely offensive" but "not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive" is beyond the purview of the law. *Harris,* 510 U.S. at 21. Thus, it is now clear that neither "the sporadic use of abusive language, gender-related jokes, and occasional testing," nor "intersexual flirtation," accompanied by conduct "merely tinged with offensive connotations" will create an actionable environment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998). Moreover, a plaintiff alleging sexual harassment must show the hostility was based on membership in a protected class. *SeeOncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 77 (1998). Thus, to succeed on a claim of sexual harassment, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimina[tion] ... because of ... sex." *Id.* at 81 (alteration and ellipses in original).

The Supreme Court has established a non-exclusive list of factors relevant to determining whether a given workplace is permeated with discrimination so severe or pervasive as to support a Title VII claim. *SeeHarris,* 510 U.S. at 23. These include the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with plaintiff's work, and what psychological harm, if any, resulted from the conduct. *Seeid.;Richardson,* 180 F.3d at 437.

Although conduct can meet this standard by being either "frequent" or "severe," *Osier,* 47 F.Supp.2d at 323, "isolated remarks or occasional episodes of harassment will not merit relief [ ]; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." ' *Quinn,* 159 F.3d at 767 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 n. 5 (2d Cir.1995)). Single or episodic events will only meet the standard if they are sufficiently threatening or repulsive, such as a sexual assault, in that these extreme single incidents "may alter the plaintiff's conditions of employment without repetition." *Id.AccordKotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992) ("[t]he incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

***7** The University quite properly argues that the conduct plaintiff alleges is not severe and pervasive. As discussed above, she claims that she was subjected to behavior by Roopnarine that consisted primarily of his yelling at her, being rude to her, and not responding to her requests as she felt he should. This behavior is insufficient to state a hostile environment claim, despite the fact that it may have been unpleasant. *See,e.g.,Gutierrez v. Henoch,* 998 F.Supp. 329, 335 (S.D.N.Y.1998) (disputes relating to job-related disagreements or personality conflicts, without more, do not create sexual harassment liability); *Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 303 (S.D.N.Y.1987) ("there is a crucial difference between personality conflict ... which is unpleasant but legal ... [and sexual harassment] ... which is despicable and illegal."). Moreover, the court notes that plaintiff has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

failed to show that this alleged behavior towards her was sexually related-an especially important failing considering plaintiff's own testimony that Roopnarine treated some males in much of the same manner. *See,e.g.,* Pl.'s Dep. at 298 ("He said that Dr. Roopnarine screamed at him in a meeting"). As conduct that is "equally harsh" to both sexes does not create a hostile environment, *Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir.1999), this conduct, while demeaning and inappropriate, is not sufficiently gender-based to support liability. *SeeOsier,* 47 F.Supp.2d at 324.

The more detailed allegations brought forth for the first time in May of 1998 are equally unavailing. These allegations are merely of two specific, isolated comments. As described above, Roopnarine told plaintiff of his sexual interaction(s) with other women, and made a single, non-sexual comment about a dream in which plaintiff, plaintiff's husband, and Roopnarine were all present. Accepting as true these allegations, the court concludes that plaintiff has not come forward with evidence sufficient to support a finding that she was subject to abuse of sufficient severity or pervasiveness that she was "effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

*Quinn,* a recent Second Circuit hostile work environment case, illustrates the court's conclusion well. There, plaintiff complained of conduct directed towards her including sexual touching and comments. She was told by her supervisor that she had been voted the "sleekest ass" in the office and the supervisor deliberately touched her breasts with some papers he was holding. 159 F.3d at 768. In the Circuit's view, these acts were neither severe nor pervasive enough to state a claim for hostile environment. *Seeid.* In the case at bar, plaintiff's allegations are no more severe than the conduct alleged in *Quinn,* nor, for that matter, did they occur more often. Thus, without more, plaintiff's claims fail as well.

***8** Yet, plaintiff is unable to specify any other acts which might constitute sexual harassment. When pressured to do so, plaintiff maintained only that she "knew" what Roopnarine wanted "every time [she] spoke to him" and that she could not "explain it other than that's the feeling [she] had." Pl.'s Dep. at 283-85, 287, 292. As defendant properly points out, these very types of suspicions and allegations of repeated, but unarticulated conduct have been shown to be insufficient to defeat summary judgment. *SeeMeiri,* 759 F.2d at 998 (plaintiff's allegations that employer " 'conspired to get of [her];' that he 'misconceived [her] work habits because of his subjective prejudice against [her] Jewishness;' and that she 'heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us," ' are conclusory and insufficient to satisfy the demands of Rule 56) (alterations and ellipses in original); *Dayes v. Pace Univ.,* 2000 WL 307382, at *5 (S.D.N.Y.2000) (plaintiff's attempts to create an appearance of pervasiveness by asserting "[t]he conduct to which I was subjected ... occurred regularly and over many months," without more "is conclusory, and is not otherwise supported in the record [and] therefore afforded no weight"); *Quiros v. Ciba-Geigy Corp.,* 7 F.Supp.2d 380, 385 (S.D.N.Y.1998) (plaintiff's allegations of hostile work environment without more than conclusory statements of alleged discrimination insufficient to defeat summary judgment); *Eng v. Beth Israel Med. Ctr.,* 1995 U.S. Dist. Lexis 11155, at *6 n. 1 (S.D.N.Y.1995) (plaintiff's "gut feeling" that he was victim of discrimination was no more than conclusory, and unable to defeat summary judgment). As plaintiff comes forward with no proper showing of either severe or pervasive conduct, her hostile environment claim necessarily fails.

B. Actual Knowledge / Deliberate Indifference

Even if plaintiff's allegations were sufficiently severe or pervasive, her hostile environment claim would still fail. As previously discussed, *seesupra* note 5, the Supreme Court recently departed from the framework used to hold defendants liable for actionable conduct under Title VII. *SeeDavis,* 119 S.Ct. at 1671;*Gebser,* 118 S.Ct. at 1999. Pursuant to these new decisions, it is now clear that in order to hold an educational institution liable for a hostile educational environment under Title IX, it must be shown that "an official who at minimum has authority to address the alleged discrimination and to institute corrective measures on the [plaintiff's] behalf *has actual knowledge of [the] discrimination* [.]" *Gebser,* 118 S.Ct. at 1999 (emphasis supplied). What's more, the bar is even higher: after learning of the harassment, in order for the school to be liable, its response must then "amount to deliberate

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

indifference to discrimination[,]" or, "in other words, [ ] *an official decision by the [school] not to remedy the violation."Id.* (Emphasis supplied). *Accord Davis,* 119 S.Ct. at 1671 ("we concluded that the [school] could be liable for damages only where the [school] itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge."). This requires plaintiff to show that the school's "own deliberate indifference effectively 'cause[d]' the discrimination." *Id.* (alteration in original) (quoting *Gebser,* 118 S.Ct. at 1999). The circuits that have taken the question up have interpreted this to mean that there must be evidence that actionable harassment continued to occur *after* the appropriate school official gained actual knowledge of the harassment. *See Reese v. Jefferson Sch. Dist.,* 208 F.3d 736, 740 (9th Cir.2000); *Soper v. Hoben,* 195 F.3d 845, 855 (6th Cir.1999); *Murreel v. School Dist. No. 1, Denver Colo.,* 186 F.3d 1238, 1246 (10th Cir.1999); *Wills v. Brown Univ.,* 184 F.3d 20, 26-27 (1st Cir.1999). There is no serious contention that plaintiff can satisfy this requirement.

***9** By the time plaintiff complained to Dean Crockett of sexual harassment in August of 1997, it is uncontested that her alleged harasser had no contact with her. Nor, for that matter, did he ultimately have any involvement in the third retake of her exam. She had a new advisor, exam committee and exam coordinator. Quite simply, by that point, Roopnarine had no involvement with her educational experience at all.[FN6] This undisputed fact is fatal to plaintiff's claim. As discussed above, the Supreme Court now requires some harm to have befallen plaintiff *after* the school learned of the harassment. As there have been no credible allegations of subsequent harassment, no liability can be attributed to the University.[FN7] *See Reese,* 208 F.3d at 740 ("There is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations. Thus, under *Davis,* the school district cannot be deemed to have 'subjected' the plaintiffs to the harassment.").

FN6. Of course, plaintiff contends that the University had notice of the harassment prior to this time, through her complaints to Burgess that she no longer could work with Roopnarine, because he yelled at her, was rude to her, and refused to assist her with various requests. But it is undisputed that she never mentioned sexual harassment, and provided no details that might suggest sexual harassment. Indeed, as pointed out by defendant, plaintiff *herself* admits that she did not consider the conduct sexual harassment until another person later told her that it might be, in June of 1997. *See* Pl.'s Dep. at 258-59, 340. As a result, plaintiff can not seriously contend that the University was on notice of the alleged harassment before August of 1997.

FN7. As mentioned previously, *see supra* note 3, plaintiff maintains without any evidentiary support that Roopnarine played a role in her third exam. This allegation is purely conclusory, especially in light of the record evidence the University puts forward which demonstrates that he was not, in fact, involved in the examination.

As plaintiff's allegations of harassment are not severe or pervasive enough to state a claim, and in any event, this conduct can not be attributed to the University, her hostile environment claim is dismissed.

*II. Retaliation*

Plaintiff's retaliation claim must be dismissed as well. She cannot establish an actionable retaliation claim because there is no evidence that she was given failing grades due to complaints about Roopnarine. *See Murray,* 57 F.3d at 251 (retaliation claim requires evidence of causation between the adverse action, and plaintiff's complaints of discrimination). The retaliation claim appears to be based exclusively on plaintiff's speculative and conclusory allegation that Roopnarine was involved in or influenced the grading of her third research methods exam.[FN8] In any event, the adverse action which plaintiff claims to be retaliation must be limited to her failing grade on the third research methods exam, since plaintiff made no complaints of sexual harassment until August of 1997, long after plaintiff failed her second examination. *See Murray,* 57 F.3d at 251 (retaliation claim requires proof that defendant had knowledge of plaintiff's protected activity at the time of the adverse reaction); *Weaver v.*

*Ohio State Univ.,* 71 F.Supp.2d 789, 793-94 (S.D.Ohio) ("[c]omplaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity"), *aff'd,* 194 F.3d 1315 (6th Cir.1999).

FN8. As properly noted by defendant, *see* Def. Mem. of Law at 28 n. 14, plaintiff's complaint alleges that a number of individuals retaliated against her, but in her deposition she essentially conceded that she has no basis for making a claim against anyone other than Roopnarine and those who graded her third exam. *See* Pl.'s Dep. at 347-53.

The undisputed evidence establishes that Roopnarine had no role in the selection of who would grade plaintiff's exam. Nor, for that matter, did he grade the exam; this was done by three other professors. Each of these professors has averred that they graded the exam without any input or influence from Roopnarine. More importantly, it is undisputed that none of the three had any knowledge that a sexual harassment complaint had been asserted by plaintiff against Roopnarine, not surprising since two of the three did not even know whose exam they were grading. Plaintiff's inability to show that her failure was causally related in any way to her complaint of harassment is fatal to her retaliation claim.[FN9]

FN9. Plaintiff's claim also fails to the extent that the school's refusal to let her take the research methods exam for a fourth time was the retaliatory act she relies upon. It is undisputed that the University's policies for CFS department students only allow a comp. exam to be given three times. *See* Gaal Aff. Ex. 53. Plaintiff cannot claim that the University's refusal to depart from its own policies was retaliation without some concrete showing that its refusal to do so was out of the ordinary, i.e., that it had allowed other students to take the exam a fourth time without a remedial course, when these other students had not engaged in some protected activity. *See* *Murray,* 57 F.3d at 251 (there is "no allegation either that NYU selectively enforced its academic standards, or that the decision in [plaintiff's] case was inconsistent with these standards.").

CONCLUSION

***10** For the aforementioned reasons, Syracuse University's motion for summary judgment is GRANTED; plaintiff's claims of hostile environment and retaliation are DISMISSED.

IT IS SO ORDERED.

N.D.N.Y.,2000.
Elgamil v. Syracuse University
Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Sean TAPP, Plaintiff,
v.
R. TOUGAS, et al., Defendants.
**Civil Action No. 9:05-CV-01479 (NAM/DEP).**

Aug. 11, 2008.

Sean Tapp, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Steven H. Schwartz, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

***1** Plaintiff Sean Tapp, a former New York prison inmate who is now apparently in the custody of Pennsylvania officials, has commenced this civil rights action pursuant to 42 U.S.C. § 1983 against Donald Selsky, who at the relevant times served as an Assistant Commissioner of the New York State Department of Correctional Services (“DOCS”), and various other employees of the department including four corrections officers, a sergeant, a nurse, a hearing officer, and a guidance counselor, complaining of several constitutional violations alleged to have occurred during the time of his confinement in New York. In his complaint, as amended, plaintiff asserts claims stemming from a series of events precipitated by an altercation between himself and several corrections officers. Plaintiff maintains that he was assaulted by corrections workers without provocation, denied adequate medical care for injuries sustained during the course of the conflict, and subjected to a lengthy period of disciplinary special housing unit (“SHU”) confinement as a result of the incident, purportedly without first having been afforded the procedural safeguards guaranteed under the Fourteenth Amendment. As relief, *inter alia,* plaintiff seeks a mandatory injunction directing the restoration of good time credits forfeited as a result of the incident and directing his release from prison, termination of all defendants' employment with the DOCS, and recovery of $15 million in compensatory and punitive damages.

Now that pretrial discovery has concluded, the defendants have moved for summary judgment requesting dismissal of plaintiff's claims, arguing that they are substantively deficient, and further asserting their entitlement to qualified immunity. In addition to opposing defendants' motion, plaintiff has since cross-moved for summary judgment on the issue of liability, based substantially upon the allegations as set forth in his complaint.

Despite the existence of what at first blush appear to be conflicting accounts of the circumstances surrounding plaintiff's excessive force claim, having surveyed the record I am convinced no reasonable factfinder could credit plaintiff's version and find in his favor with respect to that claim. Additionally, discerning the existence of no genuine issues of material fact surrounding plaintiff's remaining claims, including for deliberate medical indifference, the issuance of a false misbehavior report, and violation of his procedural due process rights, and similarly concluding that no reasonable factfinder could rule in plaintiff's favor on any of those claims, I recommend that defendants' summary judgment motion be granted in its entirety, and plaintiff's cross-motion addressing those claims correspondingly be denied.

I. *BACKGROUND*[FN1]

FN1. In light of the procedural posture of the case, the following recitation is drawn from the record now before the court, with all inferences drawn, and ambiguities resolved, in favor of the plaintiff. *See* *Wells-Williams v. Kingsboro Psychiatric Ctr.,* No. 03-CV-134, 2007 WL

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

1011545, at *2 (E.D.N.Y. Mar. 30, 2007) (citations omitted). To the extent that the parties' versions of the relevant events differ, those discrepancies will be noted.

At the times relevant to his claims, the plaintiff was entrusted to the custody of the DOCS and designated to the Great Meadow Correctional Facility ("Great Meadow"), a maximum security prison facility located in Comstock, New York. *See generally* Amended Complaint (Dkt. No. 19) ¶ 3; *see also* Brown Aff. (Dkt. No. 50-5) Exh. A at 60:21-22 (hereinafter cited as "Tapp Dep. (Dkt. No. 50-6) at ___."). On June 24, 2005, while waiting in a line in the Great Meadows B-block for a call out slip permitting him to go to the library, and later to a scheduled religious service, plaintiff was involved in a physical conflict with correctional officers at the Great Meadow facility. *See* Amended Complaint (Dkt. No. 19) ¶¶ 4-5, 7-9. It is that incident, together with events which followed, which form the underpinnings for plaintiff's claims in this action.

***2** Neither Tapp nor the defendants dispute the fact that a physical altercation, initially involving only the plaintiff and Corrections Officer R. Tougas, but with later intervention by other corrections officers, occurred on the date in question. The parties' respective versions of the controlling events, however, are sharply contradictory, particularly as relates to the issue of who initiated the confrontation. While both sides agree that the plaintiff attempted to go to the front of a relatively lengthy line of inmates awaiting call out passes, accustomed as he was to having his daily library pass already written and awaiting him, and that the plaintiff was ordered by Corrections Officer Tougas to return to the back of the line but ignored that directive, it is at this point that the parties' versions of the relevant events diverge.

Defendants assert that upon moving ahead of the other inmates also awaiting call out slips, Tapp was given a direct order by Corrections Officer Tougas to return to his place in line and, when he refused to obey that directive and instead uttered expletives directed toward that officer, was ordered to return to his cell-an instruction which he also ignored. Tougas Decl. (Dkt. No. 50-24) ¶¶ 6-10. After Tapp refused a further order to place his hands on the cat walk bars, instead assuming an offensive fighting stance, raising his clenched fist and lunging at the officer, a struggle ensued between the two. *Id.* ¶¶ 10-17. After signaling an alert in an attempt to gain control of the situation, with the assistance of Corrections Officer Sharrow, another defendant in the action, Tougas was ultimately able to force the plaintiff to lie face down on the floor, at which point mechanical restraints were applied by a third corrections officer, defendant Rando, and plaintiff was transported to the facility hospital for examination, strip frisked, and then taken to the facility SHU. *Id.* ¶¶ 16-17; Sharrow Decl. (Dkt. No. 50-22) ¶¶ 4-10 and Exh. A; *see also* Rando Decl. (Dkt. No. 50-18) ¶ 4. While at the prison infirmary plaintiff was examined by defendant Santini-Correa, who did not observe any injuries to the plaintiff, nor did he complain of any during her examination. Santini-Correa Decl. (Dkt. No. 50-8) ¶¶ 5-11 and Exh. A. During that examination, Nurse Santini-Correa wiped dried blood which did not appear to be his from the plaintiff's back. *Id.*

Plaintiff's sworn submissions recite a significantly different version of the relevant events. While acknowledging that he ignored a directive from Corrections Officer Tougas, and at one point instructed the officer to "shut the f__k up[,]" plaintiff maintains that after a verbal exchange between the two defendant Tougas "outright attacked" him, "banging [his] head against cell bars while he pulled on inmate & repeatedly punched [him] in the face, body & head for no apparent reason." Amended Complaint (Dkt. No. 19) ¶ 4; *see also* Tapp Dep. (Dkt. No. 50-6) at 66-72. While acknowledging that he punched defendant Tougas in the mouth during the course of the encounter, Tapp also asserts that it was only after he was punched and his shirt was pulled over his head, adding that he did so in an effort to defend himself. *Id.* Plaintiff also asserts that other corrections employees responded to an alert concerning the incident and continued to assault him and that defendant Michael, a corrections sergeant, stood idly by and refused to intercede on his behalf. Tapp Dep. (Dkt. No. 50-6) at 72-73.

***3** According to Tapp, once he was subdued and mechanical restraints were applied, he was escorted to the infirmary by defendant Rando who, along the way, intentionally stepped on his leg chains causing him to experience pain in his Achilles tendon. Tapp Decl. (Dkt. No. 50-6) at 75-76. Upon his arrival at the facility

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

hospital, plaintiff claims to have complained of pain in his wrist, back, right shoulder, and groin and having requested medical attention for his injuries. *Id.* at 88. Plaintiff further maintains that as a result of the incident he experienced blood in his urine, but that at the directive of defendant Michael, Nurse Santini-Correa "refused to note actual injuries of plaintiff such as swollen testicles, blood in urine & stool, lower back pain, bruises to [plaintiff's] wrist & face while she prevented co-workers from seeing [plaintiff] at sick call for" his injuries. Amended Complaint (Dkt. No. 19), at ¶¶ 5-6.

On the date of the incident, plaintiff was issued a misbehavior report charging him with multiple violations of prison disciplinary rules stemming from the altercation, including assault on staff (Rule 100.11), engaging in violent conduct (Rule 104.11), creating a disturbance (Rule 104.13), violating a direct order (Rule 106.10), and failure to comply with frisk and search procedures (Rule 115.10) .[FN2] *See* Amended Complaint (Dkt. No. 19) ¶ 4; Tougas Decl. (Dkt. No. 50-24) ¶ 19 and Exh. A; Harvey Decl. (Dkt. No. 50-10) ¶ 5 and Exh. A, p. 9. A Tier III superintendent's hearing was convened at Great Meadow to address the charges set forth in the misbehavior report, beginning on July 1, 2005 and ending two weeks later on July 15, 2005; presiding at that hearing was Andrew Harvey, a Commissioner's Hearing Officer ("CHO") employed by the DOCS.[FN3] Harvey Aff. (Dkt. No. 50-10) ¶¶ 3-6 and Exh. A. In preparation for that hearing, following the filing of charges, plaintiff was offered a list of DOCS employees available to aid in preparation for the hearing and was assigned defendant Melanie Jones, a DOCS Guidance Specialist at the facility and his designated first choice, as his assistant. Amended Complaint (Dkt. No. 19) ¶ 12; Jones Decl. (Dkt. No. 50-14) ¶¶ 2-3 and Exh. A. In his amended complaint plaintiff asserts that defendant Jones conspired with others at the prison to deprive him of "everything that [he] was entitled too [sic] by due process of law." Amended Complaint (Dkt. No. 19) ¶ 12. Plaintiff's submissions, however, fail to identify any document or information obtained by defendant Jones that was withheld from him.

FN2. Plaintiff maintains that this misbehavior report was falsely written by defendant Tougas and deliberately fashioned to make it appear as if the plaintiff caused the incident by punching Tougas and resisting restraint. *See* Amended Complaint (Dkt. No. 19), at ¶ 4.

FN3. The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the Special Housing Unit (SHU). Tier III hearings concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits. *See* *Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998).

In a declaration filed in support of defendants' summary judgment motion, defendant Jones advises that she met with the plaintiff on a total of three occasions to prepare for the impending disciplinary hearing. Jones Decl. (Dkt. No. 50-14) ¶ 4. According to Jones, during those meetings plaintiff requested numerous documents, and asked that she interview four witnesses identified by him. *Id.* ¶ 5. Upon interviewing those witnesses, defendant Jones ascertained that three of the four would agree to testify and secured a written statement from the fourth inmate declining plaintiff's request to testify on his behalf. *Id.* ¶ 5 and Exh. A. In addition, defendant Jones obtained most of the documents requested by the plaintiff, and advised him that other requested information could not be provided by prison officials. *Id.* ¶ 6. Among the documents withheld by prison officials from defendant Jones, as plaintiff's assistant, were Corrections Officer Tougas' medical records. *Id.* ¶ 7 and Exh. A.

***4** Defendant Jones explained her inability to obtain certain records to the plaintiff and informed him that in her role as his assistant she did not control what documents would be made available to the plaintiff, consistent with institutional security concerns and privacy interests. *Id.* ¶¶ 8-9. Defendant Jones also informed the plaintiff of his right to request additional information, either at the hearing or through other avenues. *Id.* ¶ 7.

At the conclusion of the hearing defendant Harvey found plaintiff guilty of all charges set forth in the misbehavior

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

report, imposing a penalty which included eighteen months of disciplinary SHU confinement, with a corresponding loss of package, commissary and telephone privileges, and additionally recommending a twelve month loss of good time credits.[FN4] Harvey Aff. (Dkt. No. 50-10) ¶ 18 and Exh. A at pp. 3-4.

FN4. Despite plaintiff's apparent belief otherwise, a Tier III superintendent's hearing officer is not empowered to make a final determination regarding forfeiture of good time credits; such determinations are left to the appropriate facility time allowance committee ("TAC"). *See* *Dawes v. Kelly,* No. 01CV6276, 2005 WL 2245688, at *3, 8 (W.D.N.Y. Sep. 14, 2005). Inmate claims regarding improperly withheld good time credits are not appropriately brought under 42 U.S.C. § 1983, the court having no power in such a case to direct that an inmate be released from custody, but instead must be pursued by means of habeas petitions brought pursuant to 28 U.S.C. §§ 2241 and/or 2254. *See generally* *Peralta v. Vasquez,* 467 F.3d 98, 104-05 (2d Cir.2006); *see also* *Jenkins v. Duncan,* No. 9:02-CV-0673, 2003 WL 22139796, at *2-3 (N.D.N.Y. Sep. 16, 2003) (Sharpe, D.J.).

CHO Harvey's determination, including the penalty imposed, was upheld following plaintiff's appeal of that decision to defendant Donald Selsky, formerly an Assistant DOCS Commissioner and the Director of Special Housing and Inmate Disciplinary Programs for the agency. Selsky Decl. (Dkt. No. 50-20) ¶ ¶ 2, 7 and Exh. A. Plaintiff opted not to avail himself of the right to commence a proceeding in New York State Supreme Court under Article 78 of the N .Y. Civil Practice Law and Rules further challenging that disciplinary determination.

II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on November 29, 2005, and later filed an amended complaint-the operative pleading now before the court-on April 11, 2006.[FN5] *See* Dkt. Nos. 1, 19. In his complaint, as amended, plaintiff asserts multiple constitutional violations relating to the events occurring on and after June 24, 2005 at Great Meadow including, *inter alia,* the use of excessive force and the failure to protect him from injury, deliberate indifference to his injuries, the deprivation of procedural due process, and denial of equal protection.[FN6,FN7] Named as defendants in plaintiff's amended complaint, apparently both in their official capacities and as individuals, are various DOCS employees, including Assistant Commissioner Selsky; Sergeant Michael; CHO Harvey; Corrections Officers Tougas, Wilson, Rando, and Sharrow; and Nurse Santini-Correa. Amended Complaint (Dkt. No. 19) at ¶¶ 4-12.

FN5. From a review of the court's records it appears that the amendment was prompted by a court order dated March 28, 2006 directing the filing of an amended complaint naming Corrections Officer Wilson as an additional defendant before that officer could be served as a defendant. Dkt. No. 10.

FN6. The introductory portion of plaintiff's complaint makes reference to supplemental jurisdiction over state law tort claims pursuant to 28 U.S.C. § 1367. *See* Amended Complaint (Dkt. No. 19) ¶ 2. The body of plaintiff's complaint, however, does not assert any such claims, which in any event could well be precluded under N.Y. Corrections Law § 24. *See* *Ierardi v. Sisco,* 119 F.3d 183, 186-88 (2d Cir.1997).

FN7. In his motion for summary judgment plaintiff addresses additional claims not included in his complaint, including discrimination, violation of his right to free speech, and lost property. *See generally* Plaintiff's Motion (Dkt. No. 56). Because those matters are raised for the first time on motion for summary judgment, and they are not included within his amended complaint, the court will not address these additional claims. *See, e.g.,* *Caidor v. Potter,* No. 5:02-CV-1486, 2007 WL 2847229, at *8 (N.D.N.Y. Sep. 26, 2007) (Mordue, C.J.) (refusing to hear a claim raised for the first time in a summary judgment motion).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

On February 20, 2008, following the close of discovery, the defendants filed a motion seeking summary judgment dismissing plaintiff's complaint in its entirety. *See generally* Defendants' Motion (Dkt. No. 50). In their motion defendants offer a variety of grounds for dismissal of plaintiff's claims, asserting deficiency of plaintiff's claims for violations of the Eighth Amendment, plaintiff's due process rights, and medical indifference. *Id.* Defendants also argue that plaintiff has not raised a cognizable constitutional question pertaining to the allegedly false misbehavior report issued by defendant Tougas, that this court lacks subject matter jurisdiction to decide plaintiff's due process claim based upon his failure to first invalidate the hearing results, and that they are entitled to qualified immunity. *Id.* In response, plaintiff has opposed defendants' motion and cross-moved for summary judgment, offering substantially the same arguments as those found in his complaint.[FN8] *See generally* Plaintiff's Motion (Dkt. No. 56).

FN8. Although the plaintiff devotes a portion of his motion submission to discussion of his efforts to exhaust administrative remedies, because the defendants have not raised failure to exhaust as an affirmative defense there is no need to address the issue in this report and recommendation. *See* Plaintiff's Brief (Dkt. No. 56) at Argument, Point 2; *see also* Schwartz Decl. (Dkt. No. 61) at ¶¶ 3-4.

***5** The parties' motions are now ripe for determination, and have been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* FED. R. CIV. P. 72(b).

III. *DISCUSSION*

*A. Summary Judgment Standard*

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see* *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material," for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also* *Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986); *but see* *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. FED. R. CIV. P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also* *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

Not Reported in F.Supp.2d, 2008 WL 4371766 (N.D.N.Y.)
(Cite as: 2008 WL 4371766 (N.D.N.Y.))

B. *Excessive Force*

***6** The centerpiece of plaintiff's complaint is his claim of being beaten on June 24, 2005, initially by Corrections Officer Tougas, and later by others including Corrections Officers Wilson, Rando, and Sharrow, and that Sergeant Michael failed to intervene to protect him from injury. This component of plaintiff's civil rights claim implicates potential violations of the right of a sentenced prison inmate to be free from cruel and unusual punishment, as guaranteed under the Eighth Amendment.

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citations and quotations omitted); *Griffen v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). The lynchpin inquiry in deciding claims of excessive force against prison officials is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6-7, 112 S.Ct. 995, 998 (1992) (applying *Whitley* to all excessive force claims); *Whitley,* 475 U.S. at 320-21, 106 S.Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973) (Friendly, J.), *cert. denied sub nom., John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462 (1973)). Analysis of claims of cruel and unusual punishment requires both objective and subjective examinations. *Hudson,* 503 U.S. at 8, 112 S.Ct. at 999; *Wilson v. Seiter,* 501 U.S. 294, 298-99, 111 S.Ct. 2321, 2324 (1991); *Griffen,* 193 F.3d at 91.

The objective prong of the inquiry is contextual, and relies upon "contemporary standards of decency." *Hudson,* 503 U.S. at 8, 112 S.Ct. at 999-1000 (quoting *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 290 (1976)). When addressing this component of an excessive force claim under the Eighth Amendment calculus, the court can consider the extent of the injury suffered by the inmate plaintiff. While the absence of significant injury is certainly relevant, it is not dispositive. *Hudson,* 503 U.S. at 7, 112 S.Ct. at 999. The extent of an inmate's injury is but one of the factors to be considered in determining a prison official's use of force was "unnecessary and wanton"; courts should also consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085 (citing *Johnson,* 481 F.2d at 1033). Under *Hudson,* even if the injuries suffered by a plaintiff " 'were not permanent or severe,' " a plaintiff may still recover if " 'the force used was unreasonable and excessive.' " *Corselli v. Coughlin,* 842 F.2d 23, 26 (2d Cir.1988) (quoting *Robinson v. Via,* 821 F.2d 913, 924 (2d Cir.1987)).

Turning to the subjective element, to prevail the plaintiff must establish that defendants acted with a sufficiently culpable state of mind. *Davidson v. Flynn,* 32 F.3d 27, 30 (2d Cir.1994) (citing *Hudson,* 503 U.S. at 8, 112 S.Ct. at 999). That determination is informed by four factors, including 1) the need for application of force; 2) the relationship between that need and the amount of force used; 3) the threat reasonably perceived by the responsible officials; and 4) any efforts made to temper the severity of a forceful response. *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085. The principal focus of this inquiry "turns on 'whether force was applied in a good faith effort to maintain discipline or maliciously and sadistically for the very purpose of causing harm.' " *Whitley,* 475 U.S. at 320-21, 106 S.Ct. at 1085 (quoting *Johnson,* 481 F.2d at 1033).

***7** The portion of defendants' motion addressing whether plaintiff was subjected to a level of force which a reasonable factfinder could conclude was unlawful, considered against this backdrop, presents a close case. Because the versions of the relevant events offered by the various participants are sharply contradictory, it could be argued that defendants' motion invites the court to make a credibility determination, something which courts are generally loathe to do on motion for summary judgment. *See Snyder v. Goord,* 9:05-cv-01284, 2007 WL 957530, at *9 (N.D.N.Y.2007) (McAvoy, S.J).

In this instance, however, the evidence now before the court overwhelmingly establishes that the incident and resulting injuries to the participants was precipitated by the plaintiff and his admitted failure to comply with lawful directives of C.O. Tougas and his admonition to that corrections officer that he should "shut the f__k up".[FN9]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Tapp Dep. (Dkt. No. 50-6) at 66. Coupled with these factors is the stark contrast presented by evidence of the injuries suffered by the two primary participants. Corrections Officer Tougas, who the plaintiff admitted punching, received an injury during the conflict which required twelve stitches to repair. Tougas Decl. (Dkt. No. 50-24) ¶ 20; Tapp Dep. (Dkt. No. 50-6) at p. 69. By comparison the plaintiff, who contends that he was beaten, punched, dragged, and stomped on by Corrections Officer Tougas, with the assistance of Corrections Officers Wilson, Sharrow and Rando, suffered little if any injury despite the alleged participation of four corrections officers, as evidenced by both the sworn declaration of Nurse Santini-Correa, who examined him shortly after the incident, a videotape of plaintiff's escort following the incident, and photographs taken of him on that day. *See* Santini-Correa Decl. (Dkt. No. 50-8) ¶¶ 5-10; *see also* Dkt. No. 50-12. This evidence, augmented by a hearing officer's finding, following a disciplinary hearing at which plaintiff was provided due process, that it was the plaintiff who in fact assaulted staff members, including Corrections Officer Tougas, on the date in question, and the fact that at least on two prior occasions plaintiff was subjected to lengthy periods of disciplinary SHU confinement for having assaulted other DOCS staff members, convinces me that no reasonable factfinder could credit plaintiff's version and determine that the force applied by the corrections officers involved in the incident, including Corrections Officer Tougas, to control the situation and restore the safety and security of the institution, was unlawfully excessive.[FN10] *See Jeffreys v. City of New York,* 426 F.3d 549, 555 (2d Cir.2005) (in circumstances where the record is lacking in support of plaintiff's contradictory and incomplete statements, summary judgment may be appropriate upon the basis that no reasonable factfinder could credit plaintiff's version of the relevant events); *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 470 (S.D.N.Y.1998) (same); *see also Panetta v. Crowley,* 460 F.3d 388, 394 (2d Cir.2006) (noting that "[j]udgment as a matter of law is appropriate if no reasonable factfinder could have viewed the evidence as supporting plaintiff's claim"). Accordingly, I recommend dismissal of plaintiff's Eighth Amendment claim against Corrections Officer Tougas, Wilson, Michael, Rando and Sharrow as a matter of law.

FN9. While the plaintiff apparently believed that Corrections Officer Tougas' directive that he return to the end of the line was somehow unreasonable, that belief did not legitimize Tapp's acknowledged failure to comply with that directive. *See Kalwasinski v. Artuz,* No. 02 CV 2582, 2003 WL 22973420, at *3 (S.D .N.Y.2003). As one court has noted,

> Under New York law, "inmates are not free to choose which orders to obey and which to ignore. *Farid v. Coombe,* 236 A.D.2d 660, 653 N.Y.S.2d 715, 716 (App.Div.1997). This is true even where the inmate feels that the order infringes upon his or her rights. "Inmates may not refuse to obey orders issued by correction officers, even if the orders appear to be without authority or to infringe upon the inmate's constitutional rights." *Keith v. Coombe,* 235 A.D.2d 879, 880, 653 N.Y.S.2d 401 (N.Y.App.Div.1997). The penological rationale for this is clear. "The threat to prison security would be manifest were we to allow inmates to decide for themselves which orders to obey and which to ignore as violative of their rights and to act accordingly." *Rivera v. Smith,* 63 N.Y.2d 501, 516, 483 N.Y.S.2d 187, 472 N.E.2d 1015 (1984).

> *Kalwasinski v. Artuz,* 2003 WL 22973420, at *3.

FN10. The incident at Great Meadow was not the first involving an altercation between the plaintiff and corrections officers. In 1996, while at the Attica Correctional Facility, plaintiff was found guilty of charges related to an alleged assault upon one or more corrections officers and was sentenced to serve three years of disciplinary confinement in the Attica SHU. *See* Tapp Dep. (Dkt. No. 50-6) at 53:3-55:22. Similarly, in 2000, while incarcerated at the Wende Correctional Facility, plaintiff became involved in a confrontation with a corrections officer, again receiving a penalty which included disciplinary confinement of between eighteen months and two years following a hearing to address the matter. *Id.* at 55:24-58:13.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*C. Deliberate Indifference*

***8** Liberally construed, plaintiff's amended complaint also appears to assert deliberate indifference on the part of the defendants to his injuries following the June 24, 2005 incident. Amended Complaint (Dkt. No. 19) ¶¶ 6-7. While this aspect of plaintiff's complaint appears to focus principally on the actions of Nurse Santini-Correa, in his motion for summary judgment plaintiff seems to expand that claim, though without disclosing specifics, explaining that it is also being asserted against defendant Jones, his assigned hearing assistant, and Sergeant Michael. *See* Defendants' Motion for Summary Judgment (Dkt. No. 56) at p. 1. In their motion, defendants also seek dismissal of this cause of action.

The Eighth Amendment's prohibition of cruel and unusual punishment encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus, the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference." *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M .J.); *see also generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at *2 (same).

In order to state a medical indifference claim under the Eighth Amendment, a plaintiff must allege a deprivation involving a medical need which is, in objective terms, " 'sufficiently serious.' " *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (citing *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324), *cert. denied sub nom., Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108 (1995). A medical need is serious for constitutional purposes if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain.' " *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citations omitted). A serious medical need can also exist where " 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain' "; since medical conditions vary in severity, a decision to leave a condition untreated may or may not be unconstitutional, depending on the facts. *Harrison v. Barkley,* 219 F.3d 132, 136-37 (2d Cir.2000) (quoting, *inter alia, Chance* ). Relevant factors informing this determination include whether the plaintiff suffers from an injury that a " 'reasonable doctor or patient would find important and worthy of comment or treatment,' " a condition that " 'significantly affects' " a prisoner's daily activities, or causes " 'chronic and substantial pain.' " *Chance,* 43 F.3d at 701 (citation omitted); *LaFave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *2-3 (N.D .N.Y. Apr. 3, 2002) (Sharpe, M.J.).

***9** Deliberate indifference, in a constitutional sense, exists if an official knows of and disregards an excessive risk to inmate health or safety; the official must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer* ); *Waldo,* 1998 WL 713809, at *2 (same).

It is well-established that mere disagreement with a prescribed course of treatment, or even a claim that negligence or medical malpractice has occurred, does not provide a basis to find a violation of the Eighth Amendment. *Estelle,* 429 U.S. at 105-06, 97 S.Ct. at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 9

Not Reported in F.Supp.2d, 2008 WL 4371766 (N.D.N.Y.)
(Cite as: 2008 WL 4371766 (N.D.N.Y.))

201-02; *Chance,* 143 F.3d at 703; *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.), *cert. denied,* 506 U.S. 1040, 113 S.Ct. 828 (1992). The question of what diagnostic techniques and treatments should be administered to an inmate is a "classic example of a matter for medical judgment"; accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle,* 429 U.S. at 107, 97 S.Ct. at 293; *Chance,* 143 F.3d at 703; *Rosales v. Coughlin,* 10 F.Supp.2d 261, 264 (W.D.N.Y.1998).

Plaintiff alleges in his complaint that as a result of the incident, he suffered from "swollen testicles, blood in urine & stool, lower back pain, bruises to [his] wrist & face" which defendant Santini-Correa allegedly refused to note, as well as cuts to his wrists, a shoulder "pop," numbness in his right shoulder, left thumb, and both wrists, as well as a rash on his wrists. [FN11] Amended Complaint (Dkt. No. 19) ¶¶ 6-8. Noticeably absent from plaintiff's complaint is any indication that these conditions gave rise to extreme pain, degeneration, or death. [FN12] Even crediting plaintiff's claims concerning these injuries, it does not appear that plaintiff has set forth a "sufficiently serious" condition to support a claim for either deliberate or medical indifference. *See* *Peterson v. Miller,* No. 9:04-CV-797, 2007 WL 2071743, at *7 (N.D.N .Y. July 13, 2007) (noting that a "dull pain" in plaintiff's back and persistent rash on plaintiff's foot did not raise a constitutional issue) (Hurd, D.J. and Peebles, M.J) (citing *Hathaway,* 37 F.3d at 66; *Salaam v. Adams,* No. 03-CV-0517, 2006 WL 2827687, at *10 (N.D.N.Y. Sept. 29, 2006)); *see also* *Ford v. Phillips,* No. 05 Civ. 6646, 2007 WL 946703, at *12 & n. 70 (S.D .N.Y. Mar. 27, 2007) (finding that plaintiff's allegations of bruises, abrasions, and blood in his urine for a few weeks did not constitute a sufficiently serious condition giving rise to a medical indifference claim).

FN11. In his summary judgment motion plaintiff also raises, for the first time, a claim that he was denied an asthma inhaler. *See* Plaintiff's Statement of Undisputed Facts (Dkt. No. 56) at § 5. Because the first mention of any issue pertaining to plaintiff's asthma medication has occurred at this late stage in the case, I recommend against expansion of his indifference cause of action to encompass this claim. *See, e.g.,* *Caidor,* 2007 WL 2847229, at *8.

FN12. In his motion for summary judgment plaintiff now asserts that his back condition has been "diagnosed as chronic serious pain," and speculates as to his physical ability to have children in the future. *See* Plaintiff's Motion (Dkt. No. 56), at p. 6; Plaintiff's Statement of Undisputed Facts (Dkt. No. 56), at § 9. It is also noted that while plaintiff's ambulatory record entry for "6/24/05" reveals "[n]o injuries noted or voiced" by the plaintiff, an entry made a day later reveals that Nurse Santini-Correa observed "dry abrasion[s]" on plaintiff's wrist and upper extremities, along with numbness of his left thumb and two big toes, all of which appear to be injuries that plaintiff "want[ed] ... noted in [his] chart." *See* Plaintiff's Ambulatory Record (Dkt. No. 56-4), Exhs. 21-22. These matters are far too speculative and attenuated from the incident in question to constitute serious medical needs arising from the June 24, 2005 incident.

Moreover, even assuming the existence of a serious medical need, the record now before the court is also lacking in any evidence from which a reasonable factfinder could conclude that any of those three defendants implicated in this claim, and in particular Nurse Santini-Correa, was deliberately indifferent to his medical needs. At best, plaintiff appears to assert a claim of negligence or malpractice against Nurse Santini-Correa for failure to treat his injuries; such a claim, however, is not cognizable under the Eighth Amendment. *Estelle,* 429 U.S. at 105-06, 97 S.Ct. at 201-02; *Chance,* 143 F.3d at 703; *Ross,* 784 F.Supp. at 44. As for the other defendants, the record is devoid of any evidence to suggest their awareness of, and deliberate indifference to, plaintiff's allegedly serious medical needs.

***10** In sum, because plaintiff has established neither the existence of a serious medical need nor defendants' subjective, deliberate indifference to any such need, his medical indifference claim is subject to dismissal as a matter of law.

D. *False Misbehavior Report*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 10

Not Reported in F.Supp.2d, 2008 WL 4371766 (N.D.N.Y.)
(Cite as: 2008 WL 4371766 (N.D.N.Y.))

One of the claims in this action is predicated upon plaintiff's contention that the misbehavior report issued by Corrections Officer Tougas, following the June 24, 2005 incident, was fabricated. In their motion, defendants seek dismissal of this claim as lacking in merit.

As defendants correctly note, the mere allegation that a false misbehavior report has been issued against an inmate, standing alone, does not implicate constitutional considerations. *Boddie v.. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997); *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986), *cert. denied,* 485 U .S. 982, 108 S.Ct. 1273 (1988)). Proof that a false misbehavior report has been issued in response to an inmate having engaged in activity protected under the First Amendment, however, may suffice to support a claim of unlawful retaliation. *See Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988).

A thorough canvas of the record in this case, including plaintiff's amended complaint, fails to reveal any evidence tending to suggest that the misbehavior report issued in this case was in retaliation for Tapp having engaged in protected activity. Because plaintiff has not raised any further allegations concerning the allegedly false misbehavior report, any constitutional claims associated with it are subject to dismissal as a matter of law.

E. *Procedural Due Process*

A second major theme of plaintiff's amended complaint surrounds the procedures which followed the issuance of the June 24, 2005 misbehavior report. Plaintiff contends that during the course of the ensuing disciplinary proceedings he was denied procedural due process, and that assigned hearing officer was biased. [FN13] Those involved in this cause of action include defendants Harvey, the hearing officer; Jones the corrections employee assigned to assist the plaintiff; and Selsky, the Assistant DOCS Commissioner who upheld the hearing determination on appeal. Defendants also seek dismissal of this claim as a matter of law.

FN13. Plaintiff also argues that the hearing did not comply with governing State requirements, in that it was not commenced within seven days of the filing of charges and did not end within the required fourteen days, and additionally because extensions were not properly sought and validly granted. Amended Complaint (Dkt. No. 19) ¶ 10. This portion of plaintiff's due process claim implicates only state procedural requirements which if violated nonetheless would not support a federal constitutional claim under section 1983. *See, e.g., Bolden v. Alston,* 810 F.2d 353, 358 (2d Cir.1987). To the extent that federal due process considerations are called into play, it appears that plaintiff's disciplinary hearing did occur within the "reasonable time" required by federal law. *See Green v. Bauvi,* 46 F.3d 189, 195 (2d Cir.1995); *see also* Harvey Declaration (Dkt No. 50-10) at §§ 7-9 (explaining that the hearing could not start until one day after the applicable state requirement of seven days due to a high volume of cases and that a six-day extension was granted due to the unavailability of defendant Tougas and certain of plaintiff's witnesses to testify).

To successfully state a claim under 42 U.S.C. § 1983 for the denial of procedural due process arising out of a disciplinary hearing, a plaintiff must show that he or she 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient process. *See Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000) (citations omitted); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998); *Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir.1996). The allegation that as a result of the disciplinary hearing at issue plaintiff was subjected to eighteen months of disciplinary confinement in a facility SHU suffices to establish the deprivation of a liberty interest and trigger the due process protections of the Fourteenth Amendment. *See Palmer v. Richards,* 364 F.3d 60, 64 n. 2 (2d Cir.2004) (citing *Welch v. Bartlett,* 196 F.3d 389, 394 n. 4 (2d Cir.1999)); see also *Alvarez v. Coughlin,* No. 94-CV-985, 2001 WL 118598, at *6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.)).

***11** The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well-established; the contours of the requisite protections were discussed in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

some detail in the Supreme Court's decision in *Wolff v. McDonnell,* 418 U.S. 539, 564-67, 94 S.Ct. 2963, 2978-80 (1974). Under *Wolff,* the constitutionally mandated due process requirements include 1) written notice of the charges; 2) the opportunity to appear at a disciplinary hearing and present witnesses and evidence, subject to legitimate safety and penological concerns; 3) a written statement by the hearing officer explaining his or her decision and the reasons for the action being taken; and 4) in some circumstances, the right to assistance in preparing a defense. *Wolff,* 418 U.S. at 564-67, 94 S.Ct. at 2978-80; *see also* *Eng v. Coughlin,* 858 F.2d 889, 897-98 (2d Cir.1988). In addition, in order to pass muster under the Fourteenth Amendment a hearing officer's disciplinary determination must garner the support of at least "some evidence." *Superintendent v. Hill,* 472 U.S. 445, 105 S.Ct. 2768 (1985).

The record now before the court convincingly establishes that plaintiff received the requisite due process during the course of the disciplinary proceedings against him. The record discloses, and the plaintiff does not dispute, that he received written notice of the charges against him, as well as a written determination from the hearing officer, following the hearing, outlining his findings.

One of the issues raised in support of his due process argument is plaintiff's contention that he was precluded from presenting witnesses on his behalf. Undeniably, under *Wolff* and its progeny an inmate must be afforded the right to call witnesses and present evidence in his or her defense "when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." 418 U.S. at 566, 94 S.Ct. at 2979. Due process requires that the hearing officer explain why any witnesses requested were not allowed to testify. *Ponte,* 471 U.S. at 497, 105 S.Ct. at 2196; *Fox v. Coughlin,* 893 F.2d 475, 478 (2d Cir.1990) (citing *Ponte* ); *Parris v. Coughlin,* No. 90-CV-414, 1993 WL 328199, at *5 (N.D.N.Y. Aug. 24, 1993) (Hurd, M.J) (same). These reasons may be provided at the disciplinary hearing itself, or by presenting testimony in the course of a later constitutional challenge. *Ponte,* 471 U.S. at 497, 105 S.Ct. at 2196; *Parris,* 1993 WL 328199, at *6 (citing *Ponte* ). The burden is not upon the inmate to prove the official's conduct was arbitrary and capricious, but rather upon the official to prove the rationality of his or her position. *Fox,* 893 F.2d at 478 (citing *Ponte* ); *Parris,* 1993 WL 328199, at *6 (citing *Kingsley v. Bureau of Prisons,* 937 F.2d 26, 30-31 (2d Cir.1991)).

In this case the record discloses that the plaintiff was permitted to call all of the witnesses necessary to present a meaningful defense to the charges. At the outset of the hearing plaintiff requested the presence of four inmate witnesses, one of whom refused to testify after which plaintiff advised the hearing officer that he did not wish to pursue securing testimony from him in any event. Jones Decl. (Dkt. No. 50-14) Exh. A; Harvey Decl. (Dkt. No. 50-10) Exh. A at pp. 1-2. The remaining three witnesses were permitted to testify on behalf of the plaintiff. Harvey Decl. (Dkt. No. 50-10) Exh. A at pp. 17-27. While the plaintiff later announced his intention to call twelve additional witnesses, and the hearing officer permitted him to select four-all of whom, when contacted, indicated their refusal to testify-plaintiff subsequently advised CHO Harvey that he did not find it necessary to call other witnesses all of whom would have repeated versions of events already given by himself and his other witnesses.[FN14] Harvey Decl. (Dkt. No. 50-10) Exh. C at pp. 41-47.

FN14. In addition to the inmate witnesses CHO Harvey also permitted plaintiff to call to elicit further testimony from Corrections Officers Walcak and Tougas. Harvey Decl. (Dkt. No. 50-10) Exh. C. at pp. 41-47.

***12** Under these circumstances it appears that CHO Harvey had a rational basis to conclude that calling the additional requested witnesses would have been cumulative and unnecessary. Similarly, it appears that the hearing officer had a reasonable basis to conclude that calling the witnesses who had refused to testify would be futile. *Dumpson v. Rourke,* No. CIVA96CV621, 1997 WL 610652, at *5 (N.D.N.Y. Sept. 26, 1997) (Pooler, D.J.) (citing *Silva v. Casey,* 992 F.2d 20, 21-22 (2d Cir.1993)). "Clearly, if a witness will not testify if called, it cannot be a 'necessity' to call him." *Silva,* 992 F.2d at 22; *see also* *Wolff,* 418 U.S. at 568-69, 94 S.Ct. at 2981 (recognizing discretion of prison officials to decline to call as witnesses fellow inmates who do not wish to testify). Regarding the two witnesses who refused to testify with an explanation, a hearing officer has no power to force an inmate to testify, and when an inmate refuses, the hearing officer

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

need not call that witness. *Silva,* 992 F.2d at 21-22; *Dumpson,* 1997 WL 610652, at *5 (citing *Greene v. Coughlin,* No. 93 Civ. 2805, 1995 WL 60020, at *14 (S.D.N.Y. Feb. 10, 1995) (hearing officer need not make independent evaluation of the basis for refusal to testify)). Finally, with regard to the plaintiff's eight additional witnesses who would have stated "basically ... the same thing," Harvey clearly had a rational basis to refuse to call these witnesses as their testimony would be unnecessarily repetitive. Thus, neither defendant Harvey or Jones took part in any improper denial of plaintiff's right to call witnesses to testify in his behalf.

It appears that the plaintiff finds fault with the aid rendered by the selected hearing assistant, Melanie Jones. The Fourteenth Amendment requires only that prison officials provide an inmate accused of a disciplinary infraction, in some though not necessarily all circumstances, meaningful assistance in preparing a defense. *Eng v. Coughlin* 858 F.2d 889, 897 (2d Cir.1988) (holding that in some circumstances, "[p]rison authorities have a constitutional obligation to provide assistance to an inmate in marshaling evidence and presenting a defense when he is faced with disciplinary charges"). The assistant acts as a *"surrogate*-to do what the inmate would have done were he able." *Silva,* 992 F.2d at 22 (emphasis in original). An assistant also may not act in bad faith in aiding a prisoner in mounting a defense. *Id.* The law does not require that the assistant assigned be a trained lawyer or that the assistant be held to a standard of competent representation guaranteed to criminal defendants under the Sixth Amendment. *Contrast Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052 (1984) (outlining the contours of the right to effective assistance of counsel guaranteed to criminal defendants). Despite plaintiff's protestations regarding the adequacy of her aid, the record discloses that defendant Jones provided him with capable assistance in preparing for the hearing, and that she met with the plaintiff on three occasions, interviewed the witnesses which he designated, and obtained a significant amount of the materials requested by him. *See generally* Jones Decl. (Dkt. No. 50-14) ¶¶ 3-9. Having carefully reviewed the record, I find no basis to conclude that plaintiff was not afforded the meaningful assistance guaranteed under *Wolff.*

***13** Although plaintiff does not place significant emphasis on this element, the due process provision of the Fourteenth Amendment requires that a hearing officer's disciplinary determination be supported by "some evidence." *See Hill,* 472 U.S. at 447, 105 S.Ct. at 2770; *Morales v. Woods,* No. 9:06-CV-15, 2008 WL 686801, at *6 (N.D.N.Y. Mar. 10, 2008) (McAvoy, S.J.) (citations omitted). Based upon a careful review of the record developed during the course of plaintiff's disciplinary proceeding, I conclude that no reasonable factfinder could determine that the hearing officer's decision in this case was not supported by the requisite modicum of evidence.

A focal point of plaintiff's due process argument relates to alleged bias on the part of the hearing officer. The fact that the hearing officer appointed to address the charges against Tapp was a DOCS employee, as is normally the case, does not disqualify him from serving as a hearing officer or in and of itself provide reason to question his objectivity. Prison disciplinary hearing officers are not held to the same standard of neutrality as are adjudicators in other types of controversies. *See Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996). Such a hearing officer must only be sufficiently impartial as to avoid "a hazard of arbitrary decision making," *Wolff,* 418 U.S. at 571, 94 S.Ct. at 2982, and is deserving of a presumption of honestly and integrity. *Winfrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 1464 (1985); *Rivera v. Senkowski,* 62 F.3d 80, 86 (2d Cir.1995). Based upon thorough review of the record associated with the disciplinary proceeding, I am unable to discern any basis from which a reasonable factfinder could conclude that CHO Harvey was biased or partial. Simply stated, plaintiff's bald allegation of bias, representing little more than sheer speculation on his part, is insufficient to overcome the presumption of impartiality. *See Lebron v. Artus,* No. 06-CV-0532, 2008 WL 111194, at *15 (W.D.N.Y. Jan. 09, 2008).

In sum, because the record firmly discloses that plaintiff was afforded all of the process to which he was entitled prior to the imposition of disciplinary SHU confinement, I recommend dismissal of plaintiff's due process claim against defendants Harvey, Jones and Selsky.[FN15]

FN15. In light of this determination, I find it unnecessary to address defendants' alternative argument, to the effect that plaintiff's section 1983 surrounding the disciplinary proceeding are precluded under *Heck v. Humphrey,* 512 U.S.

477, 114 S.Ct. 2364 (1994) and *Edwards v. Balisok,* 520 U.S. 641, 117 S.Ct. 1584 (1997). As was previous noted, however, plaintiff may not necessarily be precluded from pursuing section 1983 claims surrounding his disciplinary proceeding under *Edwards* and *Heck,* despite not having first secured reversal of that determination, provided that he agrees to forego any potential habeas corpus claim challenging the loss of good time credits which resulted from the recommendation made following that hearing. *See Peralta,* 467 F.3d at 104-05.

F. *Equal Protection*

In his amended complaint, plaintiff incants that he was denied equal protection by the defendants. Neither plaintiff's amended complaint nor his motion papers, however, articulates the basis for that claim.

The Equal Protection Clause directs state actors to treat similarly situated people alike. *See City of Cleburne, Texas v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254 (1985). To prove a violation of the Equal Protection Clause, a plaintiff must demonstrate that he or she was treated differently than others similarly situated as a result of intentional or purposeful discrimination directed at an identifiable or suspect class. *See Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995) (citing, *inter alia, McCleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 1767 (1987)). The plaintiff must also show that the disparity in treatment "cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not reasonably related to [any] legitimate penological interests." *Phillips v. Girdich,* 408 F.3d 124, 129 (2d Cir.2005) (quoting *Shaw v. Murphy,* 532 U.S. 223, 225, 121 S.Ct. 1475 (2001) (internal quotation marks omitted)).

***14** Because plaintiff has offered no proof that he was the subject of an improper classification, nor has he adduced any evidence of either invidious motivation for defendants' actions or discriminatory motivation, I recommend summary dismissal of plaintiff's equal protection claim.

G. *Conspiracy*

Also embedded within plaintiff's complaint, when liberally construed, is a claim that the defendants conspired to deprive him of his civil rights.

In a doctrine rooted in the conspiracy provision of section one of the Sherman Antitrust Act, 15 U.S.C. § 1, and which, although developed in the context of business entities, since inception has been expanded to apply to business corporations and public entities as well, the intra-corporate conspiracy doctrine provides that with exceptions not now presented, an entity cannot conspire with one or more of its employees, acting within the scope of employment, and thus a conspiracy claim conceptually will not lie in such circumstances. *See, e.g., Everson v. New York City Transit Auth.,* 216 F.Supp.2d 71, 75-76 (E.D.N.Y.2002); *Griffin-Nolan v. Providence Washington Ins. Co.,* No. 5:05CV1453, 2005 WL 1460424, at *10-11 (N.D.N.Y. June 20, 2005) (Scullin, C.J.). In this instance plaintiff alleges that the various defendants named conspired to deprive him of his civil rights. Since those conspiracy claims are asserted against officers, agents or employees of the DOCS, each acting within the scope of his or her employment, they are precluded by virtue of the intracorporate conspiracy doctrine. *See Little v. City of New York,* 487 F.Supp.2d 426, 441-42 (S.D.N.Y.2007) (citations omitted); *Lewis v. Goord,* No. 9:06-CV-504, 2008 WL 902179, at *4 (N.D.N.Y. Mar. 31, 2008) (Scullin, S.J.).

IV. *SUMMARY AND RECOMMENDATION*

The plaintiff in this action has advanced an array of constitutional claims arising out of an incident occurring on June 24, 2005, alleging the use of excessive force by prison officials, the failure to adequately address the injuries resulting from the incident, and due process deprivations associated with the disciplinary proceedings which ensued. Having carefully reviewed plaintiff's amended complaint, I conclude that no reasonable factfinder could credit plaintiff's version of the incident, and determine that defendants did not violate his rights by exerting unnecessary force against him, in violation of the Eighth Amendment. Similarly, I find that plaintiff has not alleged or proven the existence of a serious medical need

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

associated with injuries stemming from the incident, nor has he offered evidence tending to establish the defendants' subjective indifference to his medical needs, and therefore cannot support a medical indifference claim under the Eighth Amendment. Lastly, I find that while plaintiff was deprived of a liberty interest by virtue of the disciplinary proceedings against him, he received the requisite procedural due process guaranteed under the Fourteenth Amendment during the course of that deprivation. Accordingly, finding no other cognizable constitutional claim asserted in his amended complaint and supported by evidence in the record now before the court, I conclude that no reasonable factfinder could find liability on the part of one or more of the named defendants on any of plaintiff's claims, and therefore recommend dismissal of his complaint in its entirety as a matter of law.[FN16] Accordingly, it is hereby

> FN16. In light of this determination, I find it unnecessary to address the additional issue of qualified immunity, also raised by the defendants in support of their motion. *See* *Saucier v. Katz,* 533 U.S. 194, 201-02, 121 S.Ct. 2151 (2001).

***15** RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 50) be GRANTED, and plaintiff's complaint in this action be DISMISSED its entirety; and is further

RECOMMENDED that in light of this determination, plaintiff's motion for summary judgment (Dkt. No. 56) be DENIED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2008.
Tapp v. Tougas
Not Reported in F.Supp.2d, 2008 WL 4371766 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

Rashaad MARRIA, Plaintiff,

v.

Dr. Raymond BROADDUS, Deputy Commissioner of Programs; G. Blaetz, Chairperson of Green Haven Correctional Facility Media Review Committee; Warith Deen Umar, Coordinator for Islamic Affairs; and Glenn Goord, Commissioner of the New York State Department of Corrections, Defendants.

No. 97 Civ.8297 NRB.

July 31, 2003.

Prisoner brought action against New York State Department of Correctional Services (DOCS) and various officials alleging violation of his rights under First Amendment and Religious Land Use and Institutionalized Persons Act (RLUIPA). The District Court, Buchwald, J., held that: (1) prisoner's beliefs as a member of the Nation of Gods and Earths were both sincere and “religious in nature” and therefore entitled to Religious Land Use and Institutionalized Persons Act (RLUIPA) and First Amendment, and (2) DOCS' classification of Nation of Gods and Earths as a security threat group and its absolute ban on Nation literature violated prisoner's free exercise rights under First Amendment and RLUIPA.

Order in accordance with opinion.

West Headnotes

[1] **Constitutional Law 92 1305**

92 Constitutional Law

92XIII Freedom of Religion and Conscience

92XIII(A) In General

92k1302 Free Exercise of Religion

92k1305 k. Beliefs Protected; Inquiry Into Beliefs. Most Cited Cases

(Formerly 92k84.2)

A court's scrutiny of whether a plaintiff deserves free exercise protection extends only to whether a claimant sincerely holds a particular belief and whether the belief is religious in nature. U.S.C.A. Const.Amend. 1.

[2] **Constitutional Law 92 1305**

92 Constitutional Law

92XIII Freedom of Religion and Conscience

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

92XIII(A) In General

92k1302 Free Exercise of Religion

92k1305 k. Beliefs Protected; Inquiry Into Beliefs. Most Cited Cases

(Formerly 92k84.2)

Analysis of whether a claimant sincerely holds a particular belief and whether the belief is religious in nature, and thus subject to protection under free exercise clause of First Amendment, seeks to determine the subjective good faith of an adherent in performing certain rituals and can be guided by such extrinsic factors as a purported religious group's size and history, whether the claimant appears to be seeking material gain by hiding secular interests behind a veil of religious doctrine, and whether the claimant has acted in a manner inconsistent with his professed beliefs; however, courts are not permitted to ask whether a particular belief is appropriate or true, however unusual or unfamiliar the belief may be. U.S.C.A. Const.Amend. 1.

**[3] Constitutional Law 92 1422**

92 Constitutional Law

92XIII Freedom of Religion and Conscience

92XIII(B) Particular Issues and Applications

92k1421 Prisons and Pretrial Detention

92k1422 k. In General. Most Cited Cases

(Formerly 92k84.5(14))

**Prisons 310 152**

310 Prisons

310II Prisoners and Inmates

310II(B) Care, Custody, Confinement, and Control

310k151 Religious Practices and Materials

310k152 k. In General. Most Cited Cases

(Formerly 310k4(14))

Prisoner's beliefs as a member of the Nation of Gods and Earths were both sincere and “religious in nature” and therefore entitled to Religious Land Use and Institutionalized Persons Act (RLUIPA) and First Amendment protection under the free exercise clause; despite Nation members' reluctance to call the Nation of Gods and Earths a “religion,” prisoner lived by the Nation's teachings and observed the Nation's holy days to the extent possible under corrections regulations, Nation carried the same significance for its members as Christianity, Judaism, and Islam did for their adherents, and Nation's contrasting belief system meant that one could not be a part of those religions and the Nation simultaneously. U.S.C.A. Const.Amend. 1; 42 U.S.C. § 2000cc-3(g).

**[4] Constitutional Law 92 1422**

92 Constitutional Law

92XIII Freedom of Religion and Conscience

92XIII(B) Particular Issues and Applications

92k1421 Prisons and Pretrial Detention

92k1422 k. In General. Most Cited Cases

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

(Formerly 92k84.5(14))

**Prisons 310 152**

310 Prisons

310II Prisoners and Inmates

310II(B) Care, Custody, Confinement, and Control

310k151 Religious Practices and Materials

310k152 k. In General. Most Cited Cases

(Formerly 310k4(14))

Department of Correctional Services' (DOCS) classification of Nation of Gods and Earths as a security threat group and its absolute ban on Nation literature violated prisoner's free exercise rights under First Amendment and Religious Land Use and Institutionalized Persons Act (RLUIPA); Department failed to establish that its complete ban on Nation materials, literature, and activities furthered a compelling security interest and was the least restrictive means of doing so under RLUIPA. 42 U.S.C. § 2000cc-1(a).

OPINION AND ORDER

BUCHWALD, J.

***1** Plaintiff Intelligent Tarref Allah, formerly known as Rashaad Marria [FN1] (hereinafter "plaintiff"), has been an inmate in the custody of the New York State Department of Correctional Services ("DOCS") since June 1995. For the duration of his incarceration within DOCS, plaintiff has been a member of the Nation of Gods and Earths ("Nation"), which he joined in August of 1994 while awaiting trial at Rikers Island. Defendants are DOCS employees sued in their individual and official capacities: defendant Glenn S. Goord ("Goord") is current the Commissioner of DOCS; defendant Dr. Raymond Broaddus ("Broaddus") was the Deputy Commissioner for Program Services of DOCS at all times relevant to this action; defendant G. Blaetz ("Blaetz") was a Senior Counselor and the Media Review Committee Chairperson at DOCS' Green Haven Correctional Facility ("Green Haven"); and defendant Warith Deen Umar ("Umar") was the Coordinator for Islamic Affairs at DOCS at all times relevant to this action (collectively, "defendants" or "DOCS").

FN1. Plaintiff legally changed his name in December 2001. *See* Trial Transcript ("Trial Tr.") at 38:14-18. Apparently, he had also sought to do so approximately two years earlier, but without success. *See id.* at 38:21-39:7.

Plaintiff challenges DOCS' policy classifying the Nation as an "unauthorized" or "security threat" group and DOCS' consequent prohibition on his receipt of Nation materials and literature, including the group's central texts and its newspaper, and ban on formal gatherings with other members of the group. He seeks declaratory and injunctive relief pursuant to 42 U.S.C. § 1983, alleging violations of the First and Fourteenth Amendments to the United States Constitution, the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), the New York State Constitution, and state law. Plaintiff's federal due process and analogous state law claims were dismissed on qualified immunity grounds at the summary judgment stage of this case. *See Marria v. Broaddus,* 200 F.Supp.2d 280, 301-302 (S.D.N.Y.2002).

The Court held a five-day bench trial during which the parties presented evidence bearing on the issue of whether plaintiff's beliefs as a member of the Nation are entitled to Constitutional protection and, if so, what proper

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

the scope of protection would be. Having reviewed the testimony and evidence that has been presented, we find that plaintiff's sincerely-held beliefs as a member of the Nation are entitled to First Amendment and RLUIPA protection, and thus grant plaintiff's requested injunctive relief in part and remand in part for further consideration and action by DOCS not inconsistent with this decision. FN2 Our findings of fact and conclusions of law are set forth below.

FN2. It should be clear that in protecting plaintiff's constitutional rights to practice his adopted religion, we are fulfilling our sworn duty and in no way endorsing or heralding the Nation's tenets, several of which we find repugnant to the principles of tolerance and equality that are fundamental to our Constitution and the ethos of our country. *See Thomas v. Review Board of Indiana Employment Security Division,* 450 U.S. 707, 714, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981) ("religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection").

BACKGROUND

The Nation's history, teachings, and practices are largely not contested, nor are the existence and application of DOCS' policies concerning the Nation.

A. The Nation of Gods and Earths

The Nation, whose adherents are commonly referred to as "Five Percenters," the "Five Percent", or the "Five Percent Nation," was founded in New York nearly 40 years ago. The Nation traces its roots to the Black Muslim movement that emerged in the midtwentieth century and most directly to the Nation of Islam ("NOI")-a group that DOCS classifies as a religion pursuant to the settlement in *Muhammad v. Coughlin,* No. 91 Civ. 6333 (S.D.N.Y), and one with which the Nation shares some teachings and its central text (known to Nation members as the 120 Degrees).FN3 *See* Trial Tr. at 162:11-17; Trial Tr. at 56:18-23. The concept of the "Five Percent" from which the Nation derives its colloquial name was first set forth by NOI leader Elijah Muhammad, who separated the world's population into three categories: the Five Percent, the Ten Percent, and the Eighty-Five Percent. *See* Trial Tr. at 54:6-20. According to Elijah Muhammad, the Ten Percent teach the Eighty-Five Percent to believe in the existence of a "mystery God" and thereby keep the Eighty-Five Percent enslaved by having them worship something that they cannot see. *See id.* Muhammad characterized the remaining Five Percent as the poor, righteous teachers who do not believe in the teachings of the Ten Percent and instead teach the identity of the true and living God, as well as freedom, justice, and equality to all human families of the planet earth. *See id.* The term "Five Percenter," while commonly used to describe members of the Nation, can be used more generally to describe a person who subscribes to the belief that humankind can be broken down into the Five Percent, the Ten Percent, and the Eighty-Five Percent. Thus, not all people who might nominally identify themselves as "Five percenters" are necessarily members of the Nation of Gods and Earths. *See* Trial Tr. at 55:15-25.

FN3. While the NOI and the Nation differ in their interpretation of the 120 Degrees, referred to as the "Book of Supreme Wisdom" or "Lost-Found Muslim Lessons" by the NOI, both groups study them. *See* April 12, 2001 Decl. of A. Blocker ("Blocker Decl.") ¶¶ 8-11. DOCS permits the Book of Supreme Wisdom to be issued to any inmate who is a registered member of NOI, but Nation members who have not registered as members of the NOI are not permitted to view these materials. *See id.*

***2** The Nation of Gods and Earths began in 1964 when its founder Clarence 13X Smith broke with the NOI.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*See* Trial Tr. at 56:18-23. In contrast to the NOI's belief that Allah (God) appeared on Earth solely in the person of its founder Master Fard Muhammad, Smith and his followers professed the central belief that every black man is an embodiment of God with the proper name Allah and that every black woman is "Earth," from which life springs. *See* Trial Tr. at 56:24-57:7. Thereafter, with the assistance of the City of New York and the Urban League, Smith and his followers created the "Allah School in Mecca," a headquarters that also houses the "Allah Youth Center in Mecca," in Harlem, New York as a street academy designed to bring the Nation's message to urban youth. *See* Trial Tr. at 56:18-23; *see also generally* April 30, 2001 Decl. of Elise Zealand ("Zealand Decl.") Ex. N (article discussing the history of the Nation); April 27, 2001 Decl. of Rashaad Marria ("Marria Decl.") ¶ 15 & Ex. D (discussing the Nation's relationship with the Urban League and New York City). The Center, which enjoys 501(c)(3) not-for-profit tax status and a favorable ninety-nine year lease from the City paid at the rate of twenty dollars per month, continues to operate in Harlem as do several similar centers elsewhere. *See* Trial Tr. at 316:9-13. Among the activities sponsored by the Allah School and Youth Center are substance abuse programs, after-school tutoring for children, and youth trips to show children that "there is more to life than what they see in the ghettos." *See* Trial Tr. at 313:17-315:21. Aside from its headquarters in Harlem, the Nation does not have a formal structure or hierarchy beyond preaching respect for "elders"-i.e ., those with the most extensive knowledge of the group's beliefs and lessons. *See* Trial Tr. at 94:12-24.

As we previously mentioned, some of the Nation's beliefs and practices overlap with those of the NOI as a result of the two groups' shared belief in the lessons that comprise the 120 Degrees. Both groups, for example, believe that the black man is the "original Asiatic man." Both the Nation and NOI also believe that the white man is "the devil," made through a selective breeding process referred to as "grafting," as all of these teachings are set forth in the 120 Degrees. *See* Trial Tr. at 165:12-21; Trial Tr. at 302:15-20; Pl. Trial Ex. 180 (anthropological "syncretism" created by plaintiff witness Ted Swedenberg comparing the Nation of Gods and Earths to various religious traditions); Blocker Decl. ¶ 8. Members of both groups also observe dietary restrictions, such as refraining from eating pork, and fast on holy days. FN4 Finally, the Nation's emblem, known to members as the "Universal Flag," is reminiscent of the one used by NOI. *Compare* Pl. Trial Ex. 1 (cover of *Five Percenter* newspaper containing the "Universal Flag") *with* http:// www.noi.org/ (visited May 26, 2003) (NOI web page displaying crescent emblem).

FN4. Holy days observed by the Nation include the anniversaries of the birth and death of Clarence 13X Smith and the birthdays of Elijah Muhammad and Fard Muhammad. *See* Trial Tr. at 62:6-8, 18. The Nation, however, does not participate in Ramadan, Jumma, and some other traditional Islamic customs practiced by NOI members. *See* Pl. Trial Ex. 180.

***3** Although plaintiff asserts that his belief system as a member of the Nation would be commonly understood as a religion, he and other nation members reject the label "religion" in describing the Nation because they believe that the term "religion" connotes "belief in the mystery God"-i.e., the false religious belief systems promulgated by the Ten Percent to enslave the minds of others. *See* Trial Tr. at 106:13-16. Therefore, plaintiff and other Five Percenters commonly describe the Nation as a "way of life or culture," not a "religion." *See* Trial Tr. at 58:2-13.

The 120 Degrees, along with two numerology devices known as the Supreme Alphabet and Supreme Mathematics, forms the core of the Nation's literature. The 120 Degrees are lessons arranged in a question and answer format that represent the teachings of NOI founder Master Fard Muhammad and Elijah Muhammad. The Supreme Alphabet and Supreme Mathematics assign a word to each letter of the alphabet (almost all of which begin with the letter to which they correspond) and ten "righteous" principles to each number from 0 to 9. They are used as

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

the keys "to understand[ing] man's relationship to the universe and Islam," as well as to understanding and interpreting the 120 Degrees.[FN5] Marria Decl. ¶ 13. There is no dispute that the Supreme Alphabet and Mathematics have not changed since they were created by Clarence 13X Smith in the 1960's and are made widely available by the Nation and others. Members of the Nation use these sources in conjunction with one another to attain "knowledge of self," which is central to their membership in the Nation, and they must be understood and applied on a daily basis in order to live righteously. Hence, just as Nation members are required to fast on holy days and follow dietary restrictions, they are also required to study the lessons in these teachings on a regular basis both individually and in group sessions. The Nation's beliefs are also based on the Koran and the Bible, which serve as secondary texts, *see* Trial Tr. at 65:7-66:15, and "plus lessons" consisting of written commentary by Five Percenters aimed at fostering further insight into the group's texts and teachings. *See* Trial Tr. at 64:17-20, 64:25-65:6.

FN5. For example, in the nomenclature of the Supreme Alphabet, the letter "A" stands for "Allah," "B" stands for "Be," and "C" stands for "See" or "Cee." In the Supreme Mathematics, the number "1" represents "Knowledge," the number "2" represents "Wisdom," and the number "3" represents "Understanding." *See id.* One example of how Nation members apply this numerological system to their lives, according to plaintiff, is that "1" ("Knowledge") and "2" ("Wisdom") must precede "3" ("Understanding"). *See* Trial Tr. at 98:8-24 (plaintiff explaining how he uses the Supreme Alphabet and Mathematics to understand the world).

One additional piece of Nation literature specifically at issue in this case is *The Five Percenter,* a monthly newspaper published by the Allah Youth Center. It contains articles about current events relevant to the Nation, information about community activities, letters to the editor, editorials, and Five Percenter lessons and "plus lessons," including teachings from the 120 Degrees, the Supreme Alphabet, and the Supreme Mathematics. *See e.g.,* Pl. Trial Ex. 3 (copy of the October 1995 issue of *The Five Percenter* received in evidence); Pl. Trial Ex. 6 (copy of the June 1996 issue of *The Five Percenter* received in evidence). Some of *The Five Percenter's* content is directed specifically towards prison inmates, including messages advising them to better themselves and follow prison rules while incarcerated.[FN6] Plaintiff asserts that *The Five Percenter* also serves as the principal and vital link for him to communicate with members of the Five Percenter community outside prison. *See* Trial Tr. at 69:24-70:17; *see also* Trial Tr. at 154:24-155:6 (plaintiff's expert anthropologist Ted Swedenberg explaining that *The Five Percenter* shows Nation members how the group's abstract principles can be applied in life); Trial Tr. at 292:17-293:15 (Nation representative Cee Aaquil Allah Barnes discussing the importance of *The Five Percenter* as a link to the community for prison inmates who are members of the Nation); Pl. Trial Ex. 4 (December 1995 issue of *The Five Percenter* containing a "Correspond with a God Column" for readers who wish to correspond with incarcerated members of the Nation).

FN6. One such article instructs inmates: " 'Don't serve time, but make time serve you.' is the principle that you should adopt internally in order to return back to your family and community as an asset and not a continued liability ... When you serve time negatively, you waste precious moments of your life." *See* Pl. Trial Ex. 3 at Bates No. 240 (article entitled "Belly of the Beast" from the October 1995 issue of *The Five Percenter* ). The article further instructs inmates to "participate to the best of your ability within the rules of your respective prison and reap what you sow in this righteousness." *See id.*

***4** Practicing members of the Nation also have various congregative gatherings. For example, the Nation

Page 7

Not Reported in F.Supp.2d, 2003 WL 21782633 (S.D.N.Y.)

(Cite as: 2003 WL 21782633 (S.D.N.Y.))

conducts "Civilization Classes," in which more senior members-i.e., those who have studied the lessons longer than others-educate newer members about the lessons and how they can be applied. *See* Trial Tr. at 291:17-23. Such classes are held regularly at the Allah Youth Center. *See* Trial Tr. at 314:25-315:3. Nation members also gather regularly for "Parliaments" and "Rallies." During these gatherings, members come together to help one another learn their lessons, to educate one another by conversing about the lessons' meaning and application (which they call "building"), and to make decisions as a community. *See* Trial Tr. at 59:25-60:10; Trial Tr. at 287:25-288:8; Trial Tr. at 291:2-10.

Finally, as we mentioned earlier, the Nation has an official symbol referred to as the a Universal Flag, consisting of an eight-pointed star containing a number 7, a crescent, a smaller five-pointed star, and the words "In the Name of Allah." *See* Trial Tr. at 155:16-23.

B. DOCS' Policies Concerning the Nation

DOCS deems the "Five Percenters" to be an "unauthorized" or "security threat" group, which is the nomenclature that DOCS uses to describe a gang or other group that it views as an organized threat to prison safety and security. [FN7] As a result, though DOCS' correctional philosophy is primarily "behavior based," Nation members like plaintiff are regarded as gang members within the New York State correctional system and are consequently prohibited from receiving or possessing any of the group's literature or symbols, as well as from engaging in any organized activities associated with the Nation.

FN7. In doing so, DOCS does not distinguish between "Five Percenters" and members of the Nation of Gods and Earths. *See e.g.,* Def. Proposed Findings of Fact and Conclusions of Law ("Def.Findings") ¶ 36 ("Plaintiff is able to participate in DOCS' educational and rehabilitative programs in spite of the fact that he is a member of the Five Percenters."). As previously noted, however, DOCS and plaintiff do not necessarily use the term "Five Percenter" to identify the same individuals.

DOCS' policies concerning the Nation stem from its nonrecognition policy designed for security threat group management, which seeks to diminish gangs' power and importance by refusing to legitimize their existence. DOCS does not officially recognize unauthorized or security threat groups, even by tracking their activities internally, because it believes that "to do so would give them undue credibility and attention and embellish their importance." Def. Findings at ¶ 45 (citing Trial Tr. at 340:18-341:19). Pursuant to its non-recognition policy, and to further prevent the growth and/or proliferation of security threat groups through recruiting, DOCS implemented Rule 105.12 of its Standards of Inmate Behavior, which states that inmates "shall not engage or encourage others to engage in unauthorized organizational activities or meetings, display, wear, possess, distribute, or use unauthorized organizational insignia or materials." Def. Trial Ex. I. Rule 105.12 defines an unauthorized organization as "any gang, or organization which has not been approved by the Deputy Commissioner for Program Services." *Id.* Materials violating Rule 105.12 are considered contraband and are not subject to the "Media Review" process DOCS has implemented for determining the acceptability of the majority of other printed and written materials received by prisoners. *See* Trial Tr. at 360:21-361:9. DOCS has also implemented a zero-tolerance gang policy, under which any kind of behavior deemed to be part of gang activity, including possession of written materials or gang-associated emblems or logos, will subject an inmate to discipline. *See* Trial Tr. at 342:13-19.

***5** Applying its complete ban on "Five Percenter" literature pursuant to its non-recognition policy, DOCS forbids plaintiff from having lessons from the 120 Degrees, possessing the Supreme Alphabet and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Mathematics, or receiving or possessing *The Five Percenter* and other materials that are either associated with the Nation or contain its symbols.[FN8] DOCS' designation of the Nation as an unauthorized group also means that plaintiff can meet with no more than four other Five Percenter inmates at a time, and can only do so sporadically. *See* Trial Tr. at 63:6-18. He is thus prohibited from attending or organizing Civilization Classes, Parliaments, or Rallies. Finally, plaintiff is not permitted to eat his meals after sundown on fast days or to meet with other inmates on those days in order to break the fast, privileges that are extended to inmates who adhereJuly 16, 2003 to authorized religions like Nation of Islam members and Orthodox Muslims. *See* Trial Tr. at 62:11-63:5.

FN8. According to plaintiff and a supporting affidavit submitted for summary judgment purposes by an inmate NOI minister, members of the Nation are also unable to obtain the 120 Degrees in bound format from NOI members, as only inmates registered with an NOI temple outside of prison are permitted to have those lessons. *See* Trial Tr. at 57:8-15; Blocker Decl. ¶¶ 10-11.

Because DOCS' procedures for becoming "authorized" explicitly exclude religious groups, there does not appear to be an established process by which an unrecognized group like the Nation can attain recognition as a religion from DOCS in order to avoid gang treatment .[FN9] We surmise from the trial testimony, however, that a religious group cold become effectively "authorized" in a manner equivalent to becoming an authorized group directly through the Department of Program Services by attaining a favorable recommendation for accommodations from DOCS' Division of Ministerial and Family Services that is subsequently approved by executive level DOCS officials. *See* Trial Tr. 525:25-526:15, 530:3-6 (former Director of Ministerial and Family Services John LoConte describing his role in investigating and making subsequent recommendations to executive level DOCS officials concerning inmate requests for religious accommodations). It has apparently been DOCS' practice upon receiving an inmate request for religious accommodations to attempt to "verify the religious practice, whether or not it is something that is understandable in light of organized operational religious communities," Trial Tr. 512:17-21, and to "reach out to the outside religious community of the inmates [making the claim]" in order to confirm the practices' legitimacy and seek assistance in providing accommodations. Trial Tr. at 513:1-2. However, DOCS did not introduce any evidence to indicate that it has made such investigative or outreach efforts with respect to the Nation, despite having received a number of requests for religious accommodation.[FN10] Moreover, in defending this lawsuit, DOCS has consistently avoided this issue by insisting that plaintiff cannot seek religious recognition because the Five Percenters are, in its view, a gang and not a religion.

FN9. DOCS Directive 4670, which deals with inmate organizations, makes it clear that religious groups seeking to meet regularly for worship or prayer services cannot apply for inmate organization status. *See* Def. Trial Ex. F2 (Directive 4670) at ¶ II(C)(2). Trial testimony reflected some confusion concerning exactly how a group claiming to be religious in nature like the Nation can become "authorized." *Compare* Trial Tr. at 390:18-25 (DOCS official Richard Roy testifying that he did not know the answer to plaintiff's counsel's question about whether there was a way for a group claiming religious status to become authorized by DOCS short of litigation) *with* Trial Tr. 416:9-22 (Richard Roy testifying that, though he was not familiar with the details, there is a procedure by which religious groups can become recognized within DOCS through the Division of Ministerial and Family Services) *and* Trial Tr. at 525:25-528:7 (former DOCS Director of Ministerial and Family Services John LoConte discussing generally how he handled requests for religious accommodation within DOCS, but stating that he did not make the final decision about accommodating religious requests

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

and that "[o]ur recognition I don't believe is that important."). The evidence introduced at trial also indicates that at least two other Black Muslim groups, the Nation of Islam and Moorish Science Temple, resorted to litigation similar to this one before DOCS ceased treating them as "unauthorized groups" and began classifying them as religious groups. Both cases were settled without court rulings on the plaintiffs' claims for injunctive relief from DOCS' non-recognition of the groups in question. *See* Trial Tr. 389:6-20; 533:8-535:25; *see also Muhammad v. Coughlin,* No. 91 Civ. 6333 (S.D.N.Y.) (Nation of Islam); *Gilmore-Bey v. Coughlin,* No. 93 Civ. 6592 (S.D.N.Y.) (Moorish Science Temple).

FN10. *See e.g., Breland v. Goord,* No. 94 Civ. 3696, 1997 WL 139533 (S.D.N.Y. March 27, 1997); *Graham v. Cochran,* No. 96 Civ. 6166, 2000 U.S. Dist. LEXIS 1477, (S.D.N.Y. February 14, 2000) (Ellis, M.J.); *Lord Natural-Self Allah v. Annucci,* No. 97 Civ. 607, 1999 WL 299310 (W.D.N.Y. March 25, 1999) (Heckman, M.J.); Pl. Trial Exhibit 182 (October 29, 1996 letter from DOCS Deputy Commissioner for Program Services Raymond Broaddus to an inmate regarding a request for religious accommodations stating "I have been informed that the Five Percent Nation is not a religion. Therefore, there is no religious faith to practice."); Pl. Trial Ex. 81 (October 19, 1998 letter from defendant Warith Deen Umar, DOCS coordinator for Islamic Affairs, to plaintiff stating that "there are no directives or rules and regulations regarding the Five Percenters. The reason for this is the courts have ruled the Five Percenters are not a legitimate religious group").

C. Conflicting Claims About the Nature of the Nation

While plaintiff claims that DOCS' ban on Nation materials and gatherings violates his free exercise rights under the Constitution and RLUIPA, DOCS argues that his beliefs and practices as a member of the Nation are not protected because they are not sincere or religious in nature, and in any event that its ban of the Nation's literature is justified by violence associated with Five Percenter inmates. The parties' conflicting claims boil down to widely disparate characterizations of the nature of the Nation of Gods and Earths.

***6** DOCS, on the one hand, takes the position that "the Five Percenters," including purported members of the Nation of Gods and Earths, is a violent organization that, like some other gangs, utilizes symbols and seemingly innocuous literature touting the group's positive aspects to identify its members and "territory," as well as to recruit new members into its violent and illegal activities.[FN11] Such activities include assaults, intimidation, extortion, drug dealing, and retaliation against fellow members who attempt to leave the group or act against other Five Percenters. *See* Def. Findings ¶¶ 56-58. DOCS additionally asserts that Five Percenters utilize the Supreme Alphabet and Mathematics as a code in furtherance of its disruptive activities. *See* Def. Findings ¶¶ 61-63, 103-104. DOCS' stance in this case represents a shift from its previous litigation position that the content of the Nation's literature itself is dangerous.[FN12] Here, DOCS concedes that the Nation's literature is innocuous, but claims that its ban on Nation materials is still necessary to preserve prison safety and security because the materials are used to facilitate the recruiting efforts and illegal activities of a violent and disruptive organization. Furthermore, according to DOCS, it would give the Five Percenters and other security threat groups increased legitimacy and status, contrary to its non-recognition strategy, if inmates were permitted access to the groups' materials. *See* Def. Findings ¶¶ 42, 52, 90-92, 94-95 (outlining this justification for DOCS' non-recognition strategy in general and for its specific application to the Five Percenters).

FN11. According to DOCS, "[j]oining a gang such as the Five Percenters is about money,

power and respect," Def. Findings ¶ 87, and "[t]he Five Percenter newspaper is used as a tool by inmates to recruit other gang members and sometimes inmates are recruited into joining the Five Percenters without realizing that they may be asked to participate in violent or illegal activities." *See id.* ¶ 91.

FN12. In previous litigation arising from the same time period as this one, DOCS claimed that Five Percenter literature incited violence against white people with messages like "kill the White devils and their families" and asserted that a statement urging Nation members to "struggle to get out of prison houses" through education was an incitement to escape (in full, the statement read: "we've experienced the trials and tribulations of his prison house and we must now struggle to get out of his prison houses and remove the veil that has been placed over our people's minds. This can only be done through education, i.e., proper education."). *See Breland v. Goord,* No. 94 Civ. 3696, 1997 WL 139533, at *2 (S.D.N .Y. March 27, 1997). DOCS' content-based justification for banning the Nation's literature was rejected by Judge Baer of this Court, who found that the Nation's literature contained no such incitements to violence and that DOCS had "unfairly characterized the material at issue" and "unfortunately focused on the non-traditional nature of plaintiff's religion." *See id.* at *2, *6.

Plaintiff, on the other hand, asserts that the Nation is not a gang, but rather a legitimate religious group whose beliefs extol lawfulness, righteousness, freedom, justice, equality, and peace and whose literature focuses largely on positive messages, such as education, self-improvement, self-worth, and responsibility. *See* Pl. Proposed Findings of Fact ("Pl.Findings") ¶¶ 19-21, 35-36. According to plaintiff and other Nation members, "[a]ny purported member who engages in violent or disruptive activities is violating the tenets of the Nation." Pl. Findings ¶ 35; *see also* Trial Tr. at 287:9-288:8. He further asserts that the Supreme Alphabet and Mathematics are a religious numerology system, not a secret code, *see* Pl. Findings ¶¶ 16-19; *see also* Trial Tr. 47:13-16, and that Nation members are allowed to leave the group without reprisals.[FN13] *See* Pl. Proposed Conclusions of Law ("Pl.Conclusions") 26; *see also* Trial Tr. at 96:4-23; Trial Tr. at 385:6-386:11. Plaintiff thus argues that allowing him to receive the group's literature poses no threat to prison safety or security.

FN13. At the summary judgment stage of this case, plaintiff submitted the declarations of numerous Nation members, living both within and outside the DOCS system, asserting that the Nation is not a gang and does not promote violence or retaliate against members who leave. *See* June 26, 2001 Decl. of Cee Aaquil Allah Barnes (detailing the activities of the Allah Youth Center and asserting that the Five Percenters are not a gang); April 12, 2001 Decl. of Wendell Williams (asserting that Five Percenters are not a gang and do not engage in gang like activities); April 13, 2001 Decl. of Terayus Jones (same); April 25, 2001 Decl. of Rahiem Buford (same); April 18, 2001 Decl. of Gabriel Clausen (same); October 6, 200 Decl. of H. Khalif Khalifah (same).

In evaluating these contradictory positions, we make further factual findings below as they become relevant.

DISCUSSION

A. Sincerity and Religious Nature of Plaintiff's Beliefs

***7** As a threshold matter, we discuss DOCS' position that plaintiff may not seek the protections of the First Amendment or RLUIPA because he has failed to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

demonstrate either the sincerity of his professed beliefs or that they otherwise merit religious protection.

[1][2] The Second Circuit set forth the scope of this Court's inquiry into a plaintiff's beliefs in *Patrick v. LeFevre,* a previous free exercise case brought by a Five Percenter inmate, by emphasizing the "limited function of the judiciary in determining whether beliefs are to be accorded first amendment protection" as follows:

> It cannot be gainsaid that the judiciary is singularly ill-equipped to sit in judgment on the verity of an adherent's religious beliefs. Mindful of this profound limitation, our competence properly extends to determining "whether the beliefs professed by a [claimant] are sincerely held and whether they are, in his own scheme of things, religious."

*Patrick v. LeFevre,* 745 F.2d 153, 157 (2d Cir.1984) (quoting *United States v. Seeger,* 380 U.S. 163, 185, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965)). Hence, a court's scrutiny of whether a plaintiff deserves free exercise protection "extends only to whether a claimant sincerely holds a particular belief and whether the belief is religious in nature." *Jolly v. Coughlin,* 76 F.3d 468, 476 (2d Cir.1996) (discussing this standard in the context of a free exercise claim brought under the Religious Freedom Restoration Act). Sincerity analysis "seeks to determine the subjective good faith of an adherent in performing certain rituals" and can be guided by such extrinsic factors as a purported religious group's size and history, whether the claimant appears to be seeking material gain by hiding secular interests behind a veil of religious doctrine, and whether the claimant has acted in a manner inconsistent with his professed beliefs. *Int'l Soc'y for Krishna Consciousness v. Barber,* 650 F.2d 430, 441 (2d Cir.1981). However, "courts are not permitted to ask whether a particular belief is appropriate or true-however unusual or unfamiliar the belief may be." *Jolly,,* 76 F.3d at 476. *Patrick v. LeFevre* further instructs us that deciding such subjective issues as the sincerity and the perceived nature of beliefs requires the factfinder-the Court in this case-to assess the claimant's demeanor at trial and "delve into the internal operations of the claimant's mind and in turn assess the sincerity of the held beliefs and the place occupied by such beliefs in the plaintiff's life." *Patrick,* 745 F.2d at 158; *see also id.* at 159. In this regard, the Circuit has cited with approval the definition of religion espoused by philosopher William James-"the feelings, acts, and experiences of individual men in their solitude, so far as they apprehend themselves to stand in relation to whatever they may consider the divine." *Id.* at 158 (quoting W. James, *The Varieties of Religious Experiences* 31 (1910)). Having heard plaintiff's testimony and observed his demeanor throughout the week-long trial, we find that plaintiff meets the two *Patrick v. LeFevre* criteria.

i. Sincerity Analysis

***8** [3] We find that the trial record contained ample evidence of plaintiff's sincerity in his beliefs and that DOCS' arguments to the contrary are unpersuasive. Plaintiff, who is incarcerated for murder, testified that the Nation had "resurrected" him "from ... a life of total unrighteousness." Trial Tr. at 100:8-9. He also described the manner in which his life is guided by his Five Percenter beliefs-specifically the 120 Degrees, Supreme Alphabet, and Supreme Mathematics-and his efforts to conform his life to his beliefs as follows:

> When I look at that first degree in the student enrollment [the first few lessons of the 120 Degrees] and I see the black man is the God of the universe, it's endowed me with the power to know the sky's the limit. I manifested, I make changes in my life. I don't do things I did before. I became a vegan, stopped eating animals. I enhanced my discipline level. My mother's, she's amazed I've been locked up so long and haven't even had a fight. I learn to conduct myself in matters where people respect me for who I am. I don't have to be bothered no more because people respect

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

> intelligence, and once they see you living what you say, they respect that. And I learn to conduct myself in a manner which I don't put myself in predicaments that would lead to altercations and things of that nature.

Trial Tr. at 100:14-101:1. He reports that in doing so he has gone from being a person who was "trying to take things to the extreme, you know, on a negative aspect" to being a "very disciplined person, a person that's constantly striving to obtain righteousness" who has "learned and grown to have respect for other people's feelings." Trial Tr. at 43:5-17. Examples of ways in which plaintiff has conformed his life and daily activities with his beliefs as a member of the Nation include memorizing and studying his lessons to the extent possible under DOCS' complete ban, eschewing pork and pork byproducts, fasting on holy days, and officially changing his name from Rashaad Marria to a "righteous" one reflecting Nation values and custom (Intelligent Tarref Allah), not to mention diligently pursuing this litigation since 1997 and engaging in a letter-writing campaign to recover confiscated copies of *The Five Percenter* prior to that. *See* Trial Tr. at 38:14-18; 100:17-20. When one considers the totality of plaintiff's testimony, it is apparent that he has structured his daily lifestyle in conformity with the rigors of membership in the Nation for some time. This conclusion is underscored by plaintiff's record of conduct as a prisoner, which includes earning his GED, participating in numerous other classes and programs, serving on the Inmate Liaison Committee,[FN14] and no incidents of violence or disruptive conduct. *See* Trial Tr. at 126:12-14; June 18, 2001 Reply Decl. of Rashaad Marria Exs. F-J (certifications and letter of commendation documenting various classes and programs in which plaintiff participated while incarcerated).

FN14. We note that, according to DOCS witness Superintendent Joseph Smith, serving on the Inmate Liaison Committee is the kind of "positive" activity through which a charismatic inmate can become a "stabilizing influence" within a prison facility. Ironically, Smith sought to contrast this kind of positive activity with his negative perception of Five Percenter inmates. *See* Trial Tr. at 652:25-653:7.

***9** Plaintiff's sincerity was further substantiated at trial by the largely unchallenged testimony of Cee Aaquil Allah Barnes and Born Justice Allah, representatives of the Allah Youth Center, concerning the Nation's apparent legitimacy outside prison.[FN15] *See* Trial Tr. at 296:17-298:13 (DOCS' extremely limited cross examination of Mr. Barnes); Trial Tr. at 323:10-12 (DOCS declining to cross examine Mr. Justice Allah). There was no suggestion by DOCS that either of these representatives was involved in a criminal organization. Nor did DOCS contest the testimony that the Nation's non-incarcerated members include police officers, doctors, lawyers, and other professionals who would presumably not be part of a violent gang. *See* Trial Tr. at 294:17-21. Moreover, the Allah Youth Center's 501(c)(3) tax status and the favorable lease that it continues to receive from New York City, neither of which DOCS disputes, are strong indications that the Nation itself is not believed to be a criminal organization outside prison.[FN16] The various community-oriented programs and activities the representative described as taking place at the Allah School and Youth Center are also consistent with plaintiff's claims that the Nation is a sincere, legitimate religious group. *See* Trial Tr. at 290:16-25 (Cee Barnes testifying about health and book fairs taking place at the Allah Youth Center), 292:1-16 (Cee Barnes testifying about the Nation's prison outreach and assistance given to former inmates); Trial Tr. at 313:17-315:19 (Born Justice Allah testifying about the youth programs run at the Allah School).

FN15. Mr. Barnes is the Center's Chairman and Mr. Justice Allah serves as an elder and administrator.

FN16. DOCS does argue that "Five Percenters

outside of prison have engaged in criminal activity." *See* Def. Findings ¶ 80. However, this argument-relying solely on Shawangunk Superintendent Joseph Smith's recollections of supervising several Five Percenters as a probation officer in the 1970's, Investigator Ron Holvey's experiences with alleged Five Percenter gangs in New Jersey, and an inmate's testimony that he participated in Five Percenter gang activities outside prison after joining the group in a boys home-does not really address or challenge the Nation representatives' testimony to the effect that the Nation is a legitimate organization engaged in constructive and lawful activities outside prison.

The Nation thus appears to be in the somewhat unique position of having a legitimate existence outside prison while being classified exclusively as a security threat group within DOCS.[FN17]

FN17. According to DOCS' former Director of Ministerial and Family Services John LoConte, the existence of an established, legitimate religious community outside of prison would have been an important factor is his determination of whether a prisoner deserved religious accommodations during his tenure as DOCS Director of the Division of Ministerial and Family Services. *See* Trial Tr. at 536:23-538:8, 538:17-840:2; *see also* Trial Tr. 543:4-13 (LoConte testifying that DOCS recognizes Wiccans as a religion because of their "visible presence," complete with articulated doctrine, dogma, traditions, and rituals, outside prison).

In support of its position that plaintiff is insincere, DOCS makes a series of unpersuasive arguments. Several concern instances in which DOCS claims plaintiff did not conform his conduct to his professed Five Percenter tenets and thereby suggests that he is essentially faking them in order to gain the legitimacy that religious protection would afford his gang participation. *See* Def. Findings ¶¶ 21-32. DOCS first cites three instances in which plaintiff was disciplined by prison authorities for nonviolent conduct: (1) giving false information to a corrections officer, to wit, falsely telling the officer that he had received legal pads from the prison commissary; (2) failing to obey a direct order from a guard who apparently told him to stay away as he was attempting to observe another inmate's grievance meeting in the sergeant's office as the representative of the Inmate Liaison Committee; and (3) possessing an "altered item"-a toothbrush that plaintiff testified he used as a makeshift screwdriver by outfitting it with the sliding metal piece from the inside of a pair of headphones-that could be used as a weapon. *See* Def. Findings ¶¶ 29-31; Trial Tr. at 124:22-129:9. Whether or not one believes plaintiff's assertions that he was disciplined unjustly in the first two instances, they are a far cry from the kind of marked or regular departure from professed beliefs that would lead us to find a plaintiff insincere. *Cf.* *Int'l Soc'y for Krishna Consciousness v. Barber,* 650 F.2d 430, 441 (2d Cir.1981) (citing, as an example of the type of inconsistent act that would lead a court to find an adherent insincere, a Jewish adherent claiming a free exercise violation from being compelled to appear in court on the Sabbath who otherwise works on Saturdays). In the case of the altered item, which no one disagrees constituted contraband, we find credible plaintiff's explanation that he was simply using it as a makeshift screwdriver, given that he did not alter the rounded, blunt tip of the headphone piece and made no real attempt to conceal the item, which was found in a bucket filled with radio parts and other knick-knacks where it was regularly kept. *See* Def. Trial Exhibit OO (photocopy of "altered item").[FN18]

FN18. Plaintiff's expert on prison administration, former federal prison warden Toni Bair, reached a similar conclusion upon examination of the photocopy during his testimony. *See* Trial Tr. at 220:18-221:15.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 14

Not Reported in F.Supp.2d, 2003 WL 21782633 (S.D.N.Y.)

(Cite as: 2003 WL 21782633 (S.D.N.Y.))

***10** Other evidence of inconsistent conduct, according to DOCS, includes plaintiff's mentioning only that the Nation's dietary restrictions require him to eschew pork while Cee Barnes testified that the Nation's tenets require one “not to eat pork and if you go a little bit further ... not to eat any type of scavenger, and a scavenger is like shrimp or tuna fish,” Def. Findings ¶ 28; *see also* Trial Tr. at 287:7-8, plaintiff's allowing his subscription to *The Five Percenter* lapse for a time in 1996, *see* Def. Findings at ¶ 26, and plaintiff's adopting a NOI religious designation during a period in which he attended a number of NOI services. *See* Def. Findings ¶ 27. The purported inconsistencies raised by the first two arguments seem sufficiently minor that we need not address them in detail here, except to note that DOCS does not contest plaintiff's testimony that he has adhered to a vegan diet since becoming a Nation member (meaning that he does not eat shrimp or tuna) and that the lapse in plaintiff's subscription occurred during a period in which DOCS began to confiscate the newspaper as illegal contraband.[FN19]

FN19. In a similar vein, we reject DOCS' argument that plaintiff's insincerity is evidenced by his failure to formally request parliaments and other gatherings until 2000, *see* Def. Findings ¶ 22, since DOCS' complete ban on the Nation's materials and previous denials of plaintiff's requests to receive them made it fairly clear that such a request would not have been granted and plaintiff has represented that he did so merely to ensure that he had exhausted his administrative remedies.

With respect to DOCS' argument about the NOI designation, plaintiff testified that he sporadically attended both NOI and other groups' services while remaining a member of the Nation in order to “get an understanding of what separates the two and why people think the way they think,” Trial Tr. at 67:3-5, but that NOI was the only group for which DOCS required him to sign a religious designation form in order to be allowed to attend the services. *See* Trial Tr. at 67:22-68:16. He emphatically, and credibly, denied that his attendance at any other group's services constituted a commitment to be a part of a religious community other than the Nation. *See id.* We find it unsurprising that a member of the Nation, which builds on related religious traditions, like plaintiff would seek to attend NOI services and correspondingly sign up as a NOI adherent when DOCS treats the Nation itself as an unauthorized group, especially since this is exactly what DOCS encouraged him to do in response to his requests for religious accommodations.[FN20] *Cf.* *Campos v. Coughlin,* 854 F.Supp. 194 (S.D.N.Y.1994) (finding “not persuasive” DOCS' attempt to cast doubt on the sincerity of Santeria adherents' religious beliefs because they had previously self-identified as “Catholic”). Moreover, DOCS' argument that we should find plaintiff insincere because he signed up for and attended NOI services is in tension with its claim, discussed *infra,* that plaintiff's beliefs are not substantially burdened by its policies because he can gain access to the Nation's lessons through the NOI (presumably in part by attending their services).

FN20. In response to his inquiries concerning confiscated copies of the *Five Percenter* newspaper, DOCS Coordinator for Islamic Affairs, Warith Deen Umar responded as follows:

> Dear brother:
>
> This responds to your letter of September 22, 1998. There are no directives or rules and regulations regarding Five Percenters. The reason for this is because the courts have ruled that Five Percenters are not a legitimate religious group. The New York State Department of Correctional Services does not acknowledge the claims of inmates who designate themselves as Five Percenters. *You*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 15

Not Reported in F.Supp.2d, 2003 WL 21782633 (S.D.N.Y.)

(Cite as: 2003 WL 21782633 (S.D.N.Y.))

*may want to explore some of the teaching of the Muslims and the Nation of Islam in your facility.*

Your brother in Islam, Imam Warith Deen Umar Ministerial Program Coordinator Ministerial and Family Services

Pl. Trial Ex. 81 (emphasis added). We note that, to the Court's knowledge, no case law existed to substantiate Imam Umar's assertion that "the courts have ruled that Five Percenters are not a legitimate religious group."

Ultimately, the point of sincerity analysis is to "provide[ ] a rational means of differentiating between those beliefs that are held as a matter of conscience and those that are animated by motives of deception and fraud." *Patrick,* 745 F.2d at 157 (citation omitted). Having engaged in such an analysis, and while we do not find it inconceivable that a gang or other group might seek to cloak itself in a purported "religion" in order to increase its legitimacy, we find DOCS' attempt to cast doubt upon the sincerity of the plaintiff's beliefs in this case singularly unpersuasive.

ii. Religious Nature of Plaintiff's Beliefs

***11** DOCS' claims that plaintiff's beliefs are not "religious in nature" are similarly unpersuasive. DOCS' argument on this issue throughout this litigation has been a semantic one, focusing on plaintiff's and other Nation members' reluctance to call the Nation of Gods and Earths a "religion." *See* *Marria v. Broaddus,* 200 F.Supp.2d 280, 292 (S.D.N.Y.2002). DOCS asserts that Nation members' refusal to call the group a "religion" indicates that it should not be treated as one and that plaintiff's statements that he believes that the Nation fits the legal definition of a religion are merely a self-serving tactic to further this litigation. *See* Def. Findings ¶¶ 3-7, 23-25. In support of this argument, DOCS notes that plaintiff stated at his first deposition that the Five Percenters are not a religion, but rather a way of life. *See id.* ¶ 24; *see also* Feb. 12, 2001 Decl. of Dale Artus Ex. Q (issue of *The Five Percenter* with headline and article entitled "We Are Not A Religion").

The weakness of DOCS' semantic argument is evident. While it is somewhat understandable that a group that refuses to describe itself as a "religion" did not inspire immediate outreach from DOCS officials, the law of the Free Exercise Clause does not turn on mere semantic distinctions. *Cf. Graham v. Cochran,* 96 Civ. 6166, 2000 U.S. Dist. LEXIS 1477, at *30 (S.D.N.Y. February 14, 2000) (Ellis, M.J.) (noting, in a similar case brought by a Five Percenter inmate, that "just as calling one's beliefs a 'religion' does not make it such for constitutional purposes, failure to label one's beliefs a 'religion' does not prohibit constitutional protection"). The significance of plaintiff's beliefs in his life is considerably more relevant than what plaintiff and other members of his community choose to call their beliefs-"a rose by any other name," as the saying goes, "would smell as sweet." As already described in some detail, plaintiff has submitted substantial evidence that he has been a practicing member of the Nation since August of 1994 and that he lives by the Nation's teachings and observes the Nation's holy days to the extent possible under DOCS regulations. Furthermore, plaintiff, the Allah School representatives, and an expert cultural anthropologist all testified that the Nation carries the same significance for its members as Christianity, Judaism, and Islam do for their adherents, and that the Nation's contrasting belief system means that one could not be a part of those religions and the Nation simultaneously. Overall, plaintiff has convincingly demonstrated the central significance of the Five Percenter belief system in his daily life and his understanding of that which he considers divine, which is in accordance with the William James definition of religion. Finally, it would be incongruous for us to reject the notion that the Nation's belief system is "religious in nature" when it is, in several respects, more orthodox in both its practices and notions

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

of the "divine" than the belief systems espoused by other groups that currently receive religious protections.[FN21]

FN21. Despite markedly different conceptions of "the divine" from most Americans, heterodox groups like Rastifarians, Wiccans, and Hare Krishnas have all been afforded free exercise protection. Here, the Nation's doctrine is predicated on a an essentially monotheistic belief in God, its central and secondary texts-including the 120 Degrees, Bible, and Koran-are largely identical to those of other accepted religions, the Supreme Mathematics and Supreme Alphabet are reminiscent of other religions' use of numerology devices to understand the world, and the nature of its observances is far from uncommon. Moreover, the Nation appears to be a close relative of an officially recognized religion, the Nation of Islam.

***12** For these reasons, we find that plaintiff's beliefs as a member of the Nation of God's and Earths are both sincere and "religious in nature" and therefore entitled to RLUIPA and First Amendment protection under the free exercise clause. *Cf. Patrick v. LeFevre,* 745 F.2d 153 (2d Cir.1984) (finding for summary judgment purposes that an inmate's beliefs as a Five Percenter were constitutionally protected); *Breland v. Goord,* No. 94 Civ. 3696, 1997 WL 139533 (S.D.N.Y. March 27, 1997) (same); *Graham v. Cochran,* No. 96 Civ. 6166, 2000 U.S. Dist. LEXIS 1477, (S.D.N.Y. February 14, 2000) (same); *Lord Natural-Self Allah v. Annucci,* No. 97 Civ. 607, 1999 WL 299310 (W.D.N.Y. March 25, 1999) (Heckman, M.J.) (finding, for purposes of a preliminary injunction, that "Five Percenterism, in its pure uncorrupted form, represents a system of beliefs which, outside the prison context, does not advocate or promote violence").

B. Religious Land Use and Institutionalized Persons Act

Congress enacted the Religious Land Use and Institutionalized Persons Act ("RLUIPA") in response to the Supreme Court's holding in *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), declaring unconstitutional the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb-1(b).[FN22] RLUIPA applies both to programs or activities that receive federal financial assistance and to substantial burdens on religious exercise having an effect on interstate commerce. 42 U.S.C. § 2000cc-1(b). Although other courts have debated the statute's constitutionality, *see e.g., Mayweathers v. Newland,* 314 F.3d 1062 (9th Cir.2002) (finding RLUIPA constitutional); *Madison v. Riter,* 240 F.Supp.2d 566 (W.D.Va.2003) (ruling that RLUIPA violates the Establishment Clause), defendants in this case have never made such a constitutional challenge. RLUIPA's constitutionality, moreover, was assumed in our earlier opinion at the case's summary judgment stage, *see Marria v. Broaddus,* 200 F.Supp.2d 280 (S.D.N.Y.2002), without subsequent objection by either side, and we maintain that assumption for purposes of this decision. RLUIPA provides:

FN22. The constitutional controversy surrounding RFRA and the subsequent congressional enactment of RLUIPA have been discussed extensively elsewhere, *see e.g., Madison v. Riter,* 240 F .Supp.2d 566, 568-70 (W.D.Va.2003), and familiarity with RLUIPA's history is assumed.

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person -

(1) is in furtherance of a compelling governmental interest; and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). Under RLUIPA, once a plaintiff produces prima facie evidence to support a free exercise violation, the plaintiff bears the burden of persuasion over whether the regulation substantially burdens his or her exercise of religion and the state bears the burden of persuasion on all other elements. 42 U.S.C. § 2000cc-2(b).

By its terms, RLUIPA is to be construed to favor broad protection of religious exercise. *See* 42 U.S.C. § 2000cc-3(g). The statute defines religious exercise as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *Id.* § 2000cc-5(7)(A). This reflects an extension of the definition provided in RFRA, which defined exercise of religion as "the exercise of religion under the First Amendment to the Constitution." 42 U.S.C. § 2000bb-2(4); *Kikumura v. Hurley,* 242 F.3d 950, 960 (10th Cir.2001) (noting the change in definition); *Henderson v. Kennedy,* 265 F.3d 1072, 1073-74 (D.C.Cir.2001) (noting that the definition of religious exercise in RLUIPA expanded upon the protections of RFRA). The otherwise similar language of RFRA and RLUIPA, however, suggests that cases decided under RFRA may guide this Court's inquiry in this case. *See* *Wyatt v. Terhune,* 315 F.3d 1108, 1115 (9th Cir.2003) (noting that RLUIPA "provides rights similar to those delineated in RFRA").

***13** In seeking to defeat plaintiff's RLUIPA claim, DOCS argues that the record does not establish that its ban on Five Percenter literature and gatherings substantially burdens the exercise of plaintiff's beliefs. *See* Def. Findings ¶¶ 9-20. DOCS further asserts that its regulations are in furtherance of a compelling governmental interest in prison security and that the ban on Five Percenter literature and congregative gatherings is the least restrictive means of effectively controlling security threat group behavior. *See* Def. Findings at 24-25.

C. Evaluating DOCS' Treatment of the Five Percenters Under RLUIPA

i. Substantial Burden

[4] Like its predecessor RFRA, RLUIPA requires a plaintiff to demonstrate that his right to free exercise of religion has been substantially burdened. The Supreme Court has defined a substantial burden in this context as "[w]here the state ... denies [an important benefit] because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs. While the compulsion may be indirect, the infringement upon free exercise in nonetheless substantial." *Thomas v. Review Bd. of the Indiana Employment Sec. Div.,* 450 U.S. 707, 717-18, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981); *Jolly,* 76 F.3d at 477 (citing this passage of *Thomas* with approval in considering Rastafarian inmate's RFRA claim). Despite DOCS' treatment of the Nation exclusively as a security threat group and complete ban on Nation materials and literature, defendants argue that plaintiff's Five Percenter beliefs are not substantially burdened because he can still practice certain aspects of his beliefs. These include possessing the Bible and Koran, gathering informally with five or fewer Five Percenters at certain times of day, learning the Supreme Alphabet and Mathematics orally, gaining access to lessons through NOI, celebrating certain holidays informally, and communicating with Nation members outside prison (though not through the *Five Percenter* newspaper). *See* Def. Findings ¶¶ 9-20.

Defendants' arguments are untenable. Throughout this

litigation, plaintiff has credibly maintained that the study (alone and with others) of the 120 Degrees, Supreme Mathematics, the Supreme Alphabet, as well as other lessons found in *The Five Percenter,* is an integral part of the daily practice of the Nation's beliefs, and his testimony was substantiated by that of other Nation representatives. Furthermore, in a religious community that lacks both a formal organizational structure and a fixed place of worship, *The Five Percenter* newspaper serves as a central link and mechanism of communication, clearly falling within RLUIPA's broad protections of religious exercise "whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). There is no question that under DOCS' regulations plaintiff may not possess these materials and study them with other inmates and is denied the opportunity to gather with other Nation members other than informally. [FN23] The evidence at trial also established that the Bible and Koran serve only as secondary religious sources for Nation members, refuting DOCS' argument that plaintiff can meaningfully practice his religion while possessing only these texts.[FN24] Finally, DOCS' contentions that plaintiff is able to obtain the 120 Degrees through NOI and fast on holy days contradict the evidence that plaintiff cannot receive the lessons from NOI without being an official member registered with an NOI temple outside prison,[FN25] *see* Trial Tr. at 57:8-15; Blocker Decl. ¶¶ 10-11, and that he is not permitted to eat his prison meal after sundown on holy days or gather for that meal (as are NOI and Orthodox Muslim inmates), but must do so using food he has saved from the prison commissary. *See* Trial Tr. at 62:11-63:5.

FN23. According to John LoConte, DOCS' former Director of Ministerial and Family Services, such informal gatherings "wouldn't be enough" to allow Catholic inmates to practice their religion while in prison. *See* Trial Tr. at 532:11-17. Moreover, DOCS admitted the importance of formal gatherings in plaintiff's belief system at an earlier stage of this litigation when, in attempting to show that plaintiff is not a sincere believer in the Nation's tenets because he has never attended a parliament (despite having banned him from doing so), DOCS asserted that parliaments are "a fundamental ritual" for Nation members that, if consistently skipped, would be equivalent to "a Catholic never going to Mass." Defs.' Summ. J. Reply Mem. at 9.

FN24. DOCS' argument is tantamount to arguing that a Christian's or Muslim's beliefs would not be substantially burdened if he or she were permitted to possess the Jewish Bible, but not the New Testament or the Koran. The courts have recognized, however, that it is the free exercise of a *plaintiff's* religion, not someone else's, that the First Amendment and RLUIPA protect. *See* *Breland v. Goord,* No. 94 Civ. 3696, 1997 WL 139533, at *5 (S.D.N .Y. March 27, 1997) (citing *Thornburgh v. Abbott,* 490 U.S. 401, 418, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989) and *O'Lone v. Shabaaz,* 482 U.S. 342, 352, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987)). *But cf.* *Fraise v. Terhune,* 283 F.3d 506, 519-20, (3d Cir.2002) (accepting such an argument in ruling that alternatives means existed for inmates to practice their beliefs under New Jersey's treatment of Five Percenters exclusively as a security threat group).

FN25. In making its argument that plaintiff can gain access to the 120 Degrees from NOI members, DOCS apparently relies on plaintiff's testimony that NOI conducts introductory classes for non-members, similar to the Nation's civilization classes, at which the lessons are sometimes discussed. *See* Trial Tr. at 60:20-61:14; Def. Findings ¶ 19. However, plaintiff's immediately following testimony makes it clear that he is not able to obtain the 120 Degrees, or even consistent study of them, merely by attending such classes. *See* Trial Tr. at 61;15-24.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

***14** We thus find that plaintiff's free exercise of his religious beliefs are substantially burdened by DOCS' current policies concerning Five Percenters.

ii. Compelling Interest and Least Restrictive Means Tests

Moreover, DOCS has failed to establish that its complete ban on Five Percenter materials, literature, and activities furthers a compelling security interest and is the least restrictive means of doing so under RLUIPA. It is undisputed that maintaining the safety, security, and internal order of prisons is a compelling governmental interest. *See* *Campos v. Coughlin,* 854 F.Supp. 194, 207 (S.D.N.Y.1994) ("prison security and penological institutional safety goals are indeed a most compelling governmental interest"); *Muhammad v. Coughlin,* 904 F.Supp. 161 (S.D.N.Y.1995) (finding compelling interest in internal order in prisons); *Breland v. Goord,* No. 94 Civ. 3696, 1997 WL 139533, at *4 (S.D.N.Y. March 27, 1997) ("[t]here is no question that prison safety and security are legitimate penological interests"). We are also mindful of the well-established judicial tradition of giving heightened deference to the experience and judgment of prison officials on such "central" issues in the context of inmate First Amendment claims. *Duamutef v. Hollins,* 297 F.3d 108, 112 (2d Cir.2002) (citing *Giano v. Senkowski,* 54 F.3d 1050, 1054 (2d Cir.1995) and *Thornburgh v. Abbott,* 490 U.S. 401, 415, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989) *quoting* *Pell v. Procunier,* 417 U.S. 817, 823, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974) for the proposition that prison security is "central to all other corrections goals"). However, it is equally well-established that "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution," *Turner v. Safley,* 482 U.S. 78, 84, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), and our tradition of deference on security matters does not require this Court to altogether abdicate its role in constitutional cases brought by inmates. Hence, while prison officials "must be given latitude to anticipate the probable consequences of certain speech, and must be allowed to take reasonable steps to forestall violence," *Giano v. Senkowski,* 54 F.3d 1050, 1055 (2d Cir.1995), they "cannot merely brandish the words 'security' and 'safety' and expect that their actions will automatically be deemed constitutionally permissible conduct." *Campos,* 854 F.Supp. at 204. *Cf.* *Jolly v. Coughlin,* 76 F.3d 468, 479 (2d Cir.1996) ("The DOCS policy is not insulated from scrutiny merely because the defendants brandish the concepts of public health and safety."). Congress also made it clear in enacting RFRA/RLUIPA that "inadequately formulated prison regulations and policies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to meet the [A]ct's requirements." *Campos,* 854 F.Supp. at 207 (quoting the Senate Report to RFRA); *Jolly,* 76 F.3d at 479 (1996) (same). Even the less restrictive test set forth in *Turner v. Safley* that governed prisoner free exercise claims prior to the enactment of RFRA/RLUIPA recognized that deference is not warranted when a prison regulation represents an exaggerated response to security objectives. *See* *Turner,* 482 U.S. at 97-98 ("No doubt legitimate security concerns may require placing reasonable restrictions upon an inmate's right to marry, and may justify requiring approval of the superintendent. The Missouri regulation, however, represents an exaggerated response to such security objectives.").

***15** Here, DOCS proposes to treat exclusively as a gang a group that has had a law-abiding existence outside prison for the better part of 40 years, that is an offshoot of another group that DOCS considers a religion, and that has practices that largely resemble those of recognized religious groups, with the consequence that DOCS has banned literature which it concedes is facially innocuous as well as any other expression of religious identity associated with the group. In order for such a ban to be upheld, there ought to be some sense that DOCS is substantially correct in its decision to treat the group exclusively as a gang and not a religion. *Cf.* *Jolly,* 76 F.3d at 479 (holding in a RFRA analysis that "the connection between the application of a policy to an individual and the furtherance of the government's goals must be clear"). [FN26] The evidence DOCS presented at trial, however, failed to justify such treatment.

FN26. DOCS places undue reliance on the

Second Circuit's decision in *Giano v. Senkowski,* 54 F.3d 1050 (2d Cir.1995), which held that it was unnecessary for DOCS to establish an explicit link between such "emotionally charged" materials as nude photographs of inmates' wives and girlfriends and violence in order to justify its ban on such materials. *See Giano,* 54 F.3d at 1055; Def. Findings at 20-21. Here, unlike instances in which common sense would indicate that prohibited materials may pose a threat to security, DOCS predicates its policy banning any and all religious expressions associated with the Nation on the group's allegedly violent nature, which is not simply a matter of common sense.

First, DOCS failed to provide any evidence that its decision to treat "Five Percenters" as a security threat group was either reasoned or informed. The trial record is almost entirely devoid of evidence concerning DOCS' initial decision to treat the Nation as a gang and not a religion. DOCS possesses no records whatsoever setting forth the basis for its decision or even documenting its decision-making process concerning the Five Percenters. None of the DOCS officials who testified at trial were the decision-makers, nor could they do more than speculate about who the decision-makers were, when the decision was made, how it was made, or what information was deemed relevant.[FN27] Moreover, DOCS admits that its classification of Five Percenters as a security threat group is not based on any guidelines or specific criteria. *See* Trial Tr. at 340:16. Nor, pursuant to its non-recognition policy, does DOCS maintain statistics concerning gang activity or even the rough number of gang members in the system. *See* Trial Tr. at 341:16-19, 345:10-13. Rather, its decision to label the Nation itself as a security threat was based on the subjective sense of the decision-makers-whomever they were-that the group as a whole was a gang. However, it is clear that DOCS knows little about the Nation's seemingly legitimate existence outside prison,[FN28] and DOCS failed to present any evidence concerning how it came to the conclusion that the Nation of Gods and Earths is not a religion in spite of the fact that several inmates have sought religious accommodations for their beliefs as members of the Nation. *See* Footnote 10 *supra*. It is also worth noting that DOCS' previous litigation position claiming that the Nation's literature contained violent messages indicates that it was misinformed about at least that aspect of the Nation at the time it made its classification and suggests that its treatment of the Nation exclusively as a gang may be based on either exaggerated fears or speculation.

FN27. Although DOCS claims that its classification of the Five Percenters as a gang is based on a history of violence and disruptive activities associated with the group, as well as its employees' day-to-day reporting of such activities, Def. Findings ¶ 53; Trial Tr. at 378:7-15, DOCS official Richard Roy testified that there was probably no stack of materials that was reviewed by DOCS' decision-makers at the time they classified the Nation as unauthorized. *See* Trial Tr. at 408:2-18.

FN28. DOCS official Richard Roy, for example, testified that he did not believe that there was a connection between the members of DOCS' alleged "Five Percenters" prison gang and an outside organization called the Nation of Gods and Earths, *see* Trial Tr. at 346:16-19, while another official, Dale Artus, testified that "[t]he term "Nation of Gods and Earths" is not in my vocabulary. It is nothing I've been-it is just-it doesn't come about in the course of my private life or in my professional life other than this litigation." *See* Trial Tr. at 481:8-10.

Lacking a record for its decision, DOCS has attempted to justify its absolute ban *post hoc* by arguing that the evidence it has compiled in preparation for this litigation demonstrates that "the Five Percenters" are indeed a security threat group, and hence that the mere presence of the Nation's materials in the prison setting or any other forms of "recognition" pose a security threat by

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 21

Not Reported in F.Supp.2d, 2003 WL 21782633 (S.D.N.Y.)

(Cite as: 2003 WL 21782633 (S.D.N.Y.))

legitimating the group and facilitating its recruiting efforts. Several DOCS corrections officers and officials who testified at trial professed a general understanding from their training and experience that Five Percenters in prison were associated with violence and disruption, but had personal knowledge of only a few incidents involving inmates identified as Five Percenters despite their decades of combined experience.[FN29] *See* Def. Findings ¶¶ 66-68, 70-71, 74. Ron Holvey, a corrections official from the New Jersey Department of Corrections with expertise in gangs and related security issues, testified that the New Jersey prison system considers the Five Percenters to be its largest security threat group and that, after reviewing the materials and statements DOCS compiled for this litigation, he would support New York's ban on the Nation's literature as a security threat. *See* Trial Tr. at 710:1-2, 722:17-21. Mr. Holvey, however, admitted that he had never spoken with a member of the Nation of Gods and Earths in New York or set foot inside a DOCS prison. *See* Trial Tr. at 729:24-730:5. Moreover, he went on to testify that his perception of the Nation outside prison is that it is not a religion because "[t]hey don't have temples or mosques or churches. They don't have a minister that comes in. There is nothing formal about their organization. They don't have priests. They don't have rabbis. They don't have imams. They don't-they worship-they consider themselves to be God." *See* Trial Tr. at 741:10-14. Additional DOCS evidence concerning alleged Five Percenter gang activity came from two inmate-witnesses who claimed to have experienced violence and threats at the hands of Five Percenters. Their testimony, however, lacked consistency and credibility, leaving us with little reliable evidence beyond the fact that these two inmates regarded the Five Percenters as a gang.[FN30]

FN29. The most credible of these accounts in light of the evidence concerning the Nation's legitimate existence outside prison was that of Deputy Superintendent for Security Services at Collins Correctional Facility Sibato Khahaifa, who testified that, as an Orthodox Muslim who grew up in Brooklyn, he understood the Nation to be a religious group that had split from the NOI prior to joining DOCS. *See* Trial Tr. at 756:3-9. In recounting his experiences as a corrections officer in several DOCS facilities, Khahaifa also drew a distinction between some Five Percenter inmates who he perceived as sincere adherents of the Nation and others who appeared to be behaving in a gang-like fashion. *See* Trial Tr. at 757:11-758:5. 766:11-18.

FN30. One, who claimed to be a former member and participant in illegal activities on behalf of the Five Percenters, also admitted to having participated in numerous stabbings and other acts of violence, including altercations with members of the Latin Kings gang and inmates he identified as "the Muslims," even after the period he was allegedly a Five Percenter. *See* Trial Tr. at 814:9-816:7, 818:3-820:12, 823:8-824:8, 826:5-20. Yet, he claimed that his safety is at risk because Five Percenters were seeking to retaliate against him for "going against" the gang in a fight and thereafter leaving the group. *See* Trial Tr. at 799:22-800:2; Trial Tr. at 805:18-806:11. The other, a former Latin Kings gang "captain," admitted to having "snitched" on four other Latin Kings members after they had killed a fellow prisoner who was a Five Percenter, making it difficult for us to gauge his claims that he feared for his safety because of the potential for retaliation from Five Percenters in addition to the Latin Kings. *See* Trial Tr. at 846:10-20, 851:20-852:1, 853:7-854:1.

***16** DOCS' principal form of "hard evidence" concerning the nature of the Five Percenters consisted of compilations of facility reports concerning unusual incidents, inmate transfer requests, and inmate separation requests that contain gang-like references to Five Percenters and sometimes report violent acts attributed to individuals or groups identified as Five Percenters. *See* Trial Tr. at 363:23-364:10, 472:9-10, 502:5-8; Def. Trial Exhibit A (inmate transfer requests not received into evidence); Def. Trial Ex. B (sample separatee reports not

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

received into evidence); Def. Trial Exhibit C (unusual incident reports not received into evidence); Def. Trial Exhibit D (protective custody reports received into evidence); Def. Trial Ex. M (summary of separatee report “hits” for “Five Percenters” and other groups from 1990 to 1999 not received into evidence). Although there is no evidence to suggest that DOCS' decision-makers ever reviewed these reports, DOCS argues that they constitute the kind of evidence that its decision-makers would have known about when determining that the Five Percenters were a security threat group and provide an objective basis for its decision to treat the Nation exclusively as a gang. *See* Def. Findings ¶¶ 77-78, 82. The transfer reports were excluded at trial because they contained hearsay within hearsay and did not otherwise exhibit indicia of reliability.[FN31] *See* Trial Tr. at 434:11-453:3; Fed. R. Enid. 802; *Parsons v. Honeywell, Inc.,* 929 F.2d 901, 907 (2d Cir.1991) (quoting with approval the Ninth Circuit's opinion in *United States v. Passant,* 703 F.2d 420, 424 (9th Cir.1983) stating that “[it is well established that entries in a police report which result from the officer's own observations and knowledge may be admitted *but that statements made by third persons under no business duty to report may not.”* (emphasis added by Second Circuit)); *Giles v. Rhodes,* No. 94 Civ. 6835, 2000 WL 1425046, at *8-*9 (S.D.N.Y. Sept.27, 2000) (ruling that prison unusual incident reports are inadmissible hearsay not subject to the Business Record Exception under Fed. R. Enid. 803(6)). There are, in fact, several additional reasons to doubt their reliability, as well as the reliability of the reports underlying DOCS' summary chart of separatee “hits” for the term “Five Percenters,” which was similarly excluded due to DOCS' failure to comply with the Federal Rules of Evidence by providing plaintiff with the underlying documents.[FN32] *See* Trial Tr. at 468:17-480:25; Fed. R. Enid. 1006 (stating that voluminous evidence “may be presented in the form of a chart, summary or calculation,” but that the underlying documents “shall be made available for examination or copying, or both, by other parties”). Among the unusual incident reports-which document occurrences of violence or other serious disturbances-the number of relevant “hits” for references to Five Percenters was only 67 out of approximately 102,000 incidents over the ten year period from 1990 to 1999. *See* Trial Tr. at 241:13-24.

FN31. We note that, according to plaintiff's prison security and administration expert Toni Bair, such reports are “[o]ne of the most unreliable sources of information we have in prisons” because they are obtained from individuals (“snitches”) who are often desperate to get themselves out of some kind of trouble and view it as beneficial to name groups rather than individuals in order to insure that they be placed in protective custody. Trial Tr. at 244:10-245:14.

FN32. First, there are a substantial number of duplicates among the transfer requests that DOCS submitted as trial exhibits, *see e .g.,* Def. Trial Ex. A at Bates Nos. 018 & 023, 019 & 024, 010 & 026, 012 & 027, 013 & 028, and it is possible that such duplicates could be affecting the number of “hits” contained in DOCS' separatee chart as well. Second, some of the transfer requests and unusual incident reports were of questionable relevance to the Five Percenter gang activities that were alleged, raising similar concerns about the relevance of the separatee reports underlying DOCS' summary chart of relevant “hits.” *See e.g.,* Def. Trial Ex. A at Bates Nos. 032, 109, 116 (transfer requests); Def. Trial Ex. C. at Bates Nos. 006, 043 (unusual incidents). Third, DOCS has defined the Five Percenters as a security threat group for some time and apparently trains its employees to recognize them as such, which undoubtedly affects the reports. *See* Trial Tr. at 488:12-19 (Dale Artus explaining that DOCS' crisis intervention unit devotes a four-hour portion of its two week basic training specifically to unauthorized groups); Trial Tr. at 632:19-23 (Superintendent Joseph Smith testifying that his understanding of the Five Percenters as a gang came in part “from training”). Fourth, because DOCS treats any organizing activity associated with an unauthorized group as a threat to prison safety and security, its classification of the Five

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Percenters as "unauthorized" is in some sense self-fulfilling. Activities that would be permissible were they conducted by a religious group, such as recruiting, gathering, passing on literature, are deemed threatening and fuel both the group's and individuals' negative reputations reflected in the various reports. *See e.g.,* Trial Tr. 521:20-24 (John LoConte explaining that, at the time he first learned about the Nation, he was hearing that "[both the Nation of Islam, the Nation of Gods and Earths ... they were attempting to infiltrate the Muslim community in order to establish a congregation the opportunity to the [*sic* ] meet together. They were problematic."); Def. Trial Ex. D at Bates No. 014 (stating-with a negative connotation-that the Five Percenters were going to "take some action to establish themselves in the facility"); Def. Findings ¶¶ 89-90 (treating as negative the notion that plaintiff's alleged religious beliefs would require him to teach civilization to others).

***17** Thus, DOCS' *post hoc* justifications for its ban are inadequate to establish that it has a principled basis for labeling the Nation a security threat group. Finding DOCS' absolute ban to be justified based on the episodic accounts of its witnesses and unreliable facility reports would require us to make a speculative leap concerning the nature of an entire group based on spotty evidence about some of its supposed members that would be in tension with what we have learned about the group's legitimate existence outside prison. We stress that we are not saying that there are not prisoners who would describe themselves as Five Percenters who have committed crimes or otherwise violated prison regulations. However, the limitations of this "fact" should be obvious. *Cf. Breland v. Goord,* No. 94 Civ. 3696, 1997 WL 139533, at *5 (S.D.N.Y. March 27, 1997) ("The mere fact that inmates identified as Five Percenters have been involved in altercations with other inmates and guards does not establish that the literature at issue here caused those incidents."). There are prisoners who would describe themselves as Catholics, Protestants, Jews, Muslims, NOI, etc. who likewise violate prison regulations, and it is easy to imagine a situation where the common ethnic or religious bond shared by members of a group could serve as the impetus for some to band together and at times act cohesively, but no one would suggest that such facts preclude the classification of these recognized groups as religions deserving of First Amendment protection.[FN33]

FN33. For example, one of the inmates who testified on DOCS' behalf in this case referred repeatedly to altercations between himself and "Muslims" and replied "Yes sir" when he was asked whether there were any Muslim gangs. *See* Trial Tr. at 814:9-10. We also note that a number of the unusual incident reports containing the term "Five Percenter" proffered by DOCS also contain the term "Muslim." *See* Trial Tr. 243:16-21. Clearly, however, none of this would lead us to conclude either that Islam is not a religion or that Muslims would properly be classified by DOCS as a security threat group.

Additionally, at least one Second Circuit decision appears to document a street gang whose teenage founders were apparently Five Percenters, but nonetheless existed separately from the Nation of Gods and Earths. *See* *United States v. Miller,* 116 F.3d 641 (2d Cir.1997) (discussing the formation of the "Supreme Team" gang by a group of teenage Five Percenters in the mid-1980's).

A hypothetical dealing with a more mainstream group further illustrates the point: imagine, for example, that one or several gangs of inmates were to form within the New York State Correctional system each of whose membership is united by a common religious/ethnic identity-Judaism. The gangs could either be formal disruptive organizations or simply the result of an agreement among some Jewish inmates to "get each other's back" in a pinch. Imagine further that the members

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 24

Not Reported in F.Supp.2d, 2003 WL 21782633 (S.D.N.Y.)

(Cite as: 2003 WL 21782633 (S.D.N.Y.))

of the Jewish gang(s) identify themselves by displaying the Star of David, utilize Hebrew letters (which also stand for numbers) as a "code" similar to Five Percenters' alleged use of the Supreme Alphabet and Mathematics, and sometimes recruit new members by using the Bible and other traditional Jewish texts. DOCS' records would soon be replete with reports containing statements that "the Jews" were involved in violent and disruptive activities and such groups would clearly pose a security threat to prison staff and inmates. But would this transform Judaism from a religion into a security threat group? Would DOCS, in such a situation, ban anyone who identified themselves as a Jew from possessing a Hebrew Bible and Alphabet or from displaying a Star of David? The trial testimony of DOCS officials convinces us that it would not, or that it would at least exhaust other avenues of redress before subjecting the "sincere believers" of a mainstream group to the type of blanket treatment that Nation members currently receive.[FN34]

FN34. The Court posed a similar hypothetical to Shawangunk Superintendent Joseph Smith, *see* Trial Tr. at 646:2-21, who replied: "[are we going to say that we are no longer going to permit religious services or participation in religious holidays, I would say, no, that would be very unlikely, because I am going to go on a limb and say that this group that you have described would be limited to a few, and that once we were able to take proper action we should be able to go on as business as usual." Trial Tr. at 646:22-647:3. Superintendent Smith added, with regard to the Five Percenters: "Well, I can only answer that as we deal with them today. They are not an authorized religion at this point within our system." Trial Tr. at 647:25-648:2. Similarly, plaintiff's counsel posed hypothetical questions concerning violence by members of the NAACP to Dale Artus, the former director of DOCS' crisis intervention unit, who testified that he would recommend that the violent individuals "be held individually accountable for their acts" and "would not recommend that the overall program be disbanded" because he viewed the overall NAACP program as positive and it was, unlike the Five Percenters, an authorized organization. *See* Trial Tr. at 491:13-493:13. The DOCS officials' testimony stands in sharp contrast to that of Ron Holvey, who DOCS called as an expert on gangs and gang management, as well as the status Five Percenters in the New Jersey State Correctional system (which segregates those identified as "core members" from the rest of its prison population). When asked whether he would declare the Catholic Church to be a security threat group if numerous prisoners identified as Catholics were being written up for violent acts, he responded: "Within the prison, we would have to, yeah, oh yeah, and I'm sure I would be sitting in another courtroom for that one." Trial Tr. at 748:23-749:4.

***18** While we do not question the sincerity of the witnesses who testified as to their belief that there is a Five Percenters gang, their convictions alone are not sufficient. There must be admissible evidence to justify DOCS' policies, and no such evidence was introduced. Particularly lacking was evidence concerning the structure of the alleged Five Percenters gang. We are also troubled by the "Catch-22" aspect of its policies concerning the Nation, whereby the group's "unauthorized" classification leads DOCS to train its employees to recognize Five Percenters exclusively as gang members and otherwise innocuous literature and activities as threatening.[FN35] As such, we find the anecdotal evidence that DOCS has presented insufficient to justify after the fact its decision to treat the Nation solely as a gang under RLUIPA. Moreover, the trial testimony and submissions throughout this case suggest that, while DOCS now formally concedes that the Nation's literature does not contain violent or disruptive content, its officials' perception of the threat posed by the Nation and its literature was and potentially still is affected by their belief that it espouses an objectionable racist ideology.[FN36] *Cf. Marria v. Broaddus,* 240 F.Supp.2d 280, 295 (S.D.N.Y.2002) ( " "DOCS' argument that it bans Nation literature because of what it represents and not what it says seems disingenuous given

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

DOCS' prior position in past litigation from the same time period that the literature itself encourages violence.”). Whether or not these lingering objections are justified as a matter of principle, they raise questions about whether DOCS' absolute ban on Nation literature is unrelated to the literature's content. *See generally* *Turner,* 482 U.S. at 90 (“We have found it important to inquire whether prison regulations restricting inmates' First Amendment rights operated in a neutral fashion, without regard to the content of the expression.”); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 547, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) (“The Free Exercise Clause commits government itself to religious tolerance, and upon even slight suspicion that proposals for state intervention stem from animosity to religion or distrust of its practices, all officials must pause to remember their own high duty to the Constitution and to the rights it secures. Those in office must ... ensure that the sole reasons for imposing the burdens of law and regulation are secular.”).

FN35. For example, in addition to testifying that his perception of the Five Percenters as a gang came in part “from training,” *see* Trial Tr. 632:19-23, Shawangunk Superintendent Joseph Smith agreed that the Nation's unauthorized status makes it “easy” for him to treat the whole group as a gang when he would otherwise seek to distinguish sincere believers from disruptive members of a mainstream religious group. Trial Tr. at 647:25-648:6. Similarly, in response to plaintiff's counsel's questioning about DOCS' basis for treating the Nation as a gang in comparison to other authorized groups, DOCS official Richard Roy responded: “I would go the other way; they were not an authorized organization, so therefore they could not participate as an organization.” Trial Tr. at 390:10-12.

FN36. DOCS official Richard Roy, for example, testified that he found an article in *The Five Percenter* expressing the opinion that the death penalty was a form of legalized genocide and that the white man has always used his laws to justify “devilishment” potentially dangerous to prison security because it was hateful toward members of another race, and moreover that he and other DOCS employees reviewed the content of *The Five Percenter* when DOCS was making the decision to ban the Nation's materials. *See* Trial Tr. 419:15-412:14. Joseph Smith also agreed that he believes that the Five Percenter materials are dangerous. *See* Trial Tr. 673:16-18. Ron Holvey-though not a DOCS official-testified that he found the racist aspects of the Nation lessons a threat to prison security and that he objected to the Nation's beliefs because “the overall nature of the group promotes violence,” but that these views had nothing to do with his characterization of the Nation as a security threat group. *See* Trial Tr. at 737:7-738:19.

As a result of the foregoing, we cannot find, based on the trial record, that DOCS' classification of the Nation as a security threat group and absolute ban on Nation literature further a compelling security interest and is the least restrictive means of doing so.[FN37]

FN37. We acknowledge that there is some case law in tension with our decision in this case. *See* *Fraise v. Terhune,* 283 F.3d 506 (3d Cir.2002) (finding the New Jersey Department of Corrections' treatment of Five Percenters as a security threat group justified for summary judgment purposes under a *Turner v. Safley* analysis); *In re Long Term Administrative Segregation of Inmates Designated as Five Percenters,* 174 F.3d 464 (4th Cir.1999) (same with regard to the South Carolina Department of Corrections); *Lord Natural-Self Allah v. Annucci,* No. 97 Civ. 607, 1999 WL 299310 (W.D.N.Y. March 25, 1999) (Heckman, M.J.) (finding for preliminary injunctive purposes that DOCS' ban on Five Percenter materials was

justified under *Turner* ); Buford v. Goord, 258 A.D.2d 761, 686 N.Y.S.2d 121 (3d Dep't.1999) (dismissing, in an Article 78 proceeding, a *pro se* litigant's claim that DOCS' policies banning his receipt of Five Percenter materials violated his first amendment rights). Each of these cases, however, applied a more deferential standard of review than the RLUIPA analysis we apply in this decision, and the three federal case involving free exercise claims all assumed that Five Percenter beliefs would receive free exercise protection, which accords with our ruling in this case. Moreover, these other courts do not appear to have had an equally well-developed evidentiary record concerning the Nation's legitimate existence outside prison as we did in this case. Finally, we simply disagree with some of the findings and conclusions reached by those courts, most fundamentally the notion that prison policies classifying and treating an entire group as a gang can be upheld despite the fact that they are predicated on a faulty assumption that the group has no legitimate existence as a religion.

D. Relief

This case, like others in which prison inmates have asserted their First Amendment right to practice non-mainstream religions while incarcerated, "underscores the complex nature and difficulty of accommodating various religious belief systems and tenets within a prison system, wherein violence is a real and daily threat." *Campos v. Coughlin,* 854 F.Supp. 194, 197 (S.D.N.Y.1994). We have found that plaintiff is a sincere adherent to a religious belief system that qualifies for First Amendment protection, but are also prepared to accept for the purposes of this decision DOCS' claims that prison inmates identified as "Five Percenters" have been associated with instances of violence and disruption. This raises the possibility that "the Five Percenters" may somewhat uniquely connote *both* a religion *and* a gang in the New York State prison system (though the sincere religious adherents and gang members may not be the same inmates).

***19** It is apparent, however, that in pursuing its non-recognition policy DOCS has never fully considered the possibility or the policy consequences of the Nation qualifying for First Amendment protections, and did not do so at any time during the pendency of this case. Based on our review of the evidence and applying RLUIPA's compelling interest and least restrictive means tests in light of our determination that plaintiff is entitled to free exercise protection, we have concluded that plaintiff has clearly established his right to some of the relief requested. With respect to other of plaintiff's requests, given the tradition of judicial deference to the considered judgment of correction officials and the indications that there are some nominal Five Percenter inmates who violate prison rules, we remand them to DOCS in order for DOCS to reevaluate its policies in light of our free exercise ruling and to determine the appropriate accommodations that can be made consistent with security needs.[FN38] Our conclusions are set forth below.

FN38. Such a remand, which was requested by DOCS at trial, *see* Def. Findings at 26, is consistent with both the federal courts' tradition of deference and the Supreme Court's guidance concerning their appropriate supervisory role in prisoner litigation: "We have said that '[t]he strong considerations of comity that require giving a state court system that has convicted a defendant the first opportunity to correct its own errors ... also require giving the States the first opportunity to correct the errors made in the internal administration of their prisons." ' *Preiser v. Rodriguez,* 475 U.S. 475, 492 (1973).

i. 120 Degrees

In our summary judgment opinion we noted that DOCS' position concerning the 120 Degrees, "namely, that one religious group may possess the same materials

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 27

Not Reported in F.Supp.2d, 2003 WL 21782633 (S.D.N.Y.)

(Cite as: 2003 WL 21782633 (S.D.N.Y.))

that if possessed by another contribute to gang formation" was "a challenging one to sustain." *See* Marria v. Broaddus, 200 F.Supp.2d 280, 295 (S.D.N.Y.2002). Based on the trial evidence, DOCS cannot properly prevent plaintiff from receiving and possessing the 120 Degrees consistently with the Free Exercise clause and RLUIPA. As the book serves as the central text in plaintiff's religious belief system, he is clearly substantially burdened if he is denied access to it. In any event, its content is identical to the texts DOCS currently permits NOI to use and possess. Thus, because the 120 Degrees is associated with more than one group, including a currently "authorized" religious group, DOCS cannot tenably argue that its mere presence in prison legitimizes gang activity. Therefore, we order DOCS to permit plaintiff to possess a copy of the 120 Degrees in accordance with his beliefs as a member of the Nation of Gods and Earths, and that his access cannot be conditioned upon his joining the Nation of Islam.[FN39]

FN39. In accordance with our remand of plaintiff's requests to possess Nation symbols and other materials, we make no ruling at this time concerning what symbols, if any, DOCS must permit plaintiff to receive and display along with the 120 Degrees.

ii. Supreme Alphabet and Mathematics

We similarly grant plaintiff's request to be allowed to possess a copy of the Supreme Alphabet and Mathematics. As we noted earlier, these numerological devices are central aspects of the Nation's beliefs and practices, have remained unchanged since the 1960's, and are widely available to law enforcement on the Internet and elsewhere. DOCS admits that the alleged "code" is a simple one that can be learned by inmates orally even under its current ban, but maintains that the Supreme Alphabet and Mathematics are sometimes used by Five Percenter inmates to send coded messages to one another in furtherance of gang activities and would require the expenditure of significant resources to train officers to recognize and decode if they were disseminated among the inmate population (DOCS has also argued that the *Five Percenter* newspaper poses a security threat because it contains "code"). *See* Def. Findings ¶¶ 60-63, 103-104; Trial Tr. 407:13-15; Trial Tr. 665:14-19; Trial Tr. 692:9-693:8. While the Supreme Alphabet and Mathematics may indeed be susceptible to being used as a code, DOCS' arguments are unpersuasive. Toni Bair, a professor of criminal justice, former Warden of Virginia's Mecklenberg Correctional Center "Supermax" facility, and former assistant commissioner of the New York City Department of Corrections who testified as plaintiff's expert on prison security, succinctly refuted DOCS' claims that the Supreme Alphabet and Mathematics threaten prison security:

***20** It's published. The code is published. It is on the Internet. It is in the newspapers. It's everywhere. In order for a code to be effective and used, you know, covertly to be subversive or create problems in the institution, the code must be unbreakable and must not be, you know, common knowledge.... To ban the Mathematics and Alphabet because it is a code, you know, would be ludicrous. If we do that, why don't we ban Spanish, for example, because I would daresay that there is not a tremendous number of correctional officers in DOCS that are bilingual and yet we allow Spanish not only to be spoken but documents inside institutions that are Spanish ... and they are much more difficult to translate than this code would be.

Trial Tr. at 246:17-247:12.

We are persuaded that the Supreme Alphabet's and Mathematics' primary purpose is a religious one, and that, to they extent inmates might attempt to use them as a code, messages could be translated with minimal effort and training. Furthermore, the ability of inmates to communicate with each other by using the Supreme Alphabet and Mathematics in covert fashion would appear

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

to be more challenging and limited than conversations in a foreign language not spoken by guards. Hence, we see no connection between DOCS' current ban on possessing the Supreme Alphabet and Mathematics and a compelling security interest, and order that plaintiff be permitted to possess them.[FN40]

FN40. Again, in accordance with our remand of the remainder of plaintiff's claims to DOCS, we make no ruling at this time about whether plaintiff can possess or display Five Percenter symbols in conjunction with his possession of the Supreme Alphabet and Mathematics.

iii. Other Materials and Symbols, Gatherings, and Fasts

We remand the remainder of plaintiff's claims to DOCS to reevaluate its policies concerning the Nation and determine what materials and religious practices it can accommodate in light of our ruling that plaintiff's beliefs as a member of the Nation are entitled to free exercise and RLUIPA protection. It is incumbent upon DOCS to make a determination about the feasibility of allowing sincere adherents like plaintiff to possess literature and to engage in religious practices in light of its security concerns.

In particular, DOCS must reevaluate how, if at all, it can accommodate plaintiff's request to receive *The Five Percenter.* In this regard, plaintiff has proposed two suggestions addressing DOCS' concerns about permitting security threat group members to use innocuous literature to recruit, control, and intimidate as less restrictive alternatives to a complete ban on the Nation's literature. First, plaintiff suggests that DOCS utilize the existing media review committee process to redact symbols that it views as posing a security threat. Alternatively, plaintiff proposes that DOCS maintain a copy of *The Five Percenter* in the prison library that plaintiff can presumably sign for and read individually during normal library time without removing the copies from the library. At trial, DOCS' efforts to address the library suggestion were particularly unconvincing.[FN41] On remand, because plaintiff has established that his religious beliefs are substantially burdened by DOCS' current ban on *The Five Percenter,* DOCS bears the burden of demonstrating why his proposals are infeasible on remand.

FN41. DOCS' claims that maintaining a library copy of *The Five Percenter* would be infeasible because it would entail "separating plaintiff from other inmates" and "designating a separate room for plaintiff, and a separate secure space to secure the newspapers, assigning one or more staff members to supervise his movement to and from the room and assigning one or more members to issue him the Newspaper [*sic* ] and to retrieve it," as well as elevating the group's statute through such special treatment. *See* Def. Findings ¶¶ 106-108. This "parade of horribles" seems rather exaggerated.

***21** On the issue of congregative gatherings, such as parliaments, rallies, and civilization classes, DOCS has thus far dismissed the possibility of allowing such activities on the assumption that any sanctioned congregation of members of an unauthorized group would elevate that group's status and permit the group's members to conspire to engage in violent activities. Here again, DOCS' position suffers from the incorrect assumption that all Five Percenters are gang members. DOCS has also pinned its objections in part on the assumption that the gatherings would be unsupervised. *See* Def's. Findings at ¶ 122 ("Permitting plaintiff to participate in *unsupervised* inmate led parliaments would create a security risk in the prison by allow [*sic* ] Five Percenters to organize, recruit additional members and serve as a forum for criminal conspiracy.") (emphasis added); Trial Tr. at 461:3-11 (Dale Artus stating that his understanding of a parliament is "an unsupervised meeting place for the individuals who wish to be involved in this type of activity to be allowed to meet and learn" that he would view as "detrimental to the safety and security of the facility and the department").

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Plaintiff's counsel, however, has made it clear that he is not requesting unsupervised parliaments, and we note that Born Justice Allah from the Allah Youth Center testified at trial that he and other Nation members from outside prison would volunteer to assist DOCS in accommodating rallies and parliaments through advice and supervision. *See* Trial Tr. at 316:20-317:9. We recognize, however, that DOCS must consider security concerns, as well as considerations of limited time, space, and resources, in evaluating whether and how accommodations can be made for such gatherings.

Finally, DOCS must determine what can be done consistent with security concerns with respect to plaintiff's requests to receive late meals and gather with other inmates when he fasts in observance of Holy Days.

CONCLUSION

Based on the foregoing, it is ordered that DOCS conform its policies concerning the group known as the Nation of Gods and Earths with this ruling, and further that DOCS report the results of that policy reevaluation to the Court in sixty days.[FN42]

FN42. We would also be remiss if we failed to express the Court's gratitude to *pro bono* counsel for their excellent effort and professionalism throughout this case and to Sullivan & Cromwell for its sponsorship of their *pro bono* positions.

IT IS SO ORDERED.

S.D.N.Y.,2003.

Marria v. Broaddus

Not Reported in F.Supp.2d, 2003 WL 21782633 (S.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



H

Only the Westlaw citation is currently available.

United States District Court,

W.D. New York.

George FLUELLEN, Plaintiff,

v.

Commissioner Glenn S. GOORD, et al., Defendants.

No. 06-CV-602E(Sr).

March 12, 2007.

George Fluellen, Malone, NY, pro se.

J. Richard Benitez, Attorney General's Office, Rochester, NY, for Defendants.

***REPORT, RECOMMENDATION AND ORDER***

H. KENNETH SCHROEDER, JR., United States Magistrate Judge.

***1** This matter was referred to the undersigned by the Hon. John T. Elfvin, for all pretrial matters and to hear and report upon applications for injunctive relief. Dkt. # 12.

Plaintiff, a practicing Muslim affiliated with the Nation of Islam, challenges DOCS' policy of refusing to permit individuals who have designated their religion as anything other than Rastafarian to wear dreadlocks. Dkt. # 8. Plaintiff seeks injunctive relief, declaratory judgment, and compensatory and punitive damages for violations of his right to free exercise of religious beliefs, as protected by the First Amendment to the United States Constitution and the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), during his incarceration at the Attica Correctional Facility ("Attica"). Dkt. # 1. Plaintiff also claims that he was denied his constitutional right to due process during his disciplinary hearings and denied equal protection by virtue of defendants' haphazard application of the prohibition against dreadlocks. Dkt. # 1.

Currently before the Court is plaintiff's motion for a preliminary injunction preventing the defendants from disciplining him for refusing to cut his dreadlocks or change his religious affiliation. Dkt. # 7. For the following reasons, it is recommended that the Court enter a preliminary injunction preventing defendants from punishing plaintiff for refusing to cut his hair or refusing to change his religious affiliation, and preventing defendants from precluding plaintiff's attendance at Nation of Islam services and classes because of his dreadlocks. It is also recommended that this matter be consolidated, *sua sponte,* with 06-CV-490.[FN1]

FN1. Plaintiff's name was included as a plaintiff in the caption of an action filed with the Court on March 22, 2006, but the action was terminated with respect to him on November 11, 2006 for failure to submit a signed complaint or amended complaint and for failure to submit a request to proceed *In Forma Pauperis. See Amaker v.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Goord,* No. 06-CV-490, at Dkt. # 39. That action is based upon the same facts and legal theories as the instant action and, by Report and Recommendation entered March 9, 2007, the Court recommended entry of a preliminary injunction with similar terms to those requested in the instant case. Dkt. # 88.

### *BACKGROUND*

During the last week of February, 2006, C.O. Klodzinski and Sergeant O'Connell stopped plaintiff as he was entering Nation of Islam services because he was wearing his hair in matted locks (dreadlocks). Dkt. # 1, ¶¶ 1-2. Plaintiff protested that he had been wearing his hair this way for 12 years in numerous correctional facilities throughout the state, including four years at Attica, but C.O. Klodzinski informed plaintiff that only inmates of the Rastafarian faith are allowed to wear dreadlocks. Dkt. # 1, ¶ 3. Sergeant O'Connell informed plaintiff that he would consult with his supervisors about the matter and allowed plaintiff to attend services. Dkt. # 1, ¶ 5.

On May 29, 2006, plaintiff was prevented from attending Nation of Islam services by C.O. Jaboega, who instructed him to either change his religion to Rastafarian or cut his hair. Dkt. # 1, ¶ 9. Plaintiff informed C.O. Jaboega that he would violate his religious beliefs by cutting his hair. Dkt. # 1, ¶ 11. Plaintiff was escorted to his cell where he remained until he was called to the barber shop. Dkt. # 1, ¶ ¶ 12-14. C.O. Jaboega gave plaintiff a direct order to go into the barber shop and have his hair cut. Dkt. # 1, ¶ 15. When plaintiff refused the order because it violated his religious beliefs, C.O. Jaboega placed plaintiff in keeplock and issued a misbehavior report. Dkt. # 1, ¶ ¶ 16-18. Commissioner's Hearing Officer ("CHO"), Dixon found plaintiff guilty of violating a direct order and imposed a sentence of 29 days keeplock and 30 days loss of telephone, commissary and packages. Dkt. # 1, ¶ 38. Plaintiff was released from keeplock on June 28, 2006. Dkt. # 1, ¶ 47.

***2** On June 29, 2006, Sergeant O'Connell ordered plaintiff to either change his religion or cut his hair. Dkt. # 1, ¶ 48. When plaintiff refused, he was placed in keeplock, issued a misbehavior report for refusing to comply with a direct order, found guilty of the charge by CHO Murray and sentenced to 30 days keeplock and 30 days loss of commissary, telephones and packages. Dkt. # 1, ¶¶ 49-53.

One day after his release from keeplock, on July 30, 2006, C.O. Chapman ordered plaintiff to either change his religion to Rastafarian or cut his hair, ultimately resulting in 90 days keeplock and loss of commissary, telephones and packages. Dkt. # 1, ¶¶ 55-64.

Plaintiff affirms that his refusal to cut his dreadlocks is based upon a provision of the Quran, specifically, Chapter 2, verse 196, which states, in part:

> when you make up your mind to perform Hajj and Umrah, accomplish these to please Allah. But if you are hemmed in somewhere, then offer to Allah whatever sacrifice you can afford. And do not shave your heads until the sacrifice reaches its place.

Dkt. # 9, p.24. Plaintiff affirms that he took the vow to begin the pilgrimmage in 1994. Dkt. # 8, ¶ 7. Plaintiff also cites a portion of the Sunan Abu Dawud discussing the matting and growth of hair. Dkt. # 9, p.25.

DOCS' Inmate Grooming Standards provide that initial shaves and haircuts shall be required of all newly committed male inmates unless exempted. Dkt. # 14, p. 32. Inmates who profess to be a Rastafarian, Taoist, Sikh, Native American, Orthodox Jew, or member of any other religious sect of a similar nature cannot be forced to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Not Reported in F.Supp.2d, 2007 WL 4560597 (W.D.N.Y.)

(Cite as: 2007 WL 4560597 (W.D.N.Y.))

comply with the initial haircut requirements. Dkt. # 14, p.34. Thereafter, all inmates are permitted to grow their hair to any length desired by the inmate, but must tie long hair, which is defined as hair below shoulder length, in a ponytail. Dkt. # 14, pp.33 & 35. Native Americans are exempted from this restriction during the course of scheduled and approved Native American cultural ceremonies. Dkt. # 14, p.34. The only braids allowed are the corn row style and any such braids must be woven close to the scalp in straight rows from the forehead to the back of the neck, without design or symbols, and may not extend below the hairline. Dkt. # 14, p.35. In addition, DOCS asserts that, as set forth in Directive # 4040, decisions of the Central Office Review Committee ("CORC"),[FN2] including decisions providing that only inmates of the Rastafarian faith may have dreadlocks, are afforded the effect of directives. Dkt. # 14, pp.37-40.

FN2. DOCS' grievance procedure permits an inmate to file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). An inmate may appeal an adverse decision to the prison superintendent. Thereafter, an inmate may appeal the superintendent's decision to CORC. *See Hemphill v. New York,* 380 F.3d 680, 682 (2d Cir.2004); N.Y.C.R.R. § 701.7(c)(4).

Mark Leonard, Director of Ministerial, Family and Volunteer Services for DOCS, is responsible for "ensuring that all religious programs are carried out in accordance with the policies and procedures adopted by DOCS and are supervised by a qualified religious leader." Dkt. # 14, ¶ 1. Director Leonard declares that DOCS accommodates religious group activities for a number of religions represented within its facilities. Dkt. # 14, ¶ ¶ 2-3. Upon entry into DOCS, inmates voluntarily state their religion and, if that religion is a recognized religious group, the inmate is permitted to attend that group's religious services. Dkt. # 14, ¶ 10. "If an inmate is determined to be a bona fide member of the religious group, he/she is entitled to all of the religious privileges afforded to that religious group." Dkt. # 14, ¶ 12. Although DOCS recognizes that an inmate may practice a group religion in a way that is not recognized by the tenets of the religious group and may claim to need special accommodations in addition to those of the religious group to which he belongs, "DOCS cannot realistically accommodate the religious practices of every inmate who claims his individualized requests for privileges are ... based on the unique way he practices a group religion." Dkt. # 14, ¶¶ 29-31.

***3** Director Leonard declares that DOCS is unable to accommodate all inmates' individualized beliefs due to (a) the difficulty in determining whether the individualized beliefs are sincere; (b) the substantial administrative burdens; and (c) security concerns. Dkt. # 14, ¶ 41. Director Leonard notes that "[w]henever an inmate receives special privileges, DOCS needs to monitor those privileges to ensure that the correct inmate receives them and does not abuse them." Dkt. # 14, ¶ 48. Director Leonard asserts that "[m]aking inmates chose one religion helps ensure that the items and practices associated with that religion are necessary for religious purposes and not to promote illicit activities." Dkt. # 14, ¶ 58. "Without this restriction," he declares that "any inmate could wear dreadlocks ... simply by claiming that his religious beliefs required it" which "would make smuggling contraband easier and more prevalent in the correctional facilities." Dkt. # 14, ¶ 58. Director Leonard declares that "the smuggling of contraband in DOCS facilities pose[s] significant security problems and put[s] prison staff and other inmates at risk for serious bodily injury." Dkt. # 14, ¶ 60.

Director Leonard confirms that "inmates are not allowed to wear dreadlocks unless it is recognized as part of a designated religious belief" and declares that "[o]nly the Rastafarian religion has a recognized dogma regarding dreadlocks, and therefore DOCS allows only inmates of the Rastafarian faith to wear dreadlocks. Dkt. # 14, ¶ ¶ 63, 65. Director Leonard declares that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

The Rastafarian religious mandate and symbolism regarding dreadlocks also appears to be in stark contrast to Nation of Islam, where shaving is seen as a value of cleanliness ... Nation of Islam ... religious tenets simply do not require or dictate dreadlocks as a particular hairstyle, and are not an essential part of that faith. As a designated member of [Nation of Islam], plaintiff's decision to wear dreadlocks is a personal choice and is not mandated by his religion. Simply put, [Nation of Islam] does not have a recognized body of religious dogma regarding dreadlocks, and DOCS does not allow [Nation of Islam] or other faith group members to wear dreadlocks.

Dkt. # 14, ¶ 66. Director Leonard further declares that

Plaintiff's claim that he has a right as a designated member of [Nation of Islam] to wear dreadlocks is clearly in conflict with DOCS' policy, rules and regulations ... and if allowed would result in a[n] increased risk in breech of security for the correctional facility, conflict with Rastafarian principles and cause potential unrest among the Rastafarian inmate population, and jeopardize the safety of the staff and other inmates.

Dkt. # 14, ¶ 68. Director Leonard also declares that plaintiff's claim of denial of participation in Nation of Islam services "would appear to be a self-created hardship" and notes that "[a]s soon as plaintiff complies with DOCS policies and completes his SHU disciplinary penalties, he will be able to attend [Nation of Islam] services and activities." Dkt. # 14, ¶ 69.

***DISCUSSION AND ANALYSIS***

***4** A preliminary injunction is an "extraordinary remedy that should not be granted as a routine matter." *Patton v. Dole,* 806 F.2d 24, 28 (2d Cir.1986). "In the prison context, a request for injunctive relief must always be viewed with great caution so as not to immerse the federal judiciary in the management of state prisons." *Fisher v. Goord,* 981 F.Supp. 140, 167-68 (W.D.N.Y.1997), *citing Farmer v. Brennan,* 511 U.S. 825, 846-47, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

In most cases, a party seeking to obtain a preliminary injunction must establish that he will suffer irreparable harm in the absence of an injunction and demonstrate either: (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of the hardships tipping decidedly in the movant's favor. *Jolly v. Coughlin,* 76 F.3d 468, 473 (2d Cir.1996). "Where a moving party challenges government action taken in the public interest pursuant to a statutory or regulatory scheme, however, the moving party cannot resort to the fair ground for litigation standard, but is required to demonstrate irreparable harm and a likelihood of success on the merits." *Id.* (internal quotations omitted). In addition, where an injunction is mandatory-that is, where its terms would alter, rather than preserve, the status quo by commanding some positive act-the moving party must meet a higher standard than in the ordinary case by showing clearly that he or she is entitled to relief or that extreme or very serious damage will result from a denial of the injunction. *Phillip v. Fairfield University,* 118 F.3d 131, 133 (2d Cir.1997). "This heightened standard is also required where the issuance of the injunction would provide the movant with substantially all the relief he or she seeks and where the relief could not then be undone, even if the non-moving party later prevails at trial." *Id.* The same standards apply to a party seeking a temporary restraining order. *Ifill v. Goord,* No. 03-CV-355, 2004 WL 1663994, at *1 (W.D.N.Y. April 8, 2004).

In the instant case, defendants assert that the heightened standard applies becuase plaintiff is seeking a mandatory injunction. Dkt. # 15, p.5. The Court disagrees. Because plaintiff affirms that he has been wearing dreadlocks and attending Nation of Islam services since 1994, an injunction preventing enforcement of the CORC

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

Not Reported in F.Supp.2d, 2007 WL 4560597 (W.D.N.Y.)

(Cite as: 2007 WL 4560597 (W.D.N.Y.))

decisions against plaintiffs pending resolution of this lawsuit would preserve the status quo. Dkt. # 8, ¶ 7. In contrast, the Court's denial of a preliminary injunction would permit continued discipline against plaintiff and prevent his attendance at Nation of Islam services for the duration of this lawsuit. Such deprivations could not be undone should the plaintiff ultimately prevail. Accordingly, the Court will consider whether plaintiff will suffer irreparable harm in the absence of an injunction and whether he has established a likelihood of success on the merits.

*Likelihood of Success*

***5** RLUIPA was enacted following the determination of the United States Supreme Court that the Religious Freedom Restoration Act ("RFRA"), exceeded Congress' remedial powers under the Fourteenth Amendment. *See* *Cutter v. Wilkinson,* 544 U.S. 709, 715, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). RLUIPA corrected the constitutional infirmity of RFRA by invoking federal authority under the Spending Clauses to reach any program or activity that receives federal financial assistance, thereby encompassing every state prison. 42 U.S.C. § 2000cc-1(b)(1); *see* *id.* at 715-16. The statute provides that

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person-
>
> (1) is in furtherance of a compelling governmental interest;
>
> and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). This standard is "carried over from RFRA." *Cutter,* 544 U.S. at 717; *see* *Hoevenaar v. Lazaroff,* 422 F.3d 366, 368 (6th Cir.2005) ("test is the same as that previously imposed under RFRA"), *cert. denied,* --- U.S. ----, 127 S.Ct. 187, 166 L.Ed.2d 132 (2006).

By enacting RLUIPA, Congress mandated "a more searching standard of review of free exercise burdens than the standard used in parallel constitutional claims: strict scrutiny instead of reasonableness." *Lovelace v. Lee,* 472 F.3d 174, 186 (4th Cir.2006) (internal quotation omitted). "In addition to prescribing strict scrutiny, Congress mandated that RLUIPA be construed 'in favor of broad protection of religious exercise.' " *Id., quoting* 42 U.S.C. § 2000cc-3(g). "Congress, in other words, 'intended to provide as much protection as possible to prisoners' religious rights' without overly encumbering prison operations." *Id., quoting* *Murphy v. Missouri Dep't of Corr.,* 372 F.3d 979, 987 (8th Cir.), *cert. denied,* 543 U.S. 991, 125 S.Ct. 501, 160 L.Ed.2d 378 (2004). Thus, this standard is more stringent than the four-factor, rational-relationship-to-legitimate-penological-interest standard set forth in *Turner v. Safley*[FN3] for analysis of free exercise claims pursuant to the First Amendment. *See* *Warsoldier v. Woodford,* 418 F.3d 989, 994 (9th Cir.2005). Lawmakers anticipated, however, "that courts entertaining complaints under § 3 would accord 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.' " *Cutter,* 544 U.S. at 723.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN3. 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

Defendants argue that plaintiff cannot demonstrate likely success because his interpretation of the Quran is incorrect. Dkt. # 15, pp.5-9. Plaintiff responds that it is improper for the Court to assess the validity of his interpretation of his religious obligations. Dkt. # 26, ¶¶ 29-33.

***6** RLUIPA's definition of "religious exercise" includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). This expansive definition was recognized by the United States Supreme Court, which confirmed that the statute "bars inquiry into whether a particular belief or practice is 'central' to a prisoner's professed religiosity." *Id.* at 725.[FN4] As the Court of Appeals for the Second Circuit explained in the context of a constitutional claim:

> FN4. "Although RLUIPA bars inquiry into whether a particular belief or practice is 'central' to a prisoner's religion, the Act does not preclude inquiry into the sincerity of a prisoner's professed religiosity." *Cutter,* 544 U.S. at 725 (internal citation omitted); *see Ford,* 352 F.3d at 593-94 (The relevant question is whether a particular activity is considered central or important to the inmate's practice of religion). However, defendants do not challenge the sincerity of plaintiff's belief in the religious texts cited and plaintiff's credibility regarding the sincerity of his belief in the importance of maintaining his dreadlocks is bolstered by his determination to suffer keeplock and denial of participation in Nation of Islam services rather than cut his hair.

> Our founding principles require that courts resist the dangerous temptation to try to judge the significance of particular devotional obligations to an observant practitioner of faith. For, "[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds."

> *McEachin v. McGuinnis* [sic], 357 F.3d 197, 201 (2d Cir.2004), *quoting Hernandez v. Commissioner of Internal Revenue,* 490 U.S. 680, 699, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989). In other words, "a burdened practice need not be mandated by the adherent's religion in order to sustain a prisoner's free exercise claim." *Id.* at 203, *citing Ford v. McGinnis,* 352 F.3d 582, 593 (2d Cir.2003). Thus, plaintiff need not demonstrate that his interpretation of the requirements of his religion are correct in order to demonstrate likelihood of success on the merits.

Defendants argue that "DOCS' application of its rules and regulations and policy ... do not violate [RLUIPA] since DOCS has not imposed a substantial burden on plaintiff's religious exercise." Dkt. # 15, p. 14. Although the statute does not define "substantial burden," courts have incorporated the definition adopted in related contexts to conclude that a substantial burden exists where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs. *See Lovelace,* 472 F.3d at 187; *Jolly,* 76 F.3d at 477. In *Jolly,* the Court of Appeals for the Second Circuit determined that a choice of submitting to a test for latent tuberculosis or adhering to the belief that it is a sin to take artificial substances, such as those allegedly used in the test, into the body and enduring medical keeplock, constituted a substantial burden on plaintiff's religious exercise. *Id.* at 477. In a factually similar case to the instant matter, the Court of Appeals for the Ninth Circuit held that the California Department of Corrections' grooming policy imposed a substantial burden on a Native American's religious practice because it "intentionally puts significant pressure on inmates ... to abandon their religious beliefs by cutting their hair" or withstand discipline, including keeplock and loss of recreation, telephone, commissary

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

and other privileges. *Warsoldier,* 989 F.3d at 996. As in *Warsoldier,* this Court has little difficulty determining that forcing an individual who sincerely believes that he should wear dreadlocks as part of his religious practice to either forgo his affiliation with the Nation of Islam or face discipline constitutes a substantial burden upon that individual's religious practice.

***7** DOCS relies upon its compelling government interest in maintaining prison security, safety and sanitation to justify its policy. Dkt. # 55, p.5. The Court readily recognizes that prison safety and security are compelling governmental interests. *See* *Cutter,* 544 U.S. at 725, n. 13 ("prison security is a compelling state interest"); *Pell v. Procunier,* 417 U.S. 817, 823 (1974) ("central to all other corrections goals is the institutional consideration of internal security"); *Jolly,* 76 F.3d at 477 (noting DOCS compelling state interest in protecting inmates from infectious diseases). The Court also recognizes that the Court of Appeals for the Sixth Circuit, relying upon prison administrators' averments that there were no other means of achieving prison safety and security, upheld Ohio's absolute ban on long hair. *Hoevenaar,* 422 F.3d 366.

In the instant case, however, DOCS has determined that permitting Rastafarians to wear dreadlocks does not impose an insurmountable threat to DOCS' security, safety or sanitation. Moreover, DOCS does not appear to have any concerns that permitting this particular plaintiff to wear dreadlocks would threaten DOCS' security, safety or sanitation. As stated by DOCS,

> plaintiff can chose to comply with DOCS grooming standards and religious programs and practices set forth in Directive 4914, Directive 4202, and relevant CORC decisions, and attend and participate in [Nation of Islam] services or activities, or change his religious designation to Rastafarian to maintain his dreadlocks and participate in Rastafarian services and activities. The choice is his, but he cannot have it both ways since dreadlocks are not recognized for being religiously mandated for [Nation of Islam] adherents, implicate prison security and administrative concerns, and plaintiff has ample means of practicing his religious beliefs.

Dkt. # 15, p. 13. In addition, DOCS permits all inmates to grow their hair to any length so long as hair extending below shoulder length is tied back in a ponytail.

DOCS expresses concern with the administrative burden of accommodating individual religious beliefs which do not conform to the generally accepted practices of a recognized religious group. *See* Dkt. # 55, p.5 ("There would be an enormous administrative burden if DOCS were required to accommodate the individualized religious beliefs of 63,000 inmates."). While the Court is sympathetic to such difficulties, and does not suggest that DOCS' assessment of administrative burden should not be given deferential consideration, as set forth above, the statute is clear that DOCS cannot administer the religious exercise of its inmate population based upon its assessment of the validity of the requested practice to the religious denomination professed by the inmate.

*Irreparable Harm*

Defendants argue the plaintiff cannot demonstrate irreperable harm because DOCS is not demanding that plaintiff shave his head, but only that he cut his matted locks. Dkt. # 15, p.4. Because defendants interpret the religious texts that plaintiff relies upon to demonstrate the sincerity of his beliefs as only prohibiting him from shaving his head, they argue that compliance with DOCS' Inmate Grooming Standards will not harm plaintiff. Dkt. # 15, p.4. Plaintiff asserts that "it would violate his religious beliefs to cut his hair." Dkt. # 26, ¶ 17.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 8

Not Reported in F.Supp.2d, 2007 WL 4560597 (W.D.N.Y.)

(Cite as: 2007 WL 4560597 (W.D.N.Y.))

***8** "To satisfy the irreparable harm requirement, Plaintiff[ ] must demonstrate that absent a preliminary injunction [he] will suffer an injury that is neither remote nor speculative, but actual and imminent and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Freedom Holdings, Inc. v. Spitzer,* 408 F.3d 112, 114 (2d Cir.2005) (internal quotations omitted). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 747, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). Moreover, "[c]ourts have persuasively found that irreparable harm accompanies a substantial burden on an individual's rights to the free exercise of religion under RFRA." *Jolly,* 76 F.3d at 482. Defendants' discipline of plaintiff for his refusal to cut his hair or change his religious affiliation substantially burdens plaintiff's sincere religious beliefs, thereby satisfying the irreparable injury requirement.

***Consolidation***

Rule 42(a) of the Federal Rules of Civil Procedure provides that "[w]hen actions involving a common question of law or fact are pending before the court ... it may order all the actions consolidated." "The trial court has broad discretion to determine whether consolidation is appropriate." *Johnson v. Celotex Corp.,* 899 F.2d 1281, 1284-85 (2d Cir.1990). Moreover, a "district court can consolidate related cases under Federal Rule of Civil Procedure 42(a) *sua sponte." Devlin v. Transportation Commc'ns Int'l Union,* 175 F.3d 121, 130 (2d Cir.1999). "In assessing whether consolidation is appropriate in given circumstances, a district court should consider both equity and judicial economy." *Id.* The paramount concern, however, is whether "savings of expense and gains of efficiency can be accomplished *without sacrifice of justice." Id.; see Johnson,* 899 F.2d at 1285 ("Considerations of convenience and economy must yield to a paramount concern for a fair and impartial trial.").

In the instant case, the Court believes that consolidation of this action with 06-CV-490 would promote judicial economy as well as justice. Each of the three plaintiffs complain that they were disciplined for refusing to either cut their hair or change their religious affiliation from Nation of Islam to Rastafarian. Each of the three plaintiffs challenge DOCS' Inmate Grooming Standards. Six of the nine defendants named in this action are also defendants in 06-CV-490. The original complaint in 06-CV-490 named all three plaintiffs. By consolidating these cases, all parties can benefit from uniform discovery, settlement negotiations and trial strategy.

***CONCLUSION***

Based on the foregoing, it is recommended that plaintiff's motion for injunctive relief (Dkt.# 7), be granted and that defendants be enjoined from precluding plaintiffs' attendance at Nation of Islam services and classes because of his dreadlocks and from punishing plaintiff for refusing to cut his hair or refusing to change his religious affiliation. It is also recommended that this matter be consolidated with 06-CV-490.

***9** Accordingly, pursuant to 28 U.S.C. § 636(b)(1), it is hereby

ORDERED, that this Report, Recommendation and Order be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report, Recommendation and Order must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Civ.P. 72(b) and Local Rule 72.3(a)(3).

The district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

which could have been, but was not presented to the magistrate judge in the first instance. *See, e.g., Patterson-Leitch Co. v. Massachusetts Mun. Wholesale Electric Co.,* 840 F.2d 985 (1st Cir.1988).

*Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order. Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir.1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." *Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Report, Recommendation and Order), may result in the District Judge's refusal to consider the objection.*

The Clerk is hereby directed to send a copy of this Order and a copy of the Report and Recommendation to the *pro se* plaintiff and counsel for the defendant.

The Clerk is also directed to send a copy of this Order and a copy of the Report and Recommendation to the *pro se* plaintiffs in 06-CV-490 to afford them notice of the Court's recommendation to consolidate.

**SO ORDERED.**

W.D.N.Y.,2007.

Fluellen v. Goord

Not Reported in F.Supp.2d, 2007 WL 4560597 (W.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Slip Copy, 2010 WL 1875653 (S.D.N.Y.)

(Cite as: 2010 WL 1875653 (S.D.N.Y.))

H

Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

S.D. New York.

Navdeep SINGH, Plaintiff,

v.

Glenn S. GOORD, et al., Defendants.

No. 05 Civ. 9680(SCR)(LMS).

March 9, 2010.

***REPORT & RECOMMENDATION***

LISA MARGARET SMITH, United States Magistrate Judge.

***1 TO: THE HONORABLE STEPHEN C. ROBINSON, UNITED STATES DISTRICT JUDGE**

Plaintiff Navdeep Singh (herein, "Plaintiff"), brings the above captioned civil rights action against Defendants William Mazzuca (herein, "Defendant Mazzuca"), Paul Annetts (herein, "Defendant Annetts"), Wohlrab (herein, "Defendant Wohlrab"), Commia (herein, "Defendant Commia"), Lynch (herein, "Defendant Lynch"), Stewart (herein, "Defendant Stewart"), Tabor (herein, "Defendant Tabor"), Michelle Stone (herein, "Defendant Stone"), Officer John Doe # 2 (herein, "Defendant # 2), John Doe # 6 (herein, "Defendant # 6"), Brian Fisher (herein, "Defendant Fisher"), and William Connolly (herein, "Defendant Connolly"), and asserts various violations of his constitutional rights under the Religious Land Use and Institutionalized Person Act (herein, "RLUIPA"), 42 U.S.C. § 2000c *et seq,* 42 U.S.C. § 1983, and the 1st, 8th, and 14th Amendments to the Constitution. *See generally* Plaintiff's Complaint (herein, "Pl.'s Compl.). In addition, Plaintiff asserts a pendent state law claim. *Id.* Plaintiff seeks both injunctive and declaratory relief, as well as monetary damages. *Id.* Familiarity with the facts and procedural history of this case is presumed. See Judge Robinson's Memorandum Decision and Order, Oct. 9, 2007, Docket # 55. The only development of note is Plaintiff's release from prison on April 17, 2009. Defendants' Supplemental Memorandum of Law (herein "Defts.' Supp. Mem."), p. 2.

B. *Defendants' Motion for Summary Judgment*

Defendants initially filed a motion for partial summary judgment prior to Plaintiff's conditional release from prison. Defendants' Motion for Partial Summary Judgment (herein, "Defts.' Mot."), Docket # 70. At my suggestion, Defendants have since filed a supplemental memorandum of law to discuss the impact of Plaintiff's release on his remaining claims. Defendants' Supplemental Memorandum of Law In Support of Motion for Partial Summary Judgment (herein, "Defts.' Supp. Mem."), Docket # 104. In Defendants' supplemental memorandum, Defendants argue that because Plaintiff is no longer incarcerated, Count 1, which solely seeks declaratory relief, should be dismissed in its entirety as moot, and that the aspects of Counts 2, 3, and 4 that seek injunctive relief should also be dismissed as moot. *See generally* Defts.'

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Supp. Mem.

Turning to the Defendants' primary motion for partial summary judgment, Defendants first argue that Plaintiff has failed to exhaust his administrative remedies. Defendants' Memorandum of Law in Support of Motion for Partial Summary Judgment (herein, "Defts.' Mem."), pp. 3-10. Defendants also argue that money damages for violations of RLUIPA are barred by the 11th Amendment. *Id.,* pp. 10-11. In addition, Defendants argue that they are entitled to qualified immunity on the claims involving the behavior reports, and that there was not a constitutional injury. *Id.,* pp. 12-15. Fourth, Defendants argue that the claims against the Defendants who remain unnamed and unserved, including Defendant Commia, Defendant # 2, and Defendant # 6, should be dismissed from this action. *Id.,* pp. 15-16. Fifth, regarding the claim against Defendant Stewart for damage to Plaintiff's Karrah, Defendants argue that Plaintiff has failed to put forth sufficient evidence to maintain the claim. *Id.,* pp. 16-17. Sixth, Defendants assert that the claims against Defendants Annetts and Mazzuca should be dismissed from this action because Plaintiff has failed to allege that they had any personal involvement in the alleged deprivation of rights. *Id.,* p. 17. Seventh, as Defendant Stone has been sued only in her official capacity, any claim for money damages against her should be dismissed as barred by the 11th Amendment. *Id.,* pp. 20-21. Last, Defendants assert that Plaintiff has failed to proffer anything aside from conclusory allegations that Defendants retaliated against Plaintiff for exercising his religion. *Id.,* p. 22. As such, any claims of retaliation should be dismissed. *Id.*

C. *Plaintiff's Opposition*

***2** In response to Defendants' supplemental motion for summary judgment, Plaintiff argues that he should be excepted from the mootness doctrine, and that his claims for declaratory and injunctive relief should be maintained. *See generally* Plaintiff's Supplemental Opposition (herein, "Pl.'s Supp. Opp."). Specifically, Plaintiff asserts that his requests to amend DOCS Directive 4202 to cover Sikh practices "are assertions of his intention to represent other incarcerated Sikhs in a representative capacity." Pl.'s Supp. Opp., p. 4. While Plaintiff is no longer incarcerated, other incarcerated Sikhs still maintain an interest in Plaintiff's requests for declaratory and injunctive relief, and therefore Plaintiff's claims for declaratory and injunctive relief are not moot and should not be dismissed as such. Pl.'s Supp. Opp., pp. 4-5.

In addition, in opposition to Defendants' motion for partial summary judgment, Plaintiff asserts that the State of New York waived its sovereign immunity protection under the 11th Amendment by accepting federal funds following the enactment of RLUIPA, and therefore individual and official capacity damages are available for violations of RLUIPA. Plaintiff's Opposition (herein, "Pl.'s Opp."), pp. 2-11. Plaintiff also argues that with regard to the claim against Defendant Stewart for damage to Plaintiff's Karrah, there are sufficient issues of material fact that the claim should not be dismissed. *Id.,* pp. 11-15. Third, Plaintiff argues that Defendant Wohlrab is not entitled to qualified immunity. *Id.,* pp. 15-20. Last, Plaintiff counters Defendants' assertions that Plaintiff did not exhaust his administrative remedies with regard to Plaintiff's claim against Defendant Lynch for violations of his 8th Amendment rights. *Id.,* pp. 20-23.

***DISCUSSION***

A. *Summary Judgment Standard*

Pursuant to the Federal Rules of Civil Procedure, summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 320-23 (1986). A fact is "material" when it may affect the outcome of a case under the governing substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* A

trial judge may, therefore, grant summary judgment only if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law. *Id.* at 250. The inquiry performed is the threshold inquiry of determining whether there are any genuine factual issues that properly can be resolved only by a finder of fact. *Id.*

Summary judgment may be granted only "[i]f after discovery, the nonmoving party 'has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof.' " *Berger v. United States,* 87 F.3d 60, 65 (2d Cir.1996) (quoting *Celotex,* 477 U.S. at 323) (alteration in original). "The nonmoving party must have 'had the opportunity to discover information that is essential to his [or her] opposition' to the motion for summary judgment." *Trebor Sportswear Co. v. The Limited Stores, Inc.,* 865 F.2d 506, 511 (2d Cir.1989) (quoting *Anderson,* 477 U.S. at 250 n. 5). Moreover, a court should "constru[e] the evidence in the light most favorable to the nonmoving party and draw[ ] all reasonable inferences in its favor." *Mount Vernon Fire Ins. Co. v. Belize NY, Inc.,* 277 F.3d 232, 236 (2d Cir.2002); *Farias v. Instructional Sys., Inc.,* 259 F.3d 91, 97 (2d Cir.2001); *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 764 (2d Cir.1998); *see also Anderson,* 477 U.S. at 261 n. 2. Thus, "[o]nly when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted." *Cruden v. Bank of New York,* 957 F.2d 961, 975 (2d Cir.1992) (quoting *H.L. Hayden Co. of New York, Inc. v. Siemans Med. Sys. Inc.,* 879 F.2d 1005, 1011 (2d Cir.1989)).

B. *Injunctive and Declaratory Relief Claims*

***3** In the interest of judicial efficiency, I will begin by addressing whether Plaintiff's claims for declaratory and injunctive relief have been mooted as a result of Plaintiff's release from prison.

The United States Constitution, Article III, Section 2, clause 1, limits federal jurisdiction to cases and controversies. U.S. Const., art. III, § 2, cl. 1. In order to maintain jurisdiction over a particular case or controversy, parties to a suit must be able to demonstrate "a legally cognizable interest in the outcome" of the case or controversy. *Muhammad v. City of New York Dept. Of Corrections,* 126 F.3d 119, 122-23 (2d Cir.1997). In other words, "litigants are required to demonstrate a personal stake ... in the outcome of their case." *Cook v. Colgate University,* 992 F.2d 17, 19 (2d Cir.1993) (citing *United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 395 (1980)) (internal quotation marks omitted). If a party cannot demonstrate such a personal interest in the case, the case is rendered moot. *Muhammad,* 126 F.3d at 122-23. The determination of whether such an interest exists is to be made at the initiation of litigation, but is also meant to "ensure[ ] that the litigant's interest in the outcome continues to exist throughout the life of the lawsuit." *Id.* A case that begins as ripe may become moot during the pendency of the litigation, stripping the court of its jurisdiction and rendering the court without power to "redress the injury." *Id.*

An exception to the "mootness doctrine" exists in cases where the particular circumstances which give rise to the injury are "capable of repetition, yet evading review." However, this exception is to be reserved for exceptional circumstances. *Muhammad,* 126 F.3d at 123. These exceptional circumstances generally only exist in instances of class actions. *Id.* If the case does not involve a class action, the "capable of repetition, yet evading review" standard is met only if "(1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party would be subjected to the same action again." *Cook,* 992 F.2d at 19 (quoting *Weinstein v. Bradford,* 423 U.S. 147, 149 (1975)) (internal quotation marks omitted).

In this case, Plaintiff is not entitled to the benefit of the mootness doctrine. First, Plaintiff's action is not pled

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Slip Copy, 2010 WL 1875653 (S.D.N.Y.)

(Cite as: 2010 WL 1875653 (S.D.N.Y.))

as, nor is it argued to be, a class action. Second, Plaintiff concedes that there is not a reasonable expectation that Plaintiff will find himself in jail again such that he would be subject to the same allegedly discriminatory conduct. Pl.'s Supp. Opp., p. 1. Rather, Plaintiff attempts to argue that the second prong of the "capable of repetition, yet evading review" test-that the same complaining party would be subjected to the same action again-is satisfied because Plaintiff brought this action in a representative capacity on behalf of all incarcerated Sikhs. *Id.* Therefore, the "same complaining party", *i.e.,* still-incarcerated Sikhs, could be subjected to the same discriminatory conduct again. *Id.* To support this contention, Plaintiff points to the portion of his complaint that requests that DOCS Directive 4202 be amended to cover Sikh religious practices as evidence of his intent to bring this suit on behalf of all incarcerated Sikhs. Pl.'s Supp. Opp., p. 7. However, Your Honor previously determined that Plaintiff sought the amendment of Directive 4202 to protect his own interests should he be transferred to another correctional facility. Decision and Order, p. 16, Docket # 55. Your Honor did not find that Plaintiff sought such an amendment to protect the rights of similarly situated Sikhs.

***4** Moreover, Plaintiff's complaint is completely devoid of any facts or allegations that would allow this Court to conclude that Plaintiff intended to bring this cause of action on behalf of all incarcerated Sikhs. Plaintiff did not file for class certification, nor did his complaint request relief for himself and others similarly situated. On the contrary, Plaintiff's complaint refers solely to himself and his individual right to observe his religious practices. *See generally* Pl.'s Compl. Furthermore, under Plaintiff's prayer for relief, Plaintiff discusses amending DOCS Directive 4202 so that DOCS personnel will be prohibited from "restricting Navdeep's religious practices", "denying Navdeep the right to have six turbans", "denying Navdeep the right to wear turbans", "denying Navdeep the right to possess more than three Kaccheras", and so on. Pl.'s Compl., p. 30. Plaintiff does not once refer to other incarcerated Sikhs.

Plaintiff's reliance on *Trachtman v. Anker,* 563 F.3d 512 (2d Cir.1977), *Kempner v. Town of Greenwich,* No. 06-CV-1393, 2007 WL 2154178 (D.Conn.2007), and *Brandon v. Bd. of Educ.,* 635 F.2d 971 (2d Cir.1980), is misplaced. In *Trachtman,* the Second Circuit found that the plaintiff brought his suit in a representative capacity because the plaintiff's complaint specifically requested relief on behalf of himself and others similarly situated. *Trachtman,* 563 F.2d at 514 n. 1. Likewise, in *Brandon,* the Second Circuit again held that plaintiff's case had not become moot as a result of the plaintiff's graduation because the plaintiffs' complaint sought relief on behalf of themselves and other similarly situated students. *Brandon,* 635 F.2d at 973. The plaintiff in *Kempner* filed a motion to certify a class action in state court before the case was removed to federal court, evincing the plaintiff's intent to act in a representative capacity. *Kempner,* 2007 WL 2154178, at*3 n. 2.

Plaintiff has failed to establish the second prong of the "capable of repetition, yet evading review" exception to the mootness doctrine: that there is a reasonable expectation that the same complaining party would be subject to the same discriminatory conduct again. Therefore, I conclude, and respectfully recommend that Your Honor should conclude, that because Plaintiff is no longer incarcerated, and cannot establish that he is exempt from the mootness doctrine, all claims for declaratory and injunctive relief should be dismissed as moot.

C. *Plaintiff's Claims for Monetary Damages*

As a preliminary matter, Defendants correctly point out that Plaintiff does not oppose their motion for partial summary judgment as to the claims against Defendant Annetts, Defendant John Doe # 2, Defendant Lynch for writing a misbehavior report, Defendant Mazzuca, Defendant Stone, Count 4's cause of action for First Amendment retaliation, Defendant Commia, and Defendant John Doe # 6. Defendants' Reply Memorandum of Law, p. 1-2. As such, I conclude, and respectfully recommend that Your Honor should conclude, that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Plaintiff has abandoned these claims and that they should be dismissed. *See* *Lipton v. County of Orange,* 315 F.Supp.2d 434, 446 (S.D.N.Y.2004).

1. *Eighth Amendment Claim*

***5** Plaintiff claims that Defendant Lynch used excessive force against him on June 6, 2005. Pl.'s Compl., ¶ 124. Defendants argue that Plaintiff has failed to exhaust his administrative remedies with regard to this claim as none of Plaintiff's grievances against Defendant Lynch refer to an instance of excessive force or a physical assault of any kind. Defts.' Mem., p. 4. Plaintiff counters that the information contained in the June 21, 2005, grievance was sufficient to put the prison officials on notice of his claim against Defendant Lynch. Pl.'s Opp., p. 20-22. Accordingly, Plaintiff asserts that he has exhausted his administrative remedies for this claim and it should not be dismissed.[FN1] *Id.*

FN1. Defendants also assert that Plaintiff's grievance regarding Defendant Lynch and his claim of excessive force was neither timely filed nor fully appealed. Defts.' Mem., p. 6-7. Because this claim can be resolved based on the substance of the grievance, I will not address these additional grounds.

The only grievance filed by Plaintiff that can be construed as pertaining to the alleged conduct by Defendant Lynch is the grievance filed on June 21, 2005.[FN2] Marden Decl., Ex. 3, Bates 2-10-06 104-105. This grievance contains various allegations against Defendant Lynch including forcing Plaintiff to work in areas where he should not work due to a medical condition, preventing Plaintiff from seeing his visitors, and speaking to Plaintiff in a derogatory manner. *Id.* As Plaintiff points out in his opposition, at the end of the grievance, Plaintiff states that "there is a whole lot more that if I discussed, let alone put on paper, I would be jepardizing[sic] my safty[sic] here at fishkill[sic]." *Id.* It is this language which Plaintiff relies on as putting DOCS personnel on notice that Defendant Lynch had physically assaulted Plaintiff, thereby exhausting Plaintiff's administrative remedies and preserving the claim for this Court. Pl.'s Opp., p. 22-23.

FN2. Plaintiff concedes that this is the only relevant grievance. Pl.'s Opp., p. 20.

The Court is willing to accept that the above-mentioned language indicates that Plaintiff fears that he may be physically retaliated against for filing these complaints. The Court is, of course, sensitive to Plaintiff's concerns. However, Plaintiff blurs a line that warrants distinguishing. There is a significant difference between being fearful of physical retaliation as a result of filing grievances, as compared to providing notice that the Plaintiff has previously been physically assaulted. Plaintiff states that he is afraid to detail the alleged misconduct he has experienced because he fears that he will be retaliated against in the future. Plaintiff does not say that he is afraid for his physical safety because of some prior instance of excessive force. On the contrary, it is possible that Plaintiff fears he will be physically harmed for making any grievance, alleging any sort of misconduct, against any prison official. The fact that Plaintiff fears he will be physically harmed if he reports misconduct in no way provides notice that he was, in fact, physically assaulted.

While Plaintiff is correct that "uncounselled inmates cannot be expected to satisfy a standard more stringent than that of a notice pleading" Pl.'s Opp., p. 23 (quoting *Boddie v. Bradley,* 129 Fed .Appx. 658, 660 (2d Cir.2005)) (internal quotation marks omitted), they still must satisfy the requirements of notice pleading. This means that the grievance "must contain allegations sufficient to alert the Defendants to the nature of the claim." *Johnson v. Testman,* 380 F.3d 691, 697 (2d Cir.2004) (quoting *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 234 (2d Cir.2004)) (internal quotation marks

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

omitted). In other words, prisoners "must provide enough information about the conduct of which they complain to allow prison officials to take responsive measures." *Id.*

***6** Plaintiff's grievance does not meet this standard. Plaintiff's grievance does not contain any mention of excessive force by Defendant Lynch on June 6, 2005, or any other allegation that would in any way indicate to DOCS personnel that they should investigate a claim of physical assault or excessive force by Defendant Lynch against Plaintiff. *But see Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 514 (2002) (complaint satisfied notice pleading standard in employment discrimination case because complaint "detailed events leading to termination, provided relevant dates, and included ages and nationalities ... of relevant persons involved with [plaintiff's] termination"). Furthermore, Plaintiff did not mention a claim of excessive force by Defendant Lynch when interviewed by prison officials for the other claims contained within his June 21, 2005, grievance.

Therefore, I conclude, and respectfully recommend that Your Honor should conclude, that Plaintiff did not adequately exhaust his administrative remedies with regard to his claim of excessive force against Defendant Lynch and that claim should be dismissed.

2. *Religious Land Use and Institutionalized Person Act Claims*

The Religious Land Use and Institutionalized Person Act prohibits the government from burdening a prisoner's freedom to exercise his or her religion unless the government can demonstrate that the burden is in furtherance of a compelling governmental interest and "is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc1(a). The primary issue in this case, and one of some contention across jurisdictions, is whether Congress intended to include money damages as an available remedy under RLUIPA. *See Pugh v. Goord,* 571 F.Supp.2d 477, 506 (S.D.N.Y.2008) (listing cases discussing the dispute over the availability of money damages under RLUIPA).

a. *Individual Capacity*

RLUIPA was enacted by Congress pursuant to their authority under the Spending Clause of the Constitution. *Pugh,* 571 F.Supp.2d at 506 (citing *Smith v. Allen,* 502 F.3d 1255, 1274 (11th Cir.2007)). Through RLUIPA, Congress conditioned the receipt of federal funds on prisons' compliance with RLUIPA's provisions. *Id.;* 42 U.S.C. § 2000cc-1(a). As previously mentioned, courts across the country are divided on whether money damages may be imposed on individuals who violate RLUIPA's dictates. Neither the Supreme Court, nor the Second Circuit have rendered decisions clarifying the issue. However, three district courts within the Second Circuit have rendered decisions on this issue and have unanimously held that money damages are unavailable under RLUIPA. *Pugh,* 571 F.Supp.2d 477; *El Badrawi v. Dept. of Homeland Security,* 579 F.Supp.2d 249 (D.Conn.2008); *Bock v. Gold,* No. 05-CV-151, 2008 WL 345890 (D.Vt. Feb. 7, 2008). In *Pugh,* Judge Sullivan adopted the 11th Circuit's finding that because prison officials, in their individual capacities, were not "contracting" parties who themselves received federal funds, they could not be held individually liable for money damages for violating RLUIPA. *Pugh,* 571 F.Supp.2d at 506 (citing *Smith,* 502 F.3d at 1275. Prison officials, in their individual capacities, did not have the authority to accept or reject federal funds. To nevertheless hold the prison workers individually liable for violations of RLUIPA and impose money damages would "raise[ ] substantial constitutional concerns and would be incongruent with the reach of Congress' spending power." *Pugh,* 571 F.Supp.2d at 506 (quoting *Smith,* 502 F.3d at 1275) (internal quotation marks omitted). As such, Judge Sullivan concluded that the "appropriate relief" remedy provided by RLUIPA did not allow for money damages against prison officials sued in their individual capacities. This Court is likewise persuaded by the analysis in *Smith,* adopted in *Pugh,* and concludes, and respectfully recommends that Your Honor should conclude, that all

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

claims for money damages against Defendants in their individual capacities under RLUIPA should be dismissed.

b. *Official Capacity*

***7** Jurisdictions are likewise divided as to whether prison officials sued in their official capacity may have money damages imposed on them for violations of RLUIPA. *Pugh,* 571 F.Supp.2d at 507. To impose money damages on individuals sued in their official capacity, a court must find that the subject state has waived its sovereign immunity under the 11th Amendment through its acceptance of federal funds. *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 238 (1985). The Supreme Court has previously held that a state's sovereign immunity will only be waived when "(1) Congress evince[s] a clear and unequivocal intent to hold the States liable in federal court; and then (2) a state voluntarily engage[s] in that particular activity." *Pugh,* 571 F.Supp.2d at 509. Specifically, in cases involving the imposition of money damages, the waiver of sovereign immunity must be unambiguous. *Id.* (citing *Lane v. Pena,* 518 U.S. 187, 192 (1996)).

In *Pugh,* Judge Sullivan held that the remedy section of RLUIPA that refers to "appropriate relief against a government" did not satisfy the "unequivocal textual expression necessary to waive [s]tate immunity from suits for damages." *Pugh,* 571 F.Supp.2d at 508-509 (citing *Madison v. Commonwealth of Virginia,* 474 F.3d 118, 122-23 (4th Cir.2006)). Most notably, RLUIPA is devoid of any language, such as "compensatory", or other damages language that would put a state on notice that by accepting federal funds, it is absolutely waiving its sovereign immunity. *Pugh,* 571 F.Supp.2d at 509. The term "appropriate relief" is simply too ambiguous to encompass money damages and trigger the waiver of sovereign immunity. *Id.*

Likewise, in *El Badrawi v. Dept. of Homeland Security,* Judge Hall discussed the high standard that must be met in order overcome a state's sovereign immunity. *El Badrawi,* 579 F.Supp.2d at 259 ("[t]he Supreme Court has held that Congress may only abrogate the states' sovereign immunity by making its intention unmistakably clear in the language of the statute.") (quoting *Atascadero State Hosp.,* 473 U.S. at 242) (internal quotation marks omitted). As in *Pugh,* the court in *El Badrawi* focused on the fact that RLUIPA was enacted under the Spending Clause, and therefore it was incumbent upon the courts to "ensure that Congress ha[d] unambiguously spelled out the conditions that attach[ed] to the receipt of federal funds." *Id.* (citing *Arlington Cent. Sch. Dist. Bd. Of Educ. v. Murphy,* 548 U.S. 291, 295-96 (2006)). Ultimately, the Court in *El Badrawi* concluded that because the phrase "appropriate relief" was open to several different interpretations, it could not be said that Congress' intent was unambiguous such that a waiver of the state's sovereign immunity was appropriate. *Id.* at 260-261.

Similarly, in *Bock v. Gold,* the District Court in Vermont adopted Magistrate Judge Niedermeier's recommendation to dismiss the plaintiff's RLUIPA claims because there was not a legal basis for a money damages claim under RLUIPA. Bock, 2008 WL 345890, at *1. In holding that RLUIPA did not provide money damages, Judge Niedermeier also relied on the fact that the language "appropriate relief" was not a clear and unambiguous expression of Congress' intent to make money damages available under RLUIPA. *Id.* at *6.

***8** Plaintiff mistakenly relies on *Hankins* to support his contention that RLUIPA does provide money damages. Pl.'s Opp., p. 4. In *Hankins,* Magistrate Judge Lowe recommended, and Judge Scullin adopted, that plaintiff's RLUIPA claim be dismissed pursuant to Rule 12(b)(6) for failure to state a claim. *Hankins v. NYS Dept. Of Correctional Serv.,* No. 07CV408, 2008 WL 2019655, at *6 (N.D.N.Y. March 10, 2008); Order Adopting Report and Recommendation, May 6, 2008, Docket # 17. Judge Lowe's report and recommendation stated that if Judge Scullin disagreed with this conclusion, the plaintiff's

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

RLUIPA claims should not be dismissed because of the unavailability of money damages. *Id.* at *7. Judge Lowe stated that by accepting federal funds after the passage of RLUIPA, New York effectively waived its sovereign immunity. *Id.* Judge Lowe did not discuss either the origins of RLUIPA, or the constitutional implications of such a holding. More importantly, Judge Lowe did not base his ultimate recommendation upon the issue of whether RLUIPA provides for money damages. Rather, Judge Lowe's discussion of the money damages issue was more appropriately considered dicta. Furthermore, Judge Scullin, in adopting Judge Lowe's recommendation, did not specifically refer to any of Judge Lowe's findings or reasonings. Therefore, this Court is more persuaded by the rulings in *Pugh, El Badrawi,* and *Bock* and finds that RLUIPA did not explicitly and unambiguously condition the receipt of federal funds on waiving a state's sovereign immunity.

As such, I conclude, and respectfully recommend that Your Honor should conclude, that RLUIPA does not provide money damages against prison officials sued in their official capacity, and therefore, all claims against Defendants in their official capacity for money damages for alleged violations of RLUIPA should be dismissed.[FN3]

FN3. Because I so conclude, and because Plaintiff's RLUIPA claim was the only remaining claim against Defendant Wolhrab, I conclude, and recommend that Your Honor should conclude, that there are no remaining claims against Defendant Wolhrab. Therefore, assuming that Your Honor agrees with this recommendation, analysis of Defendants' argument that Defendant Wolhrab is entitled to qualified immunity would be rendered moot.

3. *Damage to Plaintiff's Karrah*

As a preliminary matter, Plaintiff's current allegations regarding damage to his Karrah occurring in August of 2005 should be dismissed. Plaintiff's complaint does not contain any allegation of damage to Plaintiff's Karrah in August of 2005. Pl.'s Compl., ¶ 64-72. The first mention of any damage occurring in August of 2005 is contained in Plaintiff's opposition to Defendants' motion for summary judgment. Pl.'s Opp., p. 12; Singh's Decl. In Opp., ¶ 40-41. As Defendants correctly point out, claims raised for the first time in opposition to summary judgement motions are improperly pled. *Jones v. Goord,* 435 F.Supp.2d 221, 261 (S.D.N.Y.2006). Therefore, I conclude, and respectfully recommend that Your Honor should conclude, that Plaintiff's claim of damage to his Karrah occurring in August of 2005 should be dismissed.

Next, Defendants argue that Plaintiff's claims that Defendant Stewart damaged his Karrah in April and July of 2005 should be dismissed for lack of sufficient evidence. Defts.' Mem. Of Law, p. 16. Plaintiff proffers that he has put forth sufficient evidence to create a fact question for a jury. Pl.'s Mem. Of Law, p. 12-15. The allegations that Plaintiff's Karrah was burned are somewhat inconsistent. In Plaintiff's complaint, he alleges that DOCS personnel burned his Karrah in April of 2005. However, Plaintiff's Declaration does not contain any allegations regarding a burning of his Karrah. Nor does Plaintiff's 56.1 Statement contain any allegations regarding a corrections officer burning Plaintiff's Karrah. *See generally* Plaintiff's 56.1 Statement. Plaintiff makes a vague reference to his Karrah being burnt in his memorandum of law in opposition, without specifying who he believes burned the Karrah or when the alleged burning occurred. Pl.'s Mem., p. 12. Ultimately, there is no evidence in the record which would be sufficient, if believed, to support Plaintiff's claims that his Karrah was damaged in April of 2005, that his Karrah was ever burned, or that Defendant Stewart burned or otherwise damaged Plaintiff's Karrah in April of 2005. Therefore, I conclude, and respectfully recommend that Your Honor should conclude that all claims against Defendant Stewart based on a burning of Plaintiff's Karrah or any damage caused to Plaintiff's Karrah in April of 2005 should be dismissed.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

***9** There is likewise insufficient evidence to maintain Plaintiff's claim that Defendant Stewart damaged Plaintiff's Karrah in July of 2005. The grievance filed by Plaintiff regarding the events of July 10, 2005, discusses two officers, one of them presumably being Defendant Stewart, failing to provide Plaintiff an envelope in which to place his Karrah, as requested. However, there are no allegations within this grievance that either of the officers bent or damaged Plaintiff's Karrah in any way. *See* Marden's Decl., Ex. 4, Bates 2-10-06 334. Furthermore, the case history and record from grievance 7-13-05 states that it was only when Plaintiff's Karrah was brought to him before breakfast, on July 11, 2005, that it was bent out of shape. Marden's Decl., Ex. 5, Bates 2-10-06 351. Plaintiff references a conversation that he had with the officer who brought him the bent Karrah that morning and refers to “she”, indicating that the officer returning the damaged Karrah was female. *Id.* Defendant Stewart is a male, and thus he could not have been the delivering officer. Later on in that same record, the Plaintiff's appeal to CORC states that Officer “Stewart w[as] never accused of damaging [Plaintiff's] Karrah.” 2-10-06 352. Again, Plaintiff references the female officer that returned Plaintiff's Karrah to him in a damaged state. *Id.* In addition, Plaintiff's declaration in opposition to Defendants' motion for partial summary judgment alleges that Defendant Stewart came to Plaintiff's cell on July 10, 2005, but does not allege that Defendnat Stewart, or any other DOCS personnel, damaged Plaintiff's Karrah on that day. Pl.'s Decl. In Opp., ¶¶ 42-44. Plaintiff again asserts that on July 11, 2005, an unnamed female officer brought Plaintiff his Karrah, and at that point, it was bent. Pl.'s Decl. In Opp., ¶ 45.[FN4] There is no evidence in the record, aside from Plaintiff's completely conclusory and unsupported allegations, to support Plaintiff's assertions that Defendant Stewart damaged Plaintiff's Karrah in July of 2005. Accordingly, I conclude, and respectfully recommend that Your Honor should conclude, that Plaintiff's claim against Defendant Stewart for damaging Plaintiff's Karrah in July of 2005 should be dismissed.

FN4. While there is a grievance dated sometime in August referencing Plaintiff's Karrah being returned to him damaged, as previously discussed, any claims for damage to Plaintiff's Karrah occurring in August were not pled in Plaintiff's complaint and will not be considered by this Court.

## *CONCLUSION*

For the aforementioned reasons, I conclude, and respectfully recommend that Your Honor should conclude, that Defendants' Motion for Partial Summary Judgment and Supplemental Motion for Summary Judgment should be granted in their entirety, and that Plaintiff's corresponding claims should be dismissed With prejudice.

## *NOTICE*

Pursuant to 28 U.S.C. § 636(b)(1), as amended, and FED. R. CIV . P. 72(b)(2), the parties shall have fourteen (14) days, plus an additional three (3) days, pursuant to FED. R. CIV. P. 6(d), or a total of seventeen (17) working days, *see* FED. R. CIV. P. 6(a), from the date hereof, to file written objections to this Report and Recommendation. Such objections, if any, shall be filed with the Clerk of the Court with extra copies delivered to the chambers of The Honorable Stephen C. Robinson at the United States Courthouse, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at the same address.

***10** Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge Robinson.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 10

Slip Copy, 2010 WL 1875653 (S.D.N.Y.)

(Cite as: 2010 WL 1875653 (S.D.N.Y.))

S.D.N.Y.,2010.

Singh v. Goord

Slip Copy, 2010 WL 1875653 (S.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.





H

Only the Westlaw citation is currently available.

United States District Court,

W.D. New York.

George FLUELLEN, Plaintiff,

v.

Commissioner Glenn S. GOORD, et al., Defendants.

No. 06-CV-602E(Sr).

March 12, 2007.

George Fluellen, Malone, NY, pro se.

J. Richard Benitez, Attorney General's Office, Rochester, NY, for Defendants.

***REPORT, RECOMMENDATION AND ORDER***

H. KENNETH SCHROEDER, JR., United States Magistrate Judge.

***1** This matter was referred to the undersigned by the Hon. John T. Elfvin, for all pretrial matters and to hear and report upon applications for injunctive relief. Dkt. # 12.

Plaintiff, a practicing Muslim affiliated with the Nation of Islam, challenges DOCS' policy of refusing to permit individuals who have designated their religion as anything other than Rastafarian to wear dreadlocks. Dkt. # 8. Plaintiff seeks injunctive relief, declaratory judgment, and compensatory and punitive damages for violations of his right to free exercise of religious beliefs, as protected by the First Amendment to the United States Constitution and the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), during his incarceration at the Attica Correctional Facility ("Attica"). Dkt. # 1. Plaintiff also claims that he was denied his constitutional right to due process during his disciplinary hearings and denied equal protection by virtue of defendants' haphazard application of the prohibition against dreadlocks. Dkt. # 1.

Currently before the Court is plaintiff's motion for a preliminary injunction preventing the defendants from disciplining him for refusing to cut his dreadlocks or change his religious affiliation. Dkt. # 7. For the following reasons, it is recommended that the Court enter a preliminary injunction preventing defendants from punishing plaintiff for refusing to cut his hair or refusing to change his religious affiliation, and preventing defendants from precluding plaintiff's attendance at Nation of Islam services and classes because of his dreadlocks. It is also recommended that this matter be consolidated, *sua sponte,* with 06-CV-490.[FN1]

FN1. Plaintiff's name was included as a plaintiff in the caption of an action filed with the Court on March 22, 2006, but the action was terminated with respect to him on November 11, 2006 for failure to submit a signed complaint or amended complaint and for failure to submit a request to proceed *In Forma Pauperis. See Amaker v.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Goord,* No. 06-CV-490, at Dkt. # 39. That action is based upon the same facts and legal theories as the instant action and, by Report and Recommendation entered March 9, 2007, the Court recommended entry of a preliminary injunction with similar terms to those requested in the instant case. Dkt. # 88.

***BACKGROUND***

During the last week of February, 2006, C.O. Klodzinski and Sergeant O'Connell stopped plaintiff as he was entering Nation of Islam services because he was wearing his hair in matted locks (dreadlocks). Dkt. # 1, ¶¶ 1-2. Plaintiff protested that he had been wearing his hair this way for 12 years in numerous correctional facilities throughout the state, including four years at Attica, but C.O. Klodzinski informed plaintiff that only inmates of the Rastafarian faith are allowed to wear dreadlocks. Dkt. # 1, ¶ 3. Sergeant O'Connell informed plaintiff that he would consult with his supervisors about the matter and allowed plaintiff to attend services. Dkt. # 1, ¶ 5.

On May 29, 2006, plaintiff was prevented from attending Nation of Islam services by C.O. Jaboega, who instructed him to either change his religion to Rastafarian or cut his hair. Dkt. # 1, ¶ 9. Plaintiff informed C.O. Jaboega that he would violate his religious beliefs by cutting his hair. Dkt. # 1, ¶ 11. Plaintiff was escorted to his cell where he remained until he was called to the barber shop. Dkt. # 1, ¶ ¶ 12-14. C.O. Jaboega gave plaintiff a direct order to go into the barber shop and have his hair cut. Dkt. # 1, ¶ 15. When plaintiff refused the order because it violated his religious beliefs, C.O. Jaboega placed plaintiff in keeplock and issued a misbehavior report. Dkt. # 1, ¶ ¶ 16-18. Commissioner's Hearing Officer ("CHO"), Dixon found plaintiff guilty of violating a direct order and imposed a sentence of 29 days keeplock and 30 days loss of telephone, commissary and packages. Dkt. # 1, ¶ 38. Plaintiff was released from keeplock on June 28, 2006. Dkt. # 1, ¶ 47.

***2** On June 29, 2006, Sergeant O'Connell ordered plaintiff to either change his religion or cut his hair. Dkt. # 1, ¶ 48. When plaintiff refused, he was placed in keeplock, issued a misbehavior report for refusing to comply with a direct order, found guilty of the charge by CHO Murray and sentenced to 30 days keeplock and 30 days loss of commissary, telephones and packages. Dkt. # 1, ¶¶ 49-53.

One day after his release from keeplock, on July 30, 2006, C.O. Chapman ordered plaintiff to either change his religion to Rastafarian or cut his hair, ultimately resulting in 90 days keeplock and loss of commissary, telephones and packages. Dkt. # 1, ¶¶ 55-64.

Plaintiff affirms that his refusal to cut his dreadlocks is based upon a provision of the Quran, specifically, Chapter 2, verse 196, which states, in part:

> when you make up your mind to perform Hajj and Umrah, accomplish these to please Allah. But if you are hemmed in somewhere, then offer to Allah whatever sacrifice you can afford. And do not shave your heads until the sacrifice reaches its place.

Dkt. # 9, p.24. Plaintiff affirms that he took the vow to begin the pilgrimmage in 1994. Dkt. # 8, ¶ 7. Plaintiff also cites a portion of the Sunan Abu Dawud discussing the matting and growth of hair. Dkt. # 9, p.25.

DOCS' Inmate Grooming Standards provide that initial shaves and haircuts shall be required of all newly committed male inmates unless exempted. Dkt. # 14, p. 32. Inmates who profess to be a Rastafarian, Taoist, Sikh, Native American, Orthodox Jew, or member of any other religious sect of a similar nature cannot be forced to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

comply with the initial haircut requirements. Dkt. # 14, p.34. Thereafter, all inmates are permitted to grow their hair to any length desired by the inmate, but must tie long hair, which is defined as hair below shoulder length, in a ponytail. Dkt. # 14, pp.33 & 35. Native Americans are exempted from this restriction during the course of scheduled and approved Native American cultural ceremonies. Dkt. # 14, p.34. The only braids allowed are the corn row style and any such braids must be woven close to the scalp in straight rows from the forehead to the back of the neck, without design or symbols, and may not extend below the hairline. Dkt. # 14, p.35. In addition, DOCS asserts that, as set forth in Directive # 4040, decisions of the Central Office Review Committee (“CORC”),[FN2] including decisions providing that only inmates of the Rastafarian faith may have dreadlocks, are afforded the effect of directives. Dkt. # 14, pp.37-40.

FN2. DOCS' grievance procedure permits an inmate to file a grievance with the Inmate Grievance Resolution Committee (“IGRC”). An inmate may appeal an adverse decision to the prison superintendent. Thereafter, an inmate may appeal the superintendent's decision to CORC. *See Hemphill v. New York,* 380 F.3d 680, 682 (2d Cir.2004); N.Y.C.R.R. § 701.7(c)(4).

Mark Leonard, Director of Ministerial, Family and Volunteer Services for DOCS, is responsible for “ensuring that all religious programs are carried out in accordance with the policies and procedures adopted by DOCS and are supervised by a qualified religious leader.” Dkt. # 14, ¶ 1. Director Leonard declares that DOCS accommodates religious group activities for a number of religions represented within its facilities. Dkt. # 14, ¶ ¶ 2-3. Upon entry into DOCS, inmates voluntarily state their religion and, if that religion is a recognized religious group, the inmate is permitted to attend that group's religious services. Dkt. # 14, ¶ 10. “If an inmate is determined to be a bona fide member of the religious group, he/she is entitled to all of the religious privileges afforded to that religious group.” Dkt. # 14, ¶ 12. Although DOCS recognizes that an inmate may practice a group religion in a way that is not recognized by the tenets of the religious group and may claim to need special accommodations in addition to those of the religious group to which he belongs, “DOCS cannot realistically accommodate the religious practices of every inmate who claims his individualized requests for privileges are ... based on the unique way he practices a group religion.” Dkt. # 14, ¶¶ 29-31.

***3** Director Leonard declares that DOCS is unable to accommodate all inmates' individualized beliefs due to (a) the difficulty in determining whether the individualized beliefs are sincere; (b) the substantial administrative burdens; and (c) security concerns. Dkt. # 14, ¶ 41. Director Leonard notes that “[w]henever an inmate receives special privileges, DOCS needs to monitor those privileges to ensure that the correct inmate receives them and does not abuse them.” Dkt. # 14, ¶ 48. Director Leonard asserts that “[m]aking inmates chose one religion helps ensure that the items and practices associated with that religion are necessary for religious purposes and not to promote illicit activities.” Dkt. # 14, ¶ 58. “Without this restriction,” he declares that “any inmate could wear dreadlocks ... simply by claiming that his religious beliefs required it” which “would make smuggling contraband easier and more prevalent in the correctional facilities.” Dkt. # 14, ¶ 58. Director Leonard declares that “the smuggling of contraband in DOCS facilities pose[s] significant security problems and put[s] prison staff and other inmates at risk for serious bodily injury.” Dkt. # 14, ¶ 60.

Director Leonard confirms that “inmates are not allowed to wear dreadlocks unless it is recognized as part of a designated religious belief” and declares that “[o]nly the Rastafarian religion has a recognized dogma regarding dreadlocks, and therefore DOCS allows only inmates of the Rastafarian faith to wear dreadlocks. Dkt. # 14, ¶ ¶ 63, 65. Director Leonard declares that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

The Rastafarian religious mandate and symbolism regarding dreadlocks also appears to be in stark contrast to Nation of Islam, where shaving is seen as a value of cleanliness ... Nation of Islam ... religious tenets simply do not require or dictate dreadlocks as a particular hairstyle, and are not an essential part of that faith. As a designated member of [Nation of Islam], plaintiff's decision to wear dreadlocks is a personal choice and is not mandated by his religion. Simply put, [Nation of Islam] does not have a recognized body of religious dogma regarding dreadlocks, and DOCS does not allow [Nation of Islam] or other faith group members to wear dreadlocks.

Dkt. # 14, ¶ 66. Director Leonard further declares that

Plaintiff's claim that he has a right as a designated member of [Nation of Islam] to wear dreadlocks is clearly in conflict with DOCS' policy, rules and regulations ... and if allowed would result in a[n] increased risk in breech of security for the correctional facility, conflict with Rastafarian principles and cause potential unrest among the Rastafarian inmate population, and jeopardize the safety of the staff and other inmates.

Dkt. # 14, ¶ 68. Director Leonard also declares that plaintiff's claim of denial of participation in Nation of Islam services "would appear to be a self-created hardship" and notes that "[a]s soon as plaintiff complies with DOCS policies and completes his SHU disciplinary penalties, he will be able to attend [Nation of Islam] services and activities." Dkt. # 14, ¶ 69.

***DISCUSSION AND ANALYSIS***

***4** A preliminary injunction is an "extraordinary remedy that should not be granted as a routine matter." *Patton v. Dole,* 806 F.2d 24, 28 (2d Cir.1986). "In the prison context, a request for injunctive relief must always be viewed with great caution so as not to immerse the federal judiciary in the management of state prisons." *Fisher v. Goord,* 981 F.Supp. 140, 167-68 (W.D.N.Y.1997), *citing Farmer v. Brennan,* 511 U.S. 825, 846-47, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

In most cases, a party seeking to obtain a preliminary injunction must establish that he will suffer irreparable harm in the absence of an injunction and demonstrate either: (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of the hardships tipping decidedly in the movant's favor. *Jolly v. Coughlin,* 76 F.3d 468, 473 (2d Cir.1996). "Where a moving party challenges government action taken in the public interest pursuant to a statutory or regulatory scheme, however, the moving party cannot resort to the fair ground for litigation standard, but is required to demonstrate irreparable harm and a likelihood of success on the merits." *Id.* (internal quotations omitted). In addition, where an injunction is mandatory-that is, where its terms would alter, rather than preserve, the status quo by commanding some positive act-the moving party must meet a higher standard than in the ordinary case by showing clearly that he or she is entitled to relief or that extreme or very serious damage will result from a denial of the injunction. *Phillip v. Fairfield University,* 118 F.3d 131, 133 (2d Cir.1997). "This heightened standard is also required where the issuance of the injunction would provide the movant with substantially all the relief he or she seeks and where the relief could not then be undone, even if the non-moving party later prevails at trial." *Id.* The same standards apply to a party seeking a temporary restraining order. *Ifill v. Goord,* No. 03-CV-355, 2004 WL 1663994, at *1 (W.D.N.Y. April 8, 2004).

In the instant case, defendants assert that the heightened standard applies becuase plaintiff is seeking a mandatory injunction. Dkt. # 15, p.5. The Court disagrees. Because plaintiff affirms that he has been wearing dreadlocks and attending Nation of Islam services since 1994, an injunction preventing enforcement of the CORC

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

decisions against plaintiffs pending resolution of this lawsuit would preserve the status quo. Dkt. # 8, ¶ 7. In contrast, the Court's denial of a preliminary injunction would permit continued discipline against plaintiff and prevent his attendance at Nation of Islam services for the duration of this lawsuit. Such deprivations could not be undone should the plaintiff ultimately prevail. Accordingly, the Court will consider whether plaintiff will suffer irreparable harm in the absence of an injunction and whether he has established a likelihood of success on the merits.

*Likelihood of Success*

***5** RLUIPA was enacted following the determination of the United States Supreme Court that the Religious Freedom Restoration Act ("RFRA"), exceeded Congress' remedial powers under the Fourteenth Amendment. *See* *Cutter v. Wilkinson,* 544 U.S. 709, 715, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). RLUIPA corrected the constitutional infirmity of RFRA by invoking federal authority under the Spending Clauses to reach any program or activity that receives federal financial assistance, thereby encompassing every state prison. 42 U.S.C. § 2000cc-1(b)(1); *see* *id.* at 715-16. The statute provides that

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person-
>
> (1) is in furtherance of a compelling governmental interest;
>
> and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). This standard is "carried over from RFRA." *Cutter,* 544 U.S. at 717; *see* *Hoevenaar v. Lazaroff,* 422 F.3d 366, 368 (6th Cir.2005) ("test is the same as that previously imposed under RFRA"), *cert. denied,* --- U.S. ----, 127 S.Ct. 187, 166 L.Ed.2d 132 (2006).

By enacting RLUIPA, Congress mandated "a more searching standard of review of free exercise burdens than the standard used in parallel constitutional claims: strict scrutiny instead of reasonableness." *Lovelace v. Lee,* 472 F.3d 174, 186 (4th Cir.2006) (internal quotation omitted). "In addition to prescribing strict scrutiny, Congress mandated that RLUIPA be construed 'in favor of broad protection of religious exercise.' " *Id., quoting* 42 U.S.C. § 2000cc-3(g). "Congress, in other words, 'intended to provide as much protection as possible to prisoners' religious rights' without overly encumbering prison operations." *Id., quoting* *Murphy v. Missouri Dep't of Corr.,* 372 F.3d 979, 987 (8th Cir.), *cert. denied,* 543 U.S. 991, 125 S.Ct. 501, 160 L.Ed.2d 378 (2004). Thus, this standard is more stringent than the four-factor, rational-relationship-to-legitimate-penological-interest standard set forth in *Turner v. Safley*[FN3] for analysis of free exercise claims pursuant to the First Amendment. *See* *Warsoldier v. Woodford,* 418 F.3d 989, 994 (9th Cir.2005). Lawmakers anticipated, however, "that courts entertaining complaints under § 3 would accord 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.' " *Cutter,* 544 U.S. at 723.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

Not Reported in F.Supp.2d, 2007 WL 4560597 (W.D.N.Y.)

(Cite as: 2007 WL 4560597 (W.D.N.Y.))

FN3. 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

Defendants argue that plaintiff cannot demonstrate likely success because his interpretation of the Quran is incorrect. Dkt. # 15, pp.5-9. Plaintiff responds that it is improper for the Court to assess the validity of his interpretation of his religious obligations. Dkt. # 26, ¶¶ 29-33.

***6** RLUIPA's definition of "religious exercise" includes "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). This expansive definition was recognized by the United States Supreme Court, which confirmed that the statute "bars inquiry into whether a particular belief or practice is 'central' to a prisoner's professed religiosity." *Id.* at 725.[FN4] As the Court of Appeals for the Second Circuit explained in the context of a constitutional claim:

FN4. "Although RLUIPA bars inquiry into whether a particular belief or practice is 'central' to a prisoner's religion, the Act does not preclude inquiry into the sincerity of a prisoner's professed religiosity." *Cutter,* 544 U.S. at 725 (internal citation omitted); *see Ford,* 352 F.3d at 593-94 (The relevant question is whether a particular activity is considered central or important to the inmate's practice of religion). However, defendants do not challenge the sincerity of plaintiff's belief in the religious texts cited and plaintiff's credibility regarding the sincerity of his belief in the importance of maintaining his dreadlocks is bolstered by his determination to suffer keeplock and denial of participation in Nation of Islam services rather than cut his hair.

Our founding principles require that courts resist the dangerous temptation to try to judge the significance of particular devotional obligations to an observant practitioner of faith. For, "[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds."

*McEachin v. McGuinnis* [sic], 357 F.3d 197, 201 (2d Cir.2004), *quoting Hernandez v. Commissioner of Internal Revenue,* 490 U.S. 680, 699, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989). In other words, "a burdened practice need not be mandated by the adherent's religion in order to sustain a prisoner's free exercise claim." *Id.* at 203, *citing Ford v. McGinnis,* 352 F.3d 582, 593 (2d Cir.2003). Thus, plaintiff need not demonstrate that his interpretation of the requirements of his religion are correct in order to demonstrate likelihood of success on the merits.

Defendants argue that "DOCS' application of its rules and regulations and policy ... do not violate [RLUIPA] since DOCS has not imposed a substantial burden on plaintiff's religious exercise." Dkt. # 15, p. 14. Although the statute does not define "substantial burden," courts have incorporated the definition adopted in related contexts to conclude that a substantial burden exists where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs. *See Lovelace,* 472 F.3d at 187; *Jolly,* 76 F.3d at 477. In *Jolly,* the Court of Appeals for the Second Circuit determined that a choice of submitting to a test for latent tuberculosis or adhering to the belief that it is a sin to take artificial substances, such as those allegedly used in the test, into the body and enduring medical keeplock, constituted a substantial burden on plaintiff's religious exercise. *Id.* at 477. In a factually similar case to the instant matter, the Court of Appeals for the Ninth Circuit held that the California Department of Corrections' grooming policy imposed a substantial burden on a Native American's religious practice because it "intentionally puts significant pressure on inmates ... to abandon their religious beliefs by cutting their hair" or withstand discipline, including keeplock and loss of recreation, telephone, commissary

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

and other privileges. *Warsoldier,* 989 F.3d at 996. As in *Warsoldier,* this Court has little difficulty determining that forcing an individual who sincerely believes that he should wear dreadlocks as part of his religious practice to either forgo his affiliation with the Nation of Islam or face discipline constitutes a substantial burden upon that individual's religious practice.

***7** DOCS relies upon its compelling government interest in maintaining prison security, safety and sanitation to justify its policy. Dkt. # 55, p.5. The Court readily recognizes that prison safety and security are compelling governmental interests. *See* *Cutter,* 544 U.S. at 725, n. 13 (“prison security is a compelling state interest”); *Pell v. Procunier,* 417 U.S. 817, 823 (1974) (“central to all other corrections goals is the institutional consideration of internal security”); *Jolly,* 76 F.3d at 477 (noting DOCS compelling state interest in protecting inmates from infectious diseases). The Court also recognizes that the Court of Appeals for the Sixth Circuit, relying upon prison administrators' averments that there were no other means of achieving prison safety and security, upheld Ohio's absolute ban on long hair. *Hoevenaar,* 422 F.3d 366.

In the instant case, however, DOCS has determined that permitting Rastafarians to wear dreadlocks does not impose an insurmountable threat to DOCS' security, safety or sanitation. Moreover, DOCS does not appear to have any concerns that permitting this particular plaintiff to wear dreadlocks would threaten DOCS' security, safety or sanitation. As stated by DOCS,

> plaintiff can chose to comply with DOCS grooming standards and religious programs and practices set forth in Directive 4914, Directive 4202, and relevant CORC decisions, and attend and participate in [Nation of Islam] services or activities, or change his religious designation to Rastafarian to maintain his dreadlocks and participate in Rastafarian services and activities. The choice is his, but he cannot have it both ways since dreadlocks are not recognized for being religiously mandated for [Nation of Islam] adherents, implicate prison security and administrative concerns, and plaintiff has ample means of practicing his religious beliefs.

Dkt. # 15, p. 13. In addition, DOCS permits all inmates to grow their hair to any length so long as hair extending below shoulder length is tied back in a ponytail.

DOCS expresses concern with the administrative burden of accommodating individual religious beliefs which do not conform to the generally accepted practices of a recognized religious group. *See* Dkt. # 55, p.5 (“There would be an enormous administrative burden if DOCS were required to accommodate the individualized religious beliefs of 63,000 inmates.”). While the Court is sympathetic to such difficulties, and does not suggest that DOCS' assessment of administrative burden should not be given deferential consideration, as set forth above, the statute is clear that DOCS cannot administer the religious exercise of its inmate population based upon its assessment of the validity of the requested practice to the religious denomination professed by the inmate.

*Irreparable Harm*

Defendants argue the plaintiff cannot demonstrate irreperable harm because DOCS is not demanding that plaintiff shave his head, but only that he cut his matted locks. Dkt. # 15, p.4. Because defendants interpret the religious texts that plaintiff relies upon to demonstrate the sincerity of his beliefs as only prohibiting him from shaving his head, they argue that compliance with DOCS' Inmate Grooming Standards will not harm plaintiff. Dkt. # 15, p.4. Plaintiff asserts that “it would violate his religious beliefs to cut his hair.” Dkt. # 26, ¶ 17.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

***8** "To satisfy the irreparable harm requirement, Plaintiff[ ] must demonstrate that absent a preliminary injunction [he] will suffer an injury that is neither remote nor speculative, but actual and imminent and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Freedom Holdings, Inc. v. Spitzer,* 408 F.3d 112, 114 (2d Cir.2005) (internal quotations omitted). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 747, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). Moreover, "[c]ourts have persuasively found that irreparable harm accompanies a substantial burden on an individual's rights to the free exercise of religion under RFRA." *Jolly,* 76 F.3d at 482. Defendants' discipline of plaintiff for his refusal to cut his hair or change his religious affiliation substantially burdens plaintiff's sincere religious beliefs, thereby satisfying the irreparable injury requirement.

***Consolidation***

Rule 42(a) of the Federal Rules of Civil Procedure provides that "[w]hen actions involving a common question of law or fact are pending before the court ... it may order all the actions consolidated." "The trial court has broad discretion to determine whether consolidation is appropriate." *Johnson v. Celotex Corp.,* 899 F.2d 1281, 1284-85 (2d Cir.1990). Moreover, a "district court can consolidate related cases under Federal Rule of Civil Procedure 42(a) *sua sponte.*" *Devlin v. Transportation Commc'ns Int'l Union,* 175 F.3d 121, 130 (2d Cir.1999). "In assessing whether consolidation is appropriate in given circumstances, a district court should consider both equity and judicial economy." *Id.* The paramount concern, however, is whether "savings of expense and gains of efficiency can be accomplished *without sacrifice of justice.*" *Id.; see Johnson,* 899 F.2d at 1285 ("Considerations of convenience and economy must yield to a paramount concern for a fair and impartial trial.").

In the instant case, the Court believes that consolidation of this action with 06-CV-490 would promote judicial economy as well as justice. Each of the three plaintiffs complain that they were disciplined for refusing to either cut their hair or change their religious affiliation from Nation of Islam to Rastafarian. Each of the three plaintiffs challenge DOCS' Inmate Grooming Standards. Six of the nine defendants named in this action are also defendants in 06-CV-490. The original complaint in 06-CV-490 named all three plaintiffs. By consolidating these cases, all parties can benefit from uniform discovery, settlement negotiations and trial strategy.

***CONCLUSION***

Based on the foregoing, it is recommended that plaintiff's motion for injunctive relief (Dkt.# 7), be granted and that defendants be enjoined from precluding plaintiffs' attendance at Nation of Islam services and classes because of his dreadlocks and from punishing plaintiff for refusing to cut his hair or refusing to change his religious affiliation. It is also recommended that this matter be consolidated with 06-CV-490.

***9** Accordingly, pursuant to 28 U.S.C. § 636(b)(1), it is hereby

ORDERED, that this Report, Recommendation and Order be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report, Recommendation and Order must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Civ.P. 72(b) and Local Rule 72.3(a)(3).

The district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

which could have been, but was not presented to the magistrate judge in the first instance. *See, e.g., Patterson-Leitch Co. v. Massachusetts Mun. Wholesale Electric Co.,* 840 F.2d 985 (1st Cir.1988).

*Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order. Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir.1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." *Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Report, Recommendation and Order), may result in the District Judge's refusal to consider the objection.*

The Clerk is hereby directed to send a copy of this Order and a copy of the Report and Recommendation to the *pro se* plaintiff and counsel for the defendant.

The Clerk is also directed to send a copy of this Order and a copy of the Report and Recommendation to the *pro se* plaintiffs in 06-CV-490 to afford them notice of the Court's recommendation to consolidate.

**SO ORDERED.**

W.D.N.Y.,2007.

Fluellen v. Goord

Not Reported in F.Supp.2d, 2007 WL 4560597 (W.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



H

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Bruce SWEEPER, Plaintiff,

v.

J. TAYLOR, Superintendent, Gouverneur Correctional Facility; Officer McCoy; Officer McBride, Defendants.

No. 906-CV-379 (NAM/GJD).

March 27, 2009.

Bruce Sweeper Auburn, NY, pro se.

Andrew M. Cuomo, Attorney General of the State of New York, Steven H. Schwartz, Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

**MEMORANDUM DECISION AND ORDER**

NORMAN A. MORDUE, Chief Judge.

***1** In this amended civil rights complaint, plaintiff alleges that defendants violated plaintiff's First Amendment right to practice his religion. (Dkt. No. 11). Plaintiff seeks monetary as well as injunctive relief. Presently before the court [FN1] is defendants' motion for summary judgment pursuant to FED. R. CIV. P. 56. (Dkt. No. 37). Plaintiff has responded in opposition to the motion. (Dkt. No. 42). For the following reasons, this court agrees with defendants and will order dismissal of the amended complaint in its entirety.

FN1. The parties are advised that the referral to a Magistrate Judge as provided for under Local Rule 72.3 has been rescinded for purposes of this motion, and as such, any appeal taken from this order, if appropriate, will be to the Court of Appeals for the Second Circuit.

**DISCUSSION**

**1. *Summary Judgment***

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED. R. CIV. P. 56; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." *Id.* However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also* *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

At that point, the nonmoving party must move forward with specific facts showing that there is a genuine

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

issue for trial. *Id.* A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See* *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

**2. *Facts***

**A. Amended Complaint**

Plaintiff alleges that on October 17, 2005, he was an inmate of the Department of Correctional Services (DOCS), incarcerated at the Gouverneur Correctional Facility (Gouverneur). (Dkt. No. 11). Plaintiff states that at approximately 2:00 p.m., he was working in the mess hall when defendant Corrections Officer (CO) McCoy walked by plaintiff as he was praying. Plaintiff is a Muslim, and October 17, 2005 was during Ramadan, a Muslim holiday. Defendant McCoy told plaintiff to stop praying and gave plaintiff a misbehavior report when plaintiff did not comply with defendant McCoy's order. In the amended complaint, plaintiff claims that defendant McCoy put plaintiff in the Special Housing Unit (SHU) for praying, and that plaintiff spent thirty days in SHU as a result. Amended Complaint (AC) at 2(a).[FN2]

FN2. Plaintiff has inserted unnumbered pages in between the pages of the form complaint. The court has simply numbered the pages following a form-page as the same form number plus a letter. Thus, this page follows page 2, but is before page 3.

Plaintiff alleges that defendant CO McBride's name appears on the "statement of the evidence" from plaintiff's disciplinary hearing, however, plaintiff claims that defendant McBride was not working on October 17, 2005, making the disciplinary determination invalid. *Id.* Plaintiff has also named Superintendent J. Taylor as a defendant. Plaintiff claims that defendant Taylor failed to implement a proper policy that would allow inmates to pray at work. Defendant Taylor's failure to do so allowed plaintiff to be improperly placed in SHU for praying in the mess hall.

**B. Additional Facts**

***2** In support of their summary judgment motion, defendants have submitted the plaintiff's disciplinary records regarding this incident, together with the declaration of Captain Clement Croyer, the hearing officer for plaintiff's disciplinary hearing. Croyer Decl. & Exs. A, B (Dkt. No. 37(8)-37(10)). Defendants have also submitted the plaintiff's "grievance packet," including all the documents submitted in conjunction with the grievance filed by plaintiff subsequent to this incident. Statement of Material Facts & Ex. A-D (Dkt. No. 37(3)-37(7)).

The Croyer Declaration states that Captain Croyer conducted a Tier III disciplinary hearing against plaintiff on October 19, 2005. Croyer Decl. ¶ 2. The hearing was based on a misbehavior report written by defendant McCoy. *Id.* The misbehavior report shows that it was written by defendant McCoy, who stated that on October 17, 2005, he walked in the back of the mess hall and observed "inmates" praying in the hot box room where supplies for the mess hall were kept. Croyer Decl. Ex. A at p. 3. Defendant McCoy further stated that plaintiff was praying "with 6 other inmates." *Id.* Defendant McCoy alerted Sergeant King and gave the inmates a direct order to stop praying. *Id.* The inmates ignored defendant McCoy's order and continued to pray for approximately ten minutes until Sergeant King arrived. *Id.* Plaintiff was escorted to SHU as a result, and defendant McCoy wrote the misbehavior report, charging plaintiff with a violation of Rules 104 .13 (creating a disturbance); 105.10

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

(unauthorized assembly); 105.11 (religious services); and 106.10 (violating a direct order). The misbehavior report also lists the other inmates who were involved. *Id.*

A transcript of the disciplinary hearing has been submitted in support of the summary judgment motion. Croyer Decl. Ex. B (Transcript) (T). At the beginning of the disciplinary hearing, Captain Croyer read plaintiff the charges and asked how plaintiff pled to the individual rule violations. (T. at 2). Captain Croyer also read the names of the other inmates involved, one of whom was an individual named "McBride." *Id.* Plaintiff pled "not guilty" to all of the charges except "refusing a direct order." *Id.* Although plaintiff did not make a specific statement, Captain Croyer asked plaintiff if he and the other inmates "were under the impression that it was ok for you to pray in your group back there. [sic]" *Id.* Plaintiff told Captain Croyer that plaintiff believed that he was allowed to pray in that location, and that the inmates had been praying there "since beginning of (inaudible)." *Id.* Captain Croyer repeated the question and plaintiff stated that the inmates "were in the kitchen at the time of our prayers." *Id.*

At that time, Captain Croyer adjourned the hearing to make his decision. (T. at 2-3). When Captain Croyer went back on the record, he began his oral disposition by stating that he relied upon "the written report of Officer McBride, which indicates that you refused his orders." (T. at 3). Captain Croyer then stated that

> ***3** [y]ou guys were praying in a group, but it appears to me that you were under the impression that is [sic] was ok to pray in a group down there in the mess hall. However, by your own admission, you did disobey the officers [sic] orders to stop which is the reason I found you guilty of a direct order.

*Id.* Captain Croyer states in his declaration that plaintiff pled guilty to refusing the order, and Captain Croyer thus, found him guilty of the charge and sentenced plaintiff to forty five days in SHU, together with a loss of privileges. Croyer Decl. ¶ 3. Plaintiff was found "not guilty" of all the other charges.

Captain Croyer also states that when he set forth his disposition on the record at the hearing and when he wrote his "Superintendent Hearing Disposition Rendered" [FN3] form, he "inadvertently and incorrectly, stated that the evidence [he] relied upon was 'the written report of Officer McBride ...,' when [he] meant to say Officer McCoy." Croyer Decl. ¶ 5. Captain Croyer states that based on a review of all the records, it is clear that the misbehavior report was written by, and the decision was based upon evidence provided by, Officer McCoy, not Officer McBride. *Id.* ¶ 6. The disposition was based solely upon the McCoy misbehavior report and plaintiff's own guilty plea to that particular charge. *Id.* By his own admission,[FN4] plaintiff served only thirty of the forty five day penalty. AC at p. 2(a); Def. Rule 7.1(a)(3) Statement ¶ 5 & Ex. C at p. 1.

FN3. A copy of this report is attached to the Croyer Decl. Ex. A at p. 2.

FN4. The amended complaint is incorrect with respect to the penalty originally imposed. In the amended complaint, plaintiff alleges that the penalty was originally "90 days," but he only served "30 days." AC at p. 2(a). It is clear, however, from all the evidence that Captain Croyer only imposed a forty five day penalty. This discrepancy does not affect this court's decision.

On November 21, 2005, plaintiff filed Grievance No.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

GOV-11061/05 regarding this incident. Def. Rule 7.1(a)(3) Statement Ex. A at p. 3-4. Plaintiff complained that he was not able to pray at the appropriate religiously mandated times. He stated that he wanted "to be able to pray when my prayer comes at its set [ ] time, at work, or be able to go back to my cube to pray." *Id.* Plaintiff also requested that the misbehavior report be expunged from his records because the name of the officer on the statement of evidence relied upon was not the officer who actually witnessed the misbehavior and who signed the misbehavior report. *Id.*

The Inmate Grievance Resolution Committee (IGRC) denied plaintiff's grievance. First, the IGRC found that it could not expunge plaintiff's misbehavior report because misbehavior reports are not "grievable," and plaintiff would have to use his available disciplinary appeal remedy. *Id.* Ex. A at pp. 7 (summary of case history of grievance), 11. The IGRC also found that according to a previous decision of the Central Office Review Committee (CORC), praying must be done in an inmate's living quarters or in designated religious areas. *Id.* The Superintendent affirmed the findings of the IGRC. *Id.* Ex. A at pp. 2, 7. The Superintendent also noted that the issue of praying at work or program was previously addressed by the CORC and "is clearly outlined in Directive # 4202. There is no provision for an inmate to pray while at program, or in your case, in the Mess Hall." *Id.*

***4** Plaintiff appealed the Superintendent's decision, and the CORC affirmed. *Id.* Ex. A at pp. 1, 7. Plaintiff argued that his religious practices could be accommodated without negative effect on prison security or rehabilitation. *Id.* at p. 7. Plaintiff also argued that he had a First Amendment right to engage in his prayer at work. *Id.* The CORC affirmed the Superintendent and quoted the pertinent section of Directive # 4202, relating to "individual demonstrative prayer" and "congregate or group prayer." *Id.* A copy of the relevant portion of Directive # 4202 has been attached to the grievance materials. *Id.* Ex. A at p. 5 (DOCS Directive # 4202(K)(1) & (2).

Defendants have also included as an exhibit, a memorandum from the Muslim Chaplain, Yahya Abdur Rahim. Def. Rule 7.1(a)(3) Statement Ex. D. This memorandum is addressed to the Watch Commander, is dated August 31, 2005, and relates to the 2005 Ramadan holiday. The memorandum discusses fasting, meals, and prayers during the Ramadan holiday. *Id.* There is no discussion about inmates being authorized to pray at their assigned program or work area.

**3. *Misbehavior Report***

Plaintiff does not appear to challenge the process that he received at his disciplinary hearing. He does not name Captain Croyer as a defendant and does not complain about the disciplinary hearing itself. Plaintiff argues that the misbehavior report should be expunged because defendant McBride "lied" about witnessing the incident, and was not even at work on October 17, 2005. Plaintiff seems to think that the misbehavior report is "false" because Captain Croyer allegedly relied upon evidence submitted by defendant McBride. Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003).

First, the misbehavior report was not false.[FN5] Plaintiff admits what he was doing and admitted at the disciplinary hearing that he refused to obey defendant McCoy's order to stop praying. Plaintiff claims that he was justified in doing so because he was entitled to pray in the mess hall. Second, it is clear that defendant McBride was not involved in any part of plaintiff's claim. Plaintiff states that Officer McBride was ***not working*** on October 17, 2005. Captain Croyer states in his declaration that he mis-spoke when he stated that he relied on the evidence provided by "Officer McBride." Croyer Decl. ¶ 5. All the evidence in

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

the records supports this assertion by Captain Croyer. The court notes that one of the inmates involved in the prayer incident with plaintiff was named "McBride." *See* Croyer Decl. Ex. A at p. 3. In any event, plaintiff pled guilty to the refusal to obey a direct order, thus, Captain Croyer relied, not only on the misbehavior report statement, but on plaintiff's guilty plea. Thus, defendant McBride was not personally involved with plaintiff at all, and the amended complaint may be dismissed as against defendant McBride.

FN5. In any event, a "false" misbehavior report on its own does not rise to the level of a constitutional violation as long as the subsequent disciplinary hearing affords the inmate due process. *Freeman v. Rideout,* 808 F.2d 949, 953 (2d Cir.1986), cert. denied, 485 U.S. 982, 108 S.Ct. 1273, 99 L.Ed.2d 484 (1988).

***5** Although plaintiff does not really challenge the disciplinary determination in itself, the court must point out that plaintiff has no due process right in connection with this disciplinary determination. In *Sandin v. Conner,* the Supreme Court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 483-84, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). In *Sandin,* the court rejected a claim that ***thirty days*** in segregated confinement was "atypical and significant." *Id.* at 486.

The Second Circuit discussed the duration element of the *Sandin* analysis in *Colon v. Howard,* 215 F.3d 227 (2d Cir.2000). The court in *Colon* noted that the longest confinement in SHU that did not meet the atypical requirement was 101 days. *Id.* at 231 (citing *Sealey v. Giltner,* 197 F.3d 578, 589-90(2d Cir.1999)). While often the issue is a question of fact in which the court must analyze the conditions of the confinement as well as the duration of the confinement, it is well-settled that a duration as short as the one involved in this case, the same time period rejected by court in *Sandin,* without more, does not create a liberty interest that is protected by due process.

**4. *First Amendment***

Plaintiff argues that defendant McCoy violated plaintiff's First Amendment rights by giving him a misbehavior report for "praying." Actually, defendant McCoy gave plaintiff a misbehavior report for a variety of rule violations, including failure to obey an order, creating a disturbance, unauthorized assembly, and unauthorized address. Plaintiff, however, was not disciplined for "praying." Plaintiff pled guilty to refusal to obey defendant McCoy's order to stop praying. Thus, the disciplinary finding was that plaintiff ***failed to obey an order,*** regardless of the content of that order. Plaintiff cannot and does not dispute that he did not stop praying, and in fact, the records show that plaintiff and the other inmates continued to pray for ten minutes until the Sergeant arrived.

In fact, Captain Croyer did ***not find plaintiff guilty of any of the other rule violations,*** stating that the inmates believed that they were allowed to pray in the mess hall as they were doing. Plaintiff testified at the hearing that he and the other inmates had been praying in that manner before. (T. at 2). The court would also point out that plaintiff did not initially make a statement in his defense at the disciplinary hearing. It was Captain Croyer [FN6] who ***three times*** brought up the fact that plaintiff and the other inmates "were under the impression that it was ok for you to pray in your group back there." *Id.* at 2-3. Captain Croyer ultimately stated that it appeared to him that "it was some misunderstanding where you were under the impression that it was ok to pray in a group down there in

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

the messhall [sic].” (T. at 3). Captain Croyer found plaintiff “not guilty” of the “unauthorized assembly” and the “religious services” violation.

FN6. The court understands that Captain Croyer is not a defendant in this case, however, this analysis is relevant because plaintiff was not disciplined for “praying,” and in fact, Captain Croyer dismissed all the rule violations that were actually related to “praying” because he believed plaintiff's statement that the inmates believed that it was proper to pray in that location.

***6** In his response to defendants' motion, plaintiff states that Officer McCoy could have waited until plaintiff was finished praying. (Dkt. No. 42-2 at p. 1). Plaintiff also states that he could not stop praying, and that he should have been allowed to continue because there was no “security issue” involved. *Id.* In another of plaintiff's response documents, plaintiff states that he missed the Ramadan feast because he was in SHU, and that the Superintendent let plaintiff out of SHU because there was no rule stating that plaintiff could not pray in the mess hall. (Dkt. No. 42-5 at p. 5). Plaintiff states that he was given his job back and “was allowed to return to his cube at all of the rest of his prayer's time of prayer.” *Id.*

Rather than arguing that plaintiff's First Amendment rights have not been violated, defendants argue in their motion that they are entitled to assert qualified immunity. The doctrine of qualified immunity shields officials from liability from civil damages if their actions did not violate “clearly established statutory or constitutional rights of which a reasonable person would have known.” *Pearson v. Callahan,* --- U.S. ----, ----, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). In *Pearson,* the Supreme Court overruled its decision in *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), to the extent that the Court in *Saucier* required a specific two-step sequence for deciding qualified immunity claims. *Pearson,* 129 S.Ct. at 815-22.

Under *Saucier,* when confronted with defendants' claim of qualified immunity, the court was mandated to use a two-step procedure. 533 U.S. at 201. The first step required the court to determine whether plaintiff's facts established the violation of a constitutional right. *Id.* If so, the court would then decide whether the right at issue was “clearly established” at the time of the defendants' alleged conduct. *Id.* Decisions prior to *Saucier* had “suggested” that the better approach was to determine whether a constitutional right was violated at all, but *Saucier* turned that suggestion into a requirement. *Pearson,* 129 S.Ct. at 816 (citing *Saucier,* 533 U.S. at 201: *County of Sacramento v. Lewis,* 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (stating that resolution of the constitutional issue first was the “better approach”).

In *Pearson,* the Supreme Court rejected what it referred to as *Saucier's* “ ‘rigid order of battle,’ “ in favor of allowing the courts to exercise their sound discretion in determining which of the two prongs of the qualified immunity analysis should be addressed first. *See* 129 S.Ct. at 817-818 (citing *Purtell v. Mason,* 527 F.3d 615, 622 (7th Cir.2008)) (referring to the *Saucier* standard as a “rigid order of battle)). The court in *Pearson* stated that the unnecessary litigation of constitutional issues is to be avoided, and there are cases in which it is “plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right.” 129 S. St. at 818. This case is just such a case. Thus, the court will first address whether a right was “clearly established.”

***7** In *Shabazz v. Coughlin,* 852 F.2d 697, 700-702 (2d Cir.1988), the Second Circuit held that while an inmate's right to attend religious services in general was clearly established, the right to group prayer and prayer in the yard was not well-established for purposes of qualified immunity. In *Chatin v. Coombe,* 186 F.3d 82 (2d

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Cir.1999), the court held that Disciplinary Rule 105.11, prohibiting the conduct of "religious services" could not be used to discipline an individual for silent demonstrative prayer in the prison yard. However, the court simply found that the rule was unconstitutionally vague for due process purposes. *Id.* Because the district court decided the case on the due process claim, the court did not reach the plaintiff's First Amendment claim. *See Chatlin v. New York,* 96 Civ. 420, 1998 U.S. Dist. LEXIS 5671, *26-27 (S.D.N.Y. April 23, 1998).

The court in *Chatin* specifically stated, however, that it was ***not*** deciding the issue of whether such conduct could be prevented by using a rule that gave inmates the required notice of what was prohibited. *Id.* at 89-90. The court also stated that it was not suggesting that prison officials were prevented from preventing such conduct by utilizing already existing rules that prevented disturbances or interference with others when the circumstances warranted it. *Id.* Thus, it still does not appear well established that an inmate has the right to pray at one's work assignment as plaintiff was attempting to do. [FN7] This court is not aware of any case at or before the time of the incident that would "clearly establish" that plaintiff had a right to pray together with six other inmates in a work area during his working hours. [FN8]

FN7. Plaintiff omits to mention that there were six other inmates praying with plaintiff at the time that defendant McCoy walked by them.

FN8. The DOCS Directive regarding this issue allowed "individual demonstrative prayer" only in living quarters and designated religious areas whenever feasible as determined by the Superintendent. DOCS Directive 4202(K)(1). Directive 4202(K)(2) provides that congregate or group prayer could only occur in a designated religious area, during a religious service or at other times as authorized by the Superintendent. The Central Office Review Committee cited this Directive in its final denial of plaintiff's grievance.

In *McEachin v. McGuinnis,* 357 F.3d 197 (2d Cir.2004), the plaintiff had been disciplined for failure to obey a corrections officer's order to return his tray and cup, an order plaintiff claims was "expressly given to him by a corrections officer who knew that completion of the task would require plaintiff to abandon religious prayers in which he was then engaged." *Id.* at 204-05. As a result of the disciplinary hearing, plaintiff was subjected to a week-long restricted diet, resulting in his inability to break his Ramadan fast with the appropriate food. *Id.* at 199. District Court *sua sponte* dismissed the complaint; the Second Circuit reversed, stating:

> When McEachin's complaint is liberally construed, two First Amendment concerns arise. First, McEachin asserts that the seven-day restrictive diet imposed upon him as discipline by the defendants impinged upon his observance of Ramadan by depriving him of properly blessed food with which to break his daily fast. In addition, McEachin alleges that this discipline was itself a product of religious discrimination by a corrections officer who intentionally ordered McEachin to return his tray and cup during McEachin's prayer, knowing that the plaintiff's beliefs would not permit him to respond to the command before he had finished making *salat.* If these allegations are true, an unconstitutional burden may have been placed on McEachin's free exercise rights.

***8** *Id.* at 201 (footnote omitted). The McEachin court thus emphasized the allegation that the corrections officer intentionally ordered plaintiff to perform the task, knowing that obeying the order would require plaintiff to violate his religious beliefs. *Id.* at 204. The court observed that "[p]recedent suggests that inmates have a right not to be disciplined for refusing to perform tasks that violate

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 8

Slip Copy, 2009 WL 815911 (N.D.N.Y.)

(Cite as: 2009 WL 815911 (N.D.N.Y.))

their religious beliefs." *Id.* at 205 (citing *Hayes v. Long,* 72 F.3d 70 (8th Cir.1995) (inmate disciplined for refusing to handle pork while performing kitchen duties)). The court in McEachin ultimately did not rule on this issue because it remanded the case to the district court for consideration of the First Amendment claims. McEachin does not clearly establish the right asserted by plaintiff in the case at bar.

In *Withrow v. Bartlett,* 15 F.Supp.2d 292 (W.D.N.Y.1998), the court granted summary judgment in a case in which plaintiff was disciplined for engaging in group demonstrative prayer in the prison yard and violating an officer's order to stop. *Withrow* and the case at bar may be distinguished from *McEachin* on the ground that in this case and *Withrow* the prohibited activity resulting in the officer's order was the method of prayer, that is, a group prayer in an area of the prison where it was not authorized by the existing rules. The officers issuing the orders believed that the plaintiffs' religious conduct was not permitted, a belief that was supported by the DOCS Directive.

In this case, as stated above, plaintiff pled guilty [FN9] without question to the charge of failure to obey an order. Additionally, it is clear that other inmates were involved, and thus, plaintiff was not simply conducting an individual prayer.[FN10] Apparently, defendant McCoy had no way of knowing what the inmates were doing, since it is clear that no one responded when he ordered the inmates to stop. The DOCS Directive regarding prayer supported defendant McCoy's actions [FN11]; he could not reasonably have believed that his actions were in violation of plaintiff's constitutional rights. Plaintiff acknowledges that after he was released from confinement, he was given his job back and allowed to go back to his "cube" at all the appropriate times to pray. Thus, based on the facts in this case, any claim for damages would be barred by the doctrine of qualified immunity even if ultimately plaintiff's First Amendment rights had been infringed.

FN9. The court also notes that plaintiff pled guilty to this charge at the beginning of the hearing without discussion. (T. at 2). Plaintiff never gave the hearing officer an opportunity to find plaintiff "not guilty" of the charge. Plaintiff had also requested the Imam as a witness, but plaintiff decided at the beginning of the hearing that he did not wish the Imam to testify. (T. at 1). Given the later conduct of the hearing officer in emphasizing that the entire incident was a "misunderstanding," it is possible that plaintiff might not have been found guilty had he not pled guilty. As stated above, the hearing officer brought the misunderstanding up himself. It appeared that plaintiff was not planning on making any statements in his defense.

FN10. In one of the documents in response to defendants' motion, plaintiff disputes that he was praying in a "group," although he does not dispute that there were six other inmates with plaintiff. (Dkt. No. 42-1 at p. 4). It is unclear how defendant McCoy could have known what plaintiff and the other inmates were thinking and whether they meant to be in a "group" or not.

FN11. The issue of plaintiff missing the Ramadan feast because he was in SHU is not a part of this action, and McCoy was not responsible for things that may have happened to plaintiff after McCoy's conduct.

Qualified immunity would not, however, bar any claim for equitable relief. *See* *Pearson,* 129 S.Ct. at 822 (no qualified immunity in cases in which injunctive relief is sought instead of or in addition to damages); *Salahuddin v. Goord,* 467 F.3d 263, 273 (2d Cir.2006) (qualified immunity is an affirmative defense to monetary liability). Plaintiff requests only equitable relief from the Superintendent for his conduct. Plaintiff alleges that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

defendant Taylor allowed the officer to put plaintiff in SHU when there was no "rule" against praying in the mess hall. Plaintiff requests that defendant Taylor "implement policies and procedures" allowing Muslims to pray at "set" times even if they work in the mess hall. AC at p. 5(a).

***9** However, plaintiff is no longer incarcerated at Gouverneur. An inmate's transfer from a facility generally renders moot any claims for declaratory and injunctive relief against officials of that facility. *Salahuddin,* 467 F.2d at 272 (citing *Prins v. Coughlin,* 76 F.3d 504, 506 (2d Cir.1996) (*per curiam); Young v. Coughlin,* 886 F.2d 567, 568 n. 1 (2d Cir.1989); *Mawhinney v. Henderson,* 542 F.2d 1, 2 (2d Cir.1976)). Because this plaintiff is no longer incarcerated at Gouverneur, his claims for declaratory and injunctive relief must be dismissed as moot.

The court notes that in one of the five documents that plaintiff filed in opposition to defendants' motion, he appears to be raising a claim under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc *et seq.* (Dkt. No. 42-5 at p. 4). RLUIPA prohibits the government from imposing substantial burdens on religion, even when the burden results from a neutral law of general applicability. ***Pugh v. Goord,* 571 F.Supp. 2d 477, 503 ( S.D.N.Y. 2008)** (citation omitted). If the government substantially burdens an inmate's religious exercise, the government must demonstrate that the imposition of the burden is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that interest. ***Id.*** (quoting 42 U.S.C. § 2000cc-1(a)). The burden on defendants in a RLUIPA case is higher than the burden articulated by the Supreme Court in *Turner v. Safely,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) for claims under the constitution. The constitutional analysis under *Turner* requires only that the burden on the inmate's religious rights be "reasonably related to legitimate penological interests." *Id.* at 89.

Plaintiff in this case never raised this issue until his response to defendants' motion for summary judgment. The court must treat *pro se* submissions with particular liberality and would be required to construe his pleading to include a claim under RLUIPA even though the complaint did not request such relief. *McEachin v. McGuinnis* 357 F.3d 197, 200 (2d Cir.2004). However, in this case, plaintiff's attempt to raise a RLUIPA claim would not be able to succeed. The qualified immunity would apply to plaintiff's RLUIPA claim. *See Orafan v. Goord,* 411 F.Supp.2d 153, 158 (N.D.N.Y.2006), *vacated and remanded on other grounds sub nom. Orafan v. Rashid,* 249 Fed. Appx. 217 (2d Cir.2007). In any event, it has been held that a RLUIPA plaintiff may not obtain monetary damages under the statute either from defendants in their individual or official capacities. ***Pugh,* 571 F.Supp. 2d at 506-509**.[FN12] Thus, plaintiff in this case would not be able to obtain money damages from defendants.

FN12. The Fifth Circuit has recently held that RLUIPA affords inmates the ability to obtain declaratory and injunctive relief against a "government," but does not provide for damages against either a defendant in his individual capacity or the state, including defendants in their "official capacities." *Sossamon v. Lone Star State of Texas,* 2009 U.S.App. LEXIS 3701, *19-34, 2009 WL 382260 (5th Cir. Feb. 17, 2009) (discussing cases, including those circuits that have allowed such actions, however, noting that where such a claim is allowed individually, the qualified immunity analysis would apply).

As stated above, plaintiff has been transferred out of Gouverneur, and can no longer obtain declaratory or injunctive relief from defendants at that facility. Thus, to the extent that plaintiff's response to defendants' motion purports to raise a new claim under RLUIPA against the existing defendants, it must also be dismissed.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 10

Slip Copy, 2009 WL 815911 (N.D.N.Y.)

(Cite as: 2009 WL 815911 (N.D.N.Y.))

***10 WHEREFORE,** based on the findings above, it is

**ORDERED,** that defendants' motion for summary judgment (Dkt. No. 37) is **GRANTED** and the amended complaint is **DISMISSED IN ITS ENTIRETY.**

N.D.N.Y.,2009.

Sweeper v. Taylor

Slip Copy, 2009 WL 815911 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Jamile HANKINS, Plaintiff,

v.

NYS DEPARTMENT OF CORRECTIONAL SERVICES; Brian Fischer, Commissioner, NYS Docs; Lucien LeClaire, Former Commissioner, NYS Docs; John Doe # 1, "Mess Hall" Corrections Officer at Shawangunk Correctional Facility; and John Doe # 2, Corrections Sergeant / Hearing Officer at Shawangunk Correctional Facility, Defendants.

No. 9:07-CV-0408 (FJS/GHL).

March 10, 2008.

Jamile Hankins, Napanoch, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Adele M. Taylor-Scott, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

***REPORT-RECOMMENDATION***

GEORGE H. LOWE, United States Magistrate Judge.

***1** This *pro se* prisoner civil rights action has been referred to me for Report and Recommendation by the Honorable Frederick J. Scullin, Jr., Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c) of the Local Rules of Practice for this Court. Generally, Jamile Hankins ("Plaintiff") brings this action under two statutes: (1) 42 U.S.C. § 1983 (for a violation of his rights under the First, Eighth and Fourteenth Amendments); and (2) the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc-1 *et seq.*[FN1] More specifically, Plaintiff's Complaint alleges that, while he was incarcerated at Shawangunk Correctional Facility ("Shawangunk C.F.") in 2004, the New York State Department of Correctional Services ("DOCS") and four of its employees ("Defendants") violated his rights in one or both of two ways: (1) by carelessly refusing to allow him to take a "purification" shower and then participate in a weekly religious service in accordance with the practice of his Islamic religion, on the afternoon of March 19, 2004; and (2) by wrongfully failing, during the days and weeks that followed, to grant *all* of the relief that Plaintiff requested in a grievance that he filed regarding the incident. (*See* Dkt. No. 1 [Plf.'s Compl.].) Currently pending before the Court is Defendants' motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Dkt. No. 11.) For the reasons that follow, I recommend that Defendants' motion be granted and that Plaintiff's Complaint be dismissed with prejudice.

FN1. Plaintiff mistakenly alleges that he is bringing his claims under "the Religious Freedom Restoration Act of 42 U.S.C. § 2000cc-1." (Dkt. No. 1, at 1 [Plf.'s Compl.].) The Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq.*, was declared unconstitutional by the United States Supreme Court in 1997. *City of Boerne v. Flores,* 521 U.S.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

507, 532-536 (1997). Because the Religious Freedom Restoration Act was amended by the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc1 *et seq.,* a plaintiff's RLUIPA claim may be construed "as an extension of its [inartfully pleaded] RFRA claim." *Prater v. City of Burnside,* 289 F.3d 417, 433 (6th Cir.2002). In short, construed with the extra liberal leniency afforded to *pro se* civil rights litigants, Plaintiff's claims arise, in part, not under the RFRA but under the RLUIPA, 42 U .S.C. § 2000cc-1 *et seq.* *See* *Phillips v. Girdich,* 408 F.3d 124, 130 (2d Cir.2005) (when district court is determining what legal claims a *pro se* civil litigant has raised, "the court's imagination should be limited only by [the plaintiff's] factual allegations, not by the legal claims set out in his pleadings") [citations omitted].

## I. BACKGROUND

### A. Plaintiff's Complaint

Liberally construed, Plaintiff's Complaint alleges as follows.

On March 19, 2004, he was working in the Mess Hall at Shawangunk C.F.[FN2] At approximately 12:30 p.m. that day, he approached Defendant John Doe # 1, the correctional officer who was supervising the Mess Hall, and requested that he be allowed to return to his housing unit in "Block D1" in order to take an obligatory religious "purification" shower in preparation for the weekly "Muslim Jumu'ah religious service[ ]," scheduled for 1:00 p.m. at Shawangunk C.F.[FN3] However, Defendant John Doe # 1 refused to allow Plaintiff to return to Block D1, stating "that 'nobody is leaving the messhall [sic] due to a contraband search being conducted in housing Block D2.' "[FN4] As a result, Plaintiff was unable to leave the Mess Hall until approximately 2:15 p.m., thereby missing his religious service.[FN5]

FN2. (Dkt. No. 1, ¶ 8 [Plf.'s Compl.].)

FN3. (*Id.* at ¶¶ 9-10.)

FN4. (*Id.* at ¶ 11.)

FN5. (*Id.* at ¶ 12.)

On March 22, 2004, Plaintiff filed an Inmate Grievance Complaint regarding the incident; the grievance was assigned number "SHG 20686." [FN6] Under the section of the grievance labeled "Action requested by Inmate," Plaintiff responded, "That this will not happen again, because I was prevented from performing my religious duty's [sic], and a significant good religious day [sic]." [FN7]

FN6. (*Id.* ¶ 13.)

FN7. (*Id.* at Ex. A.)

***2** On April 5, 2004, the Shawangunk C.F. Inmate Grievance Resolution Committee ("IGRC") issued a written ruling regarding Plaintiff's grievance. [FN8] Under the section of the decision labeled "Response of IGRC," the IGRC stated as follows: "D2 housing unit was being searched at the time and not D1 unit. Furthermore, inmates

housed in D1 during the search and scheduled for religious services were allowed to attend services on time without compromising the security of the search. Grievant could've been offered the same opportunity." [FN9] At the grievance hearing that accompanied the issuance of the IGRC's written ruling, John Doe # 2, the Hearing Officer assigned to conduct Plaintiff's grievance hearing, "gave no [other] reason for [the ruling]." [FN10] On the bottom of the written ruling issued by the IGRC, there were four boxes, which preceded the following four statements: (1) "I disagree with the IGRC response," (2) "I agree with the IGRC response," (3) "I have reviewed deadlocked responses," and (4) "I wish to appeal to the Superintendent." [FN11] Construing the IGRC's ruling as a "denial" of his grievance, Plaintiff checked the *second* and fourth boxes on April 5, 2004. [FN12]

FN8. (*Id.* at ¶ 14 & Ex. B.)

FN9. (*Id.* at Ex. B.)

FN10. (*Id.* at ¶ 14.)

FN11. (*Id.* at Ex. B.)

FN12. (*Id.* ¶ 15 & Ex. B)

At some point between April 5, 2004, and April 13, 2004, Shawangunk C.F. Superintendent Joseph T. Smith caused an investigation to be conducted regarding the subject of Plaintiff's appeal.[FN13] On April 13, 2004, Superintendent Smith issued his ruling regarding Plaintiff's appeal.[FN14] In that ruling, Superintendent Smith stated as follows:

FN13. (*Id.* at ¶ 16.)

FN14. (*Id.* at ¶ 16 & Ex. C.)

Grievant claims that he was denied attendance at religious services. He wants to avoid a reoccurrence.

Investigation reveals that grievant is correct. While an area search was being conducted on D/2 (a messhall unit) which contributed to confusion by staff, grievant nonetheless should have been permitted to attend services.

Grievance accepted only to the extent as stated above.[FN15]

FN15. (*Id.*)

Plaintiff signed his Complaint in this action on April 10, 2007.[FN16]

FN16. (*Id.* at 4.)

**B. Defendants' Motion to Dismiss**

Defendants have moved to dismiss Plaintiff's Complaint on four grounds: (1) most, if not all, of Plaintiff's claims concerning the events of March 19,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

2004, to April 13, 2004, are barred by the three-year statute of limitations governing those claims, under 42 U.S.C. § 1983; (2) Plaintiff's claims against DOCS are barred because (a) DOCS, an entity, is not a "person" within the meaning of 42 U.S.C. § 1983, and (b) in any event, the Eleventh Amendment to the United States Constitution bars Plaintiff's claim against DOCS, which is an agency of New York State; (3) Plaintiff has failed to allege facts plausibly suggesting that Defendants Fischer and LeClaire, both of whom were high-ranking DOCS officials during the time in question, were personally involved in any constitutional violations alleged; and (4) Plaintiff has failed to state a claim under RLUIPA.[FN17]

FN17. (*See generally* Dkt. No. 11, Part 2 [Defs.' Mem. of Law].)

In response to Defendants' first argument, Plaintiff argues that the limitations period that governs his claims is not three years (under 42 U.S.C. § 1983) but four years (under 28 U.S.C. § 1658[a] ).[FN18] In response to Defendants' second argument, Plaintiff argues that the broad definition of "government," set forth in 42 U.S.C. § 2000cc-5(4), allows him to assert claims against DOCS in this action.[FN19] While Plaintiff does not specifically respond to Defendants' third argument, he states generally that "[a]ny other argument by defendants is misplaced, mistaken, or arbitrary. " [FN20] In response to Defendants' fourth argument, Plaintiff argues that Defendants placed a substantial burden on his right to religious exercise, thus enabling him to state a claim under RLUIPA.[FN21]

FN18. (Dkt. No. 13, Plf.'s Memo. of Law, at 3.)

FN19. (*Id.* at 2.)

FN20. (*Id.* at 2.)

FN21. (*Id.* at 1-4.)

**II. RELEVANT LEGAL STANDARD**

***3** Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Rule 8(a)(2); [FN22] or (2) a challenge to the legal cognizability of the claim. [FN23]

FN22. *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") (citations omitted); *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

FN23. *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514 (2002) ( "These allegations give respondent fair notice of what petitioner's claims

are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") (citation omitted); *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12 [b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ("Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") (citation omitted); *Util. Metal Research & Generac Power Sys.,* 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, at *4-5 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101-102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01-CV-4430, 2002 U.S. Dist. LEXIS 1658, at *6-7 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12[b] [6] motion-one aimed at the sufficiency of the pleadings under Rule 8 [a], and the other aimed at the legal sufficiency of the claims).

Rule 8(a)(2) requires that a pleading include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Such a statement must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." [FN24] The The purpose of this rule is to "facilitate a proper decision on the merits." [FN25] A complaint that fails to comply with this rule "presents far too a heavy burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [FN26]

FN24. *Dura Pharmaceuticals, Inc. v. Broudo,* 125 S.Ct. 1627, 1634 (2005) (holding that the complaint failed to meet this test) (quoting *Conley,* 355 U.S. at 47); *see also Swierkiewicz,* 534 U.S. at 512 (quoting *Conley,* 355 U.S. at 47); *Leathernman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U .S. 163, 168 (1993) (quoting *Conley,* 355 U.S. at 47).

FN25. *See Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48).

FN26. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

The Supreme Court has long characterized this pleading requirement under Rule 8(a)(2) as "simplified" and "liberal," and has repeatedly rejected judicially

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

established pleading requirements that exceed this liberal requirement.[FN27] However, it is well established that even this liberal notice pleading standard "has its limits." [FN28] As a result, several Supreme Court decisions, and Second Circuit decisions, exist holding that a pleading has failed to meet this liberal notice pleading standard.[FN29]

FN27. *See, e.g., Swierkiewicz,* 534 U.S. at 513-514 (noting that "Rule 8(a)(2)'s simplified pleading standard applies to all civil actions, with limited exceptions [including] averments of fraud or mistake.").

FN28. 2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed.2003).

FN29. *See, e.g., Bell Atlantic Corp. v. Twombly,* 127 S.Ct. 1955, 1964-1974 (2007) (pleading did not meet Rule 8[a][2]'s liberal requirement), *accord, Dura Pharmaceuticals,* 125 S.Ct. at 1634-1635, *Christopher v. Harbury,* 536 U.S. 403, 416-422 (2002), *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 234-235 (2d Cir.2004), *Gmurzynska v. Hutton,* 355 F.3d 206, 208-209 (2d Cir.2004). Several unpublished decisions exist from the Second Circuit affirming the Rule 8(a)(2) dismissal of a complaint after *Swierkiewicz. See, e.g., Salvador v. Adirondack Park Agency of the State of N.Y.,* No. 01-7539, 2002 WL 741835, at *5 (2d Cir. Apr. 26, 2002) (affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting Rule 8[a][2] ). Although these decisions are not themselves precedential authority, *see* Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued precedential effect, after *Swierkiewicz,* of certain cases from within the Second Circuit interpreting Rule 8(a)(2). *See Khan v. Ashcroft,* 352 F.3d 521, 525 (2d Cir.2003) (relying on summary affirmances because "they clearly acknowledge the continued precedential effect" of *Domond v. INS,* 244 F.3d 81 [2d Cir.2001], after that case was "implicitly overruled by the Supreme Court" in *INS v. St. Cyr,* 533 U.S. 289 [2001] ).

Most notably, in the recent decision of *Bell Atlantic Corporation v. Twombly,* the Supreme Court, in reversing an appellate decision holding that a complaint had stated a claim upon which relief could be granted, "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 127 S.Ct. 1955, 1968-69 (2007).[FN30] Rather than turning on the conceivability of an actionable claim, the Court clarified, the Rule 8 standard turns on the "plausibility" of an actionable claim. *Id.* at 1965-74. More specifically, the Court held that, for a plaintiff's complaint to state a claim, his "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]" assuming, of course, that all the allegations in the complaint are true. *Id.* at 1965 [citations omitted]. What this means, on a practical level, is that there must be "plausible grounds to infer [actionable conduct]," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]." *Id.*[FN31]

FN30. The Court in *Twombly* further explained: "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint.... *Conley,* then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Twombly,* 127 S.Ct. at 1969.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN31. *Accord, Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) ( "[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly* ] is ... requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible."* ) [emphasis in original].

Having said that, it should be emphasized that, "[i]n reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." FN32 "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se."* FN33 In other words, while all pleadings are to be construed liberally, *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality. For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint. FN34 Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." FN35 Furthermore, when addressing a *pro se* complaint, generally a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." FN36

FN32. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) (citation omitted); *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

FN33. *Hernandez,* 18 F.3d at 136 (citation omitted); *see also Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) (citations omitted); *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) (citation omitted).

FN34. "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* 96-CV-7544, 1997 WL 714878, at *1, n. 2 (S.D.N.Y. Nov. 17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) (citations omitted), *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading-which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138-39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) (citations omitted).

FN35. *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were

insufficient) (internal quotation and citation omitted).

FN36. *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

***4** However, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." FN37 For example, an opportunity to amend should be denied where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." FN38

FN37. *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980); *accord, Standley v. Dennison,* 05-CV-1033, 2007 WL 2406909, at *6, n. 27 (N.D.N.Y. Aug. 21, 2007) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *2 (N.D.Y.Y. July 11, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *DiProjetto v. Morris Protective Serv.,* 489 F.Supp.2d 305, 307 (W.D.N.Y.2007); *Cosby v. City of White Plains,* 04-CV-5829, 2007 WL 853203, at *3 (S.D.N.Y. Feb. 9, 2007); *Lopez v. Wright,* 05-CV-1568, 2007 WL 388919, at *3, n. 11 (N.D.N.Y. Jan. 31, 2007) (Mordue, C.J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5 (N.D.N.Y. Jan. 23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan. 10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins v. Fed. Bur. of Prisons,* 05-CV-0904, 2007 WL 37404, at *4 (N.D.N.Y. Jan. 4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.).

FN38. *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) (citation omitted); *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) (citation omitted).

**III. ANALYSIS**

Because some of Defendants' arguments are stronger than others, I begin with the strongest of Defendants arguments. Furthermore, because the Court possesses the authority (and duty) to *sua sponte* review the pleading sufficiency of a prisoner's civil rights claims under the Prison Litigation Reform Act, I conduct a *sua sponte* review of various of Plaintiff's claims where appropriate. FN39

FN39. *See* 28 U.S.C. § 1915(e)(2)(B)(ii) ("[T]he court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis* ] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails to state a claim on which relief may be granted [,] ... or ... seeks monetary relief against a defendant who is immune from such relief"); 28 U.S.C. § 1915A(b) ("On review, the court shall ... dismiss the [prisoner's] complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted....").

**A. Whether Plaintiff Has Alleged Facts Plausibly**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 9

Not Reported in F.Supp.2d, 2008 WL 2019655 (N.D.N.Y.)

(Cite as: 2008 WL 2019655 (N.D.N.Y.))

**Suggesting that Defendants Fischer and LeClaire Were Personally Involved in any Constitutional Violations Alleged**

A defendant's personal involvement in alleged unlawful conduct is a prerequisite for a finding of liability in a Section 1983 action. *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987). Supervisory officials such as prison superintendents are personally involved in a constitutional violation only if: (1) they directly participated in that violation; (2) they failed to remedy that violation after learning of it through a report or appeal; (3) they created, or allowed to continue, a policy or custom under which the violation occurred; (4) they were grossly negligent in managing subordinates who caused the violation; or (5) they exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright v. Smith.* 21 F.3d 496, 501 (2d Cir.1994) (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323-324 (2d Cir.1986) (setting forth four prongs).

Here, Plaintiff states in his Complaint that Defendant Fischer is the current Commissioner of DOCS and that Defendant LeClaire was the Commissioner of DOCS at the time of the alleged violation of his constitutional rights. However, Plaintiff fails to allege any facts plausibly suggesting that Defendants Fischer or LeClaire directly participated in any constitutional violation. Nor does Plaintiff point to any policy, custom, poor management techniques, or failure to remedy that violated his constitutional right to practice his religion. For example, conspicuously missing from Plaintiff's Complaint is any factual allegation that Defendant Fischer or LeClaire knew about similar violations at Shawangunk C.F. (or anywhere) before March 19, 2004, or that they even learned of the alleged violation in question by report or appeal after March 19, 2004. Furthermore, Plaintiff has alleged facts plausibly that the DOCS' grievance procedures in place at the time resulted in a ruling that was partly, if not entirely, in Plaintiff's favor, plausibly suggesting that Defendants Fischer or LeClaire-to the extent they were responsible for supervising DOCS' grievance process-were performing their duties adequately.

***5** For these reasons, *I recommend that Plaintiff's constitutional claims (i.e., his Section 1983 claims) against Defendants Fischer and LeClaire be dismissed because of Plaintiff's failure to allege facts plausibly suggesting those two Defendants' personal involvement in the constitutional violations alleged.*

Furthermore, I find that Plaintiff has not alleged any facts plausibly suggesting that there were constitutional violations in which *any* Defendant could have been personally involved. As an initial matter, Plaintiff's claim under the Eighth Amendment is a mere superfluity. Based on even the most liberal constructions of his factual allegations, his sole constitutional claims consist of a First Amendment free-exercise claim and perhaps a Fourteenth Amendment procedural due process claim.

One reason that his First and Fourteenth Amendment claims fail is because he has not alleged facts plausibly suggesting anything other than *negligence* by Defendants. For example, he alleges that Defendant John Doe # 1 denied Plaintiff access to a shower and religious service on March 19, 2004, due to his erroneous belief that a contraband search in Housing Block D2 prevented anyone from leaving the Mess Hall. (*See, supra,* Part I.A. of this Report-Recommendation.) Moreover, he alleges that Defendant John Doe # 2 neglected to orally explain (to Plaintiff's satisfaction) the written decision of the IGRC with regard to Plaintiff's grievance. (*Id.*) Negligence is not actionable under either the First or Fourteenth Amendment.[FN40]

FN40. *See, e.g., Daniels v. Williams,* 474 U.S. 327, 331-33 (1986) (stating that "injuries inflicted by governmental negligence are not addressed by the United States Constitution" and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

rejecting § 1983 claim based on alleged due process violation under Fourteenth Amendment); *Hudson v. Palmer,* 486 U.S. 517, 531 (1984) ("[T]he Due Process Clause of the Fourteenth Amendment is not violated when a state employee negligently deprives an individual of property...."); *Riddick v. Modeny,* No. 07-1645, 2007 WL 2980186, at *2 (3d Cir. Oct. 9, 2007) ("The protections afforded prisoners by the Due Process Clause of the Fourteenth Amendment are not triggered by the mere negligence of prison officials."); *Jones v. Salt Lake County,* 503 F.3d 1147, 1162-63 (10th cir.2007) ("[N]egligence does not state a § 1983 [First Amendment] claim."); *Taylor v. Dretke,* No. 05-41738, 239 Fed. App'x 882, 883-84 (5th Cir. June 28, 2007) (dismissing prisoner's access-to-courts claim because negligence is not actionable under First Amendment); *Willis v. Washington,* No. 96-2385, 1999 U.S.App. LEXIS 532, at *2-3 (7th Cir. Dec. 16, 1998) (dismissing prisoner's interference-with-mail claim because negligence is not actionable under First Amendment).

Another reason that his First Amendment claim fails is because he has alleged merely the denial of the right to participate in *one* weekly religious service. FN41 Courts from the Second Circuit have *repeatedly* found that an allegation that prison officials caused a prisoner to miss one religious service fails to state an actionable claim under the First Amendment.FN42 Indeed, on three occasions, district courts in this Circuit have specifically held that causing a prisoner to miss one Jumu'ah service fails to state an actionable claim under the First Amendment.FN43

FN41. I take judicial notice of the fact that, in the Muslim faith, "Jumu'ah" is a weekly congregational service, occurring every Friday. *Boomer v. Irvin,* 963 F.Supp. 227, 228, n. 1 (W.D.N.Y.1997) ("As noted in this court's previous decision and order, Jummah, or 'Jumu'ah,' is a weekly Muslim congregational service commanded by the Koran to be held every Friday after the sun reaches its zenith and before the Asr, or afternoon prayer.") [internal quotation marks and citations omitted]; *Persad v. Savage,* 02-CV-0336, 2004 WL 1570286, at *7 (W.D.N.Y. May 25, 2004) ("Despite the cancellation of one ... Juma service [on Friday, September 28, 2001], Plaintiffs and other Muslim inmates were free to practice their religion [for purposes of the First Amendment],"), *adopted,* 02-CV-0336, 2004 WL 1858140 (W.D.N.Y. Aug. 19, 2004); *cf. Williams v. Weaver,* 03-CV-0912, 2006 WL 2794417, at *5, nn. 27-28 (N.D.N.Y. Sept. 26, 2006) (Kahn, J., adopting Report-Recommendation by Lowe, M.J.) (taking judicial notice of "the fact that, in 2003, no Islamic holidays occurred between June 25, 2003, and July 23, 2003") [citations omitted].

FN42. *See Johnson v. Newton,* 02-CV-1277, 2007 WL 778421, at *5 (N.D.N.Y. March 13, 2007) (McAvoy, J., adopting Report-Recommendation by Homer, M.J.) (granting defendant's motion for summary judgment dismissing prisoner's First Amendment free-exercise claim that defendant prevented the prisoner from entering a mosque on one occasion because, even assuming the truth of that allegation, "missing one religious service does not constitute a substantial burden on an inmate's right to the free exercise of his religion") [internal quotation marks and citations omitted]; *Williams v. Weaver,* 03-CV-0912, 2006 WL 2794417, at *5, n. 29 (N.D.N.Y. Sept. 26, 2006) (Kahn, J., adopting Report-Recommendation by Lowe, M.J.) (granting defendant's motion for judgment on the pleadings with respect to prisoner's First Amendment free-exercise claim that defendant caused prisoner to miss two weekly religious services) [citations omitted]; *Cancel v. Mazzuca,* 205 F.Supp.2d 128, 142 (S.D.N.Y.2002) (granting defendant's Rule

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

12[b][6] motion to dismiss prisoner's First Amendment free-exercise claim that defendant "prevented him, on one occasion, from attending a religious service"); *Wagnoon v. Gatson,* 00-CV-3722, 2001 U.S. Dist. LEXIS 8417, at *23-25 (S.D.N.Y. June 25, 2001) (granting defendants' Rule 12[b][6] motion to dismiss prisoner's First Amendment free-exercise claim that defendants caused prisoner to miss all or part of his midday Muslim prayers on one day) [citations omitted]; *Gill v. DeFrank,* 98-CV-7851, 2000 WL 897152, at *1-2 (S.D.N.Y. July 6, 2000) (granting defendants' motion for summary judgment dismissing prisoner's First Amendment free-exercise claim that defendants caused prisoner to miss one weekly religious service) [citations omitted], *aff'd,* 8 Fed. Appx. 35 (2d Cir.2001) (unpublished decision).

FN43. *See Persad v. Savage,* 02-CV-0336, 2004 WL 1570286, at *7 (W.D.N.Y. May 25, 2004) ("Despite the cancellation of one (or even two) Juma service, Plaintiffs and other Muslim inmates were free to practice their religion [for purposes of the First Amendment]."), *adopted,* 02-CV-0336, 2004 WL 1858140 (W.D.N.Y. Aug. 19, 2004); *Boomer v. Irvin,* 963 F.Supp. 227, 230-31 (W.D.N.Y.1997) (granting defendant's motion for summary judgment dismissing prisoner's free-exercise claim, asserted under both the First Amendment and the RFRA, that defendants prevented the prisoner from attending one Muslim Jumu'ah service due to keeplock confinement); *Troy v. Kuhlmann,* 96-CV-7190, 1999 WL 825622, at *4, 14-15 & n. 4 (S.D.N.Y. Oct. 15, 1999) (granting defendants' motion for summary judgment dismissing prisoner's First Amendment free-exercise claim that defendants caused prisoner, of the Muslim faith, to miss one weekly religious service on Friday, May 31, 1996) [citations omitted].

Finally, for the reasons stated above, I find that the problems with Plaintiff's First and Fourteenth Amendment claims are substantive, not merely formal. Simply stated, if Plaintiff possessed facts plausibly suggesting an actionable constitutional claim against Defendants, he would have alleged those facts in his otherwise specific Complaint.

For all of these reasons, *I recommend also that Plaintiff's remaining constitutional claims-i.e., his Section 1983 claims against Defendants DOCS, Fischer and LeClaire-be sua sponte dismissed with prejudice for failure to state a claim upon which relief may be granted.*

**B. Whether Plaintiff Has Failed to State a Claim Under RLUIPA**

RLUIPA provides that "[n]o government shall impose a *substantial burden* on the religious exercise of a person residing in or confined to an institution ... unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a) [emphasis added]. With regard to the threshold issue presented to the Court in analyzing a RLUIPA claim (i.e., whether a "substantial burden" has been alleged), it should be noted that "[a] substantial burden is more than a mere inconvenience." *Gill v. DeFrank,* 98-CV-7851, 2000 U.S. Dist. LEXIS 9122, at *4-5 (S.D.N.Y. June 30, 2000). With regard to the second issue presented to the Court in analyzing a RLUIPA claim (i.e., whether the imposition of the burden was in furtherance of a compelling governmental interest, and whether the least restrictive means of furthering that compelling governmental interest was used), it should be noted that an act by prison officials challenged by an incarcerated person is examined under a test less restrictive than that of ordinary "reasonableness"; rather, it must merely be "reasonably related to legitimate penological interests." *Salahuddin v. Goord,* 467 F.3d

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

263, 274 (2d Cir.2006) (quoting *O'Lone v. Estate of Shabazz,* 482 U.S. 349 [1987] ).

***6** Here, Plaintiff bases his RLUIPA claim on a one-time occurrence: his inability to attend the Jumu'ah service that was held on Friday, March 19, 2004, at Shawangunk C.F. (*See, supra,* Part I.A. of this Report-Recommendation.) He has not alleged even conclusorily that Defendants (or anyone) *repeatedly* denied Plaintiff (or any Muslim incarcerated in DOCS) the right to attend Jumu'ah services. (*Id.*) Furthermore, he alleges facts plausibly suggesting that Defendant John Doe # 1 caused him to miss the service due to a mistaken belief that refusing to permit Plaintiff to leave the Mess Hall for the one-and-three-quarter-hour period of time in question was necessary to maintain order and safety at Shawangunk C.F. (*Id.*) Finally, Plaintiff alleges facts plausibly suggesting that Defendant John Doe # 2, or at least the IGRC (of which Defendant John Doe # 2 was a member), acknowledged the mistake and granted Plaintiff most, if not all, of the relief he requested in his grievance. (*Id.*)

These allegations simply do not state a claim under RLUIPA. Courts have found that causing a prisoner to miss one religious service does not constitute a violation of RLUIPA.[FN44] This is especially true where, as here, (1) the deprivation in question was alleged to have been effected through a mistake, [FN45] (2) the mistake was made with the express intent to maintain order and safety at Shawangunk C.F.,[FN46] and (3) the mistake was followed by an acknowledgment of error and efforts to rectify the situation.[FN47] With regard to this last point, it bears repeating that Plaintiff's Complaint clearly alleges that, in the written ruling issued on April 15, 2004, deciding Plaintiff's grievance regarding the deprivation in question, the Shawangunk C.F. IGRC expressly stated that the actions of John Doe # 1 were in error. Specifically, it stated that the "D2 housing unit was being searched at the time and not D1 unit," that "inmates housed in D1 during the search and scheduled for religious services were allowed to attend services on time without compromising the security of the search," and that Plaintiff "could've been offered the same opportunity." [FN48]

FN44. *See Thompson v. Quartermain,* 01-CV-0001, 2007 U.S. Dist. LEXIS 73207, at *6 (S.D.Tex. Sept. 30, 2007) ("An isolated denial, such as having to miss a single religious service, does not constitute a substantial burden on a prisoner's right to practice his religion [for purposes of eighth RLUIPA or the First Amendment]."); *Welch v. Talmadage,* 05-CV-1750, 2006 U.S. Dist. LEXIS 70387, at *22-23 (E.D.Pa. Sept. 7, 2006) (granting defendants' motion for summary judgment dismissing prisoner's RLUIPA claims because "[t]he inability to attend bible study on one occasion does not constitute a substantial burden on [a prisoner's] exercise of his religion"); *cf. Boomer v. Irvin,* 963 F.Supp. 227, 230-31 (W.D.N.Y.1997) (granting defendant's motion for summary judgment dismissing prisoner's *RFRA* claim that defendants prevented the prisoner from attending one Muslim Jumu'ah service due to keeplock confinement) [emphasis added].

FN45. *See Hysell v. Pliler,* 04-CV-0355, 2008 U.S. Dist. LEXIS 2721, at *24-26 (E.D.Cal. Jan. 14, 2008) (dismissing prisoners RLUIPA claim where, *inter alia,* "the denial of [religious] materials [on a few specific instances] was admitted by prison officials to be an error....").

FN46. As the Supreme Court has observed, RLUIPA does not "elevate accommodation of religious observances over an institution's need to maintain order and safety." *Cutter v. Wilkinson,* 544 U.S. 709, 722 (2005).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN47. *See Hysell,* 2008 U.S. Dist. LEXIS 2721, at *24-26 (dismissing prisoner's RLUIPA claim where "the denial of [religious] materials [on a few specific instances] was ... an error and efforts were taken to rectify the situation").

FN48. (Dkt. No. 1, Ex. B [Plf.'s Compl., attaching the written ruling of the 4/5/04 Shawangunk C.F. IGRC regarding Plf.'s grievance, which was incorporated by reference by the allegations contained in Paragraphs 14 and 15 of Plf.'s Compl.].) *See* Fed.R.Civ.P. 10(c) ("Statements in a pleading may be adopted by reference in a different part of the same pleading.... A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes.").

For these reasons, *I recommend that Plaintiff's RLUIPA claims be dismissed for failure to state a claim upon which relief may be granted.*

**C. Whether Any of Plaintiff's Claims Are Barred by the Applicable Statute of Limitations**

Plaintiff is partly mistaken and partly correct when he argues that the applicable limitations period that governs his claims is not three years (under 42 U.S.C. § 1983) but four years (under 28 U.S.C. § 1658[a] ). (Dkt. No. 13, Plf.'s Memo. of Law, at 3.)

He is mistaken in that the statute giving rise to his claims under the First, Eighth and Fourteenth Amendments is 42 U.S.C. § 1983, not RLUIPA. Section 1983 provides, in pertinent part, "Every person who ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured...." 42 U.S.C. § 1983 [emphasis added]. Here, Plaintiff is alleging, in part, that Defendants subjected him to the deprivation of rights under the Constitution (i.e., the First, Eighth and Fourteenth Amendments). It is well settled that the statute of limitations for Section 1983 actions brought in a federal court sitting in New York is three years.[FN49] As a result, it is inappropriate to rely on the four-year limitations period provided by 28 U.S.C. § 1658(a) when analyzing the timeliness of his First, Eighth and Fourteenth Amendment claims, since Section 1658(a) applies only when a limitations period is not "otherwise provided by law." 28 U.S.C. § 1658(a).

FN49. *See Owens v. Okure,* 488 U.S. 235, 251 (1989) ("New York's 3-year statute of limitations governing general personal injury actions" applies to Section 1983 claims).

***7** However, only *some* of Plaintiff's First, Eighth and Fourteenth Amendment claims (i.e., those based on events occurring prior to April 10, 2004, which was three years before he signed his Complaint in this action) appear barred by the applicable three-year limitations period. More specifically, Plaintiff's constitutional claims against Defendants John Doe # 1 and John Doe # 2 were based on events occurring on March 19, 2004, and April 5, 2004, which are outside the applicable three-year limitations period. (*See, supra,* Part I.A. of this Report-Recommendation.) It is only his constitutional claims against Defendants Fischer and LeClaire-which *apparently* arise from their (alleged) failure to reverse Superintendent Smith's decision of April 13, 2004, on appeal-that fall within the applicable three-year limitations period. (*Id.*) (I use the word "apparently" because, as explained above in Part III.A. of this Report-Recommendation, Plaintiff does not allege what facts gave rise to his constitutional claims against Defendants Fischer and/or LeClaire.)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Moreover, Plaintiff appears *correct* when he argues that his civil rights claims arising solely under RLUIPA are governed by a four-year limitations period. *See* *Williams v. Gerges,* 05-CV-2555, 2005 WL 1773857, at *5-6 (E.D.N.Y. July 26, 2005).

For these reasons, *I recommend that, in the alternative, the Court dismiss Plaintiff's constitutional claims (i.e., his Section 1983 claims) against Defendants John Doe # 1 and John Doe # 2 as untimely, but that the Court otherwise reject Defendants' untimeliness argument.*

**D. Whether Plaintiff's Claims Against Defendant DOCS Are Barred by Section 1983's Express Language and/or the Eleventh Amendment**

I agree with Defendants that Plaintiff's constitutional claims against Defendant DOCS are barred by Section 1983's express language and, alternatively, by the Eleventh Amendment to the United States Constitution. (Dkt. No. 11, Part 2, at 2 [Defs.' Mem. of Law].) However, I have trouble concluding that Plaintiff's RLUIPA claims against Defendant DOCS are also barred by the Eleventh Amendment. (Dkt. No. 13, Plf.'s Memo. of Law, at 2.)

Generally, plaintiffs may sue governmental entities (such as DOCS) under RLUIPA because, as Plaintiff argues, under RLUIPA, "[t]he term 'government' **(A)** means-**(i)** a State, county, municipality, or other governmental entity created under the authority of a State; **(ii)** any branch, department, agency, instrumentality, or official of an entity listed in clause (i); and **(iii)** any other person acting under color of State law; and **(B)** for the purposes of *sections 2000cc-2(b)* and *2000cc-3* of this title, includes the United States, a branch, department, agency, instrumentality, or official of the United States, and any other person acting under color of Federal law." 42 U.S.C. § 2000cc-5(4) [emphasis in original].

The more significant issue before the Court concerns the applicability, under the circumstances, of the Eleventh Amendment, which generally grants states sovereign immunity from such suits unless (1) Congress has abrogated a state's sovereign immunity through a statutory enactment or (2) a state has expressly waived its sovereign immunity. It appears that, after the enactment of RLUIPA in 2000, states could accept federal funds for prison activities or programs only on the condition that they comply with RLUIPA, which effectively constituted a waiver of their sovereign immunity under the Eleventh Amendment. [FN50] As a result, if New York State has accepted federal funds for prison activities or programs, it would appear that it has waived its sovereign immunity.

> FN50. *See* *Gerhardt v. Lazaroff,* 221 F.Supp.2d 827, 851-52 (S.D.Ohio 2002) (state was not immune under Eleventh Amendment from suit by prisoners alleging violations of RLUIPA since state's acceptance of federal funds for prison activities or programs on condition that it comply with RLUIPA constituted waiver of immunity), *aff 'd sub nom.,* *Cutter v. Wilkinson,* 423 F.3d 579 (6th Cir.2005); *accord,* *Smith v. Allen,* 502 F.3d 1255, 1276 & n .12 (11th Cir.2007); *Marsh v. Granholm,* 05-CV-0134, 2006 WL 2439760, at *12 (W.D.Mich. Aug. 22, 2006).

***8** Here, it is questionable whether Plaintiff has alleged facts plausibly suggesting that New York State did so waive its sovereign immunity. Plaintiff has alleged, in his opposition memorandum of law, that RLUIPA "is an exception to the 11th Amendment's restrictions on federal suits against States and their agencies-DOCS." (Dkt. No. 13, Plf.'s Memo. of Law, at 2.) Granted, Plaintiff's statement makes no mention of the acceptance of any federal funds by New York State, as did the plaintiff in the case of *Orafan v. Goord,* 00-CV-2022, 2003 U.S. Dist. LEXIS 14277, at *24 (N.D.N.Y. Aug. 14, 2003) (Treece,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

M.J.) ("Plaintiffs have sufficiently alleged that DOCS is a state agency which receives federal funds [for purposes of the waiver of Eleventh Amendment sovereign immunity under RLUIPA], and in assuming such a statement is accurate, the Defendants' Motion to Dismiss is recommended denied on this ground."), *adopted by* Decision and Order (N.D.N.Y. filed Sept. 30, 2003) (Kahn, J.). However, whether or not New York has accepted such funds would appear to be a fact of which Plaintiff would have absolutely no personal knowledge. Under the circumstances, I am simply unable to conclude with any confidence that Plaintiff's RLUIPA claim against DOCS fails to state a claim because of the Eleventh Amendment. Rather, that claim fails to state a claim for the reasons stated above in Part III.B. of this Report-Recommendation.

For these reasons, *I recommend that, in the alternative, the Court dismiss Plaintiff's constitutional claims (i.e., his Section 1983 claims) against Defendant DOCS as barred by the express language of Section 1983 and/or the Eleventh Amendment, but that the Court otherwise reject Defendants' argument as it relates to Plaintiff's RLUIPA claims against Defendant DOCS.*

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion to dismiss for failure to state a claim (Dkt. No. 11) be ***GRANTED,*** and that Plaintiff's Complaint (Dkt. No. 1) be ***DISMISSED*** **with prejudice.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Svcs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2008.

Hankins v. NYS Dept. of Correctional Services

Not Reported in F.Supp.2d, 2008 WL 2019655 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Prince PILGRIM, Plaintiff,

v.

Dale ARTUS, Superintendent, Clinton Correctional Facility, Defendants.

Civ. No. 9:07-CV-1001 (GLS/RFT).

March 18, 2010.

Prince Pilgrim, Attica, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Aaron M. Baldwin, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendant.

***REPORT-RECOMMENDATION and ORDER***

RANDOLPH F. TREECE, United States Magistrate Judge.

***1** *Pro se* Plaintiff Prince Pilgrim has filed this civil rights action, pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1 *et seq.,* alleging that Defendant Dale Artus, Superintendent of Clinton Correctional Facility, violated his constitutional and statutory rights to freely exercise his religious beliefs. Dkt. No. 1, Compl. The crux of Plaintiff's religious expression claim is that he was repeatedly punished for exercising his sincerely held religious beliefs, which require him to wear dreadlocks, because he is a member of the Nation of Islam ("NOI") and Department of Correctional Services' ("DOCS") policy allows only those of the Rastafarian faith to wear dreadlocks. *See generally id.*

In addition, Plaintiff alleges that Artus failed to protect him from unconstitutional retaliation, his due process rights were violated during the course of several disciplinary hearings, and the penalties imposed as a result of his disciplinary convictions constituted "cruel and unusual punishment" in violation of the Eighth Amendment. *Id.*

Presently before the Court for a Report-Recommendation is Defendant's Motion for Summary Judgment. Dkt. No. 36. Since the filing of Defendant's Motion, the Court has granted Plaintiff four separate extensions of time to file a response in opposition to the Motion. *See* Dkt. No. 46, Order, dated Aug. 20, 2009, at p. 1 (cataloguing prior extensions). The final extension granted Plaintiff until September 4, 2009, to file a response, and warned Plaintiff that ***"failure to oppose Defendant's Motion will result in this Court accepting the facts set forth by Defendant as true."*** *Id.* at p. 3 (emphasis in original) (citing N.D.N.Y.L.R. 7.1(a)(3)). Despite this Court's leniency and warnings, Plaintiff's Response [FN1] was not received until September 10, 2009, six days after the deadline passed. Dkt. No. 47, Pl.'s Resp. in Opp'n to Def.'s Mot. Notwithstanding Plaintiff's failure to meet the extended deadline, because he is proceeding *pro se,* we will nonetheless consider his Response and the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Exhibits attached thereto in issuing a recommendation on Defendant's Motion.

FN1. Plaintiff's Response consists of (1) an Affidavit, dated August 31, 2009, which is in sum and substance a concise memorandum of law, and (2) a Declaration, dated August 31, 2009, which is in sum and substance a statement of material facts, with attached Exhibits. *See* Dkt. No. 47.

For the reasons that follow, we recommend that Defendant's Motion be **granted** in part and **denied** in part.

## I. FACTS NOT IN DISPUTE

The following facts were derived mainly from the Defendant's Statement of Material Facts, submitted in accordance with N.D.N.Y.L.R. 7.1, which were not, in their entirety, specifically countered nor opposed by Plaintiff. *See* N.D.N.Y.L.R. 7.1(a)(3) (*"The Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* (emphasis in original)). In any event, most, if not all, of the material facts are not in dispute, but rather, the issue is whether those facts give rise to constitutional and statutory violations.

***2** Plaintiff was received into DOCS' custody on or about November 4, 1992. Dkt. No. 36-2, Def.'s 7.1 Statement, at ¶ 1. At all times relevant to the Complaint, and continuing until the present, Defendant Dale Artus has been the Superintendent of Clinton Correctional Facility ("Clinton"), where Plaintiff was confined from April 1, 2005 through February 5, 2009. *Id.* at ¶ 2. Plaintiff is currently incarcerated at Attica Correctional Facility. *Id.*

On November 18, 2006, Plaintiff was given a direct order by Corrections Officer ("C.O.") A. Appleby to remove his dreadlocks as per DOCS' policy, which allows only inmates of the Rastafarian faith to wear dreadlocks. *Id.* at ¶ 18; Dkt. No. 47-1, Prince Pilgrim Decl., dated Aug. 31, 2009 (hereinafter "Pl.'s Decl."), at ¶ 14. DOCS' hair policy is based on DOCS Directive # 4914, entitled "Inmate Grooming Standards," and relevant decisions from the Central Office Review Committee ("CORC"), which is the final appellate body for inmate grievances and whose decisions have the same effect as directives. Dkt. No. 36-6, Mark Leonard Decl., dated Apr. 30, 2009, at ¶ 59. DOCS Directive # 4914 allows inmates to wear long hair [FN2] provided they tie it back in a ponytail at all times, but does not specifically permit nor disallow dreadlocks. *Id.,* Ex. B, DOCS Directive # 4914(III)(B)(2)(a)-(d). However, relevant CORC decisions have made clear that "[o]nly inmates of the Rastafarian faith may have dreadlocks." *Id.,* Ex. C, CORC Decision, dated May 8, 2003.

FN2. DOCS Directive # 4914 defines "long" as "below shoulder length." Leonard Decl., Ex. B, DOCS Directive # 4914(III)(B)(2) (b).

On December 19, 2006, C.O. C. Strong observed Plaintiff, who was on his way to an NOI meeting, with his hair in dreadlocks that extended down to the middle of his back. *Id.* at ¶ 17; Pilgrim Decl. at ¶¶ 17-18. C.O. Strong issued Plaintiff a Misbehavior Report (hereinafter "First MR"), charging him with Refusal to Obey a Direct Order (Rule 106.10). Def.'s 7.1 Statement at ¶ 19. At a Tier II Hearing that concluded on December 27, 2006, Lieutenant ("Lt.") Boyle found Plaintiff guilty of the charge and assessed him a penalty of thirty (30) days keeplock,[FN3] with loss of commissary, package and phone privileges. *Id.* at ¶ 20. During that hearing, Boyle refused Plaintiff's request to call Defendant Superintendent Artus as a witness, reasoning that because Artus was not present nor otherwise involved in the incident, his testimony would not be germane to the charge at issue. *Id.* at ¶¶ 40-41. However, Plaintiff was allowed to call other witnesses

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

including two C.O.'s and another inmate. *Id.* at ¶ 42. Plaintiff's appeal, dated December 27, 2006, was delegated by Defendant Artus to Captain J. Bell, who affirmed Boyle's decision. *Id.* at ¶ 21.

FN3. Generally speaking, inmates placed on keeplock are restricted to their cells for twenty-three (23) hours a day, given one hour for exercise, and are denied participation in normal prison activities that occur outside of their cells. *Parker v. Peek-Co,* 2009 WL 211371, at *4 n. 6 (N.D.N.Y. Jan. 27, 2009) (citing cases).

On February 20, 2007, Plaintiff was issued another Misbehavior Report (hereinafter "Second MR") by C.O. Appleby for again failing to cut his dreadlocks and thereby refusing to comply with both a direct order and a prior hearing disposition. *Id.* at ¶¶ 22-23; Pl.'s Decl. at ¶ 21. A Tier II Hearing was conducted by Lt. Lucia, who found Plaintiff guilty of Refusal to Obey a Direct Order (Rule 106.10) and Noncompliance with a Hearing Disposition (Rule 181 .10), and assessed Plaintiff thirty (30) days keeplock, with corresponding loss of recreation, commissary, package and phone privileges, and an additional fifteen (15) days keeplock and loss of privileges invoked from a previous disciplinary hearing determination. Def.'s 7.1 Statement at ¶¶ 23-24; Pl.'s Decl. at ¶ 25. Artus referred Plaintiff's appeal of those convictions to Captain Bell, who reviewed and affirmed the hearing officer's decision on March 5, 2007. Def.'s 7.1 Statement at ¶ 25; Pl.'s Decl. at ¶ 26. By letters dated March 14, 2007, and March 21, 2007, Plaintiff requested a discretionary review of the March 1, 2007 Tier II Hearing disposition, raising issues as to whether or not he should have been credited for time spent in pre-hearing confinement. Def.'s 7.1 Statement at ¶ 26. Artus delegated that petition to G. Haponik, First Deputy Superintendent, who denied the requested relief. *Id.* at ¶ 27.

***3** Also on February 20, 2007, Plaintiff filed a grievance with the Inmate Grievance Program ("IGP") at Clinton, alleging harassment and unlawful discrimination on the part of C.O. Appleby, and taking issue with DOCS' policy regarding dreadlocks. *Id.* at ¶¶ 43-44; Pl.'s Decl. at ¶ 22. The Inmate Grievance Review Committee ("IGRC") dismissed the grievance on the grounds that there was a pending misbehavior report against Plaintiff, making the issue non-grievable. Def.'s 7.1 Statement at ¶ 45. Plaintiff's appeal to the Superintendent was referred to the IGP Supervisor, who agreed with the IGRC's determination and issued a memorandum to Plaintiff denying his appeal. *Id.* at ¶¶ 46-47.

On August 1, 2007, Plaintiff was issued another Misbehavior Report (hereinafter "Third MR") by C.O. J. Way for failure to comply with a prior direct order to cut his hair. *Id.* at ¶ 28. Along with Refusal to Obey a Direct Order (Rule 106.10), Plaintiff was charged with Harassment (Rule 107.11) for using obscene language during his confrontation with C.O. Way, and Inmate Grooming (Rule 110.33) for failure to tie back his long hair. *Id.* at ¶ 31. Lt. Miller conducted a Tier II Hearing on August 1, 2007, at which time Plaintiff was found guilty of refusing a direct order and having unfastened long hair, but not guilty of harassment. *Id.* at ¶ 32. Plaintiff was penalized with thirty (30) days keeplock and loss of commissary, package, and phone privileges for the same amount of time. *Id.* at ¶ 33. Artus referred Plaintiff's appeal of those convictions to Captain Bell, who reviewed and affirmed the hearing officer's decision. *Id.* at ¶ 34.

On September 12, 2007, C.O. Edwards issued Plaintiff a fourth Misbehavior Report (hereinafter "Fourth MR") concerning his dreadlocks. *Id.* at ¶¶ 35-36. The Fourth MR charged Plaintiff with Refusal to Obey a Direct Order (Rule 106.10) and making a False Statement (Rule 107.20), the latter charge owing to Plaintiff's alleged statement that he was a Rastafarian when, in fact, he was registered as an NOI member. *Id.* at ¶¶ 36-37; Pl.'s Decl. at ¶ 34. A Tier II Hearing was held on September 17, 2007, before Lt. Miller, who found Plaintiff guilty on both charges and sentenced him to thirty (30) days keeplock

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

with concurrent loss of commissary, package, and phone privileges. Def.'s 7.1 Statement at ¶ 38.

On or about November 26, 2007, Plaintiff filed another grievance with the IGP, dated November 17, 2007, complaining that DOCS' policy regarding dreadlocks did not comply with DOCS Directive # 4914 and violated his First Amendment rights. *Id.* at ¶ 48. That grievance was consolidated with similar grievances filed by other inmates at Clinton who were given similar orders and/or warnings regarding their hair. *Id.* at ¶ 49; Pl.'s Decl. at ¶ 36. After conducting an investigation, First Deputy Superintendent W.F. Hulihan issued a determination, dated December 19, 2007, stating that "DOCS policy is that registered Rastafarian religion inmates are the only inmates allowed to have dreadlock hairstyles .... This issue has been addressed in numerous CORC decisions .... Based on DOCS established policy and CORC decisions, no compelling evidence has been submitted to support a change in policy." Def.'s 7.1 Statement at ¶ 52. Plaintiff and the other grievants appealed Hulihan's determination to CORC, which upheld the decision. *Id.* at ¶ 53.

***4** Plaintiff wrote Defendant Artus many times during his incarceration at Clinton, the issue of his sanctions for wearing dreadlocks being the predominant topic of such correspondences. *Id.* at ¶ 54; Compl. at ¶ 4. On each occasion that he received a letter of complaint, request for an investigation, appeal, etc., from Plaintiff, Artus referred the matter to a deputy superintendent or other staff member for review, response, or other necessary action. Def.'s 7.1 Statement at ¶ 56.

## II. DISCUSSION

### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and [the moving party] is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through " 'pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any,' " that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the non-movant must "set out specific facts showing [that there is]a genuine issue for trial," and cannot rest "merely on allegations or denials" of the facts submitted by the movant. FED. R. CIV. P. 56(e); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

**B. Personal Involvement**

1. *Due Process, Retaliation, and Cruel and Unusual Punishment*

***5** Plaintiff alleges that Defendant Artus violated his First, Eighth, and Fourteenth Amendment rights by failing to overturn disciplinary sanctions, thereby subjecting him to punishments that were cruel and unusual, and by allowing others to retaliate against him. Defendant asserts he was not personally involved in any of those alleged constitutional violations.

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz,* 1997 WL 576038, at *2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir.1995) & *Wright v. Smith,* 21 F.3d at 501) (further citations omitted). Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1948 (2009).

Nonetheless, if a plaintiff seeks to bring a § 1983 action for supervisory liability, liability on the part of the supervisor may exist

> in one or more of the following ways: 1) actual direct participation in the constitutional violation, 2) failure to remedy a wrong after being informed through a report or appeal, 3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, 4) grossly negligent supervision of subordinates who committed a violation, or 5) failure to act on information indicating that unconstitutional acts were occurring.

*Hernandez v. Keane,* 341 F.3d 137, 145 (2d Cir.2003) (citing *Colon v. Coughlin,* 58 F.3d at 873) (further citations omitted).

In this case, Plaintiff does not allege that Defendant Artus directly participated in any of the alleged harassment, retaliation, due process violations, nor disciplinary actions that were taken against him. Rather, Plaintiff hangs his hat on the second of the five aforementioned ways in which supervisory liability may attach: "failure to remedy a wrong after being informed through a report or appeal." *Id.* at 145. Plaintiff asserts that he sent several grievances, complaint letters, and appeals of his disciplinary convictions to Artus, who was thereby made aware of the allegedly unconstitutional policy regarding dreadlocks and the harassments and retaliatory misbehavior reports that were being filed against Plaintiff, but that Artus nonetheless failed to intervene on Plaintiff's behalf. The record establishes that Plaintiff appealed to Artus at least three of the four Tier II Hearing dispositions that are relevant to this lawsuit, and that he filed several grievances and complaint letters with

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Artus.[FN4] *See* Dkt. No. 36-5, Dale Artus Decl., dated Apr. 30, 2009, Exs. A-U, Docs. related to Pl.'s Misbehavior Reps. & Grievances.

FN4. Defendant contends that Plaintiff did not appeal the disposition rendered at the fourth Disciplinary Hearing held on September 17, 2007. As opposed to his appeals on the first three Tier II Disciplinary Hearing dispositions, there is no record evidence of any appeal taken as to the fourth. *See generally,* Dkt. No. 36-5, Dale Artus Decl., dated Apr. 30, 2009, Ex. E, Fourth MR Docs. Plaintiff has not presented any evidence in opposition to Defendant's claim that he did not exhaust the administrative remedies available to him with respect to the fourth hearing. *See also* Compl. at ¶ 1 (stating that Plaintiff filed *"three* appeals to Tier II Disciplinary Hearings to Superintendent Dale Artus" (emphasis added)).

***6** However, while personal involvement may be found where a supervisory official personally reviews and denies a grievance, the mere referral of an inmate's complaint by a supervisory official to the appropriate staff for investigation is not sufficient to establish personal involvement. *See* *Vega v. Artus,* 610 F.Supp.2d 185, 199 (N.D.N.Y.2009) (quoting *Harnett v. Barr,* 538 F.Supp.2d 511, 524-25 (N.D.N.Y.2008)); *cf.* *Charles v. New York State Dep't of Corr. Servs.,* 2009 WL 890548, at *6 (N.D.N.Y. Mar. 31, 2009) (noting that "courts in this circuit have held that when a supervisory official ***receives and acts on*** a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint, a sufficient claim for personal involvement has been stated" (emphasis in original) (citation omitted)). Moreover, "mere linkage in the prison chain of command is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (internal quotation marks and citation omitted). Even "the fact that an official ignored a letter alleging unconstitutional conduct is not enough to establish personal involvement." *Flemming v. Wurzberger,* 2006 WL 1285627, at *2 (W.D.N.Y. May 10, 2006) (internal quotation marks and citations omitted).

In this case, Artus asserts that he referred each and every one of Plaintiff's appeals and grievances to subordinate staff members for review, investigation, and appropriate action. Artus Decl. at ¶ 13. The documentary record confirms that contention. Artus referred Plaintiff's appeals of his convictions on the First, Second, and Third MRs to Captain Bell, who reviewed and affirmed the dispositions rendered at the corresponding Tier II Hearings. *Id.,* Exs. B-D, Interdep't Comm'ns, dated Jan. 3, 2006, Mar. 5, 2007, & Aug. 16, 2007. In addition, all of the grievances, complaints, and appeals of grievances mentioned in Plaintiff's Response to Defendant's Motion were forwarded by Artus to staff members in order to investigate, render a decision, and take appropriate actions. Artus Decl. at ¶ 13; Dkt. No. 47, Prince Pilgrim Aff., dated Aug. 31, 2009 (hereinafter "Pl.'s Aff.") at p. 5. Namely, Plaintiff's grievances dated November 9, 2006, November 21, 2006, November 28, 2006, February 20, 2007, July 1, 2007, August 1, 2007, and October 5, 2007,[FN5] were all responded to by Artus's subordinate staff members. Pl.'s Aff., Ex. F, Interdep't Mem., dated Nov. 13, 2006; Ex. H, Interdep't Mem., dated Nov. 13, 2006 (referring 11/9/06 grievance to Deputy Sup't for Sec. J. Tedford); Ex. I, Interdep't Mem., dated Nov. 29, 2006 (referring 11/21/06 grievance to Deputy Sup't of Programs L. Turner); Ex. J, Interdep't Mem., dated Nov. 29, 2006 (referring 11/28/06 grievance to Tedford); Ex. N, Interdep't Comm'n, dated Feb. 23, 2007 (forwarding 2/20/07 grievance to Deputy Sup't of Security Servs. S. Racette); Exs. Q-S, Interdep't Comm'ns, dated July 5, Aug. 7 & Oct. 10, 2007 (referring grievances dated 7/1/07, 8/1/07, and 10/5/07 to IGP Supervisor T. Brousseau).

FN5. Plaintiff also mentions complaints/grievances filed on October 22, 2006, and August 30, 2007. Pl.'s Aff. at p. 5. The only correspondences on the record with those corresponding dates are a letter Plaintiff wrote to Assistant Deputy Superintendent S. Garman on

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

October 22, 2006, regarding his self-nomination for Inmate Liaison Committee Representative, and a letter to IGP Supervisor T. Brousseau dated August 30, 2007, in which Plaintiff enclosed two previously filed grievances that allegedly had not been acknowledged at that point. Pl.'s Decl., Ex. E & H, Lts. dated Oct. 22, 2006, & Aug. 30, 2007. Neither of these letters was sent to Artus, nor did they implicate Plaintiff's issues regarding his dreadlocks.

***7** Because Plaintiff has failed to rebut Defendant's documentary case that his involvement was limited to forwarding Plaintiff's disciplinary appeals, complaints, grievances, and appeals of grievances to other staff members, we recommend that all of Plaintiff's claims, with the exception of his RLUIPA and First Amendment religious expression claims,[FN6] be **dismissed** for lack of personal involvement. *See Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (holding that the referral of appeals down the chain of command does not create personal involvement on the part of the referee); *see also Brown v. Goord,* 2007 WL 607396, at * 10 (N.D.N.Y. Feb. 20, 2007) (citing cases for the proposition that a supervisor may "delegat[e] to high-ranking subordinates the responsibility to read and respond to ... complaints by prisoners" without becoming personally involved); *Cruz v. Edwards,* 1985 WL 467, at *4 (S.D.N.Y. Mar. 25, 1985) (finding defendant superintendent was not personally involved when he referred the appeal to the deputy superintendent).

FN6. We discuss the personal involvement issues related to Plaintiff's RLUIPA and First Amendment religious expression claims below in Part II.C.2.

Moreover, even if we were to look past Plaintiff's failure to demonstrate Artus's personal involvement, we would still find all of his constitutional claims (again with the notable exception of his First Amendment religious expression claim) to be without merit.

a. *Due Process*

In his Complaint, Plaintiff appears to make a due process claim based on "prejudicial" hearings and other unspecified procedural violations that occurred during those Hearings. Compl. at ¶ 10; Pl.'s Aff. at ¶ 15; *see also* Pl.'s Decl. at ¶ 24 (stating that the proceedings were "hollow"). This claim is wholly conclusory. Plaintiff does not identify which of the four Tier II Disciplinary Hearings was conducted in a prejudicial manner, nor does he describe any of the alleged procedural violations that occurred. *See Bell. Atl. Corp. v. Twombly,* 550 U.S. at 545 (stating that a valid claim must have enough factual allegations "to raise a right to relief above the speculative level"). In short, Plaintiff has not stated a plausible due process claim.

Even if we were to look past the conclusory nature of Plaintiff's due process claim, we would still recommend dismissal of such claim. In order to state a procedural due process claim pursuant to the Fourteenth Amendment, an inmate must first establish that he enjoys a protected liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corrs. v. Thompson,* 490 U.S. 454, 460 (1989)). The Supreme Court held in *Sandin v. Conner* that state created liberty interests shall be limited to those deprivations which subject a prisoner to "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484 (1995).

Here, Plaintiff alleges that he was sentenced to and served three separate thirty (30) day and one forty-five (45) day period of keeplock with reduced privileges, but alleges no additional aggravating circumstances present during that confinement. Courts in this Circuit have held that such periods of keeplock, absent additional egregious

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

circumstances, are not "atypical and significant" so as to create a liberty interest and thereby trigger the protections of the Due Process Clause. *See* *Rivera v. Goord,* 2008 WL 5378372, at *2-3 (N.D.N.Y. Dec. 22, 2008) (holding that 40 days of room restriction "did not constitute a constitutionally cognizable liberty deprivation"); *Uzzell v. Scully,* 893 F.Supp. 259, 263 (S.D.N.Y.1995) (45 days of keeplock is not atypical and significant), *Rivera v. Coughlin,* 1996 WL 22342, at *5 (S.D.N.Y. Jan. 22, 1996) (89 days in keeplock does not create a liberty interest). Indeed, courts have roundly rejected the notion that such a short period of confinement, without additional hardships, creates a liberty interest even when that confinement is completely segregated, such as when an inmate is sent to the Special Housing Unit ("SHU"). *See* *Sealey v. Giltner,* 197 F.3d 578, 589-90 (2d Cir.1999) (101 days in normal SHU conditional was not atypical or significant) (cited in *Ochoa v. DeSimone,* 2008 WL 4517806, at *4 (N.D.N.Y. Sept. 30, 2008) (30 days in SHU, without more, did not create a liberty interest)); *Thompson v. LaClair,* 2008 WL 191212, at *3 (N.D.N.Y. Jan. 22, 2008) (30 days in SHU does not create a liberty interest). Therefore, we find that Plaintiff has failed to allege he suffered from an atypical and significant hardship and it is recommended that his due process claims be **dismissed.**

b. *Retaliation*

***8** Plaintiff claims that the disciplinary actions taken against him by DOCS staff members constituted retribution for grievances he filed and that Artus failed to protect him from such reprisals. Compl. at ¶¶ 4 & 8; Pl.'s Aff. at ¶¶ 11 & 19.

The Second Circuit has stated that courts must approach prisoner retaliation claims "with skepticism and particular care," since "virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) & *Franco v. Kelly,* 854 F.2d 584, 590 (2d Cir.1988)), *overruled on other grounds by* *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002).

In order to prevail on a retaliation claim, a plaintiff bears the burden to prove that (1) he engaged in constitutionally protected conduct; (2) prison officials took an adverse action against him; and (3) a causal connection exists between the protected speech and the adverse action. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citations omitted); *see also* *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citation omitted).

A plaintiff may meet the burden of proving an inappropriate retaliatory motive by presenting circumstantial evidence of a retaliatory motive, such as temporal proximity, thus obviating the need for direct evidence. *Bennett v. Goord,* 343 F.3d at 138-39 (holding that plaintiff met his burden in proving retaliatory motive by presenting circumstantial evidence relating to, *inter alia,* the temporal proximity of allegedly false misbehavior reports and the subsequent reversal of the disciplinary charges on appeal as unfounded). Other factors that can infer an improper or retaliatory motive include the inmate's prior good disciplinary record, vindication at a hearing on the matter, and statements by the defendant regarding his motive for disciplining plaintiff. *McEachin v. Selsky,* 2005 WL 2128851, at *5 (N.D.N.Y. Aug. 30, 2005) (citing *Colon v. Coughlin,* 58 F.3d 865, 872-73 (2d Cir.1995)).

Moreover, "in the prison context [the Second Circuit has] previously defined 'adverse action' *objectively,* as retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003) (emphasis in original). This objective test will apply even though a particular plaintiff was not himself deterred. *Id.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

If the plaintiff can carry that burden, the defendants will still be entitled to summary judgment if they can show, by a preponderance of the evidence, that they would have taken the same action in the absence of the prisoner's First Amendment activity. *Davidson v. Chestnut,* 193 F.3d 144, 148-49 (2d Cir.1999); *see* *Hynes v. Squillace,* 143 F.3d 653, 657 (2d Cir.1998); *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994).

***9** In this case, Plaintiff alleges that the disciplinary actions taken against him were done in retaliation for grievances he filed. Pl.'s Aff. at ¶ 19. The Supreme Court has noted that the right to petition government for redress of grievances is "among the most precious of the liberties safeguarded by the Bill of Rights." *See* *United Mine Workers of Am., Dist. 12 v. Illinois State Bar Ass'n,* 389 U.S. 217, 222 (1967). The Second Circuit has held that within the prison context, "inmates must be 'permit[ted] free and uninhibited access ... to both *administrative and judicial* forums for the purpose of seeking redress of grievances against state officers.' " *Franco v. Kelly,* 854 F.2d at 589 (quoting *Haymes v. Montanye,* 547 F.2d 188, 191 (2d Cir.1976)) (emphasis and alterations in original). Thus, Plaintiff has met his burden of showing he was engaged in constitutionally protected conduct.

However, the record is clear that all of the disciplinary actions taken against Plaintiff were due to his failure to abide by orders directing his compliance with DOCS' hair policy. *See* Artus Decl ., Exs. B-E, Disciplinary Packets for MR's 1-4. Therefore, even assuming Plaintiff could show that such disciplinary actions were motivated by retaliatory animus (an assumption that finds no basis in the record), Plaintiff's retaliation claims would fail because it is undisputed that his dreadlocks violated DOCS' policy, and thus, the DOCS employees who disciplined Plaintiff can easily show that they would have taken the same disciplinary actions even in the absence of his protected conduct. *See* *Davidson v. Chestnut,* 193 F.3d at 149 ("At the summary judgment stage, if the undisputed facts demonstrate that the challenged action clearly would have been taken on a valid basis alone, defendants should prevail."). Although Plaintiff has challenged DOCS' hair policy in this lawsuit, there is no suggestion that at the time he was disciplined, that policy was not valid. Thus, because there is unrefuted evidence that Plaintiff was disciplined pursuant to a valid DOCS' policy, his retaliation claims must fail.

c. *Cruel and Unusual Punishment*

Although unclear, it appears that Plaintiff asserts an Eighth Amendment claim based on the conditions of his confinement while he served his disciplinary sanctions, which included serving three thirty (30) day and one forty-five (45) day periods in keeplock, loss of phone and commissary privileges, no regular visits, twenty-three (23) hour confinement, and only three showers a week. Compl. at ¶ 6.

In order to state a valid conditions of confinement claim under the Eighth Amendment, a plaintiff must allege: (1) the conditions were so serious that they constituted a denial of the "minimal civilized measure of life's necessities," and (2) the prison officials acted with "deliberate indifference." *Wilson v. Seiter,* 501 U.S. 294, 297-99 (1991) (citation omitted) (cited in *Branham v. Meachum,* 77 F.3d 626, 630-31 (2d Cir.1996)). Here, Plaintiff does not allege that he was denied the "minimal civilized measure of life's necessities," rather, he states that he was placed on keeplock and denied various privileges for three thirty (30) day and one forty-five (45) day periods.[FN7] These conditions are not so severe as to violate the Eighth Amendment's ban on cruel and unusual punishment. *See* *Parker v. Peek-Co,* 2009 WL 211371, at *4 (N.D.N.Y. Jan. 27, 2009) ("It is well established ... that placement in keeplock confinement under the conditions normally associated with that status does not violate an inmate's Eighth Amendment rights.") (citation omitted); *see also* *Jackson v. Johnson,* 15 F.Supp.2d 341, 363 (S.D.N.Y.1998) ("The mere placement in keeplock for 99 days is not sufficiently egregious to constitute cruel and unusual punishment under the Eighth Amendment") (citing cases). Therefore, it is recommended that this claim

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 10

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

be **dismissed** as a matter of law.

FN7. Plaintiff also alleges, in conclusory fashion, that he was denied access to the law library during his periods in keeplock confinement. Compl. at ¶ 6. To the extent Plaintiff attempts to raise an access to the courts claim under the First Amendment, any such claim would fail for want of personal involvement and because Plaintiff has not alleged any injury resulting from his alleged denial of access to the law library. *See Lewis v. Casey,* 518 U.S. 343, 353 (1996).

**C. RLUIPA and First Amendment Claims**

1. *Merits of Plaintif's Claims*

***10** RLUIPA "protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation of exercise of their religion." [FN8] *Cutter v. Wilkinson,* 544 U.S. 709, 721 (2005). RLUIPA provides that

FN8. RLUIPA was enacted in the wake of the Supreme Court's invalidation of the Religious Freedom Restoration Act of 1993 ("RFRA") in *City of Boerne v. Flores,* 521 U.S. 507 (1997), on the grounds that it exceeded Congress's power under Section 5 of the Fourteenth Amendment. "RLUIPA corrected the constitutional infirmity of RFRA by invoking federal authority under the Spending Clauses to reach any program or activity that receives federal financial assistance, thereby encompassing every state prison." *Fluellen v. Goord,* 2007 WL 4560597, at *5 (W.D.N.Y. Mar. 12, 2007) (citations omitted).

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person-

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).

Thus, Plaintiff can establish a RLUIPA violation by proving that the prison regulations constitute a "substantial burden" on his religious exercise without promoting a *compelling* governmental interest that is advanced through *the least restrictive means.* As such, RLUIPA places a much higher burden on defendants than does the First Amendment, which, as articulated in the case of *Turner v.. Safely,* requires only that a burden be "reasonably related to legitimate penological interests," not the least restrictive means of protecting compelling governmental interests. 482 U.S. 78, 89 (1987).

The first issue is whether Plaintiff's freedom of religious expression has been substantially burdened. Plaintiff is a registered NOI member. The NOI does not require him to wear dreadlocks, however, Plaintiff asserts that he wears dreadlocks pursuant to his own personal faith and interpretations of the Qu'ran and Bible. Pl.'s Decl. at ¶ 43. As Plaintiff explains, his

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 11

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

(Cite as: 2010 WL 3724883 (N.D.N.Y.))

refusal to cut his hair is rooted in the spiritual understanding that he is *"one"* with the Original Man, Blackman, who is Allah, as Plaintiff is a Blackman thus claiming the Holy Qu'ran and Bible as his blueprint of his lifestyle and hair:

A. Holy Qu'ran provision, surah (Chapter) 2, verse 196: "And accomplish the pilgrimage and the visit for ALLAH. But if you are prevented, send whatever offering is easy to obtain; and shave not your heads until the offering reaches its destination."

B. Holy Bible, Numbers, Chapter 6, verse 5, commonly referred to as the Nazarite Vow 8[:] "All the days of the vow of his Naziriteship no razor should pass over his head; until the days that he should be separated to (Allah) God come to the full, he should prove holy by letting the locks of the hair of his head grow."

*Id.* at ¶ 43 (emphasis in original).

Defendant contends that because Plaintiff's desire to wear dreadlocks is "merely a personal choice and is not based upon NOI tenant or dogma," DOCS' policy does not substantially burden his sincerely held religious beliefs. Dkt. No. 36, Def.'s Mem. of Law at p. 31; *see also* Leonard Decl. at ¶ 65. RLUIPA defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S .C. § 2000cc-5(7)(A). Thus, the question of whether Plaintiff's personal religious beliefs are founded in any particular established religion is inapposite. However, RLUIPA "does not preclude inquiry into the sincerity of a prisoner's professed religiosity." *Cutter v. Wilkinson,* 544 U.S. at 725 n. 13. On that subject, the record shows that Plaintiff has been growing dreadlocks for religious reasons since approximately 1993. Dkt. No. 36-3, Pl.'s Dep. at p. 12. In addition, Plaintiff's continued refusal to cut his hair despite the successive punishments he received arguably supports his professed sincerity. Simply put, there is nothing in the record undermining the sincerity of Plaintiff's religious beliefs.

***11** RLUIPA does not define "substantial burden," however, the Second Circuit has assumed that "[s]ince substantial burden is a term of art in the Supreme Court's free exercise jurisprudence ... Congress, by using it, planned to incorporate the cluster of ideas associated with the Court's use of it." *Westchester Day Sch. v. Vill. of Mamaroneck,* 504 F.3d 338, 348 (2d Cir.2007) (citations omitted). The Supreme Court has held that a substantial burden is one that "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thomas v. Review Bd. of Ind. Employment Sec. Div.,* 450 U.S. 707, 717-718 (1981) (cited in *Westchester Day Sch. v. Vill. of Mamaroneck* ). In this case, there can be little doubt that the DOCS' policy in question substantially burdens Plaintiff's religious exercise by forcing him to choose between cutting his hair and being subjected to disciplinary punishment. In *Amaker v. Goord,* 2007 WL 4560596 (W.D.N.Y. Mar. 9, 2007), the Honorable H. Kenneth Schroeder, Jr., United States Magistrate Judge for the Western District of New York, addressed a motion for a preliminary injunction on facts nearly identical to those established here, and concluded that "forcing an individual who sincerely believes that he should wear dreadlocks as part of his religious practice to either forgo his affiliations with the Nation of Islam or face discipline constitutes a substantial burden upon that individual's religious practice." 2007 WL 4560596, at *6; [FN9] *see also* *Singh v. Goord,* 520 F.Supp.2d 487, 498 (S.D.N.Y.2007) (noting that "demonstrating a substantial burden is not an onerous task for the plaintiff").

FN9. The district court adopted Judge Schroeder's recommendation that the preliminary injunction be granted because the prisoners had shown a likelihood of success on the merits of their claim that DOCS' policy precluding NOI

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

members from wearing dreadlocks violated RLUIPA. *Amaker v. Goord et al.,* 2007 WL 4560595 (W.D.N.Y. Dec. 18, 2007).

Once an RLUIPA plaintiff meets his burden of showing a substantial burden on his exercise of religion, the evidentiary burden shifts to the defendant, who must show that the regulation (1) is in furtherance of a compelling governmental interest and (2) is the least restrictive means of furthering such interest. 42 U.S.C. § 2000cc-2(b). On the first point, Defendant has asserted an interest in maintaining prison security, which he alleges could be undermined if more prisoners are allowed to wear dreadlocks, which can be used to conceal weapons. Def.'s Mem. of Law at pp. 32-33; Dkt. No. 36-8, Lucien J. LeClaire, Jr., Decl., dated Apr. 30, 2009, at ¶¶ 7-21; Leonard Decl. at ¶¶ 48-57 & 68. Without question, DOCS' interest in safety and security is a compelling governmental interest. *See* *Cutter v. Wilkinson,* 544 U.S. at 725 n. 13.

But, in order to defeat Plaintiff's RLUIPA claim, Defendant must also show that DOCS' policy is the least restrictive means of furthering its compelling interest in security. We believe there are questions of material fact on that issue. Despite the alleged security concerns, DOCS' policy allows inmates of the Rastafarian faith to wear dreadlocks. Leonard Decl. at ¶ 63. Also, Directive # 4914 allows all inmates to grow their hair long, provided they wear it pulled back in a ponytail, and also allows inmates to wear their hair in a "Afro-natural" style. Leonard Decl., Ex. B, DOCS Directive # 4914(III)(B)(2)(a),(d). Thus, DOCS affords a degree of leeway with respect to inmates' hairstyles, but has drawn a line in the sand with respect to dreadlocks worn by non-Rastafarian prisoners. Plaintiff asserts that the least restrictive means of ensuring security is already provided in DOCS Directive # 4914(III)(B)(2)(e), which states that

***12** [a]n inmate may be subjected to a hair search when there is reason to believe that contraband may be discovered by such a search. An inmate may be subjected to such search at any time that a pat frisk, strip search, or strip frisk is being conducted. Consistent with Directive # 4910, during a pat frisk, an inmate will be required to run fingers through [his] hair. During a strip search, an inmate may be subjected to an inspection of his or her hair. During a strip frisk, an inmate will run his or her hands through the hair.

*Id.*

DOCS Deputy Commissioner for Correctional Facility Security Lucien J. LeClaire, Jr., responds to that argument in his Declaration, asserting that "[l]arge, long dreads and the matted hair close to the scalp create a hairstyle that is extremely difficult to visually inspect and nearly impossible for inmates to run their fingers through to allow staff to insure that no contraband is contained therein." LeClaire Decl. at ¶ 18. LeClaire further argues that if an inmate need only declare a personally held religious belief in growing dreadlocks in order to be given permission to do so, DOCS will have no ability to restrict the number of inmates wearing dreadlocks. *Id.* at ¶ 19. The Court does not overlook the weight of these arguments nor the deference courts must accord prison officials when analyzing their policies. However, we question the assumption that permitting dreadlocks to be worn by inmates whose sincerely held religious beliefs require them would open the proverbial floodgates. Under DOCS' current policy, any nefariously motivated inmate need only register himself as a Rastafarian in order to be given permission to wear dreadlocks, and there is no evidence presented to the Court that such policy has resulted in a substantial increase in the Rastafarian/dreadlock-wearing inmate population. Leonard Decl. at ¶ 63; *see also* Artus Decl., Ex. D, Misbehavior Rep., dated Aug. 1, 2007 (stating "[i]nmate Pilgrim was given a direct order on July 1st 2007 to cut his dreadlocks or become a registered Rastafarian") & Leonard Decl., Ex. C, CORC Decision, dated Feb. 9, 2005 (ruling that "staff have correctly directed the grievant to remove his dreadlocks, or change

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

his religious designation"). Moreover, because DOCS has deemed its current policy adequate to protect its safety interests with respect to all of the other permitted hairstyles as well as for Rastafarian inmates with dreadlocks, a material question of fact exists as to why that policy would not also suffice for inmates in Plaintiff's position. *See Amaker v. Goord et al.,* 2007 WL 4560595.

Even under a First Amendment analysis, questions of fact remain. Courts must analyze free exercise claims by evaluating "1) whether the practice asserted is religious in the person's scheme of beliefs, and whether the belief is sincerely held; 2) whether the challenged practice of the prison officials infringes upon the religious belief; and 3) whether the challenged practice of the prison officials furthers some legitimate penological objective." *Farid v. Smith,* 850 F.2d 917, 926 (2d Cir.1988) (citations omitted).

***13** The first two prongs have been met in this case. As discussed above, there is nothing in the record undermining the sincerity of Plaintiff's religious beliefs, nor any suggestion that Plaintiff is personally motivated by fraud or is otherwise attempting to deceive DOCS officials. And, on the second prong, Plaintiff has shown that DOC S' policy substantially burdens his religious beliefs. *See Salahuddin v. Goord,* 467 F.3d 263, 274-75 (2d Cir.2006).[FN10] As to the third prong, the Supreme Court has stated that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley,* 482 U.S. at 89. Courts look to the following four factors in determining the reasonableness of a prison regulation: 1) whether there is a valid and rational relationship between the prison regulation and the legitimate government interests asserted; 2) whether the inmates have alternative means to exercise the right; 3) the impact that accommodation of the right will have on the prison system and resources generally; and 4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest. *Id.* at 89-91 (citations omitted).

FN10. In *Salahuddin,* the Second Circuit left open the question of whether a plaintiff bringing a free exercise claim under the First Amendment must make a threshold showing that his sincerely held religious beliefs have been "substantially burdened." *Salahuddin v. Goord,* 467 F.3d 263, 274-75 n. 5 (2d Cir.2006). *See also Pugh v. Goord,* 571 F.Supp.2d 477, 497 n. 10 (S.D.N.Y.2008) (noting that the Second Circuit has twice declined to answer the question). To the extent that heightened standard applies to all free exercise claims, Plaintiff has met it by showing that DOCS' policy substantially burdens his religious beliefs.

DOCS has a compelling and legitimate penological interest in maintaining prison security. The policy in question, which seeks to limit the number of prisoners who are allowed to wear dreadlocks, which can be used to hide small weapons, is rationally related to that interest. The other remaining three factors, however, weigh against Defendant. On the second *Turner* factor, the Court is not aware of any other means of exercising this particular religious belief other than physically growing dreadlocks. As to the third factor, as previously discussed, questions of fact exist as to what effect the accommodation of Plaintiff's beliefs would have on the entire prison system, especially considering the fact that DOCS' current policy allows any inmate who self-identifies as Rastafarian to wear dreadlocks. For the same reasons, we believe a question of fact exists as to whether there are ready alternatives to DOCS' current policy, including the procedures already applied to those whom DOCS currently allows to wear dreadlocks and other long hair styles. Overall, there are material questions of fact as to the reasonableness of DOCS' policy Plaintiff has challenged. *See Benjamin v. Coughlin,* 905 F.2d 571, 576-77 (2d Cir.), *cert. denied,* 498 U.S. 951 (1990) (affirming district court's finding that DOCS' policy requiring Rastafarian inmates to cut their dreadlocks upon arrival into DOCS' custody was not reasonably related to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

the asserted penological interests when defendants did not demonstrate that the religious accommodation sought by prisoners would have "more than a de minimis effect on valid penological interests"); *see also* *Francis v. Keane,* 888 F.Supp. 568, 577 (S.D.N.Y.1995) (denying summary judgment where two Rastafarian C.O.'s challenged DOCS' grooming regulation prohibiting dreadlocks for officers); *Amaker v. Goord,* 2007 WL 4560595.

2. *Personal Involvement*

***14** Although neither party addresses the issue in their respective submissions to the Court, there is a question as to whether Plaintiff has sufficiently alleged personal involvement with respect to his RLUIPA claim. Neither the Supreme Court nor the Second Circuit have directly addressed the issue of whether personal involvement is a prerequisite for any valid RLUIPA claim, as it is under § 1983. However, district courts in this Circuit and elsewhere have held that personal involvement is a necessary component of valid RLUIPA claims.[FN11] *See* *Joseph v. Fischer,* 2009 WL 3321011, at *18 (S.D.N.Y. Oct. 8, 2009) (concluding that the "personal involvement of a defendant in the alleged substantial burden of plaintiff's exercise of religion is a prerequisite to stating a claim under RLUIPA") (citing cases); *Hamilton v. Smith,* 2009 WL 3199520, at *9 (N.D.N.Y. Sept. 30, 2009) (dismissing RLUIPA claim for want of personal involvement on the part of defendants); *Jacobs v. Strickland,* 2009 WL 2940069, at *2 (S.D.Ohio Sept. 9, 2009) (finding no clear error of law in magistrate judge's holding that personal involvement is a necessary element of RLUIPA claims) (citing *Greenberg v. Hill,* 2009 WL 890521, at *3 (S.D.Ohio Mar. 31, 2009); *Alderson v. Burnett,* 2008 WL 4185945, at *3 (W.D.Mich. Sept. 8, 2008)). We are in agreement with that conclusion. RLUIPA provides that "[n]o government" shall substantially burden the religious exercise of confined persons, 42 U.S.C. § 2000cc-1(a), and defines "government" as "(i) a State, county, municipality, or other governmental entity created under the authority of the State; (ii) any branch, department, agency, instrumentality, or official of an entity listed in clause (i); and (iii) any other person acting under color of State law," 42 U.S.C. § 2000cc-5(4)(A). Thus, RLUIPA protects inmates against *actions taken* by a governmental entity or person acting under color of state law; in other words, there must be some personal involvement on the part of an individual defendant or government agency in the alleged RLUIPA violation.

FN11. The Court's research uncovered no ruling that a plaintiff need *not* show personal involvement in order to bring a valid RLUIPA claim.

In this case, the uncontroverted record shows that Artus took no actions relevant to Plaintiff's claims beyond referring Plaintiff's complaints, grievances, and appeals to his subordinates. Artus Decl. at ¶ 13. Moreover, the record does not show, and it is not alleged, that Artus was the creator of the DOCS' policy Plaintiff is challenging. *Id.* at ¶ 8 (noting that the policy is based on DOCS Directive # 4914 and relevant CORC determinations, which have the effect of Directives). Plaintiff has not sued DOCS, nor any DOCS employee responsible for creating and/or enforcing the challenged policy.

However, considering Plaintiff's *pro se* status, the lack of finality in this Circuit on the issue of personal involvement in RLUIPA claims, and judicial economy, the Court recommends that DOCS and DOCS Commissioner Brian Fischer be substituted as proper Defendants to this action solely as to Plaintiff's RLUIPA and First Amendment free exercise claims.[FN12] *See* *Zuk v. Gonzalez,* 2007 WL 2163186, at *2 (N.D.N.Y. July 26, 2007) (adding a proper defendant, *sua sponte,* in the interest of judicial economy and in light of the plaintiff's *pro se* status); *see also* FED. R. CIV. P. 21 ("Parties may be dropped or added by order of the court on motion of any party or on its own initiative at any stage of the action and on such terms as are just"); *Dockery v. Tucker,* 2006 WL 5893295, at *7 (E.D.N.Y. Sept. 6, 2006) (adding *sua sponte* the United States as a defendant in a FTCA claim

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

brought by a *pro se* plaintiff); *Ciancio v. Gorski,* 1999 WL 222603, at *1 (W.D.N.Y. Apr. 14, 1999) (substituting the proper defendant *sua sponte* "in the interest of eliminating undue complication without affecting the substantial rights of the parties").

FN12. Defendant asserts that Plaintiff's claims are moot because he has been transferred from Clinton Correctional Facility, where Artus is the Superintendent, to Southport Correctional Facility. Def.'s Mem. of Law at p. 38 (quoting *Salahuddin v. Goord* for the proposition that "an inmate's transfer from a prison facility generally renders moot any claims for declaratory judgment and injunctive relief against the officials of that facility."). However, because we recommend that DOCS and Commissioner Fischer be added to the case as Defendants, this mootness argument is without merit.

3. *Monetary Damages under RLUIPA*

***15** Defendant argues that Plaintiff is barred from seeking monetary damages for the alleged RLUIPA violation. Def.'s Mem. of Law at p. 29. RLUIPA allows for "appropriate relief against a government," 42 U.S.C. § 2000cc-2(a), but does not specify what types of relief it makes available. The Second Circuit has not yet ruled on the issue, and there appears to be a divide amongst the other circuit courts that have addressed it. *See Bock v. Gold,* 2008 WL 345890, at *5-7 (D.Vt. Feb. 7, 2008) & *Pugh v. Goord,* 571 F.Supp.2d 477, 506-08 (S.D.N.Y.2008) (both noting the split among circuit and district courts).

However, the district courts in this Circuit have held that monetary damages are not available under RLUIPA against state defendants in either their official or individual capacities.[FN13] Looking to the Eleventh Amendment's protection of the states' sovereign immunity, courts have held that because RLUIPA does not make an unequivocal waiver of sovereign immunity with respect to monetary damages against state defendants in their official capacities, such relief is not available. *See Pugh v. Goord,* 571 F.Supp.2d at 509 (" 'To sustain a claim that the [g]overnment is liable for awards of monetary damages, the waiver of sovereign immunity must extend unambiguously to such monetary claims.' "(quoting *Lane v. Pena,* 518 U.S. 187, 192 (1996)); *see also Bock v. Gold,* 2008 WL 345890, at *6; *El Badrawi v. Dept. of Homeland Sec.,* 579 F.Supp.2d 249, 258-63 (D.Conn.2008). In addition, courts in this Circuit have held that to allow claims against defendants in their individual capacities would raise serious constitutional questions about whether RLUIPA exceeds Congress's powers under the Spending Clause (Article 1, Section 9, Clause 1) of the Constitution.[FN14] *See Pugh v. Goord,* 571 F.Supp.2d at 506-07; *Vega v. Lantz,* 2009 WL 3157586, at *4 (D.Conn. Sept. 25, 2009) (holding that RLUIPA does not allow damages against defendants in their individual capacities and citing cases). Essentially, courts have found that because Congress enacted RLUIPA pursuant to the Spending Clause, not its power to enforce the provisions of the Fourteenth Amendment under Section 5 of the same, there is no constitutional basis for Congress to enforce RLUIPA as to individual defendants, who are not parties to the "contract" between the federal government and the states pursuant to which, as a normal practice, the former provides funding to the latter in exchange for compliance with certain conditions. *See Sossamon v. Lone Star State of Texas,* 560 F.3d 316, 328 (5th Cir.2009) (holding that "individual RLUIPA defendants are not parties to the contract in their individual capacities") (cited in *Vega v. Lantz,* 2009 WL 3157586, at *4); *see also Pugh v. Goord,* 571 F.Supp.2d at 506-07 (citing *Smith v. Allen,* 502 F.3d 1255, 1275 (11th Cir.2007) for the same proposition). Because interpreting RLUIPA to allow suits against individuals would call into question the constitutionality of the statute itself, courts have applied the canon of constitutional avoidance [FN15] in concluding that RLUIPA does not permit such causes of action. *See Bock v. Gold,* 2008 WL 345890, at *6.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN13. Research has not revealed any district court in this Circuit that has concluded otherwise.

FN14. Both the Eleventh and the Fifth Circuits have explicitly held that Congress enacted RLUIPA pursuant to its power under the Spending Clause, not the Commerce Clause. *Sossamon v. Lone Star State of Texas,* 560 F.3d 316, 329 n. 34 (5th Cir.2009); *Smith v. Allen,* 502 F.3d 1255, 1274 n. 9 (11th Cir.2007). We agree with those courts that because "there is no evidence concerning the effect of the substantial burden" on interstate commerce, RLUIPA must necessarily be Spending Clause legislation. *See* *Sossamon v. Lone Star State of Texas,* 560 F.3d at 329 n. 34.

FN15. "The constitutional avoidance canon states that when a statute is susceptible to two possible constructions, and one raises serious constitutional questions, the other construction must be adopted." *Bock v. Gold,* 2008 WL 345890, at *6.

***16** Based on the above reasoning, we agree with the other district courts in this Circuit that RLUIPA does not allow monetary damages against individual defendants in their individual or official capacities. *See* *Pugh v. Goord,* 571 F.Supp.2d at 507 (citing cases); *see also* *Sweeper v. Taylor,* 2009 WL 815911, at *9 (N.D.N .Y. Mar. 27, 2009) (holding that no monetary damages are available under RLUIPA). Therefore, we recommend that Plaintiff's claims for monetary and punitive damages brought pursuant to RLUIPA be **dismissed.** However, because Plaintiff has requested both declaratory and injunctive relief, our finding that RLUIPA does not allow monetary damages does not totally moot his claims.

### D. Qualified Immunity

Defendant asserts the affirmative defense of qualified immunity. Qualified immunity shields "government officials from liability for civil damages when their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *African Trade & Info. Ctr., Inc. v. Abromaitis,* 294 F.3d 355, 359 (2d Cir.2002) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)); *see also* *Mollica v. Volker,* 229 F.3d 366, 370 (2d Cir.2000). Accordingly, governmental officials sued for damages "are entitled to qualified immunity if 1) their actions did not violate clearly established law, or 2) it was objectively reasonable for them to believe that their actions did not violate such law." *Warren v. Keane,* 196 F.3d 330, 332 (2d Cir.1999) (citation omitted).

Should the district court adopt this Court's recommendations, Plaintiff's RLUIPA and First Amendment religious expression claims against DOCS and Commissioner Fischer are all that will remain in this case. Qualified immunity does not apply to suits against individuals in their official capacities. *See* *Kentucky v. Graham,* 473 U.S. 159, 167 (1985) ("The only immunities that can be claimed in an official-capacity action are forms of sovereign immunity that the entity, *qua* entity, may possess, such as the Eleventh Amendment."). We have already held that, with respect to Plaintiff's RLUIPA claim, monetary damages are not available against defendants in their individual or official capacities. As such, Plaintiff's RLUIPA claims will be limited to injunctive and declaratory relief against DOCS employees in their official capacities. Therefore, qualified immunity has no bearing on Plaintiff's RLUIPA claim. *See, e.g.,* *Rodriguez v. City of New York,* 72 F.3d 1051, 1065 (2d Cir.1995) ( "[T]he defense of qualified immunity protects only individual defendants sued in their individual capacity, not governmental entities ... and it protects only against claims for damages, not against claims for equitable relief."); *see also* *Rodriguez v. Phillips,* 66 F.3d 470, 481 (2d Cir.1995) (noting that qualified immunity does not apply to claims for injunctive and declaratory relief against a defendant in his official capacity).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

***17** Plaintiff's claim for damages under the First Amendment, however, is subject to a qualified immunity analysis. On that issue, we find that it is not clearly established law that DOCS' hair policy, which allows only Rastafarians to wear dreadlocks, violates the Free Exercise Clause of the First Amendment. Although the Second Circuit has previously ruled that *Rastafarians* have a First Amendment right to maintain their dreadlocks absent a valid penological interest that requires their preclusion, *Benjamin v. Coughlin,* 905 F.2d at 576-77, neither the Supreme Court nor the Second Circuit has ruled that other, *non-Rastafarian* inmates are similarly entitled to such protection. *See* *Redd v. Wright,* 597 F.3d 532, 2010 WL 774304, at *4 (2d Cir.2010) (citing cases for the proposition that constitutional rights should be defined with "reasonable specificity" for qualified immunity purposes and granting qualified immunity because a DOCS policy had not been held unconstitutional at the time it was enforced against the plaintiff). As such, under preexisting law a reasonable DOCS official would not have realized that his creation or enforcement of DOCS' hair policy was unlawful. *See* *Dean v. Blumenthal,* 577 F.3d 60, 68 (2d Cir.2009) (citing *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991)).

Because we find that DOCS' policy did not violate clearly established law, qualified immunity would apply to all those who participated in its creation and enforcement. As such, should the District Court adopt our recommendation that Commissioner Fischer be substituted as a Defendant, Plaintiff's only potential relief against Fischer in his individual capacity could be non-monetary. *See* *Rodriguez v. Phillips,* 66 F.3d at 481. Likewise, the Eleventh Amendment's protection of the States' sovereign immunity would preclude any monetary damages Plaintiff would seek against Fischer in his official capacity. *See* *Farid v. Smith,* 850 F.2d at 921.

As such, should the District Court adopt our recommendations, DOCS and Commissioner Fischer will be substituted as Defendants and Plaintiff will be limited to non-monetary relief against those Defendants under both RLUIPA and § 1983.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendant's Motion for Summary Judgment (Dkt. No. 36) be **GRANTED in part** and **DENIED in part** in accordance with the above Report-Recommendation; and it is further

**RECOMMENDED,** that DOCS and Commissioner Brian Fischer be substituted as Defendants pursuant to FED. R. CIV. P. 21; and it is further

**RECOMMENDED,** that Defendant Artus be **dismissed** from this action; and it is further

**RECOMMENDED,** that should the District Court adopt our recommendation that DOCS and Commissioner Brian Fischer be substituted as Defendants *sua sponte* by the Court, that the Clerk of the Court shall add the "New York State Department of Correctional Services" and "Commissioner Brian Fischer" as Defendants to the Docket of this action; and it is further

***18 RECOMMENDED,** that should the District Court adopt our recommendation that DOCS and Commissioner Brian Fischer be substituted as Defendants, that the Clerk shall issue Summonses and forward them, along with copies of the Complaint, to the United States Marshal for service upon the substituted Defendants; and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

it is further

**RECOMMENDED,** that should DOCS and Fischer be substituted as Defendants, that those substituted Defendants shall file a response to Plaintiff's Complaint as provided for in the Federal Rules of Civil Procedure after they have been served with process; and it is further

**ORDERED,** that should DOCS and Fischer be substituted as Defendants, that upon the filing of their response to the Complaint, the Clerk shall notify Chambers so that a status conference may be scheduled; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

N.D.N.Y.,2010.

Pilgrim v. Artus

Slip Copy, 2010 WL 3724883 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Jerome WALDO, Plaintiff,
v.
Glenn S. GOORD, Acting Commissioner of New York State Department of Correctional Services; Peter J. Lacy, Superintendent at Bare Hill Corr. Facility; Wendell Babbie, Acting Superintendent at Altona Corr. Facility; and John Doe, Corrections Officer at Bare Hill Corr. Facility, Defendants.
**No. 97-CV-1385 LEK DRH.**

Oct. 1, 1998.

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of New York, Albany, Eric D. Handelman, Esq., Asst. Attorney General, for Defendants.

DECISION AND ORDER

KAHN, District J.

***1** This matter comes before the Court following a Report-Recommendation filed on August 21, 1998 by the Honorable David R. Homer, Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern District of New York.

No objections to the Report-Recommendation have been raised. Furthermore, after examining the record, the Court has determined that the Report-Recommendation is not clearly erroneous. *See*Fed.R.Civ.P. 72(b), Advisory Committee Notes. Accordingly, the Court adopts the Report-Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED that the Report-Recommendation is APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is GRANTED; and it is further

ORDERED that the complaint is dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m), and the action is therefore dismissed in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all parties by regular mail.

IT IS SO ORDERED.
HOMER, Magistrate J.

REPORT-RECOMMENDATION AND ORDER [FN1]

FN1. This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

The plaintiff, an inmate in the New York Department of Correctional Services ("DOCS"), brought this pro se action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that while incarcerated in Bare Hill Correctional Facility ("Bare Hill") and Altona Correctional Facility ("Altona"), defendants violated his rights under the Eighth and Fourteenth Amendments.[FN2] In particular, plaintiff alleges that prison officials maintained overcrowded facilities resulting in physical and emotional injury to the plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

and failed to provide adequate medical treatment for his injuries and drug problem. Plaintiff seeks declaratory relief and monetary damages. Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b). Docket No. 18. For the reasons which follow, it is recommended that the motion be granted in its entirety.

FN2. The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona are made against Goord and Babbie.

I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while he and two other inmates were playing cards, an argument ensued, and one of the two assaulted him. Compl., ¶ 17. Plaintiff received medical treatment for facial injuries at the prison infirmary and at Malone County Hospital. *Id.* at ¶¶ 18-19. On September 11, 1997, plaintiff was transferred to Altona and went to Plattsburgh Hospital for x-rays several days later. *Id.* at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. *Id.* at ¶¶ 10-11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. *Id.* at ¶¶ 21-22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. *Id.* at ¶¶ 22, 27-28.

II. Motion to Dismiss

***2** When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from those facts in favor of the plaintiff. *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Staron v. McDonald's Corp.,* 51 F.3d 353, 355 (2d Cir.1995) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

III. Discussion

A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Rhodes v. Chapman,* 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. *Farmer,* 511 U.S. at 837.

1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl.,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of the Eighth Amendment. *Rhodes,* 452 U.S. at 347-48. The Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver,* 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord,* 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not “an objectively serious enough injury to support a claim for damages.” *Id.* (citing *Doe v. Welborn,* 110 F.3d 520, 524 (7th Cir.1997)).

***3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. *Compare* *Ingalls v. Florio,* 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and* *Zolnowski v. County of Erie,* 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with* *Harris v. Murray,* 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare Hill should be dismissed.

2. Altona

Plaintiff also asserts a similar conditions of confinement claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21-22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an “obligation to provide medical care for those whom it is punishing by incarceration.” *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer,* 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See* *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference could be drawn that a “substantial risk of serious harm” to the plaintiff existed and that the officials actually drew the inference. *Farmer,* 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See Amos v. Maryland Dep't of Public Safety and Corr. Services,* 126 F.3d 589, 610-11 (4th Cir.1997), *vacated on other grounds,*524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

***4** Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760-61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware* that there is a significant risk of serious injury to that prisoner." *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." *Farmer,* 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above, plaintiff's allegations of broken bones and severe pain from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. *Farmer,* 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See Sims v. Bowen,* No. 96-CV-656, 1998 WL 146409, at *3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York,* No. 97-CIV-0387, 1998 WL 338097, at *3-4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

IV. Failure to Complete Service

***5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants acknowledge that service has been completed as to the three named defendants. Docket Nos. 12 & 13. The "John Doe" defendant has not been served with process or otherwise identified and it is unlikely that service on him will be completed in the near future. *See* Docket No. 6 (United States Marshal unable to complete service on "John Doe"). Since over nine months have passed since the complaint was filed (Docket No. 1) and summonses were last issued (Docket entry Oct. 21, 1997), the complaint as to the unserved defendant should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D .N.Y.L.R. 4.1(b).

V. Conclusion

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint be dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1998.
Waldo v. Goord
Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



C
Only the Westlaw citation is currently available.

United States District Court,
D. Connecticut.
Thomas MAY, Plaintiff,
v.
Miguel DeJESUS, Correctional Officer, Defendant.
**No. 3:06CV1888 (AWT).**

March 30, 2010.

Thomas J. May, Machiasport, ME, pro se.

Matthew B. Beizer, Attorney General's Office, Hartford, CT, for Defendant.

***RULING ON MOTION FOR SUMMARY JUDGEMENT***

ALVIN W. THOMPSON, District Judge.

***1** The plaintiff, Thomas May, who is currently incarcerated at Maine State Prison in Warren, Maine, commenced this civil rights action *pro se* and *in forma pauperis* against the defendant, Correctional Officer Miguel DeJesus. The plaintiff claims that the defendant deprived him of basic human needs in violation of the Eighth and Fourteenth Amendment, which resulted in physical injury and emotional distress. The defendant has moved for summary judgment on all claims. For the reasons set forth below, the motion for summary judgment is being granted.

**I. Facts**

In December 2004, the plaintiff underwent hemorrhoid surgery. Following the surgery, Dr. Ruiz, a prison physician, prescribed Ducosate Sodium, a laxative, to be taken by the plaintiff twice a day from December 9, 2004 until March 29, 2005.

In March 2005, the defendant was employed as a Correctional Officer at Osborn Correctional Institution ("Osborn") in Somers, Connecticut where the plaintiff, a sentenced inmate, was incarcerated. On March 14, 2005, the plaintiff was scheduled to participate in a trial in a case filed in the United States Bankruptcy Court in New Haven, Connecticut. Department of Correction officials assigned the defendant to transport the plaintiff in a prison van from Osborn to the Bankruptcy Court in New Haven, a distance of approximately 65 miles. The plaintiff had taken his prescribed laxative medication prior to the trip to New Haven. The plaintiff and the defendant were the only occupants in the prison van. The plaintiff wore handcuffs and leg shackles during the trip to and from New Haven.

The plaintiff avers that, at the beginning of the trip to New Haven, the defendant did not ask him whether he had to use the bathroom and did not instruct him to use the bathroom. The plaintiff avers that "[i]f [the defendant] had asked or instructed me, I would have told [the defendant] that I did not need to use a bathroom, because at that time I had no urge to defecate or urinate." (Thomas J. May Affidavit (Doc. No. 27 Ex. 2) ("May Aff.") ¶ 9) Approximately 45 to 60 minutes into the trip to New Haven, the plaintiff informed the defendant that he needed to defecate and asked the defendant to stop the van at the Cheshire Correctional Institution so that he could use the bathroom. The defendant did not stop the van and the plaintiff defecated in his pants. The plaintiff was forced to sit in his soiled pants for 15 to 30 minutes until the van arrived at the courthouse in New Haven.

Upon his arrival at the courthouse, Deputy United States Marshals permitted the plaintiff to throw out his soiled pants, underwear and socks, take a shower and change into a new pair of pants. The United States Marshals' Service did not provide the plaintiff with a new pair of socks. The bankruptcy proceeding lasted approximately two hours. Thereafter, the plaintiff was placed in leg shackles and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

handcuffs for the return trip to Osborn.

The plaintiff avers that, at the beginning of the return trip to Osborn, the defendant did not ask him whether he had to use the bathroom and did not instruct him to use the bathroom. The plaintiff avers that "[i]f [the defendant] had instructed or asked me, I would have told [the defendant] that I did not need to use a bathroom, because at that time I had no urge to urinate or defecate." (May Aff.¶ 29) Approximately 60 minutes into the return trip, the plaintiff informed the defendant that he had to urinate and asked the defendant to stop the van at the Hartford Correctional Center or MacDougall-Walker Correctional Institution in Suffield so that he could use a bathroom. The defendant did not stop the van and the plaintiff urinated in his pants. The plaintiff sat in his urine-soaked pants for 15 to 30 minutes, before the van arrived at Osborn. Upon his arrival at Osborn, the plaintiff was escorted back to his cell.

***2** The plaintiff suffered a small abrasion, approximately 1/4 inch by 1/8 inch in size on his left ankle where the leg shackle rubbed against his skin during the return trip to Osborn. On March 24, 2005, a nurse examined the plaintiff's ankle and noted a small, well-healed scab on the front of the ankle, no sign of infection, redness or swelling and excellent range of motion. The nurse recommended follow-up as needed.

**II. Legal Standard**

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. Fed.R.Civ.P. 56(c). *See* *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223 (2d Cir.1994). When ruling on a motion for summary judgment, the court may not try issues of fact, but must leave those issues to the jury. *See, e.g.,* *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 58 (2d Cir.1987). Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined ... to issue-finding; it does not extend to issue-resolution." *Gallo,* 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is *both* genuine and related to a material fact. Therefore, the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. An issue is "genuine ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248 (internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248. Only those facts that *must* be decided in order to resolve a claim or defense will prevent summary judgment from being granted. Immaterial or minor facts will not prevent summary judgment. *See* *Howard v. Gleason Corp.,* 901 F.2d 1154, 1159 (2d Cir.1990).

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and ... draw all reasonable inferences in its favor." *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir.2000)(quoting *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.,* 902 F.2d 174, 177 (2d Cir.1990)). However, the inferences drawn in favor of the nonmovant must be supported by the evidence. "[M]ere speculation and conjecture" is insufficient to defeat a motion for summary judgment. *Stern v. Trustees of Columbia University,* 131 F.3d 305, 315 (2d Cir.1997) (quoting *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d. Cir.1990)). Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position" will be insufficient; there must be evidence on which a jury could "reasonably find" for the nonmovant. *Anderson,* 477 U.S. at 252.

***3** Where one party is proceeding *pro se,* the court reads the *pro se* party's papers liberally and interprets them to raise the strongest arguments suggested therein. *See* *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). Despite this liberal interpretation, however, an unsupported assertion cannot overcome a properly supported motion for summary judgment. *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**III. Discussion**

The plaintiff contends that the defendant's failure to stop the van on the way to and from the courthouse to permit him to use the bathroom, which also resulted in injury from the application of leg shackles to his bare ankles, constituted a violation of his right to be free from unconstitutional conditions of confinement. The plaintiff also contends that he suffered humiliation and emotional distress as a result of the violation.[FN1]

FN1. Deliberate indifference by prison officials to a prisoner's serious medical need constitutes cruel and unusual punishment in violation of the Eighth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Although the plaintiff had undergone hemorrhoid surgery and was taking medication because of the surgery, he did not include a claim of deliberate indifference to medical needs in his complaint. The court does not construe the complaint as raising such a claim because even if the plaintiff could prove his medical condition was serious, he does not contend that the defendant was aware of this medical condition or of the fact that the plaintiff was taking medication. Thus, the plaintiff could not show that the defendant was deliberately indifferent to that condition.

The defendant moves for summary judgment on the ground that the plaintiff has failed to produce evidence that could show he was subjected to unconstitutional conditions of confinement during the trip to and from the courthouse.

**A. Constitutional Violation: Conditions of Confinement**

"It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney,* 509 U.S. 25, 31, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). "A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components-one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009).

In *Gill v. Riddick,* No. Civ. 9:03-CV-1456, 2005 WL 755745 (March 31, 2005), the court stated:

> A prisoner alleging that a certain prison condition constitutes cruel and unusual punishment must prove both an objective and subjective element, specifically, the inmate must show that the deprivation at issue is objectively sufficiently serious such that the plaintiff was denied the minimal civilized measure of life's necessities, and that the defendant possessed a sufficiently culpable state of mind associated with the unnecessary and wanton infliction of pain.... The objective component of an Eighth Amendment violation must be evaluated based on the severity of the deprivation imposed.... When considering whether a particular condition is so serious as to invoke the Eighth Amendment, a court should assess the duration of the condition and the potential for serious physical harm.... To prove the second, subjective component, a prisoner must establish that the person who inflicted the unconstitutional condition was deliberately indifferent to the severe deprivation.

*Id.,* at *16(internal quotation marks and citations omitted). "Because society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient" to state a claim of unconstitutional conditions of confinement. *Blyden v. Mancusi,* 186 F.3d 252, 263 (2d Cir.1999).

***4** The defendant contends that the plaintiff has not met either the objective or the subjective component of the Eighth Amendment test because, as to the objective component, he has not produced evidence that he suffered an unconstitutional deprivation during his trip to or from the courthouse in New Haven, and, as to the subjective component, he has not produced evidence that the defendant acted with the requisite state of mind. The court concludes that the plaintiff has failed to create a genuine

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

issue of fact as to the objective component and, for that reason, the defendant is entitled to summary judgment.

"To satisfy the objective component of an Eighth Amendment conditions of confinement claim, Plaintiff must show that the conditions alleged, either alone or in combination, deprive him of 'the minimal civilized measure of life's necessities,' such as adequate food, clothing, shelter, sanitation, medical care, and personal safety." *Alvarez v. County of Cumberland,* Civil No. 07-346(RBK), 2009 WL 750200, *4 (D.N.J. March 18, 2009) (citation omitted). "To the extent that certain conditions are only 'restrictive' or 'harsh,' they are merely part of the penalty that criminal offenders pay for their offenses against society." *Id.*

In addition, an important consideration in determining whether a particular condition deprived an inmate of a basic human need or life necessity is the duration of the condition. *See e.g., Smith v. Copeland,* 87 F.3d 265, 268 (8th Cir.1996) (holding that inmate's confinement in cell for four days with overflowed toilet, during which time he endured stench of his own feces and urine, did not rise to level of Eighth Amendment violation); *Davis v. Scott,* 157 F.3d 1003, 1006 (5th Cir.1998)(holding that inmate being placed in cell with blood on walls and excretion on floors for three days did not meet objective component of Eighth Amendment, especially in view of fact that cleaning supplies were made available to him); *Hutto v. Finney,* 437 U.S. 678, 687-88, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978)("A filthy overcrowded cell and a diet of 'grue' might be tolerable for a few days and intolerably cruel for weeks or months."); *Wright v. McMann,* 387 F.2d 519, 526 (2d Cir.1967) ( "civilized standards of humane decency ... do not permit" an inmate to be placed in a filthy, unheated strip cell and deprived of clothes and basic hygiene items such as soap and toilet paper for a substantial period of time, i.e., 33 days).

The defendant concedes that unsanitary conditions, including lack of access to toilet paper or a properly functioning toilet, may constitute a severe deprivation of a basic human need. *See e.g., LaReau v. MacDougall,* 473 F.2d 974, 978 (2d Cir.1972) (confinement for five days in strip cell with only a pit toilet and without light, a sink or other source of water violated minimum standards of human decency required by Eighth Amendment); *Wright,* 387 F.2d at 522, 526 (conditions of confinement in strip cell including denial of toilet paper for 33 days violated Eighth Amendment). The defendant contends, however, that depriving the plaintiff of the use of a bathroom for two short periods of time did not constitute an extreme deprivation of a basic human need.

***5** Courts in this and other circuits have consistently held that an occasional or temporary deprivation of toilet use, does not constitute an extreme deprivation of a basic human need or necessity of life. *See Jones v. Marshall,* No. 08 Civ. 0562, 2010 WL 234990, at *3 (S.D.N.Y. Jan.19, 2010) (denial of right to use bathroom for 90 minutes did not "establish the existence of an objective injury for purposes of Eighth Amendment claim"); *Rogers v. Laird,* Civ. No. 9:07-CV-668 (LEK/RFT), 2008 WL 619167, at *3 (N.D.N.Y. Feb.8, 2008) (denial of use of restroom during three hour trip to and from court causing inmate to urinate on himself did not "constitute an extreme deprivation of life's necessities"); *Simpson v. Wall,* 2004 WL 720276, at *3 (W.D.Wis. Mar.29, 2004) ("Sitting in one's feces for sixty to eighty miles cannot be said to present a risk of serious harm."); *Bourdon v. Roney,* 2003 WL 21058177, at *10-11 (N.D.N.Y. Mar.6, 2003) (three hours without bathroom privileges is not deprivation of minimal necessities of life); *Whitted v. Lazerson,* No. 96 Civ. 2746(AGS), 1998 WL 259929, at * 2 (S.D.N.Y. May 21, 1998) (temporary deprivation of use of toilet for 90 minutes at most, in the absence of serious physical injury, did not constitute denial of necessities of life).

In reaching this conclusion, courts have considered whether the deprivation of toilet use resulted in unsanitary conditions that posed a significant risk to the inmate's health. *See Gill,* 2005 WL 755745, at *16 (inmate who urinated on himself as result of denial of use of bathroom during trip to prison failed to satisfy objective element of Eighth Amendment because denial was temporary-70 minutes-and he suffered no injury to his health); *Qawi v. Howard,* No. Civ. A. 98-220-GMS, 2000 WL 1010281, at *3-4 (D.Del. Jul.7, 2000) (denial of use of bathroom for six hours during which inmate forced to urinate in drinking cup and bowl and defecate into a paper bag did not constitute sufficiently serious deprivation because duration of condition was brief and inmate suffered no significant health risk); *Odom v. Keane,* No. 95 Civ. 9941, 1997 WL 576088, at *4-5 (S.D.N.Y. Sept.17, 1997) (lack of a working toilet in prison cell for approximately 10

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

hours, absent an allegation that the prisoner risked contamination by contact with human waste, "does not rise to the level of cruel and unusual punishment").

Although the plaintiff was forced to sit in pants that were soiled with feces for up to 30 minutes on the way to court, he was permitted to clean himself and change his clothes when he arrived at the courthouse and before he was required to appear in court. Despite the fact that the plaintiff had to sit in urine-soaked pants for up to 30 minutes on the trip back to Osborn, there is no evidence to suggest that he was not able to wash himself and change his clothes after officers escorted him to his cell. Furthermore, other than a minor abrasion on his ankle, there is no evidence to suggest that the plaintiff suffered any contamination or risk to his health as a result of having to sit in pants soiled with feces and soaked with urine. There is no aspect of the conditions described by the plaintiff that could satisfy the objective element of the Eighth Amendment standard. The conditions were temporary and did not constitute an extreme deprivation of basic human need or the minimal civilized measure of life's necessities.

***6** The plaintiff fails to create a genuine issue of fact as to whether he can satisfy the objective component of the Eighth Amendment test, so it is not necessary to reach subjective component. Accordingly, the defendant's motion for summary judgment is being granted on this ground.

**B. Emotional Distress**

The plaintiff asserts that the defendant subjected him to emotional distress and humiliation because he was forced to walk into the courthouse in front of the Deputy United States Marshals in soiled pants and was escorted through a crowded prison gymnasium and housing unit on the way back to his cell at Osborn in urine-soaked pants. Having granted summary judgment on the plaintiff's sole federal claim, the court declines to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c) over the plaintiff's state law claims for negligent or intentional infliction of emotional distress. *See* *Valencia ex rel. Franco v. Lee,* 316 F.3d 299, 305 (2d Cir.2003)("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims.")(quoting *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)).

**IV. Conclusion**

For the reasons set forth above, the defendants' Motion for Summary Judgment **(Doc. No. 24)** is hereby **GRANTED.** The Clerk is directed to enter judgment in favor of the defendant and close this case.

It is so ordered.

D.Conn.,2010.
May v. DeJesus
Slip Copy, 2010 WL 1286800 (D.Conn.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.NOT FOR PUBLICATION

United States District Court, D. New Jersey.
Julio ALVAREZ, Jr., Plaintiff,
v.
COUNTY OF CUMBERLAND, et al, Defendants.
**Civil No. 07-346 (RBK).**

March 18, 2009.

West KeySummary
**Federal Civil Procedure 170A 2491.5**

170A Federal Civil Procedure
170AXVII Judgment
170AXVII(C) Summary Judgment
170AXVII(C)2 Particular Cases
170Ak2491.5 k. Civil Rights Cases in General. Most Cited Cases

Genuine issues of material fact existed as to the conditions of an inmate's confinement in an isolation unit at a county jail. Therefore, summary judgment was precluded in an action for an Eighth Amendment conditions of confinement claim. The inmate spent three days in his isolation cell without working plumbing and with a toilet overflowing with feces, urine, and other materials. The inmate also pointed to evidence that he contracted methicillin-resistant staphylococcus aureus (MRSA) while in isolation to show that he lived and slept exposed to feces in his cell. U.S.C.A. Const.Amend. 8; 42 U.S.C.A. § 1983.

Richard A. Stoloff, Law Offices of Richard A. Stoloff, Linwood, NJ, for Plaintiff.

Steven L. Rothman, Lipman, Antonelli, Batt, Dunlap, Wodlinger & Gilson, Vineland, NJ, Nancy L. Siegel, White & Williams, LLP, Cherry Hill, NJ, for Defendants.

**OPINION**

ROBERT B. KUGLER, District Judge.

***1** This matter comes before the Court on a motion by Defendants County of Cumberland, Cumberland County Board of Chosen Freeholders, Cumberland County Department of Corrections, Cumberland County Sheriff's Department, Kenneth Lamcken, Michael Palau, Glenn Saunders, and Lewis Walker (collectively, "the County Defendants") for partial summary judgment on the Complaint of Plaintiff Julio Alvarez, Jr. ("Plaintiff") and on a motion by Defendant Prison Health Services, Inc. ("PHS") for summary judgment on Plaintiff's Complaint. Plaintiff's Complaint includes allegations that the County Defendants and PHS acted negligently and violated Plaintiff's civil rights pursuant to 42 U.S.C. §§ 1983, 1985(3). The County Defendants only move for summary judgment on Plaintiff's civil rights claims against them. For the reasons expressed below, the Court will grant in part and deny in part the County Defendants' motion and grant Prison Health Services' motion.

**I. BACKGROUND**

The allegations in Plaintiff's Complaint arise from events that occurred while he was an inmate at the Cumberland County Correctional Facility ("Cumberland County Jail"). Plaintiff was placed in an isolation unit at the Cumberland County Jail on or about January 28, 2005 and released from isolation on or about February 2, 2005. Plaintiff's isolation cell measured six feet by eight feet and was the middle cell in a group of three adjacent isolation cells in the unit. The cells on either side of Plaintiff's had working toilets and sinks. However, the parties agree that the toilet and sink in Plaintiff's original cell was in a state of disrepair at the time of his placement in isolation. Other inmates occupied the adjacent isolations cells, which contained working toilets and sinks. For the purposes of summary judgment, the parties agree that Plaintiff's toilet in isolation was not only non-functional, but also filled to the point of overflowing with urine, feces, and trash.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

While in his original isolation cell, Plaintiff urinated in a Styrofoam cup which he then emptied into the broken sink so as not to cause the toilet to overflow onto the floor. Plaintiff defecated in the toilet, only after removing from it pieces of plastic and cardboard, which he placed on the floor of the cell. Plaintiff used the toilet by squatting over it, attempting to avoid touching the toilet seat.

Plaintiff was not provided with cleaning products with which to clean the isolation cell himself, nor was it cleaned by someone else while Plaintiff occupied it. Plaintiff was not provided equipment to use to empty the toilet or sink. At one time during his stay, a corrections officer did attempt to fix the toilet but was unsuccessful. Plaintiff did not ask to use a toilet outside his cell. Plaintiff alleges, and the County Defendants refute, that he did not ask because there was not a guard available to whom Plaintiff could have made such a request. Plaintiff was allowed to shower twice during his time in the original cell. The County Defendants argue that Plaintiff had frequent access to corrections officer, including at the time of his showers.

***2** Plaintiff contends that on February 1, 2005, one day before he was released from isolation, he transferred himself, with the permission of the guards, to an adjacent isolation cell with working plumbing. Plaintiff further contends that he could not have moved to an adjacent cell until February 1 because both adjacent cells were occupied from the time of Plaintiff's arrival in the isolation unit until that date. The County Defendants do not agree to the date of Plaintiff's self-transfer, but agree that he did so at some point during the time he was in isolation.

Plaintiff was released from isolation on February 2, 2005, at which time he was seen by a nurse to be treated for boils. He was seen by a doctor on February 4, 2005, at which time he had developed 10 lesions over his buttocks, legs, and penis. Plaintiff was placed in a medical isolation cell with other prisoners until February 9, 2005 when he was sent to the hospital to be treated for his lesions. Plaintiff stayed at the hospital eight days and underwent surgery. Plaintiff's medical expert reports that Plaintiff was infected with methicillin-resistant staphylococcus aureus ("MRSA") at least in part due to his exposure to waste matter in his isolation cell and his inability to wash after touching contaminated surfaces. (Pl.Opp.Ex. B.)

Plaintiff and the County Defendants agree that in 2005, the Cumberland County Jail was overcrowded. Further, Plaintiff presents the deposition testimony of Defendant Kenneth Lamcken, who was responsible for maintenance at the Cumberland County Jail in 2005. Lamcken testified that there were times in 2005 when toilets in isolation units were broken, but that inmates were placed in cells with broken toilets. He further testified that those inmates often defecated on the floor of the cell. (Pl.Opp.Ex. C.) The County Defendants do not contest Lamcken's testimony in their reply brief.

## II. LEGAL STANDARD

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 330, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could find for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When the Court weighs the evidence presented by the parties, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her]favor." *Id.* at 255.

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. Celotex, 477 U .S. at 330. The moving party may satisfy this burden by either (1) submitting affirmative evidence that negates an essential element of the nonmoving party's claim; or (2) demonstrating to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's case. *Id.* at 331.

***3** Once the moving party satisfies this initial burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). To do so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to material

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.

**III. ANALYSIS**

**A. The County Defendants' Motion**

The County Defendants move for partial summary judgment on Plaintiff's constitutional claims against the County Defendants in Count IV of the Complaint.

**1. Plaintiff's Fifth Amendment Claim**

Plaintiff's Fifth Amendment claim does not present a genuine issue for trial and will be dismissed. The County Defendants move for summary judgment on Plaintiff's claim that they violated his constitutional rights guaranteed under the Fifth Amendment, contending that there is no genuine issue of material fact regarding a Fifth Amendment violation because Plaintiff has no evidence to support such a claim. Plaintiff has provided no argument to refute the motion on this point and thus presents no evidence to satisfy his burden. *See* Fed.R.Civ.P. 56(e). Finding no genuine issue of material fact, the Court will grant summary judgment for the County Defendants on Plaintiff's Fifth Amendment claim.

**2. Plaintiff's Eighth Amendment Claim**

The County Defendants move for summary judgment on Plaintiff's claim that they violated his Eighth Amendment rights. There are genuine issues of fact regarding the conditions of Plaintiff's confinement at the Cumberland County Jail, so Plaintiff's Eighth Amendment claims will survive summary judgment.

"To state a claim under [42 U.S.C.] § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). Prisoners have a protected right in being incarcerated at a place of confinement conforming to the standards set forth by the Eighth Amendment. The Constitution "does not mandate comfortable prisons," *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), but neither does it permit inhumane ones, and it is now settled that "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney,* 509 U.S. 25, 31, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). In its prohibition of "cruel and unusual punishments, the Eighth Amendment ... imposes duties on [prison] officials, who must provide humane reasonable measures to guarantee the safety of the inmates." *Hudson v. Palmer,* 468 U.S. 517, 526-27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984); see *Helling,* 509 U.S. at 31-32; *Washington v. Harper,* 494 U.S. 210, 225, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990); *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The Eighth Amendment prohibits conditions which involve the unnecessary and wanton infliction of pain or are grossly disproportionate to the severity of the crime warranting imprisonment. *Rhodes,* 452 U.S. at 346, 347. The cruel and unusual punishment standard is not static, but is measured by "the evolving standards of decency that mark the progress of a maturing society." *Rhodes,* 452 U.S. at 346 (quoting *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958)).

***4** To state a claim under the Eighth Amendment, an inmate's allegation must include both an objective and a subjective component. *See Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). The objective component mandates that "only those deprivations denying 'the minimal civilized measure of life's necessities" ... are sufficiently grave to form the basis of an Eighth Amendment violation." *Helling,* 509 U.S. at 32 (*quoting Rhodes,* 452 U .S. at 346). This component requires that the deprivation sustained by a prisoner be sufficiently serious, for only "extreme deprivations" are sufficient to make out an Eighth Amendment claim. *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). The subjective component requires that the state actor have acted with "deliberate

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

indifference," a state of mind equivalent to a reckless disregard of a known risk of harm. *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Wilson,* 501 U.S. at 303.

To satisfy the objective component of an Eighth Amendment conditions of confinement claim, Plaintiff must show that the conditions alleged, either alone or in combination, deprive him of "the minimal civilized measure of life's necessities," such as adequate food, clothing, shelter, sanitation, medical care, and personal safety. *See Rhodes,* 452 U.S. at 347-48; *Young v. Quinlan,* 960 F.2d 351, 364 (3d Cir.1992). To the extent that certain conditions are only "restrictive" or "harsh," they are merely part of the penalty that criminal offenders pay for their offenses against society. *See Rhodes,* 452 at 347. An inmate may fulfill the subjective element of such a claim by demonstrating that prison officials knew of such substandard conditions and "acted or failed to act with deliberate indifference to a substantial risk of harm to inmate health or safety." *Ingalls v. Florio,* 968 F.Supp. 193, 198 (D.N.J.1997). An official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837.

In *Young,* the Third Circuit reversed the district court, which granted summary judgment for the defendant on plaintiff's claims regarding the conditions of his confinement. *See Young,* 960 F.2d at 353. In that case, Young was a federal prisoner who allegedly suffered continuous physical and psychological abuse by his cellmates. *Id.* at 353-54. In response to threats from one cellmate, Young stopped up his cell toilet, consequently flooding the cell. *Id.* at 355. As punishment, Young was placed in a dry cell, one without a toilet or running water, for ninety-six hours. *Id.* In addition, Young was not provided with toilet paper. *Id.* During the first twenty-nine hours of his confinement in the dry cell, Young asked repeatedly for a urinal and for permission to leave his cell to defecate. *Id.* Not receiving same, Young relieved himself in his cell. *Id.* Young was finally provided with a urinal and allowed to leave his cell to defecate, only after having been confined in the dry cell for twenty-nine hours. *Id.* The following day, Young again requested permission to leave his cell to defecate, but his requests were ignored or rejected. *Id.*

***5** When the Third Circuit considered whether Young had raised a genuine question of fact regarding the constitutionality of his confinement, it applied the standard described *supra. Id.* at 360. Specifically, the court noted that "inhumane prison conditions, including prolonged isolation in dehumanizing conditions ... and unsanitary conditions have ... been found to be cruel and unusual under contemporary standards of decency." *Id.* at 363. Further, the court explained that "segregated detention is not cruel and unusual punishment per se, as long as the conditions of confinement are not foul, inhuman or totally without penological justification." *Id.* at 364 (*citing Smith v. Coughlin,* 748 F.2d 783, 787 (2d Cir.1984); *Ford v. Board of Managers of New Jersey State Prison,* 407 F.2d 937, 940 (3d Cir.1969); *Mims v. Shapp,* 399 F.Supp. 818, 822 (W.D.Pa.1975)). Noting that "the touchstone [of the constitutional analysis] is the health of the inmate," the court determined that the conditions of Young's confinement worked a deprivation of the basic necessities of human existence and thus were sufficient to satisfy the objective prong of the analysis. *Young,* 960 F.2d at 364. Indeed, the court opined that "it would be an abomination of the Constitution to force a prisoner to live in his own excrement for four days." *Id.* at 365. Turning to the subjective prong of the Eighth Amendment analysis, the court found that among other questions, it was a genuine issue whether or not "prison officials were deliberately indifferent to Young's requests for a minimal amount of relief," and so summary judgment by the district court had been inappropriately granted. *Id.*

The facts of the instant case appear similar to Young's allegations regarding the toilet facilities in his dry cell.[FN1] As to the objective component of the analysis in Alvarez's case, the conditions of his confinement in isolation were similar to Young's. Plaintiff spent three days in his isolation cell without working plumbing and with a toilet overflowing with feces, urine, and other materials. Although the Plaintiff in this case does not claim, as Young did, that he explicitly was denied access to alternate toilet facilities, he does contend that the guards generally were unavailable to respond to his request for alternate facilities. In support of his contention, Plaintiff points to his own deposition testimony in response to the question, "Did you ever ask the guard to go someplace to use the bathroom?" Plaintiff's answer was, "They wouldn't come back there. What they are saying is all a lie." (Pl.Opp.Ex. A.) Plaintiff further points to evidence that he contracted MRSA, specifically boils in his groin area,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

while in isolation to show that he lived and slept exposed to feces in his cell.

FN1. To be sure, Young made numerous other allegations regarding his treatment in isolation, although for the purposes of this Court's analysis, we will consider the parallels to Young's and Alvarez's claims regarding toilet facilities.

The County Defendants contest Plaintiff's version of events, alleging that Plaintiff never asked to use alternate toilet facilities and was allowed to shower at least twice (which Plaintiff admits, but the County Defendants contend provided Plaintiff an opportunity to ask for alternate toilet facilities). The Court finds the facts of this case sufficiently similar to those in *Young* to find that the objective prong of the Eighth Amendment analysis is satisfied. So too, are there genuine issues of material fact as to the knowledge and response of prison officials. Summary judgment would thus be inappropriate on the Eighth Amendment claims.

**3. Plaintiff's Fourteenth Amendment Claim**

***6** Plaintiff's Fourteenth Amendment claim, insofar as it supports Plaintiff's Eighth Amendment claim, will remain before the Court, although summary judgment is appropriate as to any other Fourteenth Amendment claim. The County Defendants move for summary judgment on Plaintiff's Fourteenth Amendment claim on two grounds: (1) that the County Defendants did not violate Plaintiff's due process rights and (2) that Plaintiff's Fourteenth Amendment claim cannot stand on its own without Plaintiff's Fifth and Eighth Amendment claims. In response, Plaintiff contends that because there are genuine issues of material fact regarding the alleged violation of his Eighth Amendment rights, his Fourteenth Amendment claim must remain.

The County Defendants motion must fail in part because Plaintiff has pointed out that there is a genuine issue as to whether or not his Fourteenth Amendment rights were violated so long as Plaintiff's claim rests on the Eighth Amendment's prohibition against cruel and unusual punishment. The Court will deny summary judgment as to Plaintiff's Eighth Amendment claim made pursuant to the Fourteenth Amendment, because Plaintiff's Eighth Amendment claim remains, *see supra,* and the Eighth Amendment is applicable to the states via the Due Process Clause of the Fourteenth Amendment. *Robinson v. California,* 370 U.S. 660, 666, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

Plaintiff, having failed to provide any argument to refute the County Defendants' motion with respect to a Fourteenth Amendment due process claim in and of itself, does not meet his burden on that possible claim. *See* Fed.R.Civ.P. 56(e). Accordingly, the Court will grant summary judgment for the County Defendants on Plaintiff's Fourteenth Amendment claim as it stands alone.

**4. Plaintiff's § 1983 Claim**

The County Defendants move for summary judgment on all of Plaintiff's claims made pursuant to 42 U.S.C. § 1983. They contend that Plaintiff's constitutional rights have not been violated, nor is there evidence of a policy or custom of such violation.

"To state a claim under [42 U.S.C.] § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). As discussed *supra,* there is a genuine issue of fact as to the possible Eighth Amendment rights violations which may form the basis of a § 1983 claim against the County Defendants. The Court finds that prison officials employed by Cumberland County qualify as state actors, so Plaintiff's § 1983 claims against the individual County Defendants remain.

To hold the entity County Defendants liable under § 1983, Plaintiff must first demonstrate the underlying constitutional violation, about which there is a genuine issue of material fact, as discussed. Under § 1983, however, a local government entity such as a county "cannot be held liable solely because it employs a tortfeasor." *Monell v. New York City Dept. of Social*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts and acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694. To the extent that Plaintiff also makes allegations against those of the County Defendants which are entities, the Court undertakes a *Monell* analysis.

***7** The County Defendants contend that Plaintiff has no evidence of a policy of refusing working clean toilets to inmates in Cumberland County. So too, they contend that Plaintif has presented no evidence of similar incidents involving other inmates. Further, the County Defendants point to the undisputed material fact that the two isolation units next to Plaintiff's had working toilets to support its contention that no policy exists to satisfy the *Monell* standard. Plaintiff's responsive submission to the Court points to the deposition testimony of Kenneth Lamcken, who was responsible for maintenance at the Cumberland County Jail in 2005. Lamcken testified that there were times in 2005 when toilets in isolation units were broken and inmates were nonetheless placed in a cell with a broken toilet, where those inmates often defecated on the floor of the cell. (Pl.Opp.Ex. C.) The County Defendants do not contest Lamcken's testimony in their reply brief. Accordingly, the Court finds that there is a genuine issue of material fact with respect to whether there is a policy or custom in the Cumberland County Jail which deprives inmates' constitutional right to be free from cruel and unusual punishment. As Plaintiff's Eighth Amendment claims against the individual County Defendants remain, and there appears to be a genuine issue regarding a policy or custom of Eighth Amendment rights deprivations, the Court finds no reason to grant summary judgment for the County Defendants on Plaintiff's claims made pursuant to § 1983.

**5. Plaintiff's § 1985 Claim**

The County Defendants move for summary judgment on Plaintiff's claim made pursuant to 42 U.S.C. § 1985(3). They argue that Plaintiff has not shown evidence sufficient to make out such a claim, in particular providing no evidence of a conspiracy whatsoever, particularly not a conspiracy intended to inhibit Plaintiff's equal protection rights.[FN2] Plaintiff contends that there is a genuine issue as to whether or not a conspiracy existed that prevented him from enjoying his civil rights, as evidenced by his placement in the isolation cell without a functioning toilet. Plaintiff avers that the conspiratorial aspect of his treatment arises out of a policy of placing other inmates in the same or similar conditions.

FN2. Although the County Defendants also point out that there is no evidence of a conspiracy to deprive Plaintiff of his voting rights, Plaintiff makes clear in his opposition brief that his right to vote is not the basis of this claim.

To state a claim under 42 U.S.C. § 1985(3), Plaintiff must allege, among other things, a conspiracy motivated by a racial or class based discriminatory animus designed to deprive him of equal protection of the laws. *Lake v. Arnold,* 112 F.3d 682, 685 (3d Cir.1997) (*citing* *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971)). Plaintiff has provided no specific allegations of such discrimination, nor any evidence to support such a claim. He has simply not alleged any class or race-based motive which would support a § 1985(3) claim. Accordingly, the Court will grant summary judgment for the County Defendants on Plaintiff's claims made pursuant § 1985(3).

*B. Prison Health Services' Motion*[FN3]

FN3. Plaintiff previously agreed to dismiss Defendant Betty Gambrell from this matter; Gambrell was a health services administrator at Cumberland County Jail.

***8** PHS was contracted to provide health care management and staffing for the Cumberland County Jail at the time of the events alleged in Plaintiff's Complaint. PHS contends that it did not employ nurses to provide direct care to inmates, but rather that any nurses who did so were employed by Cumberland County. (PHS Br. at 1.) The Agreement between Cumberland County and the regional office of PHS reflects that PHS provided "physician and administrative personnel" at the Cumberland County Jail; there is no mention of PHS

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

providing nurses. (PHS Exs. B, C.)

**1. Plaintiff's § 1983 Claim**

PHS moves for summary judgment on Plaintiff's Eighth Amendment claims against it filed pursuant to 42 U.S.C. § 1983.[FN4] PHS grounds its motion on Plaintiff's lack of evidence that PHS violated his constitutional rights and upon the legal argument that 42 U.S.C. § 1983 does not permit a claim based solely upon vicarious liability. Plaintiff did not oppose the instant motion.

FN4. The Court notes that PHS does not specify that its motion only seeks summary judgment on Plaintiff's Eighth Amendment claims. It appears to the Court, however, that PHS has not addressed Plaintiff's Fifth and Fourteenth Amendment claims, nor for that matter Plaintiff's § 1985 claims, in the instant motion. Accordingly, the Court only considers PHS's motion with respect to Plaintiff's Eighth Amendment claims made pursuant to § 1983.

"To state a claim under [42 U.S.C.] § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West,* 487 U.S. at 48. Because a physician under contract with a state prison acts under the color of state law when he treats an inmate, the Court finds that PHS was also acting under the color of state law when it provided medical personnel to treat inmates at the Cumberland County Jail *Id.* Plaintiff may establish liability by showing that PHS had a policy or custom that caused the civil rights violations he alleges. *Monell,* 436 U.S. at 694. Thus, there can be no entity liability unless there is an underlying constitutional violation.

Where § 1983 claims are grounded on claims that medical treatment fell below constitutional standards, an inmate must show that the defendant was deliberately indifferent to his serious medical needs. *See* *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251; *Rouse,* 182 F.3d at 197. "Deliberate indifference" exists "where [a] prison official: (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse,* 182 F.3d at 197. Further, claims of negligence or malpractice are not sufficient to establish "deliberate indifference." *Id.*

PHS contends that Plaintiff's only evidence regarding its treatment of Plaintiff comes in the form of an expert report by Dr. John Kirby. PHS notes that Dr. Kirby, Plaintiff's own expert, mentions PHS employees when it says that, "Once detected, Mr. Alvarez's wounds were treated appropriately by his physicians," although "wound care was neglected by the prison nurses." (PHS Ex. E at 7.) [FN5] The report further states that when Plaintiff discovered the boils on his abdomen and upper legs, "the prison physician lanced [the] boils." (PHS Ex. E at 3; PHS Ex. F at 3.) PHS also argues that there is no evidence that PHS was responsible for the cleaning and sanitation of the inmates' housing, a focus of both of Dr. Kirby's reports.

FN5. The Court has taken into consideration both versions of the Kirby report submitted by PHS in support of its motion.

***9** The Court finds that PHS has met its burden, that Plaintiff's own expert report shows that PHS' physicians did not act with deliberate indifference to Plaintiff's serious medical need and that there is no evidence that PHS is responsible for Cumberland County Jail's failure to adequately prevent infection. PHS' contract with Cumberland County reinforces the notion that cell cleaning and sanitation were not its responsibility. There is thus no evidence before the Court which shows a genuine issue of material fact as to PHS' alleged Eighth Amendment violations. Plaintiff, having not opposed the instant motion, has not met his burden to show that there is a genuine issue for trial. Accordingly, the Court will grant summary judgment for PHS on Plaintiff's Eighth Amendment claims made pursuant to § 1983.

**2. Plaintiff's Negligence Claim**

PHS also moves for summary judgment on Plaintiff's

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

negligence claims FN6, arguing that Dr. Kirby's report concludes that the medical care provided to Plaintiff was appropriate. Plaintiff's medical malpractice claim fails and must be dismissed.

FN6. The Court notes that PHS does not specify that its motion only seeks summary judgment on Plaintiff's medical malpractice claims of negligence. It appears to the Court, however, that PHS has not addressed in the instant motion Plaintiff's claims that PHS was negligent in other respects. Accordingly, the Court only considers PHS's motion as to Plaintiff's medical malpractice claims.

Plaintiff's negligence claim against PHS is, in part, a medical malpractice claim requiring expert testimony establishing (1) the applicable standard of care; (2) a deviation from that standard of care; and (3) that the deviation caused the injury. *See Teilhaber v. Greene,* 320 N.J.Super. 453, 727 A.2d 518 (N.J.Super.Ct.App.Div.1999). The facts of this case, as presented to the Court, do not show that there is a genuine issue as to Plaintiff's treatment by PHS. The physicians who treated him at the Cumberland County Jail provided medical care that, according to Plaintiff's own expert, was appropriate. Because Plaintiff has not responded, and there are no facts currently before the Court to support the bare allegations of medical malpractice in the Complaint, PHS is entitled to summary judgment Plaintiff's medical malpractice claims against it.

**IV. CONCLUSION**

Based upon the foregoing, the Court will GRANT summary judgment for the County Defendants on Plaintiff's Fifth Amendment claims, Plaintiff's claims made pursuant § 1985(3), and Plaintiff's Fourteenth Amendment claim to the extent that it alleges a violation of Plaintiff's Fourteenth Amendment right to due process. Further, the Court will DENY summary judgment for the County Defendants on Plaintiff's Eighth Amendment claims made pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983. The Court will GRANT summary judgment for PHS on Plaintiff's Eighth Amendment claims made pursuant to § 1983 and on Plaintiff's medical malpractice claims against PHS. The accompanying Order shall issue today.

D.N.J.,2009.
Alvarez v. County of Cumberland
Slip Copy, 2009 WL 750200 (D.N.J.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Page 1

Slip Copy, 2009 WL 815724 (N.D.N.Y.)
(Cite as: 2009 WL 815724 (N.D.N.Y.))

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Frank BROWN, Plaintiff,
v.
Thomas G. EAGEN, et al., Defendants.
**No. 9:08-CV-0009 (TJM/DRH).**

March 26, 2009.

West KeySummary
**Civil Rights 78 1395(7)**

78 Civil Rights
78III Federal Remedies in General
78k1392 Pleading
78k1395 Particular Causes of Action
78k1395(7) k. Prisons and Jails; Probation and Parole. Most Cited Cases

An inmate's § 1983 claims of deliberate indifference to his serious medical needs were so fantastic or incredible that they were dismissed as factually frivolous. The inmate alleged that prison officials gave him a "medical resource drink" that contained blood and feces, intentionally infected him with Hepatitis A and H. Pylori and denied testing and treatment. The inmate also alleged that the prison officials were working with Spanish inmates to contaminate his food tray with blood, urine, semen, and chemicals. Further, the inmate failed to allege a tangible connection between the acts of any of the prison officials and any injuries he suffered. 42 U.S.C.A. § 1983.

Frank Brown, pro se.

Hon. Andrew M. Cuomo, New York State Attorney General, Richard Lombardo, Esq., Assistant Attorney General, of Counsel, for Represented Defendants.

**MEMORANDUM-DECISION and ORDER**

THOMAS J. McAVOY, Senior District Judge.

**I. Introduction**

***1** Plaintiff Frank Brown commenced this action *pro se* pursuant to 42 U.S.C. § 1983 ("Section 1983") alleging that Defendants violated his rights under the United States Constitution. Dkt. No. 1 (Comp.). Plaintiff seeks substantial monetary relief.

Reading Plaintiff's Complaint liberally, Plaintiff claims that Defendants conspired and retaliated against him for filing grievances; denied him access to the courts by interfering with his legal mail; were deliberately indifferent to his serious medical needs; failed to protect him from known harm; subjected him to excessive force; conspired against Plaintiff; and denied him due process, all in violation of his rights under the First, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.

Presently before the Court is Defendants' Motion to Dismiss the Complaint pursuant to FED. R. CIV. P. 12(b)(1) and (6). Dkt. No. 50. Plaintiff has responded in opposition to the Motion. Dkt. No. 65. For the following reasons, Defendants' Motion to Dismiss is granted.

**II. Standard of Review**

A motion to dismiss pursuant to Rule 12(b)(6) may not be granted so long as plaintiff's complaint includes "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544,550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007); [FN1] *cf. Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) (recognizing that the Supreme Court "is not requiring a universal standard of heightened fact pleading, but is instead requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

allegations in those contexts where such amplification is needed to render the claim *plausible."* ). The pleading of specific facts is not required; rather a complaint need only give the defendant "fair notice of what the ... claim is and the grounds upon which it rests." *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007). The court must accept the material facts alleged in the complaint as true. *Cooper v. Pate,* 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964) (per curiam)); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005). In determining whether a complaint states a cause of action, great liberality is afforded to pro se litigants. *Platsky v. Central Intelligence Agency,* 953 F.2d 26, 28 (2d Cir.1991) (citation omitted).

FN1. The Supreme Court, in *Bell Atlantic Corp.,* rejected the standard of review previously applied-namely, that "it appears beyond a doubt that plaintiff can prove no set of facts in support of his claim that would entitle him to relief"-and replaced the "no set of facts" language with the requirement that a plaintiff plead sufficient facts "to state a claim for relief that is plausible on its face." *Id.* at 1974.

For purposes of a Rule 12(b)(6) motion, the "complaint" includes any written instrument attached to the complaint and any statements or documents incorporated into it by reference. *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002); *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 674 (2d Cir.1995) (citations omitted). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Chambers,* 282 F.3d at 153 (citation omitted). The Court may also consider "matters of which judicial notice may be taken." *Kowalyshyn v. Sobieski,* 3:07-CV-687, 2008 WL 1924973, at *1 (D.Conn. Apr.30, 2008).

**III. Facts**

***2** The facts are related as alleged by Plaintiff in his complaint. Dkt. No. 1 (Comp.).

**A. First Cause of Action**

On November 4, 2004, Defendants Burge and Bellnier failed to protect Plaintiff when they did "nothing to stop" Spanish inmates from contaminating Plaintiff's food tray "by putting ketchup that was sealed and called LA-BINE-YA, which is sealed ketchup with blood inside" and by "paying black porters with drugs and money to let them violate [Plaintiff's] food trays with sperm and blood and chemicals." Comp. at 11. Plaintiff's mail was constantly tampered with at Auburn Correctional Facility by the spanish inmates and, as a result, his grievances and complaints, including a letter to the FBI which included a sample of the ketchup, were never delivered. Comp. at 11-12. Plaintiff's mail was tampered with "to prevent [Plaintiff] from contacting anyone [to] let them know that all the murders of [his] whole family was done by spanish inmates at Great Meadow from Oct, 2006, until Nov, 2007." Comp. at 12. Defendants Burge and Bellnier are "responsible for massive corruption at Auburn from 9/17/2004 until 3/8/2005, so they are responsible for all corrupt acts committed" against Plaintiff. Comp. at 13, 33.

**B. Second Cause of Action**

On December 29, 2004, spanish officers gave out Plaintiff's personal information to "their spanish people." Comp. at 13. The sharing of Plaintiff's personal information began in 1999 when he was at Southport, and since then "all spanish inmates have been able to get all information at will." Comp. at 13. John Burge, Glenn Goord, and Lucien J. LeClaire were made aware of all of these "criminal acts by many spanish inmates and officers" but did nothing to protect Plaintiff's federal rights. Comp. at 13, 33-34.

**C. Third Cause of Action**

On January 1, 2005 Defendants Nurse Smith [FN2] and Sergeant Nipper retaliated against Plaintiff because of the many grievances Plaintiff had filed against "medical and officers." Comp. at 13-14. Nurse Smith and Sergeant Nipper gave Plaintiff "an infected medical resource drink with feces and blood inside of it." Comp. at 14. Nurse Smith was very nervous when she came to Plaintiff's cell

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

on that day "[b]ecause some one put her up to this ... [and it] was done in retaliation for the many grievances and complaints" that Plaintiff was writing. Comp. at 14, 34.

FN2. Nurse Smith has not been served and has not appeared in this action.

**D. Fourth Cause of Action**

Nurse Smith and Sergeant Nipper gave Plaintiff an "infected medical resource drink with feces and blood inside of it." Comp. at 14. Defendants were deliberately indifferent to Plaintiff's serious medical needs and to his safety in violation of the Eighth Amendment. Comp. at 14, 35.

**E. Fifth Cause of Action**

On January 6, 2005, Defendant Burge was involved in a "massive conspiracy" with Southport Superintendent Michael McGinnis, who is **not a defendant** in this action, to keep Plaintiff "on mental health level one" and medicated so as to prevent Plaintiff from pursuing his legal actions in Federal Court and exposing the massive conspiracy. Comp. at 15. Burge and McGinnis knew each other because they had previously worked together at Southport. Comp. at 15. Plaintiff was put on mental health level one and transferred to Auburn "to be silenced at all costs." Comp. at 15. Plaintiff has "no mental health problems or issues at all." Comp. at 15. Burge's actions violated Plaintiff's right to due process in violation of the Fourteenth Amendment. Comp. at 35.

**F. Sixth Cause of Action**

***3** On January 12, 2005, Defendants Robinson, Laux, Wright, LeClaire, Goord, Burge, Bellnier, Meyers, Nurse Smith, Officer Smith, and Sergeant Nipper violated Plaintiff's "constitutional rights to be free from infections." [FN3] Comp. at 15. Plaintiff was infected with the hepatitis A virus and then denied medical treatment. Comp. at 16. All of the staff prevented Plaintiff from being tested for hepatitis to prevent the ongoing conspiracy from being exposed. Comp. at 16. Plaintiff advised "all staff at Central Office" of this problem but they did nothing at all. Comp. at 16. Defendants were deliberately indifferent to Plaintiff's serious medical needs and to his safety in violation of the Eighth Amendment. Comp. at 36.

FN3. Defendants Robinson and Correctional Officer Smith have not been served and have not appeared in this action.

**G. Seventh Cause of Action**

On January 18, 2005, Defendants Eagan, Bellamy, and Burge denied Plaintiff "access to the open tank cells." Comp. at 16. All Defendants are to blame for this discrimination because they "all had the opportunity to correct this policy that discriminated against [Plaintiff]." Comp. at 16. Defendants' actions were retaliatory in violation of Plaintiff's First Amendment rights. Comp. at 37.

**H. Eighth Cause of Action**

On January 23, 2005, Defendants Meyers and Toomey denied Plaintiff his right to "medical help" by destroying a paper instructing Plaintiff not to eat any food in preparation for a blood test. Comp. at 17. LeClaire, Goord, Eagen, and Bellamy "are all responsible also because they did nothing and knew of all crimes being done to [Plaintiff] many times." Comp. at 17. Defendant Wright is also responsible because it was "his duty to stop crimes against [Plaintiff] for massive infections." Comp. at 17. Defendants were deliberately indifferent to Plaintiff's serious medical needs and safety in violation of the Eighth Amendment. Comp. 38.

**I. Ninth Cause of Action**

On January 26, 2006, Defendant Nurse Vega, who is spanish, destroyed the test results from Plaintiff's stool sample to cover up the conspiracy by spanish inmates and corrupt officers. Comp. at 18. Defendant was deliberately indifferent to Plaintiff's serious medical needs in violation

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

of the Eighth Amendment. Comp. at 38.

**J. Tenth Cause of Action**

On January 27, 2005, in retaliation for Plaintiff's filing grievances, Defendant Rizzo gave Plaintiff tuna fish with "sperm in it." Comp. at 18-19. Plaintiff wrote many grievances against Defendant Rizzo. Comp. at 19. Defendant retaliated against Plaintiff in violation of his First Amendment rights. Comp. at 39.

**K. Eleventh Cause of Action**

On January 30, 2005, Defendant Meyers denied Plaintiff access to the courts "by destroying [Plaintiff's] free legal postage mail," including his Article 78 motions. Comp. at 19-20. Defendant Meyers also destroyed many of Plaintiff's grievances. Comp. at 20. Meyers is the officer "who almost always picks up the mail." Comp. at 20. Defendant Meyers denied Plaintiff access to the Courts in violation of his First Amendment rights. Comp. at 39.

**L. Thirteenth Cause of Action**[FN4]

FN4. Plaintiff's Complaint does not include a Twelfth Cause of Action. *See* Comp. at 39-40.

***4** On February 1, 2005, Defendants Rizzo, Correctional Officer Smith, Portney, Nurse Smith, Sergeant Nipper, and D. Meyers infected Plaintiff with "a life time virus called Hepatitis A" because Plaintiff filed many grievances against them and other correctional staff. Comp. at 21. Defendants subjected Plaintiff to cruel and unusual punishment and were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. Comp. at 40.

**M. Fourteenth Cause of Action**

On February 2, 2005, Plaintiff was infected with H. Pylori from the drinking water. Comp. at 21. Defendant Burge, "being the chief person at Auburn in 2004 and 2005 is responsible for [Plaintiff's] well-being." Comp. at 22. Defendant Laux refused to have Plaintiff's blood tested. Comp. at 22. Both Defendants Burge and Laux knew that Plaintiff was "bleeding inside from the drinking water" but did nothing. Comp. at 22. Defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. Comp. at 40-41.

**N. Fifteenth Cause of Action**

On February 10, 2005, Defendants Eagen, Bellamy, and Burge denied Plaintiff the right to petition the government without retaliation or reprisals "because the grievance program is not fair and effective." Comp. at 22. Plaintiff has been "infected in every prison ... most likely by chemicals, sperm, blood by officers, sergeants, medical staff and spanish inmate agents. [He] has been given three (3) life time viruses of Hepatitis A, Herpes and H pyloria. Plus massive infections in [his] stomach, throat and head for only using the grievance programs." Comp. at 23. "The whole corrupt Great Meadow murdered [Plaintiff's] whole family for only using the grievance program." Comp. at 24. Plaintiff was denied due process under the Fourteenth Amendment. Comp. at 42.

**O. Sixteenth Cause of Action**

On February 23, 2005, Defendants Burge, Bellnier, Nurse Smith, Officer Smith, Portney, Rizzo, Putman, Toomey, LeClaire, Wright, Eagen, Bellany, Laux, Robinson, Vega, Nipper, Meyers, and Goord all conspired with each other to infect Plaintiff with chemicals and to retaliate against him. Comp. at 25. Goord, Wright, LeClaire, Eagen, and Bellamy were all from the Central Office and therefore "in a position to stop all crimes being committed against [Plaintiff] but did nothing." Comp. at 25. Plaintiff claims that no white prisoners would be treated like this, only black prisoners, because there is "class-based discriminatory animus behind this massive conspiracy." Comp. at 25. Plaintiff states that

> [t]his massive conspiracy is from prison to prison with massive criminal acts of food tampering, mail tampering, property destruction, assaults, conspiracy to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

murder, attempted murders, massive infections, retaliation and murders of [Plaintiff's] whole family also. This is the biggest conspiracy in the history of United States. Plus using mental health to help [them] cover-up massive federal crimes.

***5** Comp. at 26. Plaintiff claims that Defendants conspired against him in violation of 42 U.S.C. § 1985(3).

**P. Seventeenth and Eighteenth Causes of Action**

On February 27, 2005, Defendants Portney and Correctional Officer Smith assaulted Plaintiff "by putting the black strap on [him] at sick call because nurse Androsko told the officers" to get Plaintiff out of there. Comp. at 27. When Plaintiff returned to his cell, Plaintiff put his hands out of the food slot and "all officers which [he] didn't put on this lawsuit because [he] is extremely indigent ... pulled [Plaintiff's] hands and arms very hard trying to break them and [Plaintiff's] wrists also plus [his] back was in extreme pain." Comp. at 27-28. Plaintiff alleges that he was subjected to excessive force in violation of the Eighth Amendment. Comp. at 44-46.

**Q. Nineteenth Cause of Action**

On February 28, 2005, Defendant Putnam told Plaintiff that he will remember Plaintiff till the day Plaintiff died and then threatened to give Plaintiff food and water infected with feces, urine, and sperm. Comp. at 28-29. Putnam's actions were in retaliation for Plaintiff filing grievances in violation of the First Amendment. Comp. at 29, 47.

**R. Twentieth Cause of Action**

On February 28, 2005, Officer Toomey tampered with Plaintiff's food tray by pouring some sort of liquid all over everything. Comp. at 29-30. Toomey planned this with Defendant Putnam. Comp. at 30. Plaintiff alleges that Defendants actions were retaliatory in violation of the First Amendment. Comp. at 48-49.

**S. Twenty-first Cause of Action**

On March 1, 2005, Defendant Rizzo contaminated Plaintiff's water with chemicals "that put pain in [Plaintiff's] side." Comp. at 30. Many times Defendant Officer Smith put feces and sperm in Plaintiff's hot water. Comp. at 31.

**T. Twenty-second Cause of Action**

Plaintiff was in the Auburn Special Housing Unit (SHU) from October 30, 2004 until March 7, 2005 under conditions that were an "atypical and significant hardship [and] a deprivation of a liberty interest." Comp. at 31. During this period of SHU incarceration, he was infected with two or maybe three "life time viruses." [FN5] Comp. at 31. Plaintiff alleges that he "was entitled to be free from all infections, crimes against [him] in SHU at Auburn." Comp. at 50. Plaintiff claims that he was deprived of due process. Comp. at 50.

FN5. Plaintiff was placed in SHU after he "stabbed spanish inmate Rodriguez on October 30, 2005. Comp. at 32. Plaintiff says that he stabbed Rodriguez because Defendants had failed to stop the "corruption and breaches of security" that Plaintiff had been subjected to. Comp. at 32.

**IV. Defendants' motion to dismiss**

Defendants argue that Plaintiff's Complaint should be dismissed because: (1) the Complaint fails to state a claim pursuant to 42 U.S .C. § 1983; (2) Defendants are entitled to qualified immunity; and (3) the First, Second, Third and Fourth causes of action are barred by the applicable statute of limitations. Dkt. No. 50.

**V. Discussion**

**A. Statute of limitations**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

The applicable statute of limitations for Section 1983 actions arising in New York requires claims to be brought within three years. *Pinaud v. County of Suffolk,* 52 F.3d 1139, 1156 (2d Cir.1995) (citing *Owens v. Okure,* 488 U.S. 235, 250-51, 109 S.Ct. 573, 582, 102 L.Ed.2d 594 (1989); *Eagleston v. Guido,* 41 F.3d 865, 871 (2d Cir.1994)).

***6** Defendants assert that Plaintiff's action was filed with the Court on January 4, 2008, and that therefore Plaintiff's first, second, third, and fourth causes of action should be dismissed as time-barred. Dkt. No. 50-2, Memorandum of Law at 26. However, because Plaintiff is an inmate, his pleading is deemed "filed" when it is delivered to prison officials. *Dory v. Ryan,* 999 F.2d 679, 682 (2d Cir.1993); *Pritchard v. Kelly,* 9:98-CV-0349, 2000 WL 33743378, at *2 n. 2 (N.D.N.Y. Oct.3, 2000) (Sharpe, M.J.). The date the plaintiff signed the complaint is presumed to be the date the plaintiff gave the complaint to prison officials to be mailed. *Mingues v. Nelson,* 96-CV-5397, 2004 WL 324898, at *3 (S.D.N.Y. Feb.20, 2004). In this case, Plaintiff signed his Complaint on December 25, 2007. Comp. at 52. Accordingly Plaintiff may not prevail on any claims asserted in his Complaint which occurred prior to December 25, 2004.

Plaintiff's first cause of action asserts allegations against Defendants Burge and Bellnier concerning wrongdoing that occurred on November 4, 2004, **but also alleges** that Burge and Bellnier were "responsible for massive corruption at Auburn from September 17, 2004 continuing **until March 8, 2005.** Comp. at 11-13. The alleged wrongdoing in Plaintiff's second, third, and fourth causes of action occurred, if at all, on December 29, 2004 and January 4, 2008. Accepting Plaintiff's allegations as true, the Court cannot conclude at this juncture that the allegations set forth in the first through fourth causes of action are time-barred.[FN6] Defendants' Motion to Dismiss portions of Plaintiff's Complaint as untimely is denied **without prejudice.**

FN6. The sufficiency of Plaintiff's allegations will be discussed below.

**B. Personal Involvement**

To state a viable claim under Section 1983, a plaintiff must allege that the defendant, while acting under color of state law, deprived him of a right, privilege or immunity secured by the Constitution or by the laws of the United States. *See* 42 U.S.C. § 1983. The personal involvement of a defendant is a prerequisite for the assessment of damages in a Section 1983 action, *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), and the doctrine of respondeat superior is inapplicable to Section 1983 claims. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 453, 70 L.Ed.2d 509 (1981); *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973). "Further, a Section 1983 plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas,* No. 04-CV7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar.31, 2008) (citing *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986) (other citation omitted). Any complaint that fails to allege personal involvement is "fatally defective on its face." *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 886 (2d Cir.1987) (internal quotations and citations omitted).

A defendant is "personally involved" if he or she "directly participated in the infraction." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Also, a defendant in a supervisory capacity may be "personally involved" within the meaning of Section 1983 if the state actor (1) failed to remedy the wrong after learning of the violation through a report or appeal; (2) created or continued a custom or policy under which unconstitutional practices ensued; or (3) was grossly negligent in managing subordinates who caused the unlawful condition or event. *Id.*

***7** Plaintiff has named supervisory personnel as Defendants and attempts to hold them liable for alleged violations of his rights by Department of Corrections employees. Plaintiff alleges, among other things, that Burge and Bellnier failed to stop "breaches of security" including spanish inmates from giving Plaintiff ketchup contaminated with blood (Comp. at 11-12); Burge, Goord, and LeClaire did nothing to stop "the spanish population" from tampering with Plaintiff's food and mail and disseminating Plaintiff's personal information (Comp. at 13); Burge was involved in a "massive conspiracy" to keep Plaintiff on mental health status and medicated (Comp. at 15); Wright, LeClaire, Goord, Burge, and Bellnier and "all staff at Central Office were made aware

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

of all infections and did nothing at all" (Comp. at 15-16); LeClaire, Goord, Eagan, Bellamy, and Wright are responsible for Plaintiff's injuries because "they did nothing and knew of all crimes being done to [Plaintiff]" and did not stop the crimes or the "massive infections" (Comp. at 17). Plaintiff's vague allegations that he let the supervisory Defendants and all Central Office staff know about the conspiracy and crimes against him is insufficient to provide the type of notice that would have required these Defendants to act. Moreover, none of these Defendants can be held personally liable merely because they were in a high position of authority. *See* *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985) ("[P]laintiff's claim for monetary damages against [the Commissioner] requires a showing of more than linkage in the prison chain of command.").

The Court has reviewed the Complaint in its entirety and afforded it great liberality but is unable to find any allegations to suggest that any of the supervisory Defendants-Burge, Goord, LeClaire, Bellnier, Wright, Eagan, or Bellamy-were personally involved or directly participated in any violation of Plaintiff's civil or constitutional rights. *See* *Johnson,* 481 F.2d at 1034 (when monetary damages are sought under Section 1983, the general doctrine of respondeat superior does not suffice and a showing of personal responsibility is required). Defendants Burge, Goord, LeClaire, Bellnier, Wright, Eagan, and Bellamy are **dismissed without prejudice.**[FN7]

FN7. As discussed below, even if Plaintiff could sufficiently allege personal involvement by these Defendants, Plaintiff has failed to state any claim which would entitle him to relief under Section 1983.

**C. Failure to State a Claim**

A court may dismiss an *in forma pauperis* complaint if it determines that the complaint is frivolous. *Neitzke v. Williams,* 490 U.S. 319, 325, 109 S.Ct. 1827, 1833, 104 L.Ed.2d 338 (1989). "An action is frivolous when either: (1) the factual contentions are clearly baseless, such as when allegations are the product of delusion or fantasy; or (2) the claim is based on an indisputably meritless legal theory." *Livingston v. Adirondack Beverage Co.,* 141 F.3d 434, 437 (2d Cir.1998) (internal quotations omitted) (citing *Nance v. Kelly,* 912 F.2d 605, 606 (2d Cir.1990) (per curiam) (quoting *Neitzke,* 490 U.S. at 327, 109 S.Ct. at 1833)).

***8** A complaint is factually frivolous if the facts alleged are clearly baseless, a category that includes allegations that are fanciful, fantastic, and delusional. *Denton v. Hernandez,* 504 U.S. 25, 32-33, 112 S.Ct. 1728, 1733, 118 L.Ed.2d 340 (1992) (citing *Neitzke,* 490 U .S. at 325-28, 109 S.Ct. at 1833). "[A] finding of factual frivolousness is appropriate when the facts alleged rise to the level of the irrational or the wholly incredible, whether or not there are judicially noticeable facts available to contradict them." *Denton,* 504 U.S. at 33, 112 S.Ct. at 1733. A complaint is based on an "indisputably meritless" legal theory when either the claim lacks an arguable basis in law, *Benitez v. Wolff,* 907 F.2d 1293, 1295 (2d Cir.1990) (per curiam), or a dispositive defense clearly exists on the face of the complaint. *See* *Pino v. Ryan,* 49 F.3d 51, 53 (2d Cir.1995). Although the Court must accept the truth of Plaintiff's allegations on a motion to dismiss, the federal *in forma pauperis* statute grants the Court "the unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual allegations are clearly baseless." *Neitzke,* 490 U.S. at 327, 109 S.Ct. at 1833.

Moreover, the law in this Circuit clearly provides that "complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Hunt v. Budd,* 895 F.Supp. 35, 38 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987) (other citations omitted)); *Pourzandvakil v. Humphry,* 94-CV-1594, 1995 WL 316935, at *7 (N.D.N.Y. May 22, 1995) (Pooler, J.) (citation omitted).

**1. Eighth Amendment**

The Eighth Amendment prohibits cruel and unusual punishment which encompasses punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 8

Slip Copy, 2009 WL 815724 (N.D.N.Y.)
(Cite as: 2009 WL 815724 (N.D.N.Y.))

*Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290-91, 50 L.Ed.2d 251 (1976) (citations and quotations omitted). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference." *See* *Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (quoting *Wilson v. Seiter,* 501 U.S. 294, 297-98, 111 S.Ct. 2321, 2323-24, 115 L.Ed.2d 271 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.). Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979.

***9** Plaintiff alleges multiple violations of his Eighth Amendment rights. Plaintiff claims that Defendants were deliberately indifferent to his health and safety because they purposely infected him with and then denied him treatment for three "life-time" viruses, served him contaminated food, and subjected him to excessive force.

**a. Medical claims**

Generally, to prevail on a claim of inadequate medical care under the Eighth Amendment, a plaintiff must show two things: (1) that the plaintiff had a *sufficiently serious* medical need; and (2) that the defendant was *deliberately indifferent* to that serious medical need. *Estelle,* 429 U.S. at 104, 97 S.Ct. at 290-91. Mere disagreement with prison officials about what constitutes appropriate medical care does not state a cognizable claim under the Eighth Amendment. *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.1992). Prison officials have broad discretion in determining the nature and the character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does not have the right to treatment of his choice. *Id.* at 45 (citing *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986); *Jackson v. Fair,* 846 F.2d 811, 817-18 (1st Cir.1988)). "Further, a delay in treatment does not violate the constitution unless it involves an act or failure to act that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Thomas v. Nassau County Correctional Center,* 288 F.Supp.2d 333, 339 (E.D.N.Y.2003) (citation omitted). "The Second Circuit has 'reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment, ignored a life threatening and fast-degenerating condition for three days, or delayed major surgery for over two years.' " *Thomas,* 288 F.Supp.2d at 339 (citing *Espinal v. Coughlin,* 98 Civ. 2579, 2002 WL 10450, at *3 (S.D.N.Y. Jan.3, 2002)). Even if a prisoner is able to establish delay, in order to establish deliberate indifference, he must also show that his condition became worse or deteriorated as a result of the delay. *Thomas,* 288 F.Supp.2d at 339.

Plaintiff alleges that Defendants were deliberately indifferent to his serious medical needs when they gave him a "medical resource drink" containing blood and feces (fourth cause of action); intentionally infected him with Hepatitis A and then denied testing and medical treatment for the disease (sixth and thirteenth causes of action); infected him with H. Pylori (fourteenth cause of action); and served Plaintiff water intentionally contaminated with chemicals (twenty-first cause of action). Plaintiff also alleges that the supervisory Defendants allowed spanish inmates and corrupt correctional officers to contaminate his food tray with blood, semen, urine, and chemicals. These allegations are so fantastic or incredible as to be factually frivolous. Moreover, with respect to the sixth, thirteenth, and fourteenth causes of action, Plaintiff has failed to allege a tangible connection between the acts of any of the Defendants named in those causes of action and the injuries suffered by Plaintiff. Accordingly, Plaintiff's fourth, sixth, thirteenth, fourteenth, and twenty-first causes of action are dismissed **without prejudice.**

***10** Plaintiff also alleges that he was unable to have his blood tested on January 23, 2005 because Defendants Meyers and Toomey destroyed the paper instructing

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Plaintiff to fast before the test (eighth cause of action). Finally, Plaintiff alleges that on January 26, 2005, Defendant Vega destroyed the results from Plaintiff's stool sample to cover up the conspiracy by spanish inmates and officers (ninth cause of action). Plaintiff does not, however allege that any of these actions resulted in a delay in treatment which was life-threatening or that Plaintiff was ultimately denied medical treatment because of these acts. *See, e.g. Amaker v. Coombe,* No. 96 Civ. 1622, 2002 WL 523388, at *8 (S.D.N.Y. Mar. 29, 2002) ("delay in treatment does not automatically indicate a violation of a prisoner's Eighth Amendment rights, 'unless the delay reflects deliberate indifference to a serious risk of health or safety, to a life-threatening or fast-degenerating condition or to some other condition of extreme pain that might be alleviated through reasonably prompt treatment.' "). Moreover, Plaintiff's claims against Defendants Meyers, Toomey, and Vega when read in their entirety are, as all of Plaintiff's claims in this Complaint, factually frivolous. Plaintiff alleges that the actions of these Defendants were part of the massive conspiracy to deliberately infect Plaintiff with viruses and then deny him proof that he had such viruses or treatment for the viruses. Plaintiff's eighth and ninth causes of action are also **dismissed without prejudice.**

**b. Food contamination**

In the context of Eighth Amendment protections, prisoners are to be provided with "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (citation omitted); *see also Lunney v. Brureton,* No. 04 Civ. 2438, 2005 WL 121720, at *6 (S.D.N.Y. Jan.21, 2005). Consequently, "[d]epriving an inmate of food or serving him contaminated food may constitute a violation of the Eighth Amendment." *Moncrieffe v. Witbeck,* No. 97-CV-253, 2000 WL 949457, at *6 (N.D.N.Y. June 29, 2000) (citing *Robles v. Coughlin,* 725 F.2d at 15). However, as with most of his medical claims, Plaintiff's allegations that his food was contaminated with blood (sealed in packaged ketchup); feces; urine; semen; and chemicals are so conclusory and fantastic as to rise to the level of factually frivolous. Accordingly, these allegations are dismissed **without prejudice.**

**c. Excessive force**

While the Eighth Amendment protects a prisoner against the excessive use of force, it "excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind ." *Branham v. Meachum,* 77 F.3d 626, 630 (2d Cir.1996) (quoting *Hudson v. McMillian,* 503 U.S. 1, 9-10, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (other quotations omitted)). A truly *de minimis* use of force will rarely suffice to state a constitutional claim. *Hudson,* 503 U.S. at 9-10, 112 S.Ct. at 1000 ("[Not] every malevolent touch by a prison guard gives rise to a federal cause of action."); *Johnson,* 481 F.2d at 1033 ("Not every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights").

***11** Plaintiff alleges that Defendants Portnoy and Correctional Officer Smith "put the black strap" on Plaintiff's hands when transporting him from sick call to his cell. Comp. at 27. The restraining of Plaintiff's hands with a black strap on one occasion during transport from sick call to his cell is a *diminimis* use of force at best and does not allege conduct which is "repugnant to the conscience of mankind." Plaintiff's excessive force claims against Portnoy and Correctional Officer Smith are **dismissed without prejudice.** [FN8]

> FN8. To the extent that Plaintiff claims to have suffered emotional and mental harm for the alleged use of force by Defendants Portnoy and Smith, Plaintiff fails to state a claim upon which relief may be granted. *See* 42 U.S.C. § 1997e(e) (No Federal civil action may be brought by a prisoner confined in a jail, prison or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury).

Plaintiff also alleges that once back at his cell, he held his hands out through the food slot to have the black strap removed and "all officers which [Plaintiff] didn't name in this law suit started pulling his hands and arms really hard trying to break them and [his] wrists also." Comp. at 27-28. Since Plaintiff has not named any of the officers

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

responsible for this incident, this claim is also dismissed **without prejudice.**

Defendants' Motion to Dismiss Plaintiff's excessive force claims is granted and those claims (seventeenth and eighteenth causes of action) are dismissed **without prejudice.**

**2. Retaliation**

When adverse action is taken by prison officials against an inmate, motivated by the inmate's exercise of a right protected under the Constitution, including the free speech provisions of the First Amendment, a cognizable retaliation claim under § 1983 lies. *See* *Franco v. Kelly,* 854 F.2d 584, 588-90 (2d Cir.1988). Courts must approach claims of retaliation " 'with skepticism and particular care' because 'virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.' " *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (quoting *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), overruled on other grounds by *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)).

In order to survive a motion to dismiss a complaint, a plaintiff asserting a First Amendment retaliation claim must advance "non-conclusory" allegations establishing:

> (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech [or conduct] and the adverse action.

*Davis,* 320 F.3d at 352 (quoting *Dawes,* 239 F.3d at 492). "[A] complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone." *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983).

Plaintiff alleges that he was retaliated against for filing grievances and complaints (third, seventh, tenth, nineteenth, and twentieth causes of action). Since the filing of prison grievances is a constitutionally protected activity, Plaintiff meets the first prong of the retaliation test. *See* *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996); *Franco,* 854 F.2d at 590.

***12** Plaintiff has not proffered non-conclusory allegations showing a causal connection between any of the alleged retaliatory conduct with any of Plaintiff's grievances. More importantly, the retaliatory conduct alleged-which includes intentionally infecting Plaintiff with viruses; contaminating his food with blood, urine, semen, and chemicals; and murdering his whole family-are so outrageous and unbelievable as be factually frivolous. Plaintiff's retaliation claims are **dismissed without prejudice** in their entirety.

**3. Denial of access to the courts**

Inmates have a First Amendment right to "petition the Government for a redress of grievances." This right, which is more informally referred to as a "right of access to the courts," requires States "to give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights." *Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), *modified on other grounds,* *Lewis v. Casey,* 518 U.S. 343, 350, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996); *see also* *Bourdon v. Loughren,* 386 F.3d 88, 92 (2d Cir.2004) (citations omitted). "However, this right is not 'an abstract, freestanding right to a law library or legal assistance' and cannot ground a Section 1983 claim without a showing of 'actual injury.' " *Collins v. Goord,* 438 F.Supp.2d 399, 415 (S.D.N.Y.2006) (quoting *Lewis,* 518 U.S. at 351). As a result, to state a claim for denial of access to the courts, a plaintiff must assert non-conclusory allegations demonstrating both (1) that the defendant acted deliberately and maliciously, and (2) that the plaintiff suffered an actual injury. *Lewis,* 518 U.S. at 353; *Renelique v. Duncan,* 03-CV1256, 2007 WL 1110913, at *9 (N.D.N.Y. Apr.12, 2007) (Strom, J.) (same) (citing *Howard v. Leonardo,* 845 F.Supp. 943, 946 (N.D.N.Y.1994)).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Plaintiff alleges that Defendant Meyers denied Plaintiff access to the courts by destroying Plaintiffs' free legal postage mail, including Plaintiff's Article 78 motions (eleventh cause of action). Comp. at 19-20. Plaintiff does not allege any actual injury as a result of Defendant's alleged conduct. Plaintiff fails to state a claim for denial of access to the Courts, and therefore his eleventh cause of action is dismissed **without prejudice.** *See* *Lewis,* 518 U.S. at 351, 116 S.Ct. at 2180 (to state a constitutional claim for denial of access to the courts, a plaintiff must make a showing that he has suffered, or will imminently suffer, actual harm; that is, that he was "hindered [in] his efforts to pursue a legal claim"); *accord* *Morello v. James,* 810 F.2d 344, 347 (2d Cir.1987).

**4. Conspiracy claims under Sections 1983 and 1985**

To survive a motion to dismiss, a conspiracy claim under § 42 U.S .C.1983 must allege that: (1) an agreement existed between two or more state actors to act in concert to inflict an unconstitutional injury on plaintiff and (2) an overt act was committed in furtherance of that goal. *Ciambriello v. County of Nassau,* 292 F.3d 307, 324-25 (2d Cir.2002); *see also* *Concepcion v. City of New York,* No. 05 Civ. 8501, 2008 WL 2020363, at *5 (affirming the continued viability of the *Ciambriello* standards when analyzing a conspiracy claim *vis a vis* a motion to dismiss).[FN9] Vague and conclusory allegations that defendants have engaged in a conspiracy must be dismissed. *Ciambriello,* 292 F.3d at 325; *see also* *Sommer v. Dixon,* 709 F.2d 173, 175 (2d Cir.1983) ("A complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss."); *Brown v. City of Oneonta,* 106 F.3d 1125, 1133 (2d Cir.1997) (complaints containing only conclusory, vague or general allegations of a conspiracy to deprive a person of constitutional rights do not state a claim for relief). Moreover, a Section 1983 conspiracy claim must not only allege a conspiracy, but also the "actual deprivation of constitutional rights." *Romer v. Morgenthau,* 119 F.Supp.2d 346, 363-64 (S.D.N.Y.2000) (citing *Malsh v. Austin,* 901 F.Supp. 757, 765 (S.D.N.Y.1995). "Thus, if a plaintiff cannot sufficiently allege a violation of his rights, it follows that he cannot sustain a claim of conspiracy to violate those rights." *See id.*

FN9. The *Concepcion* Court stated that "in accord with Supreme Court precedent as well as the overwhelming weight of authority in this Circuit, this Court applies the *Ciambrello* standard in evaluating the sufficiency of the conspiracy claim ... under the Rule 12(b)(6) standard. In this regard ... the Court notes that it does not construe the decision in *Ciambrello* as imposing a 'heightened pleading requirement [ ]' for civil rights conspiracy claims ... nor a requirement that plaintiff must plead 'specific facts' to support his claim.... Rather, it reads *Ciambrello* as informing this Court's understanding of the type of factual allegations that are minimally sufficient to state a 'plausible' conspiracy claim under § 1983." *Concepcion,* 2008 WL 2020363, at * 5.

***13** Plaintiff alleges in conclusory fashion that all of the Defendants were involved in a massive conspiracy against Plaintiff. Plaintiff does not assert any facts giving rise to a conspiracy, but instead makes vague and shocking statements about a massive conspiracy involving Defendants, spanish inmates, and corrupt officers. Plaintiff has not alleged, except in conclusory fashion, that any meeting of the minds occurred between any of the Defendants. The Complaint does not contain any allegations to support a "plausible" conspiracy claim involving any of the Defendants. "[A]lthough a plaintiff does not need to provide detailed factual allegations, the allegations in the complaint must be 'enough to raise a right to relief above the speculative level.' " *Flores v. Levy,* No. 07-CV-3753, 2008 WL 4394681, at *9 (E.D.N.Y. Sep. 23, 2008) (citing *Bell Atlantic Corp.,* 127 S.Ct. at 1965).

Plaintiff also asserts conspiracy claims under 42 U.S.C. § 1985(3). To state a claim under 42 U.S.C.1985(3) a plaintiff must allege:

> " '(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of the citizens of the United States.' " *Fox v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*City of New York,* No. 03 Civ. 2268, 2004 WL 856299, at *9 (S.D.N.Y. Apr. 20, 2004) (quoting *Mian [v. Donaldson, Lufkin & Jenrette Sec. Corp.],* 7 F.3d [1085,] 1087-88 [ (2d Cir.1993) ] ).

*Mione v. McGrath,* 435 F.Supp.2d 266, 271-72 (S.D.N.Y.2006). Under § 1985(3), the language requiring intent to deprive of equal protection of the laws "means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirator's action." *Segreto v. Kirschner,* 977 F.Supp. 553, 565 (D.Conn.1997) (quoting *Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971)).

However, "[a]s the Second Circuit has noted repeatedly, conspiracy claims are to be viewed with skepticism and must be supported by more than mere conclusory allegations." *Webb,* 340 F.3d at 110 ("In order to maintain an action under Section 1985, a plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end.") (internal quotation marks omitted). Plaintiff's conclusory allegations of a conspiracy against him fail to provide any factual basis to plausibly support a meeting of the minds between the Defendants or that Defendants entered into an agreement to violate Plaintiff's rights.

Finally, even if Plaintiff's allegations of conspiracy were found to be more than merely conclusory, Plaintiff's conspiracy claims are barred by the "intra-corpo rate conspiracy" doctrine, also sometimes referred to as the intraenterprise conspiracy doctrine. The "intracorporate conspiracy" doctrine provides that a corporation or public entity "generally cannot conspire with its employees or agents as all are considered a single entity." *Everson v. New York City Transit Auth.,* 216 F.Supp.2d 71, 76 (E.D.N.Y.2002) (citation omitted); *see also Orafan v. Goord,* 411 F.Supp.2d 153, 165 (N.D.N.Y.2006) (holding that the conspiracy claim failed because the alleged co-conspirators were all DOCS officials and employees acting within the scope of their employment) (internal citations and quotations omitted), vacated and remanded on other grounds by *Orafan v. Rashid,* 249 Fed. Appx. 217, 2007 WL 2875968 (2d Cir.2007). An exception exists if the individuals are motivated by personal interests, separate and apart from the entity. *Orafan,* 411 F.Supp.2d at 165. To allege facts plausibly suggesting that defendants were pursuing personal interests, more is required than merely alleging defendants were motivated by personal bias. *See Peters v. City of New York,* 04-CV-9333, 2005 WL 387141, at *3 (S.D.N.Y. Feb.16, 2005) ("[P]ersonal bias is not the sort of individual interest that takes a defendant out of the intraenterprise conspiracy doctrine") (internal quotation marks and citation omitted); *accord, Johnson v. City of New York,* 01-CV-1860, 2004 WL 502929, at *5 (E.D.N.Y. Jan.12, 2004).

***14** In this case, all of the Defendants were DOCS employees during the period set forth in the Complaint and all were acting within the scope of their employment. Therefore, the intra-corporate conspiracy doctrine applies. Additionally, Plaintiff has not alleged facts to plausibly suggest that the exception to the intra-corporate conspiracy doctrine applies.

For all of the foregoing reasons, Plaintiff's conspiracy claims (the fifth and sixteenth causes of action) are **dismissed** in their entirety **without prejudice.**

**5. Due process**

To state a claim for violation of procedural due process, Plaintiff must allege first that he had a protected liberty interest and, second, if he had such an interest, that he was deprived of that interest without being afforded due process of law. *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997); *see generally Wolff v. McDonnell,* 418 U.S. 539, 557, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

Plaintiff alleges that Defendant Burge violated Plaintiff right to due process because he was involved in "massive conspiracy" to keep Plaintiff on mental health status and medicated in order to silence Plaintiff (fifth cause of action). Comp. at 15. This claim is dismissed as conclusory and for failure to state any sort of claim for denial of due process.

Plaintiff also alleges that Defendants Eagen, Bellamy, and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Burge denied Plaintiff due process by having in place a "grievance program [that is] not fair and effective." (fifteenth cause of action). Comp. at 22-23. Inmates do not have a constitutional right to have grievances processed or to ensure that grievances are processed properly. *See e.g. Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003) (prison grievance procedures do not confer any constitutionally protected right on an inmate). A violation of the inmate grievance procedures does ***not*** give rise to a claim under Section 1983. *Cancel v. Goord,* No. 00 Civ.2042, 2001 WL 303713, at *3 (S.D.N.Y. Mar. 29, 2001). Thus, Plaintiff's claims regarding the unfairness of the grievance process are dismissed.

Finally, Plaintiff alleges that he was subjected to an "atypical and significant hardship" during his SHU incarceration at Auburn in violation of his due process rights (twenty-second cause of action). Comp. at 31. Plaintiff has not however alleged that he received insufficient process prior to being confined in SHU nor does he indicate what Defendants, if any, were personally involved in the alleged denial of due process. Plaintiff fails to allege a plausible claim for denial of due process.

**6. Qualified Immunity**

Defendants raise the affirmative defense of qualified immunity. Dkt. No. 50-2, Memorandum of Law at 24-25. "Qualified immunity is an affirmative defense that shields government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Stephenson v. Doe,* 332 F.3d 68, 76 (2d Cir.2003) (quoting *McCardle v. Haddad,* 131 F.3d 43, 50 (2d Cir.1997) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).

***15** In determining whether qualified immunity applies, the court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001), modified by *Pearson v. Callahan,* ---U.S. ----, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (holding that although "the sequence set forth [in *Saucier* ] is often appropriate, it should no longer be regarded as mandatory"). If the plaintiff establishes that the violation of a constitutional right occurred, the court can examine "whether the right was clearly established ... in light of the specific context of the case, not as a broad general proposition." *Saucier,* 533 U.S. 194 at 201, 121 S.Ct. 2151, 150 L.Ed.2d 272. "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier,* 533 U.S. at 201, 121 S.Ct. at 2156. Because Plaintiff has not sufficiently alleged that any of the Defendants have violated his constitutional rights, "there is no necessity for further inquiries concerning qualified immunity."

**VI. Conclusion**

Plaintiff's recounting of the facts is conclusory at best and wholly fantastic. Plaintiff claims that he is the target of a "massive conspiracy" to infect him with three "life-time" viruses; contaminate his food; and destroy his mail. Plaintiff claims that spanish inmates have been putting "LA-BINE-YA" on Plaintiff's food tray, which he describes as "sealed ketchup with blood inside." Plaintiff also claims that spanish officers are giving out Plaintiff's personal information; Plaintiff is being kept at "mental health level one" and medicated to prevent him from litigating his actions in the courts; he has been deliberately infected with Hepatitis A, H. pylori, and herpes; and his food has been contaminated with feces, sperm, blood, urine, and chemicals. Additionally, Plaintiff alleges that as part of this conspiracy, his whole family has been murdered. Plaintiff claims that "[t]his is the biggest conspiracy in the history of the United States." Comp. at 26.

Even reading Plaintiff's Complaint in the most generous manner, the Court finds Plaintiff's allegations as a whole to be unbelievable. Moreover, Plaintiff's history of mental illness, as documented in the psychiatric evaluations attached as exhibits to Plaintiff's Complaint (*see* Comp., Exhibits at 8-15), further supports a finding that his allegations are the product of delusion. The Court finds that the Complaint is factually frivolous under the standards delineated in *Denton, Neitzke,* and *Livingston* (*see* Section V.C., *supra* ) and therefore dismisses the Complaint in its entirety.[FN10]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN10. Since the Complaint has been found to be factually frivolous, it "is exactly the sort of case that the PLRA now requires that a district court dismiss 'before docketing, if feasible' ... [since a]llowing these frivolous suits to proceed would subject the prospective defendants to the type of inconvenience and expense that concerned the Supreme Court in *Neitzke*...." *Jones v. City of New York,* Nos. Civ.A. 99-8281 and Civ.A. CV-00-370, 2000 WL 516889, at *3 (E.D.N.Y. Mar.15, 2000). Moreover, because the problem with Plaintiff's complaint is substantive, such that a better pleading will not cure it, leave to re-plead is denied as futile. *See* *Cuocco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000).

WHEREFORE, based on the findings above, it is hereby

ORDERED, that Defendants' Motion to Dismiss (Dkt. No. 50) is **GRANTED** and Plaintiff's claims and all Defendants are **dismissed in their entirety without prejudice;**[FN11] and it is further

FN11. While Defendants Correctional Officer Smith, W. Robinson, and Nurse Smith have not been served or appeared, because all of Plaintiff's claims have been dismissed in their entirety, this action is dismissed as to the unserved Defendants as well.

***16** ORDERED that the Clerk shall serve a copy of this Memorandum-Decision and Order upon the parties in accordance with the Local Rules.

N.D.N.Y.,2009.
Brown v. Eagen
Slip Copy, 2009 WL 815724 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



C
Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Gabriel MIDALGO, Plaintiff,
v.
Sgt. BASS, Spinner, C.O. Streeter, John Doe,[FN1] Head Medical Staff, C.O. Bennet,[FN2] Sgt. Trimm, C.O. Bouyea, Defendants.

FN1. Defendant John Doe has not been identified and therefore has not been served with the Amended Complaint or otherwise appeared in this action. *See* Dkt No 12.

FN2. Plaintiff mistakenly spells Defendant Bennett's name as "Bennet." *See* Dkt. No. 23, Answer at n. 1. The Court will refer to this Defendant by the proper spelling.

**No. 9:03-CV-1128 (NAM/RFT).**

Sept. 26, 2006.

Gabriel Midalgo, Plaintiff, Pro Se.

Eliot Spitzer, Attorney General for the State of New York, Senta B. Siuda, Esq., Assistant Attorney General, Syracuse, NY, Attorney for Defendants.

**MEMORANDUM-DECISION AND ORDER**

NORMAN A. MORDUE, Chief U.S. District Judge.

***1** Presently before this Court is defendants' motion (Dkt. No. 105) for summary judgment dismissing the complaint in this civil rights action pursuant to 42 U.S.C. § 1983. In his amended complaint (Dkt. No. 8), plaintiff, an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), alleges deliberate indifference towards his health and safety in violation of the Eighth Amendment, interference with mail and access to the law library in violation of the First Amendment, inadequate visitation, and harassment.

Defendants' motion was referred to United States Magistrate Judge Randolph F. Treece for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c). In a thorough Report and Recommendation (Dkt. No. 110), Magistrate Judge Treece recommends that the Court grant the motion for summary judgment. Plaintiff objects (Dkt. No. 112). After the Court extended time for plaintiff to file additional objections to the Report-Recommendation (Dkt. No. 113), plaintiff filed a second objection (Dkt. No. 114).

Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court conducts a *de novo* review of those parts of a magistrate judge's Report and Recommendation to which a party specifically objects. Where only general objections are filed, the Court reviews for clear error. *See* *Brown v. Peters,* 1997 WL 599355,*2-* 3 (N.D.N.Y.), *aff'd without op.,* 175 F.3d 1007 (2d Cir.1999). Failure to object to any portion of a Report and Recommendation waives further judicial review of the matters therein. *See* *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993).

Plaintiff's objections include a variety of allegations. A number of them revisit issues which are the subject of the Report and Recommendation. They do not, however, demonstrate the existence of material questions of fact which would warrant denial of summary judgment. Other allegations concern events allegedly occurring subsequent to the filing of the amended complaint herein; these are not properly the subject of this action. Upon thorough *de novo* review, the Court accepts and adopts the Report and Recommendation.

It is therefore

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

ORDERED that the Report and Recommendation (Dkt. No. 110) is accepted and adopted in its entirety; and it is further

ORDERED that defendants' motion for summary judgment (Dkt. No. 105) is granted and the action is dismissed.

IT IS SO ORDERED.
RANDOLPH F. TREECE, Magistrate Judge.

***REPORT-RECOMMENDATION and ORDER***

Pro se Plaintiff Gabriel Midalgo brings a civil action pursuant to 42 U.S.C. § 1983, alleging deliberate indifference towards his health and safety in violation of the Eighth Amendment, interference with mail and access to the law library in violation of the First Amendment, inadequate visitation, and harassment. Dkt. No. 8, Am. Compl. at ¶¶ 42-54. Defendants Bass, Sergeant at the Upstate Correctional Facility ("Upstate"), Correction Officer ("C.O.") Spinner, C.O. Streeter, C.O. Bennett, Trimm, Sergeant at Upstate, and C.O. Bouyea, bring this Motion for Summary Judgment. Dkt. No. 105. Plaintiff opposes the Motion. Dkt. No. 106. For the reasons to follow, it is recommended that the Motion for Summary Judgment be **granted.**

## I. FACTS[FN3]

FN3. Plaintiff's response to the Motion for Summary Judgment fails to comport with the requirements of the Local Rules for the Northern District of New York. Plaintiff only submitted a Memorandum of Law and some Exhibits but did not provide a Statement of Material Facts as required. *See* N.D.N.Y.L.R. 7.1(a). Normally, if no Statement of Material Facts are filed, Defendants' Statement of Material Facts are deemed admitted. N.D.N.Y.L.R. 7.1(a)(3). This Court, nonetheless, will proceed to decide this Motion with the aid of Defendants' Statement of Material Facts with accompanying Exhibits and Plaintiff's Verified Amended Complaint with Exhibits. Although no exhibits were attached to the Amended Complaint on the Docket Report, attachments were available with the Original Complaint and will hereby be incorporated into the Amended Complaint. *See* Dkt. Nos. 1 & 8.

***2** During the period of time of the alleged incidents, Plaintiff was incarcerated at the Upstate Correctional Facility. Dkt. No. 105, Defs.' 7.1 Statement at ¶ 3. In December 2002, an inmate was placed in Plaintiff's cell who Plaintiff alleges "was a paid informant." Am. Compl. at ¶ 16. Plaintiff further alleges that a wiretap was also placed in his cell during that time. *Id.* On February 4, 2003, Plaintiff wrote letters to the mail clerk and warden regarding his misplaced or delayed newspaper and magazine subscriptions and was told that they were handed out by correction officers. *Id.* at ¶ 23, Ex. C, Lt. to Warden, dated Feb. 4, 2003; Lt. to Mail Clerk, dated Feb. 4, 2003; Lt. from Nason to Midalgo, dated Feb. 10, 2003. Plaintiff believed his subscriptions had been misplaced or delayed since January 2003. *Id.* at ¶ 22. Plaintiff's complaints about his subscriptions were forwarded to the Deputy Superintendent of Programs. *Id.* at ¶ 23, Ex. C, Lt. from Girdich to Midalgo, dated Feb. 5, 2003. Several months later, Plaintiff alleged he still had not received his magazines and newspapers and thus canceled his subscriptions. *Id.* at ¶ 24, Ex. C, Lts. to F.H.M. & Maxim, dated Apr. 21, 2003. Then, on April 20, 2003, Plaintiff's family arrived for a visit but were delayed for several hours in seeing him. *Id.* at ¶ 25. Plaintiff also claims that on April 24, 2003, and from June to September 2003, he received rotten fruits and vegetables and spoiled milk at meal time on several occasions.[FN4] *Id.* at ¶¶ 26 & 28. On April 26, 2003, Plaintiff wrote a complaint where he grieved that an officer took an excessive amount of time to read his legal mail, he received rotten food, there was a delay in visitation with his family, magazine and newspapers were intercepted and either destroyed or misplaced, his cell was wiretapped, and the outgoing and incoming mail was being read. *Id.,* Ex. A, Grievance, dated Apr. 26, 2003. Since Plaintiff received no response, he submitted a letter seeking an appeal to the Superintendent.[FN5] *Id.,* Grievance Lt., dated May 27, 2003.

FN4. Plaintiff does not provide any specific dates as to when he received rotten or spoiled

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

food.

FN5. It is unknown to this Court whether a response from the Superintendent was received.

On June 21, 2003, Plaintiff filed a grievance concerning "continuous harassment" regarding Plaintiff's legal mail as well as complaints made about his food and recreation. Defs.' 7.1 Statement, Ex. A, Grievance, dated June 21, 2003, & Case History & Record, UST 16208-03. C.O. Streeter provided a memo based on Plaintiff's grievance stating that he did not provide Plaintiff with spoiled food and that the meal "is inspected and packed in the mess" and then it is inspected once again by him prior to going into Plaintiff's cell. *Id.,* Ex. A, Streeter Lt. to Sgt. King, dated July 20, 2003. Correction Officers Spinner and Trimm also submitted memos regarding the grievance and noted they did not refuse recreation time and the grievance may have been a result of a misbehavior report filed against Plaintiff. *Id.,* Ex. A, Spinner Lt. to Sgt. King, dated July 23, 2003, & Trimm Lt. to Sgt. King, dated July 29, 2003. Sergeant King then submitted a memo to Captain Bezio stating that after he spoke to Plaintiff, and after interviewing several corrections officers on the matter, he could find no evidence to support the allegations. *Id.,* Ex. A, Sgt. King Lt. to Captain Bezio, dated Aug. 1, 2003. Based on the above investigation, the Inmate Grievance Resolution Committee ("IGRC") recommended that the grievance complaint pass through to the Superintendent. *Id.,* Ex. A, Case History & Record on Grievance dated June 21, 2003. Thereafter, the Superintendent found that the complaint had been investigated and that there was "no evidence to support [the] complaint[.]" *Id.,* Ex. A, Superintendent's Appeal, dated Aug. 6, 2003. Plaintiff then appealed to the Central Office Review Committee ("CORC"). The CORC made several findings which included that the Superintendent's determination be upheld based on the same reasoning provided by the Superintendent and that there was no substantiation to the claim that Plaintiff was harassed nor was there sufficient evidence to conclude there was harassment and that performance of the employees' duties should not be construed as harassment.[FN6] *Id.,* Ex. A, CORC Appeal, dated Oct. 1, 2003.

FN6. The CORC also stated that no grievances were received by the IGRC in April or May 2003, as Plaintiff has alleged he filed grievances during those months. Defs.' 7.1 Statement, Ex. A, CORC Appeal, dated Oct. 1, 2003; Am. Compl., Ex. A; *see also supra* p. 3.

***3** On June 27, 2003, a Fight Investigation Form was prepared by Sergeant Bass. Am. Compl., Ex. "Exhaustion of my Administrative Remedies ... [with fight investigation] ...," Fight Investigation Form, dated June 27, 2003. The form had a notation stating that Midalgo purportedly was defending himself in a fight he had with his cellmate because they had been in rival gangs. *Id.* The Sergeant's assessment was that it was a real fight and they were in rival gangs. *Id.* After the fight, Midalgo and his cellmate were placed in different cells. *Id.*

On July 1, 2003, Plaintiff sent Captain Bezio a letter stating that a known enemy had been placed in his cell and that his cell had been searched and that no contraband slip was received by Plaintiff.[FN7] Defs.' 7.1 Statement, Ex. A, Pl.'s Lt., dated July 1, 2003. Captain Bezio responded stating that an investigation had been completed as to the issues Plaintiff had raised. *Id.,* Ex. A, DOCS Lt. from Captain Bezio, dated July 14, 2003. In Captain Bezio's letter, he noted that Sergeant Trimm interviewed Plaintiff about the missing materials but that Plaintiff did not provide any information. *Id.* Furthermore, the facility records were reviewed and it was found that there were no documented enemies of Plaintiff at the facility. *Id.*

FN7. It is unclear to this Court as to which cellmate Plaintiff referred to as a known enemy in the grievance.

On July 10, 2003, Plaintiff filed a grievance regarding bunking with an alleged known enemy, harassment, and other complaints. *Id .,* Ex. A, Grievance, dated July 10, 2003. C.O. Spinner submitted a memo to Sergeant Trimm stating that no legal material was removed from the cell and only items which were of excess were removed and logged, for which Plaintiff received a copy. *Id.,* Ex. A, Spinner Lt. to Sgt. Trimm, dated July 6, 2003. The Cell Search or Inspection Notice listed the items that were removed. *Id.,* Ex. A, Cell Search or Inspection Notice, dated June 27, 2003. Similarly, Sergeant Trimm sent a memo to Captain Bezio on July 6, 2003, stating that he

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

had interviewed Plaintiff and that Plaintiff could provide no information as to the law books removed or any legal work that was missing. *Id.,* Ex. A, Sgt. Trimm Lt. to Captain Bezio, dated July 6, 2003. In addition, Trimm stated that Midalgo was not in a cell with a known enemy. *Id.* The IGRC recommended that the grievance complaint filed pass through to the Superintendent. *Id.,* Ex. A, Case History & Record for Grievance dated July 10, 2003. The Superintendent found that after an investigation, there was no evidence to show that Plaintiff was placed in a cell with a known enemy and that inmates are bunked together based on "[a]n assessment of compatibility" and that there was no evidence to support any of the other complaints. *Id.,* Ex. A, Superintendent's Appeal, dated July 15, 2003. Plaintiff appealed to the CORC, which found the complaint to be without merit.[FN8] *Id.,* Ex. A, CORC Appeal, dated Aug. 20, 2003.

FN8. Once again, the CORC noted that IGRC had not received grievances on April 26 or June 21, 2003, as Plaintiff has alleged he filed grievances on those dates. Am. Compl. at ¶ 27; Defs.' 7.1 Statement, Ex. A, CORC Appeal, dated Aug. 20, 2003.

On July 17, 2003, Plaintiff wrote to food services stating he was receiving spoiled food. Am. Compl., Ex. "Exhaustion of my Administrative Remedies Some Material Lost ...," Food Services Lt., dated July 17, 2003. On August 5, 2003, in a letter from Captain Racette to Plaintiff, Captain Racette stated that after conducting an investigation "a check with the messhall indicates that the trays were received in the proper condition" and that no other inmate had any problems with the trays. *Id.,* Ex. "Exhaustion of my Administrative Remedies Some Material Lost ...," Mem. from Captain Racette, dated Aug. 5, 2003.

***4** On July 28, 2003, Plaintiff received a letter stating two books he was requesting from the law library were not required to be provided by the facility's law library and that the other book he sought should be available and if it was missing, then a replacement would be ordered. *Id.,* Ex. D, Lt. from Litzenberger, dated July 28, 2003. On August 3, 2003, Plaintiff wrote a letter to Jean Botta stating that the library staff was refusing to provide him with a law book and that he had been told that two books were not available at the facility.[FN9] *Id.,* Ex. D, Lt. to Botta, dated Aug. 3, 2003. Then, on August 4, 2003, Plaintiff submitted a letter to "D.S.G. Kiebert" stating he was receiving the wrong books and cases from the law library.[FN10] *Id.,* Ex. C, Lt., dated Aug. 4, 2003. He also noted that he did not receive a law book that was supposed to be available. *Id.* On August 5, 2003, Midalgo received a memo from Captain Racette stating that his complaints were investigated and that when Plaintiff was interviewed, he did not provide any further information, which resulted in a finding that the staff acted properly. *Id.,* Ex. "Exhaustion of my Administrative Remedies Some Material Lost ...," Mem. from Captain Racette, dated Aug. 5, 2003. On August 19, 2003, Plaintiff received a letter from the Law Library Supervisor, C.O. Bennett, stating one book requested was available but since it was in looseleaf and because Plaintiff was in SHU, he could request a photocopy of the materials. *Id.,* Ex. D., Lt. from Bennett, dated Aug. 19, 2003.

FN9. Jean Botta is not named as Defendant in this action.

FN10. "D.S.G. Kiebert" is also not named as a Defendant in this action.

## II. DISCUSSION

### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that there is no genuine issue of material fact. *F.D.I. C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

To defeat a motion for summary judgment, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts submitted by the moving party. FED. R. CIV. P. 56(e); *see also* *Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) and *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)).

***5** When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994).

### B. Eleventh Amendment

Plaintiff brings suit against Defendants Bass, Spinner, Streeter, Bennett, Trimm, and Bouyea in both their individual and official capacities. *See* Am. Compl. Plaintiff seeks injunctive relief as well as compensatory damages against these individuals in their individual and official capacities. *Id.* at Wherefore Clause.

The Eleventh Amendment states "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. The Eleventh Amendment bars a suit against the state in federal court unless the state consents to being sued or Congress legislatively overrides a state's immunity. *Huang v. Johnson,* 251 F.3d 65, 69 (2d Cir.2000). The state's immunity extends to state officials "act[ing] on behalf of the state" when the state is the "real, substantial party in interest." *Id.* at 69-70 (citing *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddie, Inc.,* 506 U.S. 139, 142-47 (1993) & quoting *Pennhurst State School and Hosp. v. Halderman,* 465 U.S. 89, 101-02 (1984)). Moreover, the Eleventh Amendment will bar recovery for money damages in a suit "against state officials in their official capacities." *Ford v. Reynolds,* 316 F.3d 351, 354 (2d Cir.2003).

Therefore, the Defendants cannot be sued in their official capacities in a claim for money damages. However, Midalgo may seek damages from them in their individual capacities. Furthermore, Plaintiff may sue the Defendants for injunctive relief in both their individual and official capacities because "official-capacity actions for prospective relief are not treated as actions against the State." *Cruz v. Gomez,* 202 F.3d 593, 595 n. 2 (2d Cir.2000) (quoting *Will v. Michigan Dep't of State Police,* 491 U .S. 58, 71 n. 10 (1989)).

### C. Exhaustion of Remedies

Defendants claim that Plaintiff has failed to exhaust his administrative remedies as to the following claims: 1) medical care; [FN11] 2) mail tampering; 3) law library issues; and 4) family visitation. Dkt. No. 105, Defs.' Mem. of Law at p. 4.

FN11. As to Plaintiff's medical care claim, Plaintiff may have grieved his medical care issues. *See* Am. Compl., Ex. "Exhaustion of my Administrative Remedies Some Material Lost ...," Grievance, dated Aug. 13, 2003. However, since the Eighth Amendment medical indifference claim is against the John Doe

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Defendant who was never identified nor appeared in this action, the issue will not be addressed further.

The Prisoner Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997(e)(a), states that "[n]o action shall be brought with respect to prison conditions under [section 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." This exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002); *see also* *Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir.2004).

***6** The New York State Department of Corrections has created a three-step process to exhaust all administrative remedies available to inmates. *See* *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004). First, the inmate must file a grievance complaint with the Grievance Clerk within fourteen (14) days of the incident. N.Y. COMP.CODES R. & REGS. tit. 7, § 701.7(a)(1). The complaint is then submitted to the IGRC to review the grievance. N.Y. COMP.CODES R. & REGS. tit. 7, § 701.7(a)(2)-(5). Second, the inmate may appeal the IGRC decision to the Superintendent. *See* N.Y. COMP.CODES R. & REGS. tit. 7, § 701.7(b). Third, if the inmate appeals the Superintendent's determination, the CORC is to make a final administrative determination. N.Y. COMP.CODES R. & REGS. tit. 7, § 701.7(c). Upon the completion of all three steps, an inmate may "seek relief pursuant to 42 U.S.C. § 1983." *Colon v. Harvey,* 344 F.Supp.2d 896, 897 (W.D.N.Y.2004) (citing *Neal v. Goord* 267 F.3d 116, 122 (2d Cir.2001) & *Santos v. Hauck,* 242 F.Supp.2d 257, 259 (W.D.N.Y.2003)). Moreover, "[e]ven if a prisoner receives no reply to a grievance or appeal, he is not excused from completing the appeals process. The rules provide that matters not decided within the prescribed time limits must be appealed to the next level of review." *Walters v. Carpenter,* 2004 WL 1403301, at *3 (S.D.N.Y. June 22, 2004) (citing N.Y. COMP. CODES R. & REGS. tit. 7, § 701.8 [FN12] & *Mendoza v. Goord,* 2002 WL 31654855, at *2 (S.D.N.Y. Nov. 21, 2002)).

FN12. N.Y. COMP.CODES R. & REGS. tit. 7, § 701.8 states: "[t]ime limit extensions may be requested at any level of review, but such extensions may be granted only with the written consent of the grievant. Absent such extension, matters not decided within the time limits may be appealed to the next step."

The Second Circuit has suggested a three-step inquiry when the inmate opposes a defendant's assertion that the inmate did not exhaust his remedies.

> Depending on the inmate's explanation for the alleged failure to exhaust, the court must ask whether administrative remedies were in fact "available" to the prisoner. *Abney v. McGinnis,* 380 F.3d 663, 667-68 (2d. Cir.2004). The court should also inquire as to whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, *Johnson v. Testman,* 380 F.3d 691, 695 (2d. Cir.2004), or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense, *Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir.2004). If the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped and have not forfeited their non-exhaustion defense, but that the plaintiff nevertheless did not exhaust available remedies, the court should consider whether "special circumstances" have been plausibly alleged that justify "the prisoner's failure to comply with administrative procedural requirements." *Giano v. Goord,* 380 F.3d at 675 (citing *Berry v. Kerik,* 366 F.3d 85, 88 (2d Cir.2003); *Rodriguez* order).

*Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004); *see also* *Braham v. Clancy,* 425 F.3d 177, 181-82 (2d Cir.2005).

***7** Since failure to exhaust is an affirmative defense and defendants may be estopped from asserting the defense as "special circumstances may excuse a prisoner's failure to exhaust," the specific circumstances of each case must be examined. *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004) (citations omitted). Some special circumstances include, but are not limited to, occasions when prison

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

officials "inhibit an inmate's ability to utilize administrative grievance procedures," if the prisoner received a favorable disposition from his grievance but the time to appeal had expired and no relief was forthcoming, and all appeals were undertaken but prison officials did not respond within the required time period. *Id.* at 677. The effect of a plaintiff's justification as to why there was no exhaustion "is that, even though the administrative remedies are no longer available for reasons of timing or other procedural restrictions, such restrictions cannot serve to keep the plaintiff's suit from proceeding." *Id.* at 676. Additionally, "exhausted claims filed alongside unexhausted ones may proceed even though the unexhausted claims must be dismissed." *Id.* at 675.

Here, the Amended Complaint was filed on October 24, 2003. Dkt. No. 8. Any grievances filed subsequent to that date are untimely and irrelevant to the current action.[FN13] Therefore, only grievances filed prior to the date the Amended Complaint was filed will be considered.

> FN13. As Exhibits to their 7.1 Statement, Defendants include grievances filed by Plaintiff on April 27, 2004, and May 20, 2004, which clearly were submitted after the filing of the Amended Complaint.

Plaintiff's June 21st complaint grieved the issues of harassment, food, and recreation. *See* Defs.' 7.1 Statement, Ex. A, Grievance, dated June 21, 2003. Plaintiff's other complaint in July addressed the issues of a known enemy in his cell, harassment, and a cell search where items were taken. *Id.,* Ex. A., Grievance, dated July 10, 2003. Both of these grievances were appealed to the Superintendent and CORC, thus, they are exhausted.

As to Plaintiff's claims regarding the law library, outgoing/incoming mail, and visitation, Defendants assert such were not fully exhausted. Plaintiff states that he did exhaust all his remedies as shown by the Exhibits to his Amended Complaint. Dkt. No. 106, Pl.'s Mem. of Law at Point Two. Plaintiff claims that Defendant Spinner destroyed legal documents that showed he attempted to exhaust. *Id.* Midalgo also alleges that he "filed and appealed at least ten grievances" and that "more than half were ignored or intercepted" by Defendant Streeter. *Id.*

Plaintiff did provide a copy of his grievance on the law library, outgoing/incoming mail, and visitation issues, which was dated April 26, 2003; however, the CORC stated they never received any grievances from April 2003. Am. Compl., Ex. A, Grievance, dated Apr. 26, 2003; Defs.' 7.1 Statement, Ex. A, CORC Appeal, dated Oct. 1, 2003. Plaintiff also submitted a letter stating that since he received no response that he sought an appeal to the Superintendent. Am. Compl., Ex. A, Grievance Lt., dated May 27, 2003. No other appeals were instituted on that grievance. Nonetheless, even if the CORC stated they did not receive the grievance, Plaintiff attempted to fulfill the exhaustion requirement by seeking an appeal to the next level as required when he received no response. *See* *Walters v. Carpenter,* 2004 WL 1403301, at *3; N.Y. COMP.CODES R. & REGS . tit. 7, § 701.8.

***8** Since Defendants put forth the affirmative defense of failure to exhaust, this Court will make the three-step inquiry set forth by the Second Circuit. With the first inquiry, depending on the prisoner's explanation, the Court must decide whether the remedies were "available." " 'Available' means more than the mere presence of a grievance system but also that the system is functionally available to the prisoner." *Shaheen v. Hollins,* 2005 WL 2179400, at *3 (N.D.N.Y. Sept. 7, 2005) (citing *Hemphill v.. New York,* 380 F.3d at 686-87 ("[I]n some circumstances, the behavior of the defendants may render administrative remedies unavailable.")); *see also* *Abbas v. Senkowski,* 2005 WL 2179426, at *6 (S.D.N.Y. Sept. 9, 2005). The "proper test for determining whether ordinary grievance procedures were 'available' [is] whether 'a similarly situated individual of ordinary firmness [would] have deemed them available.' " *McCullough v. Burroughs,* 2005 WL 3164248, at *3 (E.D.N.Y. Nov. 29, 2005) (quoting *Hemphill v. New York,* 380 F.3d at 688). In addition, "threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system, or to external structures of authority such as state or federal courts." *McCullough,* 2005 WL 3164248, at *3 (quoting *Hemphill v. New York,* 380 F.3d at 688). Here, administrative remedies were available as a similarly situated inmate of ordinary firmness could deem the remedies available and because Plaintiff stated he did actually file the grievances, copies

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

of which were provided to the Court.

As remedies were "available," it must be determined if the Defendants' own actions estop them from raising the failure to exhaust affirmative defense. The Second Circuit has held that "prison officials' threats or other inhibiting conduct may estop defendants from asserting the affirmative defense of non-exhaustion." *Hemphill v. New York,* 380 F.3d at 688. Also, in making a determination based on the second inquiry, "[t]o establish equitable estoppel, the party claiming estoppel must show: (1) a misrepresentation by the opposing party; (2) reasonable reliance on that misrepresentation; and (3) detriment." *McCullough,* 2005 WL 3164248, at *4 (quoting *Lewis v. Washington,* 300 F.3d 829, 834 (7th Cir.2002)). In addition, "[w]hen asserting equitable estoppel against the government, one must also prove affirmative misconduct." *McCullough,* 2005 WL 3164248, at *4 (quoting *Lewis v. Washington,* 300 F.3d at 834). In this case, Plaintiff claims that Defendant Spinner destroyed legal documents showing he attempted to exhaust his administrative remedies and that "more than half [of the grievances] were ignored or intercepted" by Defendant Streeter. Pl.'s Mem. of Law at Point Two. Plaintiff's claim raises a matter of credibility but, for the purposes of this Motion, drawing all inferences in favor of Plaintiff, since Plaintiff set forth allegations of affirmative misconduct that could be considered "inhibiting," Defendants shall be deemed estopped from asserting the affirmative defense of failure to exhaust. Since we are considering Defendants actions as inhibiting, again for the purposes of this Motion, the claims will be deemed exhausted.

**D. Eighth Amendment Claims**

***9** Plaintiff alleges that Defendants Bass and Trimm were deliberately indifferent to his health and safety when they placed incompatible cellmates or known enemies in Plaintiff's cell. Am. Compl. at ¶ 42. Plaintiff also contends that Defendants Bouyea, Spinner, and Streeter served him spoiled food which caused him psychological harm. *Id.* at ¶ 54.

The Eighth Amendment to the U.S. Constitution prohibits cruel and unusual punishment. Prohibited punishment includes that which "involve[s] the unnecessary and wanton infliction of pain." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173 (1976)). To state a claim under § 1983, the inmate "must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice." *Hayes v. New York City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir.1996).

The Supreme Court has delineated a two-part test for deliberate indifference. First, the "depravation alleged must be, objectively, sufficiently serious," and "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer v. Brennan,* 511 U.S. 825, 834 (1994) (internal quotation marks and citations omitted). Second, the prison official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837; *see also* *Hayes v. New York City Dep't of Corr.,* 84 F.3d at 620.

The Eighth Amendment also imposes on prison officials "a duty ... to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan,* 511 U.S. at 833 (citation omitted). Nonetheless, prison officials may not be constitutionally liable for every injury an inmate suffers at the hands of other inmates. *Id.* at 834. A plaintiff may recovery for injuries received while in custody "if the injury resulted from the defendant prison official's purposeful subjection of the prisoner to a 'substantial risk of serious harm' or from the official's deliberate indifference to that risk." *Fischl v. Armitage,* 128 F.3d 50, 55 (2d Cir.1997) (quoting *Farmer v. Brennan,* 511 U.S. at 834). The Second Circuit has stated that "[t]he failure of custodial officers to employ reasonable measures to protect an inmate from violence by other prison residents has been considered cruel and unusual punishment." *Ayers v. Coughlin,* 780 F.2d 205, 209 (2d Cir.1985) (citing *United States v. Bailey,* 444 U.S. 394, 423 (1980)). However, "[a]n isolated omission to act by the state prison guard does not support a claim under section 1983 absent circumstances indicating an evil intent, or recklessness, or at least deliberate indifference to the consequences of his conduct for those under his control and dependent upon him." *Id.* (quoting *Williams v. Vincent,* 508 F.2d 541, 546 (2d Cir.1974)). Instead, "reckless disregard of plaintiff['s] right to be free from attacks by other inmates may be

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

shown by the existence of a pervasive risk of harm to inmates from other prisoners and a failure by prison officials to reasonably respond to that risk." *Knowles v. New York City Dep't of Corr.,* 904 F.Supp. 217, 221-22 (S.D.N.Y .1995) (citing *Rucco v. Howard,* 1993 WL 299296, at *4 (S.D.N.Y. Aug. 4, 1993) & *Martin v. White,* 742 F.2d 469, 474 (8th Cir.1984)) (internal quotation marks omitted) (alteration in original). Furthermore, "an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference." *Sims v. Bowen,* 1998 WL 146409, at *3 (N.D.N.Y. Mar. 23, 1998). Moreover, there is no constitutional right to the cellmate of a prisoner's choice even if a prisoner is not getting along with his cellmate. *Harris v. Greer,* 750 F.2d 617, 618 (7th Cir.1984).

***10** Here, Plaintiff claims a known enemy was placed in his cell. Midalgo states that he filed a grievance expressing his fear that he would be placed with a "known or made for hire enemy" and that on June 27, 2003, he was bunked with a known enemy and a fight broke out where Plaintiff suffered injuries to his face, eye, knees, and tricep. Am. Compl. at ¶¶ 27 & 31. However, Captain Bezio stated in a letter to Midalgo that "there [was] no evidence to indicate that [he] was placed in a cell with a known enemy. A review of facility records reveal[ed] that there [were] no documented enemies of [his] at [the] facility" and that if an inmate should be considered an enemy, Midalgo should contact the assigned Correction Counselor. Defs.' 7.1 Statement, Ex. A, DOCS Lt. from Captain Bezio, dated July 14, 2003. Defendant Trimm also conducted an investigation into the grievance and found that there was no evidence that there was a known enemy placed in Midalgo's cell. *Id.,* Ex. A, Sgt. Trimm Lt. to Captain Bezio, dated July 6, 2003. Even the Superintendent stated that inmates were bunked based on compatibility. *Id.,* Ex. A, Superintendent's Appeal, dated July 15, 2003.

When questioned about how Plaintiff knew there was a known enemy placed in his cell, Plaintiff stated that his "circumstantial evidence clearly proves that [he] was placed in the cell with a known enemy. The timing, the dates, [his] grievances, [his] appeals, the coincidences, everything[.]" Dkt. No. 105, Ex. A., Pl.'s Dep. at p. 63, lines 5-8. He also stated he told his correction counselor he was in danger from "all gang members" but then stated that he did not tell his counselor anything of such nature since "there was no counselor for [him] to speak to" until after the incident occurred. *Id.* at pp. 63, lines 12-14, 64, lines 17-20, & 65, lines 17-23. Plaintiff further stated that the fights he had with his cellmate occurred because his cellmate made "homosexual advances" on him. *Id.* at p. 16, line 14. After that cellmate, Plaintiff had approximately twenty (20) more cellmates because "things weren't working out" and he was fighting with them as well over alleged homosexual advances. *Id.* at pp. 25, lines 11-14 & 30, lines 21-24, & 31, lines 1-11. Plaintiff stated he had "plenty of fights" with other cellmates. *Id.* at p. 31, lines 16-24.

Midalgo has failed to meet the Eighth Amendment standard of deliberate indifference. First, Midalgo must show that he was incarcerated under conditions that posed a substantial risk of serious harm. Plaintiff has stated he fought with many of his cellmates and was injured, especially with his first cellmate whom "Sergeant Bass thought was a rival gang member." Am. Compl., Ex. "Exhaustion of my Administrative Remedies ... [with fight investigation] ...," Fight Investigation Form, dated June. 27, 2003. However, Plaintiff has not shown that the injuries he received were based on the purposeful subjection of Midalgo to a substantial risk of serious harm or by deliberate indifference to the risk. Plaintiff's claims were investigated and found to be without merit as there were no known enemies in the facility. Furthermore, after Plaintiff's fight with his cellmate, they were separated and placed in different cells. *Id.* Moreover, Plaintiff, over time, had numerous cellmates because they were not compatible. Prison officials took appropriate measures to protect Midalgo after the fights by removing the other inmate from the cell. Therefore, Plaintiff has failed to prove that any depravation alleged was serious and that he was incarcerated under conditions that posed a substantial risk of harm.

***11** Even if Plaintiff could satisfy the first prong, Plaintiff clearly fails on the second prong. Midalgo has not shown that the Defendants knew of and disregarded an excessive risk to his health or safety. This is evidenced by the fact that he had nearly twenty other cellmates. He was not forced to bunk with another cellmate for an extended period of time. Even with his first cellmate, he only bunked with him for a month or so. Pl.'s Dep. at pp. 16,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

lines 12-24, & 17, lines 1-3. Investigations were conducted into the matter and no evidence was found to support Plaintiff's claim that there was a known enemy placed in his cell. Plaintiff also admitted that many of his fights were because he thought other inmates were making homosexual advances towards him. *Id.* at pp. 30, lines 21-24, & 31, lines 1-11. Although there is a duty to protect placed on prison officials, the injuries were not a result of indifference on the part of the officials. Furthermore, Plaintiff did not inform the correction officials of his belief until a fight ensued. *Id.* at p. 65, lines 22-23. Plaintiff seemingly would prefer to choose his own cellmate, however inmates do not possess such a right, and the Superintendent noted that cellmates were chosen based on compatibility.

Plaintiff also claims that Defendants Spinner, Streeter, and Bouyea brought him spoiled or rotten food on several occasions and that from June to September 2003, Defendants Spinner and Streeter served Midalgo “moldy cheese, bread, spoiled milk and rotten fruits .” *Id.* at p. 14, lines 3-6; Am. Compl. at ¶ 28.

The Eighth Amendment places a duty upon prison officials to ensure that prisoners receive adequate food. *Farmer v. Brennan,* 511 U.S. at 832. In that context, prisoners are to be provided with “nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it.” *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (citation omitted); *see also Lunney v. Brureton,* 2005 WL 121720, at *6 (S.D.N.Y. Jan. 21, 2005).

Here, C.O. Streeter stated that he did not provide Plaintiff with spoiled food and that meals are inspected and placed on the trays at the messhall and then are further inspected once again by him prior to Plaintiff receiving the food. Defs.' 7.1 Statement, Ex. A, Streeter Lt. to Sgt. King, dated July 20, 2003. The Superintendent found no evidence to support Plaintiff's claim on this issue. *Id.,* Ex. A, Superintendent's Appeal, dated Aug. 6, 2003. Plaintiff admits that the officers do not prepare food trays and that they merely inspect them before they get to Plaintiff. Pl.'s Dep. at pp. 36, lines 19-24, & 37, lines 1-5. Midalgo also stated that while in the normal population, all the meals are sealed but in SHU some items are not sealed, however some do remain sealed such as cheese and meat. *Id.* at p. 38, lines 2-14. Plaintiff further stated that he received expired milk from the correction officers and that Defendants Spinner and Streeter provided spoiled food during breakfast and lunch from June to September 2003. *Id.* at pp. 41, lines 23-24, 42, lines 1-13, 50, lines 16-24, & 51, lines 1-12. On October 10, 2003, Plaintiff received a memo from the Food Services Administrator stating that his kosher meal was prepared in accordance with the guidelines set by the Department of Correctional Services. Pl.'s Mem. of Law, Ex., Inter-Departmental Memo from Haug to Midalgo, dated Oct. 10, 2003. The memo also states that items such as milk and bread are prepackaged and the trays are checked and wrapped with cellophane before they are delivered to the inmates. *Id.* The Superintendent further stated that after an investigation was conducted with the Food Service Administrator, since the food is prepackaged, contact between an officer and the trays are limited. Pl.'s Mem. of Law, Ex. Superintendent's Appeal, dated Oct. 28, 2003. Midalgo states, however, that he had to beg other prisoners to sell him food so that he “wouldn't starve or get sick” and that as a result he received psychological harm which include “anxiety, nightmares about being poisoned, delusions and dizziness.” *Id.* at p. 50; Am. Compl. at ¶ 54.

***12** Prison officials are required to provide nutritionally adequate meals that are served under conditions which do not present an immediate danger to the health and well being of an inmate. Here, Plaintiff received kosher meals for several years because the food was more healthy than regular food received by the inmates. Pl.'s Dep. at pp. 38, lines 15-24, & 39, lines 1-18. Upstate provided the kosher meals since Plaintiff made the request. *Id.* at p. 39, lines 1-18. Furthermore, Midalgo only stated he received psychological harm from the alleged incident. There was no immediate danger to his health or well being. Plaintiff did not starve nor was he denied meals. He also does not state he had weight loss or anything of the sort which would put his health in immediate danger. He stated that he purchased food from other inmates. Moreover, investigations were conducted into Plaintiff's spoiled and rotten food claims and the claims were found to be unsupported by any evidence as most items were prepackaged and wrapped in cellophane. Moreover, Plaintiff admits that the Defendants he seeks to hold liable had no control over the contents on his foodtrays.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Therefore, it is recommended that the Motion for Summary Judgment on Plaintiff's Eighth Amendment claims be **granted.**

**E. First Amendment Claims**

Plaintiff claims that Sergeant Trimm and "her C.O.s" were misplacing or destroying his magazine and newspaper subscriptions and that his outgoing mail/legal mail was read by Defendant Bouyea in order to "play mind games with [Plaintiff]." Am. Compl. at ¶¶ 22 & 46. Plaintiff further alleges that Defendant Bennett purposefully gave him the wrong books and cases and lost legal documents which resulted in frustrating Plaintiff's lawsuit and an inability to file a 440 motion pursuant to New York State's Criminal Procedure Law. *Id.* at ¶ 48.

"Interference with legal mail implicates a prison inmate's rights to access to the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). In order to state a claim for lack of access to the courts by interference with legal mail, "an inmate must allege that a defendant's deliberate and malicious interference actually impeded his access to the court or prejudiced an existing action." *Cancel v. Goord,* 2001 WL 303713, at *4 (S.D.N.Y. Mar. 29, 2001) (citing *Lewis v. Casey,* 518 U.S. 343, 349 (1996)). However, "[a] delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." *Cancel v. Goord,* 2001 WL 303713, at *5 (citing *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995) & *Jones v. Smith,* 784 F.2d 149, 151-52 (2d Cir.1986)). But, if an adverse judgment to an "otherwise meritorious" motion resulted from defendants' delay, then a § 1983 claim is stated. *Id.*

A prisoner maintains the right to the flow of incoming and outgoing mail as protected by the First Amendment. *Davis v. Goord,* 320 F.3d at 351 (citing, *inter alia, Heimerle v. Attorney General,* 753 F.2d 10, 12-13 (2d Cir.1985)). Any "[r]estrictions on prisoners' mail are justified only if they 'further [ ] one or more of the substantial governmental interests of security, order, and rehabilitation ... [and] must be no greater than is necessary or essential to the protection of the particular governmental interest involved.' " *Id.* (quoting *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986)) (alterations in original). Therefore, "in balancing the competing interests implicated in restrictions on prison mail, courts have consistently afforded greater protection to legal mail than to non-legal mail, as well as greater protection to outgoing mail than to incoming mail." *Id.* (citing, *inter alia, Thornburgh v. Abbott,* 490 U.S. 401, 413 (1989)). Although an inmate has the right to be there when his legal mail is opened, an isolated event of tampering will be insufficient to allege a constitutional violation unless the inmate can show "that prison officials 'regularly and unjustifiably interfered with the incoming legal mail.' " *Id.* (quoting *Cancel v. Goord,* 2001 WL 303713, at *6); *see also Wolff v. McDonnell,* 418 U.S. 539, 574-76 (1974); *Morgan v. Montanye,* 516 F.2d 1367, 1371 (2d Cir.1975); *Gill v. Riddick,* 2005 WL 755745, at *15 (N.D.N.Y. Mar. 31, 2005).

***13** With regard to non-legal incoming mail, a prison's "regulations or practices affecting a prisoner's receipt of non-legal mail must 'be reasonably related to legitimate penological interests[.]' " *Cancel v. Goord,* 2001 WL 303713, at *6 (quoting *Thornburg v. Abbott,* 490 U.S. 401, 409 (1989)). "[P]rison security is a sufficiently important governmental interest to justify limitations on a prisoner's [F]irst [A]mendment rights." *Id.* (quoting *Gaines v. Lane,* 790 F.2d 1299, 1304 (7th Cir.1986)). In order to state a claim for interference with incoming non-legal mail, the inmate will have to show a pattern and practice of interference without the legitimate penological interest. *Id.*

With regard to Plaintiff's legal mail being read, Plaintiff states that C.O. Bouyea "mumble[d] something similar to what [Plaintiff] wrote in [his] legal mail under his breath." Am. Compl. at ¶ 26. Bouyea purportedly repeated "something verbatim to a letter" Midalgo had written to a legal organization and that there were similar occurrences on several occasions. Pl.'s Dep. at pp. 39, lines 19-24, & 40, lines1-6. Plaintiff claims that Bouyea whispered so that only Plaintiff could hear the statements. *Id.* at p. 40, lines 19-23. When Plaintiff was asked about the statement made in his Amended Complaint that "outgoing mail/legal mail was being read due to a fabricated penological interest" Midalgo stated that he believed his mail was read because he "agitated [the facility's] security interest and that ... gave them a reason to read [his] mail and things

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

[he] was writing in [his] mail." *Id.* at p. 83, lines 3-8. Another reason Plaintiff believed the mail was read was because the inmates who became his cellmates "would try to start a whole situation based on letters" that Plaintiff had written. *Id.* at p. 83, lines 9-12. Plaintiff had submitted a grievance about his legal mail and it was found to have no merit and that there was no evidence to support his complaint. Defs.' 7.1 Statement, Ex. A, Sgt. King Lt. to Captain Bezio, dated Aug. 1, 2003; Ex. A, Superintendent's Appeal, dated Aug. 6, 2003.

Here, Plaintiff has failed to show that there was interference with his legal mail. Plaintiff has not alleged any deliberate and malicious interference that actually impeded his access to the courts nor prejudiced an existing action. Plaintiff also provides no proof that his mail was read except that he states Defendant Bouyea was mumbling under his breath something similar to what had been written in Plaintiff's letters. Moreover, Midalgo has not shown that Bouyea opened and read his mail on a regular and unjustifiable basis.

Plaintiff further states he was not receiving his magazine and newspaper subscriptions and that Defendant Trimm "was aware that her C.O.s were purposefully misplacing [his] magazines and newspaper subscription" or providing them to other inmates. Am. Compl. at ¶ 22; Pl.'s Dep. at p. 34. Midalgo says he knew some of his magazines that were in the "rec room" were his because he saw his name on the label. Pl.'s Dep. at p. 34, lines 2-4. He also stated he wrote to the mail clerk to inquire about his mail, the mail clerk told him that magazines were given to the correction officers to be handed out, that they were not delivered to him. *Id.* at p. 34, lines 8-12. Then when Plaintiff spoke to Sergeant Trimm about the situation, she gave him "a devious smile and wrote something out on a pad and said she would look into it and she never did." *Id.* at p. 34, lines 16-19.

***14** In regards to the non-legal mail, Plaintiff does have a right to incoming, non-legal mail, although to a lesser extent than legal, outgoing mail. *See Davis v. Goord,* 320 F.3d at 351. Plaintiff would have to show a pattern and practice of interference without a penological interest or purpose. Midalgo makes the general claim that he did not receive his subscriptions for several months. In a letter to the Warden, Plaintiff provides the names of five different magazines which were not delivered to him. Plaintiff only submitted two letters to the Court that were sent to two different magazine companies stating he needed to cancel his subscriptions due to his failure to receive the magazines. Am. Compl., Ex. C, Lt. to Warden, dated Feb. 4, 2003; Lts. to F.H.M. & Maxim, dated Apr. 21, 2003. Midalgo also states he received one issue per each subscription. Lts. to F.H.M. & Maxim, dated Apr. 21, 2003. Plaintiff states he received one issue of Maxim after it had gone through the procedure of media review. Pl.'s Dep. at pp. 34, lines 20-24, & 35, lines 4-12. Despite the letters, Plaintiff has not shown that there was a pattern and practice in not receiving his subscriptions. Plaintiff has not stated with any specificity which magazines he did not receive and, more importantly, for what time periods he did not receive them. *See* Am. Compl. at ¶¶ 22-24; Pl.'s Mem. of Law at Point Five. Plaintiff merely makes a generalization that from January 2003 until he cancelled his subscriptions, his magazines and newspapers were misplaced and that several months had passed without receiving any subscriptions. Am. Compl. at ¶¶ 23 -24. More to his detriment, Plaintiff does not state which officers misplaced or destroyed his magazines nor does he show that there was a practice of this by the Defendants.[FN14] Therefore, Plaintiff has failed to state a claim on his non-legal, incoming mail.

FN14. The Court also notes that the Defendants fail to address whether or not there was a penological interest in the regulations or practices that may have affected Midalgo's receipt of non-legal mail. *See* Defs.' Mem. of Law.

In addition, "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). Even if the Court were to draw all inferences in favor of Plaintiff that a pattern and practice has been established, Plaintiff has failed to allege the personal involvement of Defendant Trimm or any other Defendant. Furthermore, to the extent Plaintiff states that Defendant Trimm would be liable in a supervisory capacity, Plaintiff has failed to show what supervisory position Defendant Trimm holds as to the corrections officers who may have misplaced or destroyed his magazines.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Plaintiff further makes the claim that he received the wrong books and cases from the law library or that he never received the books requested. *Id.* at ¶ 48. Midalgo also alleges that his legal documents were lost and he was unable to file court documents as a result. *Id.*

Under the First Amendment, "prisoners have a constitutional right of access to the courts." *Bounds v. Smith,* 430 U.S. 817, 821 (1977); *Bourdon v. Loughren,* 386 F.3d 88, 92 (2d Cir.2004). This right "requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Bounds v. Smith,* 430 U.S. at 828; *Bourdon v. Loughren,* 386 F.3d at 92 (quoting *Bounds).* However, there is no "abstract, freestanding right to a law library or legal assistance, [and] an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." *Lewis v. Casey,* 518 U.S. at 351. The Supreme Court held that in order to fulfill the actual injury requirement, derived from the constitutional doctrine of standing, on a law library claim where there is a lack of access to the courts, the inmate must be pursuing direct appeals from the conviction for which he or she was incarcerated, a *habeas corpus* petition, or a civil rights claim pursuant to § 1983 "to vindicate basic constitutional rights." *Lewis v. Casey,* 518 U.S. at 354.

***15** As to Plaintiff's law library claim, in regards to some of the books Midalgo sought, he received a letter stating that the law library was not required to carry two of the books he requested and that the other book should have been available and if it was missing, then a replacement would be ordered. Am. Compl., Ex. D, Lt. from Litzenberger, dated July 28, 2003. Then Plaintiff wrote two letters noting that the library staff was refusing to provide him with a law book, that he had been told that two books were not available at the facility, and that he was receiving the wrong books and cases from the law library. *Id.,* Exs. D, Lt. to Botta, dated Aug. 3, 2003 & Ex. C, Lt., dated Aug. 4, 2003. However, Plaintiff received a memo noting that an investigation had been completed and that the staff had acted properly. *Id.,* Ex. "Exhaustion of my Administrative Remedies Some Material Lost ...," Mem. from Captain Racette, dated Aug. 5, 2003. Midalgo also received a letter from C.O. Bennett whereby Plaintiff was told that one book he had requested was available but that because Plaintiff was in SHU and since the book was looseleaf, he could request a photocopy of the materials. *Id.,* Ex. D., Lt. from Bennett, dated Aug. 19, 2003. However, Plaintiff claims that the book was not in looseleaf and that Defendant Bennett had lied and then stated the book was missing after Plaintiff claimed that all he received was the index. Pl.'s Dep. at pp. 78, lines 14-24, & 79, lines 1-3. Plaintiff alleges that every book he requested from the law library was missing and that one book that he did receive had a section ripped out that Plaintiff needed. *Id.* at p. 85, lines 1-18. However, Plaintiff states that he would not say it was Defendant Bennett's fault but that it is his duty to oversee the law library. *Id.* at p. 86, lines 18-24.

Additionally, Plaintiff states that he was trying to find out how to copyright some of his poetry. *Id.* at p. 74, lines 22-23. Midalgo further acknowledges he was trying to file a N.Y. CRIM. PROC. LAW 440 motion because he claims he was wrongfully convicted and that he is still unable to file the motion because he received the wrong books and cases. *Id.* at pp. 74, line 24, & 75, lines 1-20. Plaintiff claims that he sent legal documents, which were exhibits Plaintiff wanted to attach to his 440 motion, to the law library to be copied, but that they were never returned even though the request was made. *Id.* at pp. 79, lines 16-24, & 80, lines 1-8. As a result, Plaintiff claims that this was another reason why he was unable to file the motion. *Id.* at p. 80, lines 1-5. Midalgo stated that he did not file the 440 motion prior to arriving at Upstate because he had been studying the process and procedures. *Id.* at p. 81, lines 18-21. Plaintiff alleges that if not Defendant Bennett, then either Defendants Streeter or Spinner lost his copies because "[t]hey colluded together" and conspired against Plaintiff. *Id.* at pp. 87, lines 10-24, & 88, lines 1-4. Midalgo avers that his claim could be proven by "circumstantial evidence," which would include his grievances and hearings. *Id.* at p. 88, lines 7-17.

***16** Here, Plaintiff does have a constitutional right to the access of the courts and, in turn, the right to an adequate law library or assistance from those trained in the law when preparing and filing legal documents. Plaintiff does not state a claim as to the availability of books he sought for the purposes of his copyright lawsuit. *See Lewis v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Casey,* 518 U.S. at 354. Plaintiff does state a claim in regards to the missing books and copies of exhibits to his 440 motion as he seeks to challenge his conviction, which would provide standing as it would be a direct appeal from the conviction for which he was incarcerated. *See id.*

However, the Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). In this case, as only Plaintiff's law library claim as to his 440 motion could proceed, Plaintiff has failed to allege any personal involvement on the part of any of the Defendants. Plaintiff states that Defendant Bennett was not at fault for the missing books. That statement belies the notion that there was any personal involvement. In addition, Plaintiff fails to state a claim for supervisory liability against Defendant Bennett for the missing books as Plaintiff does not state which Defendants Bennett was supervising. Furthermore, as to the missing copies of exhibits for the 440 motion, Plaintiff merely claims that Defendants Bennett, Streeter, and Spinner were involved because he believes there was a conspiracy. That allegation does not constitute personal involvement.

Therefore, it is recommended that the Motion for Summary Judgment be **granted** on the First Amendment claims.

### F. Inadequate Visitation

Plaintiff alleges that Defendant Trimm delayed his visit with his mother for several hours causing him emotional distress. Am. Compl. at ¶ 50.

"Although inmates do not relinquish their constitutional rights when imprisoned, implicit with incarceration is the fact that confinement imposes a limitation on privileges and rights." *Henry v. Coughlin,* 940 F.Supp. 639, 642 (S.D.N.Y.1996) (citing, *inter alia, Sandin v. Conner,* 515 U.S. 472, 485 (1995)). Restrictions that are placed upon an inmate's constitutional rights "may be upheld as long as they are 'reasonably related to legitimate penological interests.' " *Hernandez v. McGinnis,* 272 F.Supp.2d 223, 226 (W.D.N.Y.2003) (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). However, family visitations for inmates only constitute a privilege and not a right. *See Block v. Rutherford,* 468 U.S. 576, 589 (1984); *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 125-26 (1977) (holding that one of the more obvious constitutional rights curtailed by confinement is the right to freely associate with those outside the penal institution); *see also Lynott v. Henderson,* 610 F.2d 340, 342 (5th Cir.1980) (stating that "[c]onvicted prisoners have no absolute constitutional right to visitation"); *Oxendine v. Williams,* 509 F.2d 1405, 1407 (4th Cir.1975) (holding that a "[prisoner] has no constitutional right to physical contact with his family"); *Hernandez v. McGinnis,* 272 F.Supp.2d at 227.

***17** Here, Plaintiff does not claim that he was denied visitation nor has he stated that visitation was delayed at any other time than the one time alleged. He merely states that a visit with his mother and brother was delayed by a few hours. Am. Compl. at ¶ 25. As there is no constitutional right to visitation and because of the fact that Plaintiff did actually receive visitation that same day, Plaintiff has failed to state a claim.

Therefore, it is recommended that the Motion for Summary Judgment be **granted** as to the visitation claim.

### G. Harassment

Plaintiff claims that Defendants Trimm and Bass harassed him by placing a wiretap in his cell as well as confidential informants and/or hired help in order to cause him physical and psychological harm.[FN15] Am. Compl. at ¶ 52.

FN15. Although Plaintiff does not specify what aspect of the Constitution was violated, though Plaintiff does insert a short sentence saying Defendants were deliberately indifferent, this Court will analyze the wiretap claim pursuant to the Fourth Amendment. *See* Am. Compl. at ¶ 52.

In terms of the wiretap, the claim would turn on whether

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

a plaintiff had a legitimate expectation of privacy with respect to his conversations. To assess the expectation, "the person asserting a privacy interest must demonstrate a subjective expectation of privacy." *George v. Carusone,* 849 F.Supp. 159, 165 (D.Conn.1994) (citing *California v. Greenwood,* 486 U.S. 35, 39 (1988)) (further citations omitted). Then "that person's subjective expectation must be one that society accepts as reasonable." *Id.* (citing *California v. Greenwood,* 486 U.S. at 39) (further citations omitted). The Second Circuit has held that "a convict has no expectation of privacy in his prison cell" because "society is not prepared to recognize as legitimate any subjective expectation of privacy that a [prisoner] might have in his prison cell[.]" *Willis v. Artuz,* 301 F.3d 65, 66, & 69 (2d Cir.2002) (citing *Hudson v. Palmer,* 468 U.S. 517, 526 (1984)).

Here, besides alleging that a wiretap was placed in his cell, Plaintiff does not provide a shred of evidence that there was actually a wiretap placed within his cell. Plaintiff sets forth certain circumstances, which to him seem like too much of a coincidence that a wiretap had to have been placed in his cell. Pl.'s Mem. of Law at Point Eight. Plaintiff merely states that he **thought** there was a wiretap because his cellmate attempted to talk about illegal activity and that his neighbor was trying to get Midalgo to bring back drugs. Pl.'s Dep. at p. 15, lines 13-17. He also stated the lights would flicker and that some of the officers would talk about the same things Midalgo and his cellmate had discussed. *Id.* at p. 15, lines 18-24. Even though Plaintiff does not have an expectation of privacy in his cell, Plaintiff fails to allege any facts that are not general or conclusory as to state any claim in regards to the alleged wiretap.

With regard to his claim of a confidential informant or hired help being placed in his cell to harass him, Plaintiff states that he believes his cellmate was a confidential informant because Officer Bouyea, Officer Streeter, and others gave the cellmate extra food trays, magazines, and books. Pl.'s Dep. at pp. 17, lines 4-12 & 29, lines 4-10. Other than supposition, Plaintiff has not provided any proof or evidence that his cellmate was a confidential informant. Midalgo's claims are merely conclusory and unsupported by any facts. Furthermore, the Superintendent stated that inmates are placed together based on compatibility. Defs.' 7.1 Statement, Ex. A, Superintendent's Appeal, dated July 15, 2003. Plaintiff has not stated any type of claim available and moreover, Plaintiff would not have any choice in who was placed within his cell as inmates do not a have a constitutional right to the cellmate of their choice. *Harris v. Greer,* 750 F.2d 617, 618 (7th Cir.1984).

***18** Therefore, it is recommended that the Motion for Summary Judgment be **granted** on his claim.

### H. John Doe Defendant

As noted previously, Defendant John Doe has not been identified or appeared in this action. *See* Dkt No 12. FED.R.CIV.P. 4(m) states that "[i]f service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, then the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time[.]" Furthermore, pursuant to the Local Rules for the Northern District of New York, "service of process [is required] upon all defendants within sixty (60) days of the filing of the complaint." N.D.N.Y.L.R. 4.1. Plaintiff's time for service on John Doe has expired, per both the Local Rules and the Federal Rules, as the date of the filing of the Amended Complaint was October 24, 2003. *See* Dkt. No. 8. Since Plaintiff has failed to properly identify this Defendant, such claims should be dismissed.

## III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that the Motion for Summary Judgment (Dkt. No. 105) be **GRANTED;** and it is further

**RECOMMENDED,** that all claims against the John Doe Defendant be **DISMISSED** due to Plaintiff's failure to timely identify and serve such Defendant; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 16

Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)
(Cite as: 2006 WL 2795332 (N.D.N.Y.))

to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 72, 6(a), & 6(e).

N.D.N.Y.,2006.
Midalgo v. Bass
Not Reported in F.Supp.2d, 2006 WL 2795332 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



C

Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

W.D. New York.

Michael MODLENAAR, Plaintiff,

v.

C.O. LIBERATORE, Superintendent James Conway, Deputy Superintendent R. James, Physician Assistant Magee, Nurse Administrator Frisbee, and Inmate Records Coordinator Sandra Prusak, Defendants.

No. 07-CV-6012 CJS.

July 22, 2009.

Michael Modlenaar, aka Michael Mondon, New York, NY, pro se.

J. Richard Benitez, Esq., Assistant Attorney General, Office of the New York State Attorney General, Rochester, NY, for Defendants.

DECISION AND ORDER

CHARLES J. SIRAGUSA, District Judge.

INTRODUCTION

***1** This is an action brought pursuant to 42 U.S.C. § 1983, in which Michael Modlenaar ("Plaintiff"), a former prison inmate, proceeding *pro se,* is suing various employees of the New York State Department of Correctional Services ("DOCS") who were employed at Attica Correctional Facility ("Attica"). Specifically, Plaintiff is suing Corrections Officer James Liberatore ("Liberatore"), Superintendent James Conway ("Conway"), Deputy Superintendent Randy James ("James"), Physician's Assistant Robert Magee ("Magee"), Nurse Administrator Barbara Frisby ("Frisby"), sued as Barbara Frisbee, and Inmate Records Coordinator Sandra Prusak ("Prusak"). Now before the Court is Defendant's motion for judgment on the pleadings. (Docket No. [# 13] ). For the reasons that follow, the application is granted in part and denied in part.

BACKGROUND

The following facts are taken from the Complaint in this action. At all relevant times Plaintiff was housed in Attica's Special Housing Unit ("SHU"). On May 12, 2006, Plaintiff filed an inmate grievance against Liberatore, accusing him of harassment. On May 24, 2006, Liberatore delivered Plaintiff's breakfast tray. According to Plaintiff, Liberatore did not give him a styrofoam cup of hot water, which was usually included with breakfast. Later that day, Corrections Officer Gordon ("Gordon"), who is not a party to this action, collected Plaintiff's breakfast tray and utensils, and ordered Plaintiff to return a styrofoam cup. Plaintiff protested that he had not received a cup that morning. Gordon checked with Liberatore, who stated that he had provided Plaintiff with a cup. Consequently, Gordon issued Plaintiff a misbehavior report, charging Plaintiff with three infractions: contraband, refusing a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

direct order, and misusing state property.

In connection with the misbehavior report, Liberatore placed Plaintiff on a pre-hearing restricted diet, consisting of "loaf." (Complaint ¶ 26).[FN1] James approved the imposition of the restricted diet. In an inmate grievance that Plaintiff filed near the date of the incident, he stated that he was kept on the restricted diet for only three days. However, in the complaint in this action, Plaintiff alleges that the restricted diet lasted for six days. A medical document attached to the complaint appears to indicate that Plaintiff was on the restricted diet from May 24, 2006 through May 29, 2006. (Complaint, Exhibit B).

FN1. New York State's administrative code addresses the imposition of restricted diets on inmates confined in SHU, in relevant part, as follows:

**Section 304.2. Food**

Inmates confined in the SHU will be provided meals of the same type as the meals available to inmates in general population and in sufficient quantity to be nutritionally adequate, except as provided in this section.

* * *

(b) Inmates may be placed on a restricted diet in accordance with the provisions of Chapter V of this Title, for the following reasons:

* * *

(3) refusing to obey a direct order at the time of meal distribution or refusing to obey a direct order to return a food container or utensil at the conclusion of a meal, while assigned to SHU;

* * *

(c) The superintendent or his designee may issue a written order placing an inmate reported to have engaged in conduct described in subdivision (b) of this section on a restricted diet for no more than seven days pending the outcome of the inmate's superintendent's hearing. The order shall briefly state the reason(s) for the imposition of the restricted diet and contain the following notice to the inmate: "You m ay write to the deputy superintendent of security or his/her designee to make a statement as to the need for the continued pre-hearing imposition of the restricted diet." One copy of the order shall be given to the inmate and another copy forwarded to the commissioner within 24 hours of issuance.

* * *

(e) The restricted diet must consist of a sufficient quantity of wholesome and nutritious food.

(f) Health services and food services shall be notified in advance of the imposition of a restricted diet. A physician, nurse or physician's assistant, designated by the facility health services director, must examine into the state of health of the inmate within 24 hours of the commencement of the restriction and daily thereafter during the period of restriction.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

* * *

7 NYCRR § 304.2 (2009).

Plaintiff claims that he is Jewish, and that he was supposed to receive kosher meals. Plaintiff further maintains that Attica's facility food administrator informed him that kosher loaf was available. Plaintiff contends that Liberatore gave him non-kosher loaf, but Plaintiff refused to eat it because it was not kosher. Plaintiff asked Liberatore for kosher loaf, but Liberatore responded that there was no such thing as kosher loaf.

Magee gave medical approval for the restricted diet. On May 27, 2006, Plaintiff wrote to Frisby, and asked her whether the facility medical staff had received notice that he was being placed on a restricted diet. Frisby responded in the affirmative. Moreover, medical staff monitored Plaintiff for "adverse effects of diet" each day that he was on the restricted diet. (Complaint, Exhibit B).

***2** A Tier III disciplinary hearing concerning the misbehavior report was conducted between June 2, 2006 and June 7, 2006. During the hearing, at Plaintiff's request, a videotape ("the videotape") was produced, which depicted the area near his cell on the morning of May 24, 2006. At the conclusion of the hearing, the hearing officer found Plaintiff not guilty of the charges, purportedly because the staff member appointed to assist Plaintiff with the hearing provided inadequate assistance.

On June 7, 2006, Plaintiff filed an inmate grievance, complaining that due process rights had been violated. Plaintiff also alleged that he had been improperly placed on the restricted diet, in violation of his "constitutional rights." [FN2] In the grievance, Plaintiff asked permission to purchase a copy of the videotape. On June 23, 2006, Conway denied the grievance, stating that Plaintiff's constitutional rights were not violated, since the hearing officer found Plaintiff not guilty of the charges. Conway further stated that the pre-hearing restricted diet was "properly authorized." Finally, Conway informed Plaintiff that he could "request a copy of the video tape in question through [a Freedom of Information Law ("FOIL") request.]. Subsequently, Plaintiff asked Prusak for a copy of the videotape. Prusak responded that there was no record of a misbehavior report filed against Plaintiff on May 24, 2006, and that Plaintiff therefore could not have a copy of the videotape. Prusak further stated that Plaintiff could not purchase a copy of the tape in any event. Plaintiff appealed Conway's decision, and on August 23, 2006, the Central Officer Review Committee ("CORC") "accepted [the appeal] in part," and informed Plaintiff that he could appeal the denial of his FOIL request to DOCS's Counsel's Office. Plaintiff appealed to DOCS's Counsel, who responded that the videotape in question had not been preserved.

FN2. In this action, Plaintiff alleges that he was placed on the restricted diet for six days. However, in his inmate grievance, he stated that he was on the restricted diet for only three days.

Plaintiff subsequently commenced this action. Plaintiff alleges that Liberatore retaliated against him, in violation of the First Amendment, by setting him up for a false misbehavior report. Plaintiff further alleges that Liberatore violated his Fourteenth Amendment due process rights by placing him on a restricted diet, and violated his First Amendment religious rights by failing to provide him with a kosher diet. Plaintiff alleges that Frisby violated his Eighth Amendment rights by failing to conduct "an overall medical evaluation" before Plaintiff was placed on the restricted diet. Plaintiff also alleges that Magee violated his Eighth Amendment rights, by acting with deliberate indifference to Plaintiff's medical needs and approving the restricted diet. Plaintiff alleges that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

James violated his First Amendment religious rights when he approved the restricted diet. Plaintiff further alleges that James violated his Fourteenth Amendment due process rights by failing to investigate the incident. Plaintiff alleges that Conway violated Plaintiff's First Amendment religious and Fourteenth Amendment due process rights by "upholding the unlawful restricted diet," failing to investigate the incident, and "reversing the Grievance Committee's decision." Plaintiff alleges that Prusak violated his due process rights by failing to provide him with the videotape, in an attempt to cover up the Defendants' wrongdoing. The Court also construes the claim against Prusak as alleging a violation of Plaintiff's First Amendment right of access to the courts.

***3** Defendants subsequently filed the subject motion for judgment on the pleadings. Defendants contend that the complaint fails to allege any constitutional violation. Specifically, Defendants maintain that: 1) the restricted diet did not violate Plaintiff's Eighth Amendment rights because the diet was nutritionally adequate; 2) the restricted diet did not violate Plaintiff's religious rights, because the diet lasted only a few days and was therefore *de minimis;* 3) the restricted diet did not violate Plaintiff's due process rights, because DOCS regulations, and specifically, 7 [FN3] NYCRR § 304.2(b)(3), provided for the imposition of a restricted diet.

> FN3. Defendants incorrectly identify the regulation as "20 NYCRR § 304.2(b)(3)." (Defendants' Memo of Law [# 14] at 5).

DISCUSSION

In deciding a motion for judgment on the pleadings under FRCP 12(c), the Court must apply the same standard that applies to motions under FRCP 12(b)(6). *Johnson v. Rowley,* 569 F.3d 40, 43 (2d Cir.2009). That is, the Court must

> accept all factual allegations in the complaint as true and draw all reasonable inferences in Johnson's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007). To survive a Rule 12(c) motion, [the] "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1949, [173] L.Ed.2d [868] (2009) (*quoting Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

*Id.* At 43-44. As to that,

> [a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Ashcroft v. Iqbal,* 129 S.Ct. at 1949 (citations omitted). In short, the facts alleged must "permit the court to infer more than the mere possibility of misconduct." *Id.* at 1950. "Legal conclusions" need not be accepted as true, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 1949 (citation omitted). However, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* Moreover, since Plaintiff is proceeding *pro se,* the Court is required to construe his submissions liberally, "to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*First Amendment Retaliation*

At the outset, Defendants' motion does not address Plaintiff's claim that Liberatore set him up to receive a false misbehavior report, in retaliation for the grievance that Plaintiff filed against Liberatore on May 12, 2006. On this issue, the filing of a false misbehavior report in retaliation for engaging in protected activity is actionable as retaliation. *Franco v. Kelly,* 854 F.2d 584, 590 (2d Cir.1988). Accordingly, the retaliation claim against Liberatore may go forward.

*First Amendment Access to the Courts*

***4** With regard to the alleged failure to preserve the videotape, the Court construes the complaint as attempting to plead a claim against Prusak for denial of access to the courts.[FN4] *See, Washington v.. James,* 782 F.2d 1134, 1138 (2d Cir.1986) ("A prisoner has a constitutional right of access to the courts for the purpose of presenting his claims, a right that prison officials cannot unreasonably obstruct and that states have affirmative obligations to assure.") (citations omitted). Specifically, it appears that Plaintiff wanted a copy of the videotape in order to pursue a legal claim against Liberatore for retaliation, since, according to Plaintiff, the videotape would show that Liberatore never gave Plaintiff a styrofoam cup on the morning of May 24, 2006. Plaintiff alleges that Prusak prevented him from obtaining the videotape, to cover up Liberatore's actions. Defendants' motion does not address the "denial of access to the courts" claim against Prusak, so the claim may proceed. On the other hand, the complaint does not state a claim against Conway (or any other defendant) for denying access to the courts. In that regard, Conway never denied a request by Plaintiff for the videotape, but instead, informed Plaintiff that he could obtain a copy of the tape through a FOIL request. There is no allegation that Conway was responsible for the failure to preserve the tape.

> FN4. The complaint does not state a claim against Conway for denial of access to the Courts, since Conway informed Plaintiff that he could request a copy of the videotape through a FOIL request.

*Free Exercise of Religion*

Plaintiff alleges that Defendants violated his right to religious freedom by serving him a non-kosher restricted diet. It is well settled that the right to free exercise of religion includes "the right of prisoners to receive diets consistent with their religious scruples." *Kahane v. Carlson,* 527 F.2d 492, 495 (2d Cir.1975). Defendants contend that the complaint fails to state a free exercise claim because the denial of kosher food was "reasonably related to legitimate penological interests." (Defendants' Memo of Law [# 14] at 4). However, Plaintiff alleges that Liberatore denied him kosher meals, even though kosher loaf was available. Defendants have not identified any legitimate penological reason why Liberatore would have failed to provide Plaintiff with kosher loaf.

Defendants also contend that the six-day restricted diet was a *de minimis* injury that fails to rise to the level of a constitutional violation. *Id.* at 5. However, the Court finds that at the pleading stage, Plaintiff's claim may go forward. *See, McEachin v. McGuinnis,* 357 F.3d 197, 201 (2d Cir.2004) (In which the Second Circuit held that a seven-day deprivation of religious meals, could be actionable under the First Amendment.); *Wesley v. Alexander,* No. 99 CIV 2168(LAK), 2005 WL 1352593 at * 10 (S.D.N.Y. Jun. 8, 2005) ("Defendant cites no legal authority-and we are aware of none-for the proposition that a plaintiff must prove that he missed a specified number of meals because of the violation of his religious precepts in order to press a free-exercise claim ...."); *but see, Tapp v. Stanley,* No. 04-CV-6400 CJS, 2008 WL 4934592 at *7 (W.D.N.Y. Nov. 17, 2008) ("[W]here a delay in providing an inmate with a religious diet is brief and caused by ordinary administrative delay, the inmate's religious rights are not violated.").

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

***5** Plaintiff, though, has not alleged that he requested a kosher restricted diet from any defendant except Liberatore. Plaintiff alleges that he wrote letters to a Rabbi and a food service administrator concerning the restricted diet, and that he filed a grievance after the restricted diet ended, but there is no indication that any defendant beside Liberatore had notice that Plaintiff was being denied kosher meals while the restricted diet was in place. In other words, there is no allegation that any other defendant except Liberatore was personally involved in the denial of kosher meals. Accordingly, the free exercise claim is dismissed as against all defendants except Liberatore.

*Procedural Due Process*

Plaintiff alleges that being placed on a restricted diet violated his procedural due process rights.

> The law is well settled that to show a violation of his procedural due process rights, an inmate must establish interference with a protected liberty interest by satisfying a two-part test: (1) the confinement or restraint must create an "atypical and significant hardship in relation to the ordinary incidents of prison life," *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); and (2) the state must have granted a liberty interest by statute or regulation to be free from that confinement or restraint. *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996) (citing *Sandin,* 515 U.S. at 484, 115 S.Ct. 2293).

*Bonet v. Khahaifa,* 512 F.Supp.2d 141, 142-143 (W.D.N.Y.2007). Plaintiff's due process claims are based on the fact that he was placed on a restricted diet for a period of six days. Although Plaintiff contends that he refused to eat the loaf since it was not kosher, he does not allege that the restricted diet loaf was nutritionally inadequate or that it otherwise posed a risk to his health. Placement on a restricted prison diet for a period of six days, without an allegation that the diet endangered the inmate's health, is not sufficient to establish an "atypical and significant hardship." *Johnson v. Gummerson,* 198 F.3d 233, 1999 WL 822523 at *1 (Table) (2d Cir. Sep. 24, 1999) ("[T]he mere allegation of the imposition of a one-week dietary restriction, without an additional allegation that the restriction endangers the prisoner's health, does not demonstrate an "atypical and significant hardship" capable of satisfying *Sandin."* ). Consequently, Plaintiff has not pleaded that he had a protected liberty interest, and the due process claims are dismissed.

*Eighth Amendment Diet Claim*

Plaintiff also alleges that the restricted diet violated his Eighth Amendment right to be free from cruel and unusual punishment. However, the denial of kosher meals does not violate the Eighth Amendment. *See, Wesley v. Kalos,* No. 97 CIV. 1598(RWS), 1997 WL 767557 at *4 (S.D.N.Y. Dec. 11, 1997) (Denial of Halal food to Muslim inmate did not "rise to the level necessary to be deemed cruel and unusual under the Eighth Amendment."); *Perez v. Westchester County Dept. Of Corrections,* No. 05 Civ. 8120(RMB), 2007 WL 1288579 at *5 (S.D.N.Y. Apr. 30, 2007) (Denial of halal and kosher meat is not cruel and unusual punishment). Therefore, the Eighth Amendment diet claims are dismissed.

*Eighth Amendment Medical Claim*

***6** Plaintiff alleges that by failing to conduct a medical evaluation prior to placing him on a restricted diet, Defendants violated his Eighth Amendment rights. The legal standards applicable to such claims are clear:

> In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove deliberate indifference to his serious medical needs. This standard incorporates both objective and subjective elements. The objective 'medical need' element measures the severity of the alleged deprivation, while

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind.

Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation. [T]he Supreme Court [has] explained that the Eighth Amendment's prohibition on cruel and unusual punishments encompasses the deliberate failure to treat a prisoner's serious illness or injury resulting in the infliction of unnecessary pain and suffering. Because society does not expect that prisoners will have unqualified access to health care, a prisoner must first make this threshold showing of serious illness or injury in order to state an Eighth Amendment claim for denial of medical care. Similarly, a prisoner must demonstrate more than an inadvertent failure to provide adequate medical care by prison officials to successfully establish Eighth Amendment liability. An official acts with the requisite deliberate indifference when that official knows of and disregards an excessive risk to inmate health or safety, a state of mind equivalent to the familiar standard of 'recklessness' as used in criminal law.

*Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003) (citations and internal quotations omitted).

Here, Plaintiff does not allege that he had any medical condition which would have made it unsafe for him to be placed on a restricted diet. Accordingly, the Eighth Amendment medical claim is dismissed.

*Qualified Immunity*

As a final matter, Defendants have thrown in a one-sentence request to dismiss, based on qualified immunity. The request is denied since Liberatore and Prusak, the only defendants remaining in this action, have not shown that they are entitled to qualified immunity.

CONCLUSION

Defendants' motion (Docket No. [# 13] ) is granted in part and denied in part. Defendants are granted judgment on the pleadings with regard to all claims except the following: 1) First Amendment retaliation claim against Liberatore; 2) First Amendment free-exercise claim against Liberatore; and 3) First Amendment access-to-the courts claim against Prusak. The action is dismissed as against Conway, James, Magee and Frisby. The parties are directed to inform the Court in writing, within thirty days of the date of this Decision and Order, whether this action is ready for trial.

***7** SO ORDERED.

W.D.N.Y.,2009.

Modlenaar v. Liberatore

Not Reported in F.Supp.2d, 2009 WL 2179661 (W.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



H

Only the Westlaw citation is currently available.

United States District Court,

W.D. New York.

Llewellyn GEORGE, Plaintiff,

v.

James T. CONWAY, et al., Defendants.

No. 05-CV-510A.

May 21, 2009.

West KeySummary **Prisons 310 157**

310 Prisons

310II Prisoners and Inmates

310II(B) Care, Custody, Confinement, and Control

310k157 k. Food and Drink. Most Cited Cases

**Sentencing and Punishment 350H 1540**

350H Sentencing and Punishment

350HVII Cruel and Unusual Punishment in General

350HVII(H) Conditions of Confinement

350Hk1540 k. Food. Most Cited Cases

Prison officials did not subject prisoner to unconstitutional cruel and unusual punishment by refusing to remove plastic wrap from prisoner's meals in prisoner's presence, even if this practice caused the meals to be exposed to hair, dust particles from construction work and the stench of feces. Prisoner failed to make any showing that his meals had actually been contaminated or tampered with, and prisoner's grievances alleging contamination and tampering had previously been investigated and found to be meritless. U.S.C.A. Const.Amend. 8.

Llewellyn George, Fishkill, NY, pro se.

Michael A. Siragusa, New York State Attorney General's Office, Buffalo, NY, for Defendants.

ORDER

RICHARD J. ARCARA, Chief Judge.

***1** The above-referenced case was referred to Magistrate Judge H. Kenneth Schroeder, Jr., pursuant to 28 U.S.C. § 636(b)(1)(B). On March 25, 2009, Magistrate Judge Schroeder filed a Report and Recommendation, recommending that plaintiff's motion for summary judgment be denied and defendants' cross-motion for summary judgment be granted in its entirety.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

The Court has carefully reviewed the Report and Recommendation, the record in this case, and the pleadings and materials submitted by the parties, and no objections having been timely filed, it is hereby

ORDERED, that pursuant to 28 U.S.C. § 636(b)(1), and for the reasons set forth in Magistrate Judge Schroeder's Report and Recommendation, plaintiff's motion for summary judgment is denied and defendants' cross-motion for summary judgment is granted in its entirety.

The Clerk of Court shall take all steps necessary to close the case.

SO ORDERED.

***REPORT, RECOMMENDATION AND ORDER***

H. KENNETH SCHROEDER, JR., United States Magistrate Judge.

This case was referred to the undersigned by the Hon. Richard J. Arcara, pursuant to 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report upon dispositive motions. Dkt. # 25.

Plaintiff filed this *pro se* action on or about July 22, 2005, seeking relief pursuant to 42 U.S.C. § 1983. Dkt. # 1. Plaintiff alleges that while an inmate at the Attica Correctional Facility, his rights pursuant to the First, Eighth, and Fourteenth Amendments to the United States Constitution were violated. *Id.* Currently before the Court are plaintiff's motion for summary judgment (Dkt.# 42) and defendants' cross-motion for summary judgment (Dkt. # 60). For the following reasons, it is recommended that plaintiff's motion for summary judgment be denied and defendants' cross-motion for summary judgment be granted in its entirety.

***BACKGROUND***

Plaintiff, proceeding *pro se,* commenced this action on or about July 22, 2005, against defendants James Conway, Randy James, Jeffrey Bea, Carol Edwards, Rosalind Rosolowski, Darryl Borawski, Rabbi S. Charitonow and Don Lopes alleging violations of his rights pursuant to the First, Eighth and Fourteenth Amendments to the United States Constitution while he was housed at the Attica Correctional Facility ("Attica"). On each of his two claims, plaintiff seeks $15 million in compensatory damages and $10 million in punitive damages. It bears noting that plaintiff has also filed a separate action against several of the same defendants named herein, entitled *Llewellyn George v. Glenn S. Goord, et al.,* Case No. 05-CV-788 and alleging causes of action arising out of similar facts. That case is also pending before Chief United States District Judge Richard J. Arcara and has been referred to the undersigned for the handling of all pretrial matters and to hear and report on dispositive motions. Cross-motions for summary judgment are also pending in that action and will be the subject of a separate Report, Recommendation & Order.

***2** In his first claim, plaintiff alleges that from April 25, 2005 to June 8, 2005, defendants Rosalind Rosolowski, Don Lopes, and Carol Edwards "deliberately deprived [him] of [his] kosher meals" in violation of his rights pursuant to the First and Fourteenth Amendments to the United States Constitution. Specifically, plaintiff alleges that defendants Rosolowski, Lopes and Edwards,

> deliberately deprived me of my kosher meals from 4-25-05 to 6-8-05 after I had missed three meals, unintentionally. I was never issued a date to report to the diet line. After the Inmate Grievance Program had agreed with my complaint and recommended that my

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

> kosher meals be reinstated on 5-4-05, I was still deprived of my kosher meals until 6-8-05.

Dkt. # 1, p. 9. In his second claim, plaintiff alleges that from June 8, 2005 to "unresolved" (no later than July 22, 2005, the date when the instant action was commenced), defendants James Conway, Randy James, Jeffrey Bea, Darryl Borawski, and Rabbi S. Charitonow violated his rights pursuant to the First, Eighth and Fourteenth Amendments to the United States Constitution. Plaintiff's second claim states,

> my kosher meals were exposed to hair, dust particles from construction work, the stench of feces because each of the above mentioned defendants denied my numerous of [sic] requests to have the plastic wrapper removed from the kosher trays in my presence, even after I had repeatedly complained that certain food items were being stolen from my kosher trays.

Dkt. # 1, p. 21.

***Kosher Meal Plan, a/k/a Cold Alternative Diet***

On April 18, 2005, plaintiff signed a Cold Alternative Diet ("CAD") meal plan, or kosher meal plan whereby he agreed that he would miss no more than three meals per week. Dkt. # 61, ¶ 3; Dkt. # 67, p. 5. Thereafter, the CAD meal plan was approved on April 19, 2005 by defendant Rabbi S. Charitonow, Jewish Chaplain, defendant Rosalind Rosolowski, Coordinating Chaplain and defendant Carol Edwards, Deputy Superintendent for Programs. Dkt. # 67, ¶ 4 and p. 5. Also on April 19, 2005, consistent with standard procedure, defendant Carol Edwards sent a copy of the CAD agreement to plaintiff through the facility mail system. Dkt. # 61, ¶ 4; Dkt. # 67, ¶ 4. At that time, sending an inmate a copy of the CAD agreement was sufficient to put the inmate on notice that the CAD meal plan had commenced. *Id.*

On April 25, 2005, plaintiff was removed from the CAD meal plan for missing too many meals. Dkt. # 61, ¶ 5. For the period April 20, 2005 to April 23, 2005, plaintiff missed eleven meals. *Id.* On April 25, 2005, defendant Don Lopes, Attica Food Service Administrator, sent plaintiff a memo advising him that he would be removed from the CAD meal plan due to missed meals. Dkt. # 61, ¶ 6; Dkt. # 76, ¶ 6 and Exhibit B. Removal from the CAD meal plan could take a couple of days before becoming effective. *Id.* On April 26, 2005, plaintiff signed the Kosher Sign-In Sheets for breakfast and lunch, however, plaintiff's name does not appear on any of the days preceding or following April 26, 2005. Dkt. # 61, ¶ 7; Dkt. # 76, ¶ 7.

***Grievance No. A-48662-05-Removal from CAD***

***3** On April 27, 2005, plaintiff filed Grievance No. A-48662-05 alleging that he was being denied his kosher meals. Dkt. # 61, ¶ 8. Specifically, plaintiff stated:

> I did not report to the diet line, because I had been under the impression that I had to wait for some kind of notice, and did not want to be charged with being out of place. I was never advised as to when, exactly, my kosher meals would commence, not even the application I had signed for diet, kosher meals, program had given me any kind of indication.

Dkt. # 75, p. 11. On May 4, 2005, the Inmate Grievance Review Committee ("IGRC") recommended that plaintiff be placed back on the list and that plaintiff should not be removed from the diet because plaintiff was never informed when the diet would begin. Dkt. # 61, ¶ 9; Dkt. # 75, p. 12. Thereafter, on May 5, 2005, plaintiff noted on the bottom of the form setting forth the IGRC recommendation that although he agreed with the IGRC response, he wished to appeal to the Superintendent because he still had not received his kosher meals. Dkt. 61, ¶ 12; Dkt. # 75, ¶ 7 and p. 12. On May 11, 2005,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

plaintiff was transferred from the housing unit “A-Block” to the Special Housing Unit (“SHU”) because of an incident that occurred on May 10, 2005. Dkt. # 61, ¶ 10.

On May 15, 2005, plaintiff wrote defendant Rosalind Rosolowski a letter claiming that she had removed him from the “kosher meal list .” Dkt. # 61, ¶ 11; Dkt. # 72, ¶ 6 and p. 10. In his letter, plaintiff also notes that he filed a grievance and that the IGRC recommended that his kosher meals be reinstated. *Id.* Notwithstanding the IGRC's recommendation of reinstatement, plaintiff complained that his kosher meals had not been reinstated. *Id.* Defendant Rosolowski noted on the bottom of plaintiff's letter, “I do not remove anyone from KOSHER DIETS-the kitchen keeps track on [sic] attendance + writes the decision not me-...” Dkt. # 72, p. 10 (emphasis in original).

On May 17, 2005, plaintiff wrote to defendant Lopes, the Food Service Administrator at Attica, concerning the grievance he had filed after his removal from the CAD meal plan. Dkt. # 76, ¶ 8, p. 16. As in his May 15, 2005 letter to defendant Rosolowski, plaintiff noted that the IGRC recommended that his kosher meals be reinstated. *Id.* Notwithstanding the IGRC's recommendation of reinstatement, plaintiff complained to defendant Lopes that his kosher meals had not been reinstated. *Id.* On May 23, 2005, defendant Lopes responded to plaintiff's May 17, 2005 letter stating, in part, that the Food Service Department is bound by both the directives from Albany and the operating procedures at Attica. Dkt. # 76, ¶ 9 and p. 18. Moreover, defendant Lopes reminded plaintiff that he was removed from the kosher meal plan for missing too many meals and that the actions taken by the Food Service Department were in accordance with DOCS' directives and procedures. *Id.*

On or about May 25, 2005, defendant Superintendent Conway denied plaintiff's appeal stating,

> ***4** The issue of reinstatement to the cold alternative diet menu needs to be addressed to the chaplain's office. Notification of the original diet was forwarded to you and you were removed for missing required meals. There is now a time period to wait before being put back on the menu.

Dkt. # 61, ¶ 12; Dkt. # 75, ¶ 7 and p. 12. Because plaintiff was removed from the diet plan for missing too many meals, he had to wait thirty days before being put back on the kosher diet plan. Dkt. # 61, ¶ 13. On May 26, 2005, plaintiff appealed Superintendent Conway's decision to the Central Office Review Committee (“CORC”). Dkt. # 75, p. 14. CORC upheld Superintendent Conway's determination, stating,

> Upon full hearing of the facts and circumstances in the instant case, and upon recommendation of the Division of Nutritional Services, the action requested herein is hereby accepted only to the extent that CORC upholds the determination of the Superintendent for the reasons stated. CORC notes from additional investigation that the grievant signed an agreement to participate in the Cold Alternative Diet Program on 5/31/05 and was approved on 6/06/05.

Dkt. # 75, p. 19. On May 31, 2005, plaintiff was eligible for reinstatement to the CAD meal plan and signed a new CAD agreement which was approved by Rabbi Charitonow, Rosalind Rosolowski and Carol Edwards on June 6, 2005. Dkt. # 75, ¶ 8 and p. 13.

***Grievance No. A-48969-05***

On or about June 13, 2005, plaintiff sent a letter to defendant Darryl Borawski, formerly a Sergeant at Attica, complaining that he was not receiving hot water with his Kosher meals, that certain food items were missing from

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

his tray and requesting that the corrections officers remove the plastic wrap from his tray in front of him. Dkt. # 61, ¶ 16; Dkt. # 79, ¶ 5 and p. 14. On June 15, 2005, plaintiff filed Grievance No. A-48969-05 (a letter to Theresa Dyson) stating,

> I am being denied portions of my food each day, because certain food items are always missing from my kosher trays, and I am not receiving any hot water. I have addressed these issues to the Rabbi, the food administrator, the S.H.U. officers and supervisors, but nothing is being done, because of the previous grievances I had filed. Action requested my [sic] grievant, is for the S.H.U. officers to remove the plastic wrapper from the kosher trays, in the presence of the S.H.U. prisoners, see to it that the S.H.U. prisoner's [sic] are provided with hot water as they are entitled to, and that the S.H.U. prisoners be issued menus for the kosher diet.

Dkt. # 79, p. 17. At the time of the incidents alleged in the complaint, Theresa Dyson was the Inmate Grievance Program Supervisor and in a June 20, 2005 Investigative Report, she found that plaintiff produced no evidence that certain foods were missing from his trays. Dkt. # 61, ¶ 20; Dkt. # 74, p. 28. Theresa Dyson further found that hot water was distributed on a daily basis and that the plastic wrapping covering the meals will not be removed in the presence of the inmates. *Id.* Moreover, she found that there was no provision for SHU inmates to receive menus. *Id.* Finally, she concluded that there was no evidence to support plaintiff's assertion that there had been retaliation for plaintiff's prior grievances. *Id.* Theresa Dyson's ultimate conclusion was that plaintiff's grievance was without merit. *Id.* The IGRC denied plaintiff's grievance and defendant Superintendent Conway endorsed the unanimous response of the IGRC. Dkt. # 61, ¶ 20; Dkt. # 75, ¶ 9 and pp. 31 and 33. Thereafter, the CORC upheld the Superintendent's ruling. Dkt. # 75, p. 34.

***5** At the time plaintiff filed Grievance No. A-48969-05, he was housed in SHU. Dkt. # 61, ¶ 17. As noted above, all inmates housed in SHU are offered hot water on a daily basis. *Id.* Moreover, for security reasons, the plastic wrapping covering meals may not be removed in front of inmates. *Id.* All meals delivered to SHU are in a closed Styrofoam tray. *Id.* at ¶ 18. In order to preserve sanitation and to prevent contraband from being transported, before the kosher meals leave the kitchen, the entire tray is wrapped in plastic wrap. *Id.* The meals are then transported on a cart to the SHU kitchen or preparation area where a porter (designated inmate) under the supervision of a SHU officer unwraps the Styrofoam tray to inspect for contraband. *Id.* A SHU officer then delivers each meal to the inmates' cell. *Id.* For the safety and security of the inmates and staff, no contraband whatsoever may be on the SHU gallery. *Id.* Section 304.2(a) of DOCS Directive # 4933 concerns the standards of operation of the SHU and provides that "[a]ll food items will be delivered to the inmates upon receipt from the food service area, and in a manner that will ensure receipt of the food in an appropriate condition." *Id.* at ¶ 21.

***Grievance No. A-49087-05***

On June 27, 2005, plaintiff sent a letter to Thomas Eagen, the former Director of the Inmate Grievance Program, alleging that his kosher meals were being deliberately mishandled, tampered with and exposed to unsanitary conditions. Dkt. # 61, ¶ 22; Dkt. # 64, ¶ 10 and pp. 47-48. By letter dated July 6, 2005, Thomas Eagen acknowledged receipt of plaintiff's June 27, 2005 letter and reminded plaintiff that pursuant to DOCS' policy, Directive # 4040, the Inmate Grievance Program "provides inmates with an orderly, fair, simple and expeditious method of resolving grievances pursuant to the Correction Law." Dkt. # 64, p. 49. Thomas Eagen further stated that Directive # 4040 "makes no provision for an inmate to refer grievances directly to Central Office." *Id.* Plaintiff's letter was returned to him and Thomas Eagen's office did not retain a copy. *Id.* On June 30, 2005, plaintiff wrote to defendant Don Lopes alleging that his kosher meals were being tampered with and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

requesting that the plastic wrapper be removed from the kosher trays in the presence of the prisoners. Dkt. # 76 ¶ 11 and p. 34.

On July 12, 2005, plaintiff filed Grievance No. A-49087-05 complaining of the odors and cleanliness of the SHU and requesting that the cells be cleaned and prisoners given showers, new clothing and new bedding. Dkt. # 61, ¶ 26; Dkt. # 75, p. 53. The IGRC denied plaintiff's request stating,

> Grievant is advised he may clean his own cell be [sic] addressing this to his area Supervisor along with other issues. No evidence was presented verifying the odor complaints or other [sic]. SHU inmates not being fed [sic]. Further, each cell ventilation system should be working properly.

***6** Dkt. # 75, p. 50. Although the following series of events relating to Grievance No. A-49087-05 occurred after the filing of plaintiff's complaint, for purposes of completeness, this Court will describe them briefly. On or about August 9, 2005, Inmate Grievance Supervisor George Struebel made the following notation, "made rounds on 8/2 in SHU no problems noted as described in grievance." Dkt. # 75, p. 54. On or about August 11, 2005, defendant Superintendent Conway denied plaintiff's grievance stating,

> [e]very effort is made to maintain a safe and hygenic [sic] living space. Galleries and cells are cleaned. Inmates are fed three times a day and showers provided per directive. Sufficient bedding materials and clothing are also supplied. The IGP Supervisor recently made rounds in SHU and did not find the conditions existent as you describe.

Dkt. # 75, p. 51. Plaintiff appealed the Superintendent's ruling to CORC, claiming that the Superintendent's views were "deliberately biased and misleading and the I.G.P. supervisor is a fraud." Dkt. # 75, p. 51. CORC upheld the Superintendent's determination and reasoned that it had not been presented with sufficient evidence to substantiate any malfeasance by the staff. Dkt. # 75, p. 51. Moreover, CORC advised plaintiff to address his housing concerns to the area supervisor. *Id.*

### *DISCUSSION AND ANALYSIS*

As a threshold matter, defendants argue that all plaintiff's claims against them in their official capacity must be dismissed pursuant to the Eleventh Amendment to the United States Constitution. With respect to plaintiff's claims against defendants James Conway, Rosalind Rosolowski and Carol Edwards, defendants argue that they must be dismissed for lack of personal involvement. Defendants Rosolowski, Edwards and Lopes argue that plaintiff cannot establish that his right to free exercise of religion was violated because plaintiff was not deliberately deprived on his kosher meals from April 25, 2005 to June 8, 2005. Defendants Conway, James, Bea, Borawski and Charitonow also argue that plaintiff cannot establish that his right to free exercise of religion was violated or that his right to be free from cruel and unusual punishment was violated because plaintiff cannot establish that defendants were responsible for exposing plaintiff's kosher meals to hair, dust and the stench of feces and/or defendants tampered with his kosher meals. Similarly, defendants further argue that plaintiff's claims of being deprived of his kosher meals from April 25, 2005 to June 8, 2005 and his kosher meals being exposed to hair, dust particles and the stench of feces do not rise to the level of a violation of his rights under the Fourteenth Amendment. Lastly, defendants claim that they are entitled to qualified immunity. Because the Court agrees that defendants are entitled to judgment as a matter of law on each of plaintiff's claims, the Court need not reach the issue of whether defendants are entitled to qualified immunity. For the following reasons, it is recommended that plaintiff's motion for summary judgment be denied and defendants' motion for summary judgment be granted.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

***Summary Judgment***

***7** Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "In reaching this determination, the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party, and must give extra latitude to a *pro se* plaintiff." *Thomas v. Irvin,* 981 F.Supp. 794, 798 (W.D.N.Y.1997) (internal citations omitted).

A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see Catanzaro v. Weiden,* 140 F.3d 91, 93 (2d Cir.1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248; *see Bryant v. Maffucci,* 923 F.2d 979 (2d Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

Once the moving party has met its burden of "demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of conjecture or surmise." *Bryant,* 923 F.2d at 982 (internal citations omitted). A party seeking to defeat a motion for summary judgment,

> must do more than make broad factual allegations and invoke the appropriate statute. The [party] must also show, by affidavits or as otherwise provided in Rule 56 of the Federal Rules of Civil Procedure, that there are specific factual issues that can only be resolved at trial.

*Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995).

***Official Capacity Claims***

Plaintiff commenced the instant action against James Conway, Superintendent at Attica; Randy James, former Deputy Superintendent of Security at Attica; Jeffrey Bea, a Lieutenant at Attica; Carol Edwards, former Deputy Superintendent of Programs at Attica; Rosalind Rosolowski, Coordinating Chaplain at Attica; Darryl Borawski, former Sergeant at Attica; Rabbi S. Charitonow, former Rabbi at Attica; and Don Lopes, Food Service Administrator at Attica in their personal and official capacities. Dkt. # 1. Plaintiff's claims against the above-named defendants are asserted pursuant to 42 U.S.C. § 1983. In order to state a claim pursuant to § 1983, a plaintiff must allege (1) that the challenged conduct was attributable at least in part to a person acting under color of state law, and (2) that such conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States. *Dwares v. City of New York,* 985 F.2d 94,98 (2d Cir.1993).

The Eleventh Amendment to the United States Constitution bars federal courts from exercising subject matter jurisdiction over claims against states absent their consent to such a suit or an express statutory waiver of immunity. *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89,90-100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). It is well-settled that states are not "persons" under § 1983, and thus, Eleventh Amendment immunity is not abrogated by that statute. *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). The Eleventh Amendment bar extends to agencies and officials sued in their official capacities. *Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). Accordingly, plaintiff's claims against the defendants in their official

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

capacities are barred by the Eleventh Amendment and it is recommended that those claims be dismissed. Based on the foregoing, the balance of this Court's Report, Recommendation and Order will address plaintiff's claims against defendants in their individual capacities.

***Personal Involvement***

***8** It is well settled that the personal involvement of defendants in an alleged constitutional deprivation is a prerequisite to an award of damages under § 1983. *Gaston v. Coughlin,* 249 F.3d 156, 164 (2d Cir.2001); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Al- Jundi v. Estate of Rockefeller,* 885 F.2d 1060,1065 (2d Cir.1989). Personal involvement may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation; (2) was informed of the violation and failed to remedy the wrong; (3) created or permitted the continuation of a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating unconstitutional acts were occurring. *Colon,* 58 F.3d at 873, *citing Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994).

***James Conway***

In his second claim, plaintiff alleges that for the period June 8, 2005 to "unresolved," defendant James Conway, Superintendent at Attica, knew that plaintiff's meals were being exposed to hair and dust particles and the stench of feces. Dkt. # 1. Defendant Conway argues that he cannot be held liable simply because of his position as the Superintendent at Attica. Dkt. # 63, p. 7. Plaintiff filed two grievances, A-48969-05 (June 15, 2005) and A-49087-05 (July 12, 2005), complaining that his kosher meals were being tampered with and complaining of the odors and cleanliness of the SHU. Grievance No. A-48969-05 was fully investigated by Theresa Dyson, the Inmate Grievance Program Supervisor, and she concluded that plaintiff's grievance was without merit. Dkt. # 61, ¶ 20; Dkt. # 74, p. 28. Thereafter, the IGRC denied plaintiff's grievance and defendant Superintendent Conway endorsed the unanimous response of the IGRC. Dkt. # 61, ¶ 20; Dkt. # 75, ¶ 9 and pp. 31 and 33. The CORC upheld the Superintendent's ruling. Dkt. # 75, p. 34.

Grievance No. A-49087-05 was also fully investigated by Theresa Dyson and the IGRC denied plaintiff's request stating,

> Grievant is advised he may clean his own cell be [sic] addressing this to his area Supervisor along with other issues. No evidence was presented verifying the odor complaints or other [sic]. SHU inmates not being fed [sic]. Further, each cell ventilation system should be working properly.

Dkt. # 75, p. 50. After plaintiff filed the instant complaint, on or about August 9, 2005, Inmate Grievance Supervisor George Struebel made the following notation, "made rounds on 8/2 in SHU no problems noted as described in grievance." Dkt. # 75, p. 54. On or about August 11, 2005, defendant Superintendent Conway denied plaintiff's grievance stating, "[e]very effort is made to maintain a safe and hygenic [sic] living space. Galleries and cells are cleaned. Inmates are fed three times a day and showers provided per directive. Sufficient bedding materials and clothing are also supplied. The IGP Supervisor recently made rounds in SHU and did not find the conditions existent as you describe." Dkt. # 75, p. 51. Plaintiff appealed the Superintendent's ruling to CORC, claiming that the Superintendent's views were "deliberately biased and misleading and the I.G.P. supervisor is a fraud." Dkt. # 75, p. 51. CORC upheld the Superintendent's determination and reasoned that it had not been presented with sufficient evidence to substantiate any malfeasance by the staff. Dkt. # 75, p. 51. Moreover, CORC advised plaintiff to address his housing concerns to the area supervisor. *Id.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

***9** The record before this Court is simply devoid of any evidence to support a conclusion that defendant Conway: participated in any way in the alleged constitutional violation; was informed of the violation and failed to remedy the wrong; created or permitted the continuation of a policy under which unconstitutional practices occurred; was grossly negligent in supervising subordinates who committed the wrongful acts; or exhibited deliberate indifference to the rights of inmates by failing to act on information indicating unconstitutional acts were occurring. Moreover, there is no evidence that defendant Conway ever dealt directly with plaintiff or oversaw the supervision of the investigation into plaintiff's grievances. Accordingly, because defendant Conway was not personally involved in the alleged constitutional violation, it is recommended that the claim against defendant Conway be dismissed.

***Rosalind Rosolowski and Carol Edwards***

In his first claim, plaintiff claims that defendants Rosolowski and Edwards, for the period April 25, 2005 to June 8, 2005, deprived plaintiff of his kosher meals. Dkt. # 1. In support of their motion for summary judgment, defendants maintain and plaintiff does not dispute that the Food Service Administrator, defendant Don Lopes, bears the sole responsibility for ensuring that inmates who are approved to receive a CAD are, in fact, provided with kosher meals. Dkt. # 63, p. 9. Notwithstanding the foregoing, defendants Rosolowski and Edwards' involvement with respect to plaintiff's participation in the CAD program was minimal at most.

On April 19, 2005, defendants Rosalind Rosolowski, Coordinating Chaplain and Carol Edwards, Deputy Superintendent for Programs approved plaintiff's CAD meal plan. Dkt. # 67, ¶ 4 and p. 5. Also on April 19, 2005, consistent with standard procedure, defendant Carol Edwards sent a copy of the CAD agreement to plaintiff through the facility mail system. Dkt. # 61, ¶ 4; Dkt. # 67, ¶ 4. On May 15, 2005, plaintiff wrote defendant Rosalind Rosolowski a letter claiming that she had removed him from the "kosher meal list." Dkt. # 61, ¶ 11; Dkt. # 72, ¶ 6 and p. 10. In his letter, plaintiff also noted that he filed a grievance and that the IGRC recommended that his kosher meals be reinstated. *Id.* Notwithstanding the IGRC's recommendation of reinstatement, plaintiff complained that his kosher meals had not been reinstated. *Id.* Defendant Rosolowski noted on the bottom of plaintiff's letter, "I do not remove anyone from KOSHER DIETS-the kitchen keeps track on [sic] attendance + writes the decision not me-..." Dkt. # 72, p. 10 (emphasis in original). Thus, absent any evidence that defendants Rosolowski and Edwards were involved in any way in the alleged constitutional violation; were informed of the violation and failed to remedy the wrong; created or permitted the continuation of a policy under which unconstitutional practices occurred; were grossly negligent in supervising subordinates who committed the wrongful acts; or exhibited deliberate indifference to the rights of inmates by failing to act on information indicating unconstitutional acts were occurring, it is recommended that the claims against defendants Rosalind Rosolowski and Carol Edwards be dismissed.

***First Amendment Claims***

***10** Plaintiff alleges that defendants Rosolowski, Edwards and Lopes deliberately deprived him of his kosher meals for the period April 25, 2005 to June 8, 2005, in violation of his rights under the First Amendment to the United States Constitution. Moreover, in further violation of his rights under the First Amendment, plaintiff alleges that by reason of defendants Conway, James, Bea, Borawski and Charitonow's refusal to have the plastic wrapper removed from plaintiff's food in his presence, plaintiff's kosher meals were exposed to hair, dust particles and the stench of feces.

"Prisoners have long been understood to retain some measure of the constitutional protection afforded by the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 10

Not Reported in F.Supp.2d, 2009 WL 1449046 (W.D.N.Y.)

(Cite as: 2009 WL 1449046 (W.D.N.Y.))

First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003), *citing* *Pell v. Procunier,* 417 U.S. 817, 822 (1974). However, "[b]alanced against the constitutional protections afforded prison inmates, including the right to free exercise of religion, are the interests of prison officials charged with complex duties arising from administration of the penal system." *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.), *cert. denied,* 498 U.S. 951, 111 S.Ct. 372, 112 L.Ed.2d 335 (1990). As a result, the free exercise claims of prisoners are judged under a reasonableness test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights. *Ford,* 352 F.3d at 588. Accordingly, a regulation that burdens a protected right will pass constitutional muster if it is reasonably related to legitimate penological interests. *Salahuddin v. Goord,* 467 F.3d 263, 274 (2d Cir.2006), *citing* *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) and *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

It is the inmate's initial burden to demonstrate that the disputed conduct substantially burdens his sincerely held religious beliefs.[FN1] *Salahuddin,* 467 F.3d at 474-75. In assessing the sincerity of an inmate's religious beliefs, courts may not "question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *McEachin v. McGuinnis,* 357 F.3d 197, 201 (2d Cir.2004), *quoting* *Hernandez v. Commissioner of Internal Revenue,* 490 U.S. 680, 699, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989). Instead, courts may only consider whether a claimant sincerely holds a particular belief and whether the belief is religious in nature." *Ford,* 352 F.3d at 590. Once a plaintiff has made this showing, the burden then shifts to the defendant to identify a legitimate penological purpose justifying the decision under scrutiny. *Salahuddin,* 467 F.3d at 474-75. If such a legitimate penological interest is articulated, its reasonableness is then analyzed under the test articulated by the United States Supreme Court in *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

FN1. In *Ford v. McGinnis,* 352 F.3d 582 (2d Cir.2003), the Second Circuit noted a circuit split over whether prisoners must demonstrate that a burden on their religious exercise is substantial in order to establish a free exercise claim, but declined to resolve the issue and instead assumed the continued applicability of the substantial burden test. Recent cases suggest that the Second Circuit resolved the split in *Salahuddin v. Goord* by subscribing to the substantial factor test. *Koehl v. Greene,* No. 05-CV-582, 2008 WL 4822520, *7, n. 11 (N.D.N.Y. Oct. 31, 2008); *Livingston v. Griffin,* No. 04-CV-607, 2007 WL 1500382, at *15 (N.D.N.Y. May 21, 2007); *King v. Bennett,* No. 02-CV-349, 2007 WL 1017102, at *4 (W.D.N.Y. Mar.30, 2007).

Pursuant to *Turner,* the court must determine "whether the governmental objective underlying the regulations at issue is legitimate and neutral, and [whether] the regulations are rationally related to that objective. *Koehl v. Greene,* No. 05-CV-582, 2008 WL 4822520, *7, n. 11 (N.D.N.Y. Oct. 31, 2008), *citing Thornburgh v. Abbott,* 490 U.S. 404, 414 (1989). Then, the court must ask whether the inmate is afforded adequate alternative means for exercising the right in question. *Thornburgh,* 490 U.S. at 417. Finally, the court must examine "the impact that accommodation of the asserted constitutional right will have on others (guards and inmates) in the prison." *Id.* at 418.

***Alleged Deliberate Deprivation of Kosher Meals***

***11** After "unintentionally missing only three meals," plaintiff claims that defendants Rosolowski, Lopes and Edwards deliberately deprived him of Kosher meals from April 25, 2005 to June 8, 2005, in violation of his rights under the First Amendment to the United States Constitution. Dkt. # 1. Defendants argue that "as far as [they] knew, plaintiff signed and received the C.A.D. meal plan agreement, was on notice that his participation in the C.A.D. had commenced, and that plaintiff missed too

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

many of the required meals, therefore he was removed from the C.A.D." Dkt. # 63, p. 12. Once plaintiff was removed, pursuant to Attica's operating procedures, plaintiff had to wait 30 days to be reinstated. *Id.* Thus, defendants' maintain that plaintiff was not deliberately denied kosher meals.

In a case that bears a striking factual similarity to the instant case, Senior United States District Judge John T. Curtin granted defendants' motion for summary judgment with respect to an inmate's First Amendment claim concerning his removal from the CAD program for failure to comply with DOCS mandatory meal attendance policy. *Davidson v. Zon,* 94-CV-184 (W.D.N.Y. Sept. 10, 2002). FN2 Davidson commenced his action while he was housed at Attica alleging that various DOCS personnel had violated his right to practice his religion when they refused to allow him to participate in Attica's kosher diet program unless he attended a minimum of 18 meals per week in the mess hall. Dkt. # 63, p. 35. As set forth in Judge Curtin's Decision and Order, in November 1992, the Deputy Superintendent for Program Services at Attica advised Davidson and others that DOCS was implementing a "pilot" Alternative Diet program in an effort to standardize the kosher menu and eligibility procedures statewide. *Id.* at p. 36. Under the new program, inmates participating in the Alternative Diet program were required to attend all meals in the mess hall, with no more than three unexcused absences per week. *Id.* The mandatory attendance policy was implemented as a waste-reduction and cost-control measure to monitor and manage the special ordering, storage, and handling requirements involved with providing the Alternative Diet system-wide. *Id.*

FN2. A copy of Senior United States District Judge Curtin's September 10, 2002 Decision and Order in *Davidson v. Zon* is attached to Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment and in Support of their Cross-Motion for Summary Judgment. Dkt. # 63, pp. 33-53.

For a period of time while receiving the kosher diet, Davidson was housed in SHU and he received his meals in his cell. *Id.* at p. 36. After his release back into the general population, Davidson was required to receive and began receiving his meals in the mess hall. *Id.* Shortly thereafter, Davidson found that sitting on the mess hall stools for up to an hour three times a day exacerbated his chronic back condition. *Id.* So he decided to skip one meal per day and he requested a "feed in" order to have one meal per day delivered to his cell. *Id.* After receiving a warning concerning missing meals, Davidson was removed from the Alternative Diet list. *Id.* at p. 38.

Following the reasoning in *Turner* and *O'Lone,* Judge Curtin found that the mandatory attendance component of DOCS' Alternative Diet program was reasonably related to legitimate penological interests and, with respect to the second *Turner* factor, that Davidson had alternative means available to exercise his right to receive kosher food on a regular basis. *Id.* at pp. 45-46. Accordingly, Judge Curtin granted defendants' motion for summary judgment "to the extent it alleges that the removal of plaintiff from the Alternative Diet roster in October 1993 was based on an unconstitutional policy resulting in the denial of his rights under the Free Exercise Clause of the First Amendment." *Id.* at p. 47. With respect to Davidson's second claim that his free exercise rights were violated when DOCS officials refused his request to be reinstated to the C.A.D. program, Judge Curtin also granted defendants' motion for summary judgment, finding,

> ***12** DOCS' policy requires inmates who are suspended from participation in the Alternative Diet program for failure to comply with the mandatory attendance policy to go through a reevaluation process, including approval by both the Jewish Chaplain and the Deputy Superintendent for Program Services, to substantiate the inmate's Judaic background and intent to strictly observe Jewish dietary laws. This process, as part of the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

overall policy already found by this court to be reasonably related to DOCS' legitimate interest in controlling its Nutritional Services budget, necessarily entails some level of institutional delay. Plaintiff has failed to allege or make a factual showing to suggest that the delay between the time his request for reinstatement was sent to the facility Chaplain on April 14, 1994, and his transfer out of Attica on May 2, 1994, constitutes anything more than typical and acceptable institutional delay which does not implicate the Free Exercise Clause.

Dkt. # 63, p. 51.

In the instant case, the record before this Court is devoid of any evidence submitted by plaintiff that any of the defendants deliberately deprived him of his kosher meals. Absent any such evidence, plaintiff's wholly unsubstantiated and conclusory allegations are insufficient to sustain his claims. Additionally, the period of delay following the IGRC's recommendation that plaintiff be reinstated to the CAD was nothing more than an institutional delay consistent with the policies and procedures in place at Attica which does not implicate the free exercise clause of the First Amendment. Accordingly, for the same reasons articulated by Judge Curtin in *Davidson v. Zon,* this Court recommends that plaintiff's motion for summary judgment on his First Amendment claim concerning a deprivation of his kosher meals be denied and defendants' motion for summary judgment on the same claim be granted.

***Tampering with and Exposure of Kosher Meals***

Plaintiff next claims that his kosher meals were exposed to hair, dust particles from construction work and the stench of feces because defendants Conway, James, Bea, Borawski and Charitonow denied his requests to have the plastic wrapper removed from his food in his presence, in violation of his First Amendment rights. Dkt. # 1. With the exception of unsubstantiated and wholly conclusory allegations, plaintiff has failed to submit any evidence to support his claim that his meals were tampered with and exposed to hair, dust and the stench of feces or to identify those individuals who tampered with or exposed his meals to such conditions.

Plaintiff filed Grievance No. A-48969-05 on June 15, 2005 alleging that his kosher meals were being tampered with and requesting that the plastic wrap be removed in front of the inmates. Specifically, plaintiff stated in Grievance No. A-48969-05 (a letter to Theresa Dyson):

> I am being denied portions of my food each day, because certain food items are always missing from my kosher trays, and I am not receiving any hot water. I have addressed these issues to the Rabbi, the food administrator, the S.H.U. officers and supervisors, but nothing is being done, because of the previous grievances I had filed. Action requested my [sic] grievant, is for the S.H.U. officers to remove the plastic wrapper from the kosher trays, in the presence of the S.H.U. prisoners, see to it that the S.H.U. prisoner's [sic] are provided with hot water as they are entitled to, and that the S.H.U. prisoners be issued menus for the kosher diet.

***13** Dkt. # 79, p. 17. In her June 20, 2005 investigative report, Theresa Dyson, Inmate Grievance Program Supervisor, found that plaintiff produced no evidence that certain foods were missing from his trays. Dkt. # 61, ¶ 20; Dkt. # 74, p. 28. Theresa Dyson further found that hot water was distributed on a daily basis and that the plastic wrapping covering the meals could not be removed in the presence of the inmates. *Id.* Moreover, she found that there was no provision for SHU inmates to receive menus. *Id.* Finally, she concluded that there was no evidence to support plaintiff's assertion that there had been retaliation for plaintiff's prior grievances. *Id.* Theresa Dyson's ultimate conclusion was that plaintiff's grievance was without merit. *Id.* The IGRC denied plaintiff's

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 13

Not Reported in F.Supp.2d, 2009 WL 1449046 (W.D.N.Y.)

(Cite as: 2009 WL 1449046 (W.D.N.Y.))

grievance and defendant Superintendent Conway endorsed the unanimous response of the IGRC. Dkt. # 61, ¶ 20; Dkt. # 75, ¶ 9 and pp. 31 and 33. The CORC upheld the Superintendent's ruling. Dkt. # 75, p. 34.

At the time plaintiff filed Grievance No. A-48969-05, he was housed in SHU. Dkt. # 61, ¶ 17. As noted above, all inmates housed in SHU are offered hot water on a daily basis. *Id.* Moreover, for security reasons, the plastic wrapping covering meals may not be removed in front of inmates. *Id.* All meals delivered to SHU are in a closed Styrofoam tray. *Id.* at ¶ 18. In order to preserve sanitation and to prevent contraband from being transported, before the kosher meals leave the kitchen, the entire tray is wrapped in plastic wrap. *Id.* The meals are then transported on a cart to the SHU kitchen or preparation area where a porter (designated inmate) under the supervision of a SHU officer will unwrap the Styrofoam tray to inspect for contraband. *Id.* A SHU officer then delivers each meal to the inmates' cell. *Id.* For the safety and security of the inmates and staff, no contraband whatsoever may be on the SHU gallery. *Id.* Section 304.2(a) of DOCS Directive # 4933 concerns the standards of operation of the SHU and provides that "[a]ll food items will be delivered to the inmates upon receipt from the food service area, and in a manner that will ensure receipt of the food in an appropriate condition." *Id.* at ¶ 21.

The unsubstantiated and wholly conclusory allegations submitted by plaintiff are insufficient to merit summary judgment in his favor and equally insufficient to defeat defendants' motion for summary judgment. It is undisputed that none of the defendants were personally involved in the delivery of plaintiff's meals, nor were they involved in the inspection or delivery of the meals to plaintiff's cell. Moreover, plaintiff has failed to identify any individuals who were involved in tampering with his kosher meals or who exposed his kosher meals to hair, dust and the stench of feces. Additionally, plaintiff's complaints were not ignored, rather, they were fully investigated and found to be without merit. Furthermore, following the reasoning set forth by Judge Curtin in *Davidson v. Zon,* the policy of removing the plastic wrap prior to the meal entering SHU is for legitimate penological reasons and there can be no dispute that plaintiff was receiving his kosher meals, so there was no need to have an alternative means available for plaintiff to exercise his right to receive kosher food on a regular basis. Accordingly, it is recommended that plaintiff's motion for summary judgment be denied and defendants' motion for summary judgment be granted.

***Eighth Amendment Claims***

***14** As discussed at length above in connection with plaintiff's claims that his rights under the First Amendment were violated, plaintiff alleges that his kosher meals were exposed to hair, dust particles from construction work and the stench of feces because defendants Conway, James, Bea, Borawski, and Charitonow denied his requests to have the plastic wrap removed from his food in his presence, in violation of his rights under the Eighth Amendment. For the following reasons, it is recommended that plaintiff's motion for summary judgment be denied and defendants' motion for summary judgment be granted.

The Eighth Amendment prohibits cruel and unusual punishment that involves the unnecessary and wanton infliction of pain. *Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). The Eighth Amendment to the United States Constitution imposes the duty on prison officials to provide humane conditions of confinement and officials must ensure that inmates receive adequate food, clothing, shelter and medical care. *Farmer v. Brennan,* 511 U.S. 825, 833, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). In order to prevail on a claim of a violation of the Eighth Amendment, a plaintiff must satisfy both an objective and subjective component. First, the deprivation must be, objectively, sufficiently serious, such as "a prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities.' " *Id.* at 834, *citing* *Rhodes,* 452 U.S. at 347. The second component requires that the prison official

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

have a "sufficiently culpable state of mind." *Id.* In cases such as this, the state of mind is one of deliberate indifference to the health and safety of an inmate. *Id.*

"Although the Constitution does not require that sentenced prisoners [receive] every amenity which one might find desirable, the Eighth Amendment prohibition against cruel and unusual punishment does require that prisoners be served nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (internal citations omitted). The requirement established by the Eighth Amendment is augmented by the First Amendment which includes an inmates's clearly established right to a diet consistent with his or her religious scruples. *Koehl v. Greene,* No. 05-CV-582, 2008 WL 4822520, *6 (N.D.N.Y. Oct. 31, 2008). In a similar case, *Stokes v. Goord,* No. 03-CV-1402, 2007 WL 995624 (N.D.N.Y. Mar. 30, 2007), the plaintiff claimed that DOCS officials violated his Eighth Amendment rights when they "served him food that was ... stale, contaminated, rotten, spoiled, and re-heated." *Id.* at *4. The court granted summary judgment in favor of the defendants stating:

> [A]lthough Stokes contends that defendants delivered him the food, he fails to allege that he saw any of them actually contaminate or tamper with his food. Further, Stokes filed various grievances complaining about the quality of the food, but the complaints were found to be without merit. Moreover, although Stokes makes general allegations regarding the health effects he suffered because of the alleged contaminated and inadequate food, there is nothing in his medical records to indicate that he suffered any adverse health effects from the food served to him by defendants ... Thus, under the circumstances, these deprivations are not sufficiently serious to constitute cruel and unusual punishment under the Eighth Amendment.

***15** *Id.* at *4-5; *see also Livingston v. Goord,* 225 F.Supp.2d 321, 332-33 (W.D.N.Y.2002) (granting summary judgment to defendants regarding plaintiff's claim that his meals were drugged because "even assuming that the food was contaminated by someone, it would ... be speculative to conclude that these defendants were the culprits simply because they delivered plaintiff's food to him."), *rev'd on other grounds, Livingston v. Piskor,* 153 Fed. Appx. 769 (2d Cir.2005).

Here, the record before this Court is devoid of any evidence to demonstrate that plaintiff's food was contaminated in any way or that it was tampered with in any way. Plaintiff filed grievances alleging that his food had been mishandled, contaminated and exposed to unsanitary conditions and each of those grievances was fully investigated and found to be without merit.

With respect to the subjective component, a prison official will not be held liable for inhumane conditions, "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The Supreme Court of the United States adopted "subjective recklessness" as is used in criminal law as the test for "deliberate indifference" under the Eighth Amendment. *Id.* at 839-40. Here, plaintiff is not alleging that he did not receive his kosher meals, to the contrary, plaintiff claims that although he received his kosher meals, those meals had been tampered with and contaminated because the defendants denied plaintiff's requests to have the plastic wrap removed in his presence. Each of plaintiff's grievances concerning his kosher meals was fully investigated and denied as being without merit. Moreover, as discussed at length above, plaintiff's kosher meals were delivered to him consistent with the policies and procedures. Accordingly, because plaintiff can satisfy neither the objective nor the subjective component of a claim under the Eighth Amendment, it is recommended

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 15

Not Reported in F.Supp.2d, 2009 WL 1449046 (W.D.N.Y.)

(Cite as: 2009 WL 1449046 (W.D.N.Y.))

that plaintiff's motion for summary judgment be denied and defendants' motion for summary judgment be granted.

***Fourteenth Amendment Claims***

To state a cognizable § 1983 due process claim, a plaintiff must demonstrate that he possessed a protected liberty or property interest and that he was deprived of that interest without due process. *Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir.1996); *Frazier v. Coughlin,* 81 F.3d 313, 316 (2d Cir.1996). Plaintiff claims that his rights under the Fourteenth Amendment were violated because he was deprived of kosher meals from April 25, 2005 to June 8, 2005 and because his kosher meals were exposed to hair, dust particles and the stench of feces. Dkt. # 1. Each of the defendants assert that plaintiff received all the process he was due. Dkt. # 63, pp. 25-28. Notwithstanding the allegations in the complaint, in his motion for summary judgment and in opposition to defendants' motion for summary judgment, plaintiff does not factually or legally distinguish between his claims under the First Amendment and those claims he purports to bring under the Fourteenth Amendment.

***16** An inmate's liberty interests are generally derived from two sources, the Fourteenth Amendment Due Process Clause and state statutes or regulations. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998).

> With respect to interests arising directly under the Due Process Clause, the Supreme Court has narrowly circumscribed its scope to protect no more than the [sic] the most basic liberty interests in prisoners. The Due Process Clause does not protect against every change in the conditions of confinement having a substantial adverse impact on inmates, if those changes are within the normal limits or range of custody which the conviction has authorized the State to impose. Instead, the Due Process Clause protects against restraints or conditions of confinement that exceed [ ] the sentence in ... an unexpected manner.

*Id.* (Internal quotation marks and citations omitted). In the instant case, plaintiff has failed to identify a protected liberty interest in that he has failed to show how the conditions of his confinement exceed his original sentence. Moreover, even if plaintiff could demonstrate a protected liberty interest, which he clearly cannot, plaintiff cannot demonstrate that he was deprived of anything without due process of law. As discussed above, plaintiff filed grievances claiming that he had been deprived of his kosher meals and that his kosher meals had been tampered with and contaminated. Each of those grievances was fully investigated and found to be without merit.

In order to establish the existence of a protected liberty interest under a state statute or regulation, an inmate must show that his confinement: "(1) creates an atypical and significant hardship ... in relation to the ordinary incidents of prison life, and (2) that the state has granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that confinement or restraint." *Arce v. Walker,* 139 F.3d 329, 334 (2d Cir.1998) (internal quotations marks and citations omitted). Neither plaintiff's motion for summary judgment nor plaintiff's opposition to defendants' motion for summary judgment demonstrate that the alleged deprivation of his kosher meals or the alleged tampering with or contamination of his kosher meals created an atypical and significant hardship. Accordingly, because plaintiff has failed to show that he was deprived of a protected liberty interest without due process and that the alleged deprivation created an atypical and significant hardship, it is recommended that plaintiff's motion for summary judgment be denied and defendants' motion for summary judgment be granted.

***CONCLUSION***

Based on the foregoing, it is **RECOMMENDED** that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

plaintiff's motion for summary judgment (Dkt.# 42) be **DENIED** and defendants' cross-motion for summary judgment (Dkt.# 60) be **GRANTED.**

Accordingly, pursuant to 28 U.S.C. § 636(b)(1), it is hereby

ORDERED, that this Report, Recommendation and Order be filed with the Clerk of the Court.

***17** ANY OBJECTIONS to this Report, Recommendation and Order must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Civ.P. 72(b) and Local Rule 72.3(a)(3).

The district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but was not presented to the magistrate judge in the first instance. *See, e.g., Paterson-Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co.,* 840 F.2d 985 (1st Cir.1988).

*Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order. Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir.1988).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." *Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Report, Recommendation and Order), may result in the District Judge's refusal to consider the objection.*

The Clerk is hereby directed to send a copy of this Order and a copy of the Report and Recommendation to counsel for the parties.

**SO ORDERED.**

W.D.N.Y.,2009.

George v. Conway

Not Reported in F.Supp.2d, 2009 WL 1449046 (W.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.